# E X H I

## IN THE MATTER OF AN AD HOC ARBITRATION PURSUANT TO THE NIGERIAN ARBITRATION AND CONCILIATION ACT

**Esso Exploration and Production Nigeria Limited**

and

**Shell Nigeria Exploration and Production Company Limited**

Claimants

v.

**Nigerian National Petroleum Corporation**

Respondent

## FINAL AWARD

### *The Arbitral Tribunal*:

L. Yves Fortier, C.C., Q.C. (Chairman)
The Hon. Charles N. Brower
Prof. Paul Idornigie

### *Secretary to the Tribunal:*

Alison G. FitzGerald
Rachel Bendayan (*Pro Tempore*)

| *Representing the Claimants:* | *Representing the Respondent:* |
|---|---|
| **Mr. Constantine Partasides** | **Mr. Robert Clarke, SAN** |
| **Ms. Elizabeth Snodgrass** | **Mr. Chidi Egwuenu** |
| **Mr. Patrick Taylor** | **Mr. B. Muhammed** |
| **FRESHFIELDS BRUCKHAUS DERINGER LLP** | **Ms. A.K. Dosunmu** |
| | **CLARKE, PAIKO & CO.** |
| **Mr. Oghogho Akpata** | |
| **Mr. Adewale Atake** | |
| **Mr. Afolabi Elebiju** | |
| **TEMPLARS** | |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................5

II.     PROCEDURAL HISTORY .....................................................................................5

        A.      The Parties ................................................................................................5

        B.      The Notice of Arbitration .........................................................................6

        C.      The Arbitral Tribunal and Commencement of the Proceedings................6

        D.      The Written Procedure...............................................................................7

                1.      Written Submissions, Evidence and Authorities.............................7

                2.      Procedural Orders Nos. 2 and 3 ...................................................9

                3.      Procedural Orders Nos. 4 and 5 .................................................10

        E.      The Oral Procedure .................................................................................12

        F.      The Post-Hearing Procedure ...................................................................13

        G.      The Arbitration Agreement .....................................................................14

        H.      Relief Requested......................................................................................15

III.    FACTUAL BACKGROUND ..................................................................................18

                1.      Negotiation of the PSC ................................................................19

                2.      Terms of the PSC .........................................................................23

                3.      Amendments to the PSC and the Government Guarantee.....................28

                4.      Production under the PSC.............................................................30

                5.      The Stabilisation Claim ...............................................................35

IV.     ISSUES TO BE DETERMINED...............................................................................39

V.      ANALYSIS AND DISCUSSION .............................................................................40

        A.      Context of the Dispute ............................................................................40

        B.      Jurisdiction ..............................................................................................42

                1.      The Respondent's Position ..........................................................42

2.  The Claimants' Position ............................................... 46

3.  Discussion ................................................................... 50

C.  Liability ...........................................................................57

1.  Enforcement of the PSC ............................................ 57

2.  The Lifting Allocation Claim.................................... 64

3.  The Production Tranches Claim ............................... 71

4.  The Tax Calculation and Return Preparation Claim............................ 90

5.  The Stabilisation Claim ............................................ 95

D.  Causation, Quantum & Interest .................................106

1.  The Claimants' Position .......................................... 106

2.  The Respondent's Position ...................................... 107

3.  Discussion................................................................. 108

E.  Summary of Findings .................................................109

VI.  COSTS .....................................................................................110

1.  The Claimants' Position .......................................... 110

2.  The Respondent's Position ...................................... 111

3.  Discussion................................................................. 112

VII.  OPERATIVE PART ...............................................................115

# GLOSSARY

| | |
|---|---|
| DPR | Department of Petroleum Resources |
| EEPNL | Esso Exploration and Production Nigeria Limited |
| FIRS | Federal Inland Revenue Service |
| ITC | Investment Tax Credit |
| NNPC | Nigerian National Petroleum Corporation |
| OPL | Oil Prospecting License |
| OML | Oil Mining License |
| PPT | Petroleum Profits Tax |
| PSC | Production Sharing Contract, dated 21 May 1993 |
| SNEPCo | Shell Nigeria Exploration and Production Company Limited |
| TAT | Tax Appeal Tribunal |

THE ARBITRAL TRIBUNAL

Composed as above,

After deliberation,

Makes the following Award:

## I.   Introduction

1.    This arbitration involves a dispute over the interpretation of certain provisions in a production sharing contract entered into by the parties almost 20 years ago for the exploration and development of offshore ultra-deep water crude oil reserves in the Niger Delta region.  The Claimants contend that they have the sole right under the production sharing contract to determine lifting allocations of crude oil according to which royalty, cost, tax and profit oil are allocated, and that the Respondent has overlifted its share of crude oil in breach of that contract.  The Claimants also contend that they have the sole right to prepare tax returns estimating the tax payable on the crude oil lifted, and that the Respondent has breached the PSC by filing its own tax returns in lieu of those prepared by the Claimants.

2.    The Respondent denies that the Arbitral Tribunal has jurisdiction to hear the present dispute, averring that the matters addressed herein are primarily within the jurisdiction of the Nigerian Tax Appeal Tribunal.  The Respondent also denies that it has overlifted crude oil or otherwise acted in breach of the parties' contract.

## II.   Procedural History

### A.   The Parties

3.    The Claimants, Esso EXPLORATION AND PRODUCTION NIGERIA LIMITED ("EEPNL") and SHELL NIGERIA EXPLORATION AND PRODUCTION COMPANY LIMITED ("SNEPCo") (together, the "Contractor"), have their main offices at Mobil House, Lekki Expressway, Lagos, Nigeria and Freeman House, 21/22 Marina, Lagos, Nigeria, respectively.  They are represented in this arbitration by Mr. Constantine Partasides, Ms. Elizabeth Snodgrass and Mr. Patrick Taylor of FRESHFIELDS BRUCKHAUS DERINGER LLP, 65 Fleet Street, London, EC4Y 1HS, England, and Messrs. Oghogho Akpata, Adewale Atake and

Afolabi Elebiju of TEMPLARS, 4th Floor, The Octagon, 13A, A.J. Marinho Drive, Victoria Island Annexe, P.O. Box 72252, Victoria Island, Lagos, Nigeria.

4.   The Respondent, Nigerian National Petroleum Corporation ("**NNPC**" or the "**Corporation**"), has its main office at NNPC Towers, Herbert Macaulay Way, Central Business District, Garki, Abuja, Nigeria.  NNPC is represented in this arbitration by Chief Robert Clarke, SAN, Mr. Chidi Egwuenu, Mr. B. Muhammed and Ms. A.K. Dosunmu of CLARKE, PAIKO & CO., Barristers, Solicitors & Notaries Public, Ground Floor, Union Bank Building, 6 Moloney Street, Onikan, Lagos, Nigeria.

### B.  The Notice of Arbitration

5.   The Claimants commenced these arbitration proceedings by way of a Notice of Arbitration, dated 31 July 2009, pursuant to Article 3 of the Arbitration Rules contained at Schedule 1 of the Nigerian *Arbitration and Conciliation Act* 1988, Cap 19, Laws of the Federation of Nigeria 1990 (the "**Act**") and Clause 21 of the Production Sharing Contract, dated 21 May 1993 (the "**PSC**"), entered into by EEPNL and NNPC for the purpose of conducting petroleum operations in ultra-deep waters off the coast of the Federal Republic of Nigeria ("**Nigeria**").

### C.  The Arbitral Tribunal and Commencement of the Proceedings

6.   The Arbitral Tribunal was constituted on 6 May 2009.  It is composed of Mr. L. Yves Fortier, C.C., Q.C. (Canadian), appointed by agreement of the Co-arbitrators as Chairman, the Hon. Charles N. Brower (American), appointed by the Claimants as co-arbitrator, and Professor Paul Obo Idornigie (Nigerian), appointed by the Respondent as co-arbitrator (the "**Tribunal**").

7.   The Tribunal held a first meeting with the Parties on 6 May 2010, in London, England, to discuss, among other matters, the execution of Terms of Appointment, the appointment of an assistant to the Tribunal, and a provisional timetable for the conduct of the proceedings.

8.   During the first procedural meeting, the Tribunal and the Parties duly executed Terms of Appointment which provide, *inter alia*, that the proceedings shall be conducted in

accordance with the Act and the PSC; that the substantive law of the arbitration is the Laws of Nigeria; and that the place of arbitration is Abuja, Nigeria.

9.      Accordingly, this reference is a domestic arbitration governed by the laws of Nigeria.

10.     The Parties also agreed to the appointment of Ms. Alison G. FitzGerald (Canadian) as Secretary to the Tribunal, consistent with the terms of Article 7(h) of the Terms of Appointment.    Subsequently, on 17 January 2011, the Parties further agreed to the appointment of Ms. Rachel Bendayan (Canadian) as *pro tempore* Secretary to assist the Tribunal during the Hearing in Nigeria.

11.     After consulting with the Parties, the Tribunal established a provisional timetable for the conduct of the proceedings, which is recorded in Procedural Order No. 1, dated 10 May 2010.

### D. The Written Procedure

1.   Written Submissions, Evidence and Authorities

12.     The Claimants filed their Statement of Claim, together with five (5) witness statements, documents and legal authorities, on 13 April 2010.  Witness statements were filed by the following individuals:

-       Mr. Edwin Barrett Turner, counsel with Exxon Mobil Corporation's ("**Exxon**") legal department, providing evidence relating to the tender process for the Erha PSC;

-       Mr. Louis Eugene Smith, senior advisor to the upstream planning group of Exxon Exploration Company ("**EEC**"), providing evidence relating to negotiation of the Erha PSC;

-       Mr. Gerald Christopher Mudd, Regional Vice-President, EEC, providing evidence relating to negotiation of the Erha PSC;

-       Mr. Francis Usoro, Crude Lifting and Coordination Manager for Erha, providing evidence relating to the calculation of crude oil liftings and the evolution of the overlifting dispute; and

-   Mr. Adebayo Sofidiya, Manager for Deepwater Development, EEPNL, providing evidence relating to the topographical characteristics of the Erha block and the application of the royalty regime.

13.   The Respondent filed its Statement of Defence, together with documents and legal authorities, on 30 June 2010.

14.   The Claimants filed their Statement of Reply, together with three (3) reply witness statements, two (2) expert reports, documents and legal authorities, on 11 October 2010. Specifically, reply witness statements and expert reports were filed by the following individuals:

-   Mr. Adebayo Sofidiya (see above), providing evidence relating to the stabilisation claim and proposed modifications to the PSC;

-   Mr. Olawale Dawodu, Financial Reporting Manager, Exxon Nigerian subsidiaries, providing evidence relating to the Claimants' lifting allocation entitlement model;

-   Mr. Adedoyin Adeleke Lawal, Supervisor, Deepwater Financial Reporting & Analysis, Exxon Nigerian subsidiaries, providing evidence relating to the effect on lifting of changes in FIRS' policy and modifications to the allocation procedure under Annex C to the PSC;

-   Hon. Justice O. Uwaifo, JSC, CON., providing expert evidence regarding certain aspects of Nigerian law and their application to matters in dispute;

-   Mr. Oluseyi Bickersteth, national senior partner of KPMG Professional Services, providing expert evidence relating to the application of the Investment Tax Credit ("**ITC**").

15.   The Respondent filed its Statement of Rejoinder on 3 December 2010, together with documents and legal authorities.  As explained below, the Respondent simultaneously brought an application for approval to serve four (4) witness statements.

16.   On 7 February 2011, each Party filed a Pre-Hearing Brief with the Tribunal.

## 2. Procedural Orders Nos. 2 and 3

17.   On 7 July 2010, the Claimants wrote to the Tribunal advising that they were not in a position to serve document requests on the Respondent by the date stipulated in Procedural Order No. 1 because, while the Respondent had not served any witness statements with its Statement of Defence, it had not confirmed its intention not to file any such evidence.  The Respondent responded on 16 July 2010, confirming that it did not intend to file such evidence.

18.   On 22 July 2010, the Claimants served requests for the production of documents on the Respondent.  The Respondent made no requests for the production of documents.

19.   On 6 August 2010, the date by which the Respondent was to either produce the requested documents or identify its objections to such production, the Respondent neither produced the requested documents nor conveyed its objections to the production of the requested documents.

20.   On 18 August 2010, following a written query to the Respondent regarding its intentions with respect to document production, the Claimants brought an application before the Tribunal for an order for the production of documents.

21.   On 18 August 2010, the Tribunal invited the Respondent to reply to the Claimants' application by 25 August 2010.  No reply was received.

22.   The Tribunal issued Procedural Order No. 2, dated 30 August 2010, ordering the Respondent to produce to the Claimants the responsive documents to those requests set out in the Claimants' application on or before 13 September 2010.

23.   On 13 September 2010, the Respondent requested an extension of time until 17 September 2010 to provide its response.  The Tribunal granted this extension of time by email dated 13 September 2010.

24.   On 17 September 2010, the Respondent wrote to the Tribunal, objecting to the production of certain documents ordered to be produced pursuant to Procedural Order No. 2.

25.   On 24 September 2010, the Claimants provided a further submission in respect of Procedural Order No. 2, requesting that the Respondent's objections be rejected as untimely.

26.   The Respondent replied on 27 September 2010, confirming its position as stated in its letter of 17 September 2010, and averring that its objections were timely made according to the extension of time granted on 13 September 2010.

27.   On 28 September 2010, the Tribunal issued Procedural Order No. 3, dismissing the Respondent's objections and confirming the terms of Procedural Order No. 2.

### 3.   Procedural Orders Nos. 4 and 5

28.   In parallel to the filing of its Statement of Rejoinder on 3 December 2010, the Respondent brought an application for approval to file four (4) witness statements in support of its defence.

29.   On 8 December 2010, the Claimants filed a response to the Respondent's application, objecting to the application on the grounds it was both untimely and prejudicial.  In the alternative, the Claimants requested that strict conditions be placed on the scope of the witness evidence and, should the Respondent seek to adduce additional evidence, the Claimants reserved their right to object and/or respond to such evidence with supplemental reply evidence.

30.   On 9 December 2010, the Tribunal directed the Respondent to provide further details by 13 December 2010 in respect of the identity of the four (4) witnesses, the nature of the evidence of each proposed witness, and a brief outline of what each witness would say in his or her statement.

31.   On 16 December 2010, the Respondent identified the four (4) proposed witnesses and provided further details in respect of the nature of the evidence each would give in this proceeding.

32.   The Claimants replied on 17 December 2010, indicating that, based on the further details provided by the Respondent, they were uncertain as to the Respondent's evidential case.

33.     The Tribunal issued Procedural Order No. 4 on 20 December 2010, granting the Respondent's application to serve the four (4) proposed witness statements by 28 December 2010, and allowing the Claimants to serve and file rebuttal witness evidence by 18 January 2011. The Tribunal expressly conditioned its grant of relief on the Respondent's advisement that the introduction of the four (4) witness statements would not in any circumstance alter the agreed timetable, including the scheduled Hearing dates.

34.     On 22 December 2010, the Respondent applied for an extension of time to file the four (4) witness statements authorized by Procedural Order No. 4 in view of the public holidays in Nigeria. On 23 December 2010, the Tribunal granted this extension, directing that the witness statements be filed on 31 December 2010, and extending the time for service of any rebuttal evidence by the Claimants to 21 January 2011.

35.     On 31 December 2010, the Respondent filed three (3) witness statements authorized by Procedural Order No. 4, advising that, due to the present unavailability of the fourth witness, the fourth witness statement would be filed shortly. The fourth witness statement was subsequently filed on 10 January 2011. Specifically, the following individuals filed witness statements:

-       Ms. Juliet Ogedi David-West, Manager, Oil & Gas Tax Administration, NNPC-NAPIMS, providing evidence relating to administration of the Petroleum Profits Tax ("**PPT**");

-       Mr. Moses Dayo Olamide, Deputy Manager, Crude Oil Marketing Division, NNPC, providing evidence relating to the contractual petroleum allocation procedure;

-       Mr. David Ogugua Mbanefo, Commercial Manager, NNPC, providing evidence relating to the distinction between joint venture operations and production sharing contracts;

-       Mr. Mark Anthony Dike, Director, Tax Policy, Federal Inland Revenue Service ("**FIRS**"), providing evidence relating to a letter prepared by FIRS in respect of certain taxes issues in dispute, submitted into evidence by the Respondent.

36.     On 5 January 2011, the Claimants requested that the deadline set out in Procedural Order No. 1 for the filing of new evidence be extended from 7 January 2011 to 21 January 2011, in view of the Tribunal's Procedural Order No. 4 and its further directions of 23 December 2010, as well as the fact that the Respondent had yet to file its fourth and final witness statement.

37.     On 5 January 2011, the Tribunal granted the Claimants' request, extending the deadline for the submission of additional fact evidence to 21 January 2011.

38.     On 21 January 2011, the Claimants filed their "Additional Evidence and Authorities" with the Tribunal.

39.     On 24 January 2011, the Respondent brought an application before the Tribunal, objecting to the filing of the Claimants' "Additional Evidence and Authorities" on the grounds that such evidence was inconsistent with the terms of Procedural Order No. 4, which authorized the filing of "rebuttal witness evidence", and requesting its exclusion from the record.

40.     On 27 January 2011, the Claimants responded to the Respondent's application, submitting that the cut-off date for the final introduction of "New Evidence, Authorities or Arguments", stipulated in Procedural Order No. 1, had been extended from 7 January to 21 January 2011, by the Tribunal's directions of 23 December 2010.

41.     The Respondent replied on 3 February 2011, confirming its earlier position.

42.     The Tribunal issued Procedural Order No. 5 on 8 February 2011, dismissing the Respondent's application and allowing the Claimants' Additional Evidence and Authorities to be admitted on the record.

### E. The Oral Procedure

43.     A Hearing on jurisdiction and the merits was held in Abuja, Nigeria, between 28 February and 2 March 2011 (the "**Hearing**").  The following persons appeared before the Tribunal:

– On behalf of the Claimants: Mr. Constantine Partasides, Ms. Elizabeth Snodgrass and Mr. Patrick Taylor of Freshfields Bruckhaus Deringer LLP and Messrs. Oghogho Akpata, Adewale Atake and Afolabi Elebiju of Templars; and

– On behalf of the Respondent: Chief Robert Clarke, SAN, Mr. Chidi Egwuenu, Mr. B. Muhammed., and Ms. A.K. Dosunmu of Clarke Paiko & Co.

44.     During the Hearing, the following fact witnesses were called to testify: *for the Claimants* – Mr. Edwin Barrett Turner, Mr. Francis Usoro, Mr. Adebayo Sofidiya, Mr. Olawale Dawodu and Mr. Adedoyin Adeleke Lawal; *for the Respondent* – Ms. Juliet Ogedi David-West, Mr. Moses Dayo Olamide, Mr. David Ogugua Mbanefo and Mr. Mark Anthony Dike.

45.     The Parties agreed prior to the Hearing that the presence of Messrs. Louis Eugene Smith and Gerald Christopher Mudd was unnecessary.  The non-attendance of these witnesses does not, however, constitute an admission by either Party as to the relevance or credibility of their evidence.

46.     The following expert witnesses were also called to testify: *for the Claimants* – The Hon. Justice Uwaifo and Mr. Oluseyi Bickersteth.

47.     The Respondent chose not to call any expert witness.

## F.  The Post-Hearing Procedure

48.     At the close of the Hearing, the Tribunal directed the Parties to exchange post-hearing briefs simultaneously on 5 April 2011, and to exchange costs submissions simultaneously on 19 April 2011.  These submissions were duly filed by the Parties.  The Respondent filed a second cost submission on 21 April 2011, having omitted to attach its costs figures with its original filing.

49.   The Claimants also filed a supplemental quantum submission with the Tribunal on 25 May 2011, bringing their damages figures current to 30 April 2011.[1]

50.   On 6 July 2011, the Tribunal directed the Parties to exchange comments on their respective costs submissions simultaneously on 18 July 2011.  The Claimants comments on the Respondent's costs submission were duly filed on 18 July 2011.

51.   On 11 July 2011, the Tribunal directed the Claimants to address the Respondent's jurisdictional argument under the Constitution of Nigeria, which was raised for the first time in the Respondent's post-hearing brief.  This submission was duly filed by the Claimants on 25 July 2011.

52.   On 26 July 2011, the Tribunal invited the Respondent to reply to the Claimants' submission. This reply submission was duly filed by the Respondent on 2 August 2011.

## G.  The Arbitration Agreement

53.   Clause 21 of the PSC contains the Parties' arbitration agreement and provides as follows:

> "If a difference or dispute arises between the CORPORATION and the CONTRACTOR, concerning the interpretation or performance of this Contract, and if the parties fail to settle such difference or dispute by amicable agreement, then either Party may serve on the other a demand for arbitration. Within thirty (30) days of such demand being served, each party shall appoint an arbitrator and the two arbitrators thus appointed shall within a further thirty (30) days appoint a third arbitrator and if the arbitrators do not agree on the appointment of such third arbitrator, or if either Party fails to appoint the arbitrator to be appointed by it, such an arbitrator or third arbitrator shall be appointed by the President of the Court of Arbitration of the International Chamber of Commerce (ICC) in Paris on the application of the other Party (notice of the intention to apply having duly given in writing by the applicant party to the other party) and when appointed the third arbitrator shall convene meeting [sic] and act as chairman thereat.  If an arbitrator fails or is

---

[1] The Claimants state as follows in respect of their updated quantum figure (see Cl. Updated Quantum Submission, para. 4):

> "This figure is a reduction from the figure at 31 December 2010 due to variations in the volumes of oil that NNPC demanded to lift. It remains based on a mechanical comparison of the amount of oil the Contractor is entitled to have lifted based on the Lifting Allocation pursuant to the PSC and the amount of oil that the Contractor has actually lifted as at 30 April 2011."

unable to act, a successor shall be appointed by the respective party or by the arbitrators in the event the chairman must be succeed. The arbitration award shall be binding upon the parties and the expenses shall be borne by the parties in such proportion and manner as may be provided in the award. The Nigerian Arbitration and Conciliation Act, Cap. 19, Laws of the Federation of Nigeria, 1990 shall apply to this contract. The venue of the arbitration shall be anywhere in Nigeria as agreed by the parties."

### H. Relief Requested

54.   The Claimants seek both declaratory relief and damages for alleged breaches of the PSC. In particular, the Claimants request the following relief from this Tribunal (see Cl. Post-Hearing Br., para. 161):

(a)   DECLARE that the Respondent has breached the PSC;

(b)   DECLARE that the Respondent has wrongfully overlifted cargoes of Crude Oil in excess of its entitlements;

(c)   ORDER the Respondent to cease such overlifting forthwith;

(d)   ORDER the Respondent to lift future cargoes of Crude Oil only in accordance with the Contractor's Lifting Allocation and/or entitlement schedules;

(e)   DECLARE that the Respondent cannot, consistent with the terms of the PSC, submit its own unilateral tax returns or alter tax returns prepared by the Contractor and ORDER the Respondent to refrain from doing so;

(f)   ORDER that the Respondent cease making or purporting to make tax payments that are inconsistent with tax returns prepared by the Contractor;

(g)   ORDER that the Respondent request PPT receipts from the FIRS bearing the names of the Contractor parties and allocating PPT paid between them in proportion to their entitlement to Profit Oil as provided for in Clause 15.6 of the PSC, the First Memorandum and sections 11(2) and 14 of Decree No. 9 of 1999;

(h)   DECLARE that the Contractor is entitled on an ongoing basis to lift as Cost Oil an amount of Available Crude Oil sufficient to generate proceeds equivalent to all of the Operating Costs reflected in the Contractor's books and accounts, subject

only to an exception subsequently arising out of NNPC's retrospective audit of the Contractor's books and accounts pursuant to Clause 13.2;

(i)     DECLARE that, as agreed by the Parties in the PSC, in calculating Tax Oil, the ITC shall only be deducted from assessable tax and shall not also be deducted from qualifying expenditures;

(j)     DECLARE that, for purposes of ascertaining Tax Oil pursuant to the PSC, costs are to be treated as tax deductible as provided for in Nigerian legislation regardless of whether they are recoverable as Cost Oil under the PSC;

(k)     DECLARE that, in calculating Tax Oil pursuant to the PSC:

   (i)     The Signature Bonus is to be included as a qualifying capital expenditure for purposes of calculating the ITC and the annual capital allowance pursuant to paragraph 1(d) and 6 of the Second Schedule to the PPT Act;

   (ii)    Inter-company loan interest is, if pre-production, to be included as a qualifying capital expenditure for purposes of calculating the ITC and the annual capital allowances, and, if post-production, to be deducted from profit, in both cases to the extent that it is obtained on terms prevailing under the open market and is wholly, exclusively and necessarily paid for the purpose of generating income from Petroleum Operations as provided for in sections 10(1)(f) and (g) of the PPT Act; and

   (iii)   Any other costs, including sole costs, non-Operator costs and costs not recoverable as Cost Oil are, if pre-production, to be included as a qualifying capital expenditure for purposes of the ITC and annual capital allowances, and, if post-production, to be deducted from profit and, in both cases to the extent they are wholly, exclusively and necessarily incurred for the purpose of generating income from Petroleum Operations as provided for in Section 10(1) of the PPT Act.

(l)     AWARD the Claimants damages and other compensation and appropriate relief for all losses suffered by the Contractor, including those losses caused by NNPC's

- 16 -

breaches of the PSC, including, but not limited to, the wrongful overlifting of Crude Oil cargoes with a value of approximately US$1.87 billion as of 31 December 2010 (such figure to be updated as at the end of the first quarter of 2011 at the end of April);[2]

(m)     Subject to the other remedies granted by the Tribunal, ORDER that the terms of the PSC are forthwith modified as requested by the Contractor in paragraphs 230 and 231 of its Pre-Hearing Brief in accordance with Clause 19.2 of the PSC;

(n)     AWARD the Claimants interest at the rate of LIBOR plus four percent on any monetary sums awarded to the Claimants, from the date of breach up to the date of payment, which as at 31 December 2010 was US$214 million (such figure to be updated as at the end of the first quarter of 2011 at the end of April);[3]

(o)     ORDER that, without prejudice to the Claimants' right to enforce the above monetary awards by any and all other means available to them, the Contractor shall be entitled to nominate and lift such quantum of Available Crude Oil as enables the Contractor to generate Proceeds sufficient to satisfy the Contractor's contractual entitlement and all monetary awards;

(p)     AWARD the Claimants their costs and expenses of the arbitration (including interest on such costs and expenses); and

(q)     ORDER such other interim or final relief as the Arbitral Tribunal considers appropriate.

55.     The Respondent seeks the following relief from this Tribunal (see Statement of Rejoinder, para. 109):

**Declaratory and Injunctive Relief**

---

[2] In their Updated Quantum Submission of 25 May 2011, the Claimants revised their damages claim to US$1.799 billion as at 30 April 2011, see below, *infra* at para. 371.

[3] In their Updated Quantum Submission of 25 May 2011, the Claimants revised their interest calculation to US$243 million as at 30 April 2011, see below, *infra* at para. 373.

(a)     As the Arbitral Tribunal lacks the jurisdiction to adjudicate on the claims presented by the Claimants, all declaratory and injunctive reliefs sought by the Claimants should be declined.

(b)     In the alternative, as the Claimants are not entitled to any of the declaratory and/or injunctive relief sought, the same should be dismissed in their entirety.

**Monetary Awards**

(c)     As the Arbitral Tribunal lacks jurisdiction to adjudicate on the claims presented by the Claimants, all the monetary claims presented by the Claimants should be declined.

(d)     In the alternative, as the Claimants are not entitled to any monetary award, the claims therefore should be dismissed in their entirety.

**Costs**

(e)     The Respondent seeks an order terminating these proceedings by the making of a final award dismissing the claims herein (either on the ground that the Arbitral Tribunal lacks jurisdiction to entertain the claims made herein, or on the merits) and directing that the Claimants should pay the Respondent the costs of the arbitration incurred by the Respondent including:

(i)     The fees of the Arbitral Tribunal;

(ii)    The travel and other expenses incurred by the arbitrators; and

(iii)   The costs incurred by the Respondent for legal representation and assistance.

## III.   Factual Background

56.     The Tribunal sets out below the principal factual basis for its decisions in the present Award in the form of a detailed chronology.  The facts are largely undisputed (see Resp. Pre-Hearing Br., para. 3.7; Cl. Post-Hearing Br., para. 5).  However, where disputed by the Parties, the Tribunal has established these facts primarily from the contemporaneous documentation adduced in evidence by the Parties, supplemented by the testimony of the

factual witnesses (both oral and written) as provided to the Tribunal in these arbitration proceedings.

1. Negotiation of the PSC

57. In 1990, Nigeria began inviting bids from international oil companies for open acreage for petroleum exploration. The open acreages included a total of 136 blocks in five sedimentary basins of the Nigerian mainland and offshore waters, including 15 blocks in the deep offshore covering approximately 31,000 km$^2$ (see Exh. C-16).

58. The significance of petroleum to the Nigerian economy was acknowledged by the Minister of Petroleum Resources at the time, in a statement announcing the opening of bids (see Exh. C-16):

> "Petroleum accounts for the bulk of the foreign exchange resources and government revenues essential for our social and economic development. Although every effort is being made by the government to diversify the economy, petroleum will for the foreseeable future continue to contribute significantly to national development. It is therefore necessary to ensure the optimal development of our hydrocarbon resources."

59. The Minister advised that fiscal and other incentives, offered in the past by the Nigerian Government to encourage investment in oil exploration, would be available to ensure the attractiveness of investment in the Nigerian petroleum sector (see Exh. C-16).

60. From October 1990 to March 1992, Esso Exploration Inc. (subsequently EEPNL, together referred to as **"Esso"** with respect to the pre-contractual phase), conducted a technical evaluation of the exploration possibilities in the available deep offshore blocks.

61. On 12 March 1992, having completed their technical evaluations, Esso bid on the Oil Prospecting License ("**OPL**") for Block 209 ("**Erha**") and Block 210 (see Exh. C-20), both located in the Niger Delta. The Erha block lies at an average water depth exceeding 1,000 metres and was therefore considered to be an "ultra-deep water block". Petroleum exploration at this depth was unprecedented at the time and raised a number of challenges, both technical and financial. These challenges translated to greater risk for the contractor which would need to invest heavily in the exploration and development of the block without any certainty as to the size of oil and gas reserves, and therefore the economic viability of the investment.

62.     On 5 June 1992, the Department of Petroleum Resources ("**DPR**") approved the allocation of OPL 209 to Esso (see Exh. C-21).   Consistent with Section 2 of the Petroleum Act, the OPL was, however, granted directly to NNPC, a government agency (see Resp. Pre-Hearing Br., para. 3.1).

63.     From June 1992 to May 1993, Esso proceeded to negotiate the terms of the PSC with the Ministry of Petroleum and Mineral Resources ("**Ministry of Petroleum**") and NNPC. Among those matters discussed in the course of the negotiations were fiscal incentives appropriate to reflect the highly technical nature of the proposed venture in deep offshore waters.   Although fiscal incentives had been available in connection with petroleum exploration and development in the past, such incentives were considered by many international petroleum companies and the NNPC to have reflected a greater sharing of risk as between international petroleum companies and NNPC through joint venture operations (see Exh. 136).

64.     In a letter to the Ministry of Petroleum, dated 30 June 1992, Esso advised of the unique conditions associated with petroleum exploration in the Erha block, which it considered should be taken into account in the negotiation of the PSC (see Exh. C-22):

> "As mentioned above, block 209 is unique in that virtually the entire block is in greater than 1,000 meters of water. Such ultra deep water requires extreme deep water methods for both exploration and development. These methods, when combined with the high risk nature of the prospects, make the block quite different from all others awarded to date. In fact, we believe the economics of the ultra deep water may require that block 209 and other blocks (existing or future) in greater than 1,000 meters of water be considered separately from the blocks previously allocated. Both the fiscal terms and the work programmes should reflect the greater economic cost and risk. Even with such changes, block 209 by itself may in fact be non commercial with out infrastructure support from block 210."

65.     A government drafting committee was constituted in October 1992 to prepare a draft agreement for use in negotiating specific PSCs.   In a report dated 5 November 1992, the committee recorded the following "important points" as regards the negotiation of fiscal incentives (see Exh. C-28):

"9.4     IMPORTANT POINTS TO NOTE ARE:

o   No taxes will become payable to Government until all investment in exploration and production have been fully recovered.

o   No taxes will become payable to Government until a further 20% of cost of qualifying pre-production expenditure, by way of investment tax credit is recovered from tax payable.

o   In effect, with the PPT rate at 50%, the operations will have been allowed 140% of pre-production cost against income, before any taxes will become due for payment.

o   All investment in exploration and production will be recovered by the third year of production.

o   No 'Profit Oil' will become available for sharing until all pre-production cost plus interest charges have been fully recovered by the contractor.

9.5     From the results above, the Committee does not find the need to recommend an increase in the Investment Tax Credit from its existing levels. We believe that, sufficient incentive has been given to the contracting companies in the Accelerated Capital Allowance referred to below, the flat rate of tax of 50% as against 67.75 and 85% and the formula for sharing 'profit oil' as is stipulated in Clause 8(e) of the PSC.
...

Accelerated Capital Allowance

9.6     A case was made by NAPIMS for Accelerated Capital Allowances in respect of all expenditure incurred during the OPL stage by the Deep Offshore Operators. Unfortunately, this has been erroneously described as an investment tax credit (ITC) in the draft PSC of NAPIMS.

9.7     Having carefully examined and analysed the projected costs and revenue figures, the Committee accepts and recommends that the proposal to amortise 80% of the qualifying pre-production costs in the first year of production be accepted and the balance of 20% be amortised in the second year. Any unrecouped allowance in any year shall be carried forward to the subsequent year, until it is amortised. This recommendation is reflected in the accompanying draft PSC.

Investment Tax Credit

For reasons stated in paragraphs 9.5 and 9.6 above, we recommend that the existing provisions in the law on investment tax credits should apply."

66. On 20 November 1992, Esso presented a seminar to the DPR on the economic conditions associated with exploration and development of the Erha block. In their presentation, they argued that "the indicated fiscal terms do not adequately compensate for greater cost and risk of ultra deep water", and therefore the fiscal terms of the PSC needed to be improved. Esso proposed that the following fiscal terms be incorporated into the PSC (see Exh. C-30):

| ROYALTY | WATER DEPTH, METERS | ROYALTY, % |
|---|---|---|
| | 0 – 200 | 16.67 |
| | 200 – 400 | 15.00 |
| | 400 – 600 | 13.25 |
| | 600 – 800 | 11.50 |
| | 800 – 1000 | 9.75 |
| | 1000- 1200 | 8.00 |
| | 1200 – 1400 | 6.25 |
| | 1400 -1600 | 4.50 |
| | 1600 – 1800 | 2.75 |
| | 1800 – 2000 | 1.00 |
| | > 2000 | 0.00 |
| PETROLEUM PROFITS TAX | | 50% |
| INVESTMENT TAX CREDIT | PRE-PRODUTION | 80% |
| | POST-PRODUCTION | 20% |

**NOTE:  DEPRECIABLE BASIS NOT REDUCED**
         **EXCESS MAY BE CARRIED FORWARD INDEFINITELY**

| PROFIT SHARE TO NNPC | CUMULATIVE PRODUCTION, MB | PROFIT SHARE, % |
|---|---|---|
| | 0 – 350 | 20 |
| | 350 – 750 | 35 |
| | 750 – 1000 | 45 |
| | > 1000 | 50 |

67. Fiscal provisions, among others, continued to pose a challenge to the Parties in the course of their negotiations. In a letter to the Ministry of Petroleum, dated 24 February 1993, Esso made the following observations in connection with the ITC, Royalty and NNPC profit share provisions of the draft PSC (see Exh. C-38):

> "During our 19 February meeting, it was indicated that the Investment Tax Credit (ITC) would 1) be shared with NNPC, and 2) be based on a tiered system of 200 meters to 300 meters: 20% and 301 meters to 2000 meters: 40%. We believe the 40% rate is too low and the 20% rate is totally unacceptable. We understand the logic that the decision to have the ITC shared with NNPC was based upon. We understand that constraints have been placed on the Ministry to keep the ITC at or under

> 40%. However, given the current package of fiscal terms, some aspect of these terms must be changed to provide the Contractor with a sufficient return to stimulate its investment in this high cost, high risk environment. If there can be no improvement in the Royalty or Profit Shares as requested in our letter of 22 January and the Ministry intends to split the ITC between Contractor and NNPC, then there must be some other incentive offered in the Contract. Exxon requests that part of this relief be granted in the form of a 3 year royalty holiday, during which no royalty will be due under the PSC. Exxon further requests that the ITC be set at a flat rate of 60% for the entire Contract Area or at the original 80%/20% rate on a field by field basis."

68.   Further negotiations between the Parties ensued, ultimately culminating on 31 May 1993 with the execution of the PSC on the terms set out below (see Exh. C-1).

### 2.   Terms of the PSC

69.   The PSC has a term of 30 years, which includes a 10-year exploration period under the OPL and a 20-year "OML period", that is, production under an Oil Mining License ("**OML**"). The OML is a lease granted by the Minister of Petroleum Resources under the *Petroleum Act*, CAP 350, Laws of the Fed. of Nigeria 1990, as amended, "to search for, win, work, carry away and dispose of Petroleum" (see Exh. C-1, Clause 1 and 3). At the end of the OML period, NNPC is obligated to seek renewal of the OML and, if granted, the PSC will be extended at the option of either party for a period to be determined.

70.   Clause 2 sets out the scope of the PSC:

>   2.1   This Contract is a Production Sharing Contract governed in accordance with the terms and provisions hereof. Petroleum Operations and provision of financial and technical requirements by the CONTRACTOR in accordance with the terms of this Contract shall be in consultation with the CORPORATION. The CORPORATION, as holder of all rights in and to the Contract Area, hereby appoints and constitutes the CONTRACTOR the exclusive company to conduct Petroleum Operations in the Contract Area.

>   2.2   During the term of this Contract the total Available Crude Oil shall be allocated to the Parties in accordance with the provisions of Clause 8, the Accounting Procedure (Annex B) and the Allocation Procedure (Annex C).

>   2.3   The CONTRACTOR shall provide funds and bear the risk of Operating Costs required to carry out Petroleum Operations and shall therefore have an economic interest in development of Crude Oil deposits in the Contract Area.

2.4   The CONTRACTOR is engaged in Petroleum Operations pursuant to the Petroleum Profits Tax Act 1959 Cap 354 Laws of the Federation of Nigeria 1990 ("PPT Act") as amended and accordingly the Companies Income Tax Act 1979 Cap 60 Laws of the Federation of Nigeria 1990, as amended, shall have no application."

71.   As shall be seen, an important aspect of the dispute between the Parties concerns whether the Claimants are carrying out "petroleum operations" for the purposes of the PPT Act, such that it is subject to the PPT Act and entitled to certain tax benefits established thereunder.

72.   Clause 7 of the PSC sets out the respective rights and obligations of the Parties.   Among other obligations, Clause 7 establishes that the Contractor must prepare estimated and final PPT returns and submit same to NNPC in accordance with the PPT Act.

73.   Clause 8 describes how "Available Crude Oil" (*i.e.*, the "Crude Oil won and saved from the Contract Area after deducting amounts used in Petroleum Operations") will be allocated under the PSC.   The Claimants describe the tiered structure of Clause 8 as a "waterfall", each contractual tranche of crude oil giving rise to the next:

"8.1   The allocation of Available Crude Oil shall be in accordance with the Accounting Procedure (Annex B), the Allocation Procedure (Annex C) and this Clause 8 as follows:

(a)   Royalty Oil shall be allocated to the CORPORATION in such quantum as will generate an amount of Proceeds equal to the actual Royalty payable during each month and the Concession Rental payable annually.

(b)   Cost Oil shall be allocated to the CONTRACTOR in such quantum as will generate an amount of Proceeds sufficient for recovery of Operating Costs in OPL 209 any OML derived therefrom.   All operating Costs extended in U.S. Dollars will be recovered in U.S. Dollars through Cost Oil allocations.

(c)   Tax Oil shall be allocated to the CORPORATION in such quantum as will generate an amount of Proceeds equal to the actual PPT liability payable during each month.

(d)   All approved expenses incurred on the OPLs for exploration activities prior to the Effective Date of this Contract shall be recoverable as Operating Cost by the CONTRACTOR from Cost Oil under this Contract.

Such cost shall be capitalised and recoverable in accordance with the PPT Act 1959 as amended.

(e) The CONTRACTOR shall for PPT purposes be entitled to consolidate OPL 209 and any OMLs derived therefrom.

(f) Profit Oil, being the balance of Available Crude Oil after deducting Royalty Oil, Tax Oil, and Cost Oil, shall be allocated to each Party pursuant to Schedule B-2 of the Accounting Procedure (Annex B) as follows:

| CUMULATIVE PRODUCTION MMB FROM CONTRACT AREA | PROFIT OIL PERCENTAGES CORPORATION | CONTRACTOR |
|---|---|---|
| 0-350 | 20 | 80 |
| 351-750 | 35 | 65 |
| 751-1000 | 45 | 55 |
| 1001-1500 | 50 | 50 |
| 1501-2000 | 60 | 40 |

(g) Above 2000 MMB Cumulative Production to the CORPORATION and the CONTRACTOR shall meet to agree on the profit sharing percentage.

8.2 The quantum of Available Crude Oil to be allocated to each Party under this Contract shall be determined at the fiscalisation point.

8.3 Each Party shall take in kind, lift and dispose of its allocation of Available Crude Oil in accordance with the Lifting Procedure (Annex D).

8.4 Allocation of Royalty Oil and Tax Oil to the CORPORATION shall be applied towards the liabilities of the CONTRACTOR and the CORPORATION for Royalty, Concession Rentals, and PPT and the Proceeds therefrom shall be paid to the Government by the CORPORATION on behalf of both Parties.

8.5 Either Party may at the request of the other, lift the other Party's Available Crude Oil pursuant to Clause 9.1 and the lifting Party shall within sixty (60) days transfer to the account of the non-lifting Party the Proceeds of the sale to which the non-lifting Party is entitled. Overdue payments shall bear interest at the rate of one (1) month LIBOR plus two percent (2%).

8.6 The CONTRACTOR may purchase any portion of the CORPORATION's allocation of Available Crude Oil from the Contract Area under the CORPORATION's terms and

> conditions including valuation and pricing of the Crude Oil as applicable to other third party buyers of the CORPORATION's Crude Oil.
>
> 8.7.   Both Parties shall meet on a monthly or quarterly basis as may be agreed to reconcile all Crude Oil allocated and lifted during the period as per Article III(7) of Annex D."

74.   Clause 11 establishes who shall hold title to equipment used in conducting Petroleum Operations in the Contract Area, which is relevant to whether the Contractor is entitled to claim certain tax deductions and benefits under the PPT Act. Clause 11 provides in relevant part as follows:

> "11.1   The CONTRACTOR shall finance the cost of purchasing all equipment to be used in Petroleum Operations in the Contract Area pursuant to the Work Programmes and such equipment shall become the property of the CORPORATION on arrival in Nigeria. The CONTRACTOR and CORPORATION shall have the right to use such equipment outside the Contract Area, such use shall be subject to terms and conditions agreed by the Parties provided that it is understood Petroleum Operations hereunder shall take precedence over such use by the CORPORATION."

75.   Royalty rates, PPT rates and ITC rates are set out in Clause 15, which establishes the following:

> "15.1   <u>Royalty</u>
>
> Royalty rates will be graduated as follows:

| <u>Area</u> | <u>Rate</u> |
|---|---|
| In areas up to 200 metres water depth | 16.67% |
| In areas from 201 to 500 metres water depth | 12% |
| From 501 to 800 metres water depth | 8% |
| From 801 to 1,000 metres water depth | 4% |
| In areas in excess of 1,000 metres | 0% |

> 15.2   <u>Petroleum Profit Tax (PPT)</u>
>
> (a)   The PPT shall be in accordance with the PPT Act 1959 as amended.
>
> (b)   The PPT rate applicable to the Contract Area shall be fifty percent (50%) for the duration of the contract.

15.3    INVESTMENT TAX CREDIT (ITC)

(a)    The ITC shall be in accordance with the PPT Act as amended.

(b)    The ITC rate applicable to the Contract Area shall be fifty percent (50%) flat rate for the duration of this Contract. In computing the PPT payable, the ITC shall be applicable in full to the Petroleum Operators in the Contract Area such that the chargeable tax is the amount of the assessable tax less tax offsets of which ITC is an item. The chargeable tax so derived shall be split between the CORPORATION and the CONTRACTOR in accordance with the proportion of the percentage of Profit Oil split.

15.4    The CORPORATION shall pay all Royalty, Concession Rentals and PPT on behalf of itself and the CONTRACTOR out of Available Crude Oil allocated to it under Clause 8.1 of this Contract.

15.5    The Realizable Price established by the CORPORATION in accordance with Clause 9 of this Contract shall be used in determining the amount payable on Royalty and PPT in respect of Crude Oil produced and lifted pursuant to this Contract. The parameters of new Crude Oil streams produced from the Contract Area shall also be determined in accordance with provisions of Clause 9 of this Contract.

15.6    The CORPORATION shall make available to the CONTRACTOR copies of receipts issued by the Federal Board of Inland Revenue bearing the names of each Party for payment made for PPT in accordance with each Party's Tax oil allocation as provided in Annex B Schedule B1 in the same proportion of the percentage of Profit Oil split clause 8(1)(f)."

76. These terms are confirmed in Article III of Annex B to the PSC, entitled "Computation of Royalty, Concession Rental and PPT". Article III further affirms that it is the Contractor's responsibility to "compute the PPT payable by [NNPC] pursuant to Clause 8.1 of this Contract in accordance with the provisions of the PPT Act and any prevailing Government fiscal incentives including, but not limited to, any credit which offset PPT liability".

77. A detailed crude oil allocation procedure is set out in Annex C to the PSC, while Annex D contains detailed nomination and lifting procedures. Article III(3) to Annex C is central to the Parties' overlifting dispute and, in particular, who as between the Parties is entitled to estimate the lifting allocation for each Party under the PSC. Article III(3) provides as follows:

"Thirty-five (35) days before commencement of production from the Contract Area and thereafter thirty-five (35) days prior to the beginning

of the Forecast Quarter, the CONTRACTOR shall notify the CORPORATION of the estimated Lifting Allocation which can be produced and made available for disposal during the Forecast Quarter. Such estimated Lifting Allocation shall take into account any Proceeds Imbalance for the quarter first preceding the Current Quarter and any estimated Proceeds Imbalance for the Current Quarter computed in accordance with paragraph 3 of Article IV. Such notice shall be in the form of Schedule C-1 attached hereto indicating the estimated quantities of Royalty Oil, Tax Oil, Cost Oil and Profit Oil, each Party's estimated Lifting Allocation and the estimated Realizable Price used to prepare such estimated Lifting Allocations."

78. Finally, the PSC includes a stabilization clause at Clause 19.2, which forms the basis for the Claimants' alternative and additional claim in this arbitration:

> "19.2   In the event that any enactment of or change in the laws or regulations of Nigeria or any rules, procedures, guidelines, instructions, directives, or policies, pertaining to the Contract introduced by any Government department or Government parastatals or agencies occurs subsequent to the Effective Date of this Contract which materially and adversely affects the rights and obligations or the economic benefits of the CONTRACTOR, the Parties shall use their best efforts to agree to such modifications to this Contract as will compensate for the effect of such changes. If the Parties fail to agree on such modifications within a period of ninety (90) days following the date on which the change in question took effect, the matter shall thereafter be referred at the option of either Party to arbitration under Article 21 hereof. Following arbitrator's determination, this Contract shall be deemed forthwith modified in accordance with that determination."

### 3.   Amendments to the PSC and the Government Guarantee

79. Two memoranda were also signed by the Parties to supplement the PSC.   The first memorandum, dated 31 May 1993, provides as follows on matters concerning the PPT (see Exh. C-3):

> "(a)   The PPT rate applicable to the Parties with respect to the Contract Area shall be fifty percent (50%) for the PSC duration and the Contractor as defined in the PSC shall compute the PPT payable on behalf of the Parties, such calculation to be agreed by the Parties.
>
> (b)   For each year, Corporation shall timely provide Contractor with original official tax receipts issued by the Federal Board of Inland Revenue in the names of each Party for the payment of PPT made on behalf of each of the Parties in accordance with each Party's Tax Oil allocation and liability as provided for in Annex B Schedule B1 of the

PSC, in the same proportion of the Percentage of Profit Oil split in clause 8(1)(f) (f) of the PSC.

(c) Contractors' share of Tax Oil is allocable to Corporation and shall be lifted by Corporation for the sole purpose of paying Contractor's share of PPT liability. The tax returns shall have attached to them separate schedules calculating the tax liability allocable to each of the Parties.

(d) The Corporation agrees that it shall not receive any benefits, directly or indirectly, relating to the amount of the taxes paid on Contractor's behalf or the calculation of taxes due."

80.    The second memorandum, dated 1 December 1993, further clarified certain aspects of the PSC and the Parties' respective obligations, including the following (see Exh. C-4):

"It is understood and agreed that notwithstanding Clause 11.1 of the PSC which provides that all equipment purchased under the PSC shall become the property of the CORPORATION on arrival in Nigeria, such equipment shall become the property of the CORPORATION on the earlier of either the termination of the relevant PSC or when the cost thereof is fully recovered under the Accounting Procedure."

81.    The Government of Nigeria also executed a letter of guarantee in favour of EEPNL on 31 May 1993, which provides as follows (see Exh. C-2):

"Pursuant to Government policy, the PSC will be approved with the guarantee that the following terms which require amendments to existing Nigerian laws are applicable and enforceable:

(i)    The OPL shall be for a maximum term of ten (10) years;

(ii)    The Petroleum Profit Tax (PPT) for petroleum operations under the PSC shall be 50% flat in accordance with the PSC terms;

(iii)    The Investment Tax Credit (ITC) for NNPC and the Contractor in respect of petroleum operations under the PSC shall be 50% flat in accordance with the PSC terms;

(iv)    Royalty Rates shall be as provided in the PSC; and

(v)    Computation and payment of estimated and final PPT is to be made in US dollars on the basis of the US dollar returns filed.

This letter shall be valid until the respective applicable laws are amended to reflect the terms of the PSC herein stated.

Dated this 21st day of May 1993

[signed]

- 29 -

P.C. Asiodu
Hon. Secretary of Petroleum and Mineral Resources
For and on behalf of the Federal Government of Nigeria."

82. During the Hearing, the Respondent took the position that the Guarantee ceased to exist or have any effect once the legislative framework applicable to the PSC was amended (see Tr. Day 1, p 128; Day 3, pp. 229-230). Justice Uwaifo agreed with this position to the extent the Parties are agreed that the legislative amendments have in fact done their job (see Tr. Day 3, pp. 101-103). In its post-hearing submission, the Respondent confirmed that the *Deep Offshore and Inland Basin Production Sharing Contracts Act*, Cap D3 LFN 2004 (see Exh. LA-9*bis*), which entered into effect on 1 January 1993, gave legislative effect to the fiscal incentives in the Guarantee (see Resp. Post Hearing Br., para. 2.4). The Tribunal therefore understands that this is no longer a point in contention between the Parties.

83. Several assignments of EEPNL's interest under the PSC have taken place, resulting in EEPNL holding 56.25% of the Contractor's interest under the PSC and SNEPCO holding the remaining 43.75% interest (see Exhs. C-5, C-6 and C-7). The validity of such assignments is challenged by the Respondent for failure of the Claimants to obtain prior written consent pursuant to Clause 7.1(e) of the PSC (see Statement of Rejoinder, para. 31). Such challenge does not, however, appear to be linked to the Respondent's substantive defence to the claims in this arbitration, was not raised during the Hearing, and is therefore not considered further.

    4. Production under the PSC

84. The Contract Area subject to the PSC is composed of three (3) fields: Erha, Erha North and Bosi. Production from the Erha field began in March 2006, followed by production from Erha North in September 2006. Production has not yet commenced from Bosi.

85. On 8 September 2006, EEPNL wrote to the DPR, advising that NNPC had scheduled the lifting of three cargoes of Crude Oil from Erha in November 2006 for payment of Royalty Oil (see Exh. C-45). In a further letter dated 25 September 2006, Esso explained that, in its view, production from the Erha field is not subject to royalty payment because the entire hydrocarbon area is deeper than 1000 meters in water depth (see Exh. C-47).

86.    EEPNL wrote to NAPIMS, the corporate unit within NNPC charged with managing the Nigerian Government's investment in the upstream oil and gas sector, on 11 October 2006, shortly after production began from Erha North, recalling that, pursuant to Clause 15 of the PSC, royalty rates are graduated based on water depth with 0% royalty rate in areas in excess of 1000 meters of water depth.  EEPNL therefore advised NAPIMS as follows (see Exh. C-48):

> "Based on seismic-based bathymetry data, the entire hydrocarbon area associated with the Erha resource is deeper than 1000 meters water depth. For Erha North, the majority of the resource area is deeper than 1000 meters with some hydrocarbon volume extending into shallower water depths.
>
> Pursuant to Article III of the OML 133 PSC, EEPNL as Contractor shall compute the amount of royalty payable by the Corporation. As previously reviewed with NAPIMS, EEPNL has computed the applicable royalty rates as follows:
>
> Erha             0.00%
>
> Erha North    0.331%"

87.    A working session was held between the Parties to the PSC on 19 March 2007 to discuss, among other matters, the applicable royalty rate for production from these fields. Following this working session, NNPC advised EEPNL in a letter dated 18 April 2007 that, pending the final outcome of the determination of the royalty rate applicable to Erha, a one percent (1%) royalty rate would be applied (see Exh. C-50 and C-51).

88.    It appears from a synopsis of the Parties' meeting of 19 March 2007 that Mr. Sofidiya then "explained the basis of the 0.3% [sic] royalty being applied in Erha North" (see Exh. C-50).  In this regard, Mr. Sofidiya states (see Witness Statement of Adebayo Sofidiya, at para. 18):

> As set out above, the two producing fields within OML 133 lie entirely in water depths below 1,000 metres with the exception of a small section of the Erha North field, which lies at 996 metres water depth.  Based on this, only crude oil from the portion of the Erha North field lying below the 1,000 metre depth contour attracts a royalty payment.  On that basis, in October 2006, we computed that the royalty rate payable in respect of oil production from Erha North is 0.331%.

89.   In a letter dated 1 June 2007, EEPNL expressed its disagreement with the application of a one percent (1%) royalty rate to the Erha field, noting its location in water depths exceeding 1000 meters (see Exh. C-54).  NNPC nonetheless maintained its position in a letter dated 3 July 2007 that, pending final resolution of the royalty issue, a one percent (1%) royalty rate would be applied to the Erha field (see Exh. C-55).

90.   NNPC and EEPNL attended a Crude Oil Allocation and Cost Recovery Meeting on 27 September 2007, during which the Parties discussed the continuing royalty issue, as well as their differing understandings in respect of the appropriate computation of tax on Erha for 2006 and 2007 (see Exh. C-57).

91.   On 17 October 2007, NNPC wrote to EEPNL advising of its decision to recover all outstanding taxes, royalty and NNPC profit oil in an accelerated manner, explaining that NNPC's entitlement model showed that the Contractor was at an overlift position of US$415.7 million of Crude Oil by the end of August 2007 (see Exh C-59).

92.   EEPNL replied on 14 November 2007, stating that it objected to NNPC's position on the basis that it disregarded the express provisions of the PSC with respect to the procedure for the determination of entitlements and liftings.  Specifically, EEPNL took the position that it was their exclusive right and obligation, pursuant to Annexes C and D of the PSC, to advise NNPC of the estimated lifting allocation and consequent lifting entitlements and computations using its entitlement model (see Exh C-60).

93.   NNPC wrote to EEPNL on 20 November 2007, stating that, in accordance with Clause 8.1 and Annex B, Article IV, of the PSC, NNPC had evaluated the Schedule B-1 submissions provided by EEPNL for consideration and approval and established that the basis of EEPNL's computations did not conform to provisions of the PSC and relevant Nigerian Laws.  NNPC clarified the basis for its rejection of EEPNL's Schedules as follows (see Exh. C-11):

> **"Treatment of ITC**
>
> Your model failed to deduct ITC from cost of assets before arriving at the amount of Qualifying Capital Expenditure (QCE) and computing Capital Allowance, thereby treating ITC as **Gratis**.

Please note that Decree 9 (1999) reintroduced ITC for all PSC signed before 1st July 1998 and Decree 30 (1999) clarifies its treatment in Section 12 to align with paragraph 5 of Decree 24 (1979) by deleting its sub-paragraph 3.

**Timing of Capital Allowance**

Your model grants a full year allowance for the year in which an asset is acquired or first used. This implies that even if an asset is acquired or used by November, a full year capital allowance would be granted.

NNPC relies on the superiority of the Decree 9 (1999) which requires payment of actual PPT liabilities on monthly basis (Paragraph 9) and the PSC which requires payment within 60 days from the month under consideration. Annual computation based on estimates cannot guarantee this provision.

**Royalty Rates**

The royalty rate applicable to OML 133 shall be as advised by DPR. However, pending the determination of the royalty rate applicable to OML 133 by DPR, NNPC decide to apply the rate of 1%.

The objective of Clause 8.1 and Annex B (IV) stating that the Corporation is to consider and approve Schedule B-1 is to ensure that all computations by the Contractor conform to the terms of the Agreement and relevant Nigerian laws.

Your Schedule B-1 will be considered and approved by the Corporation as soon as you align your position on the above with the terms of the PSC and the relevant laws of Nigeria. Thereafter, the Corporation will completely cede the responsibility for producing Annex C-1 to ESSO."

94.     On 22 November 2007, EEPNL wrote to the FIRS, claiming a refund of overpaid 2007 PPT instalments, explaining that NNPC was unilaterally determining the amount of PPT, notwithstanding that the PSC establishes the Contractor as the responsible party for preparing tax returns and calculating the amount of monthly PPT payable.  EEPNL had calculated a zero PPT liability for 2007 in its PPT return (see Exh. C-62).

95.     EEPNL also wrote to NNPC on 27 November 2007, formally advising of its disagreement with NNPC's interpretation of the PSC with respect to the treatment of each party's lifting allocation and consequent entitlement to lift crude oil.  EEPNL stated as follows (see Exh. C-63; see also Exh. C-64):

"Based on COMD's interpretation of the terms and conditions of the PSC, COMD nominated five Erha crude cargoes for January 2008 out of available six cargoes. Since NNPC has already allocated these January

2008 cargoes, albeit erroneously, we shall in the spirit of good working relations but in protest, go ahead to award the acceptances as overlifts against NNPC's account. The disagreement in interpretation herein above stated and the resultant lifting allocation entitlements are very fundamental and so we seek an urgent meeting with you during the week of December 3 2007 to arrive at a resolution of these issues. We urge that this meeting and resolution of these issues be finalised before the February 2008 Lifting Program is concluded. This is to avoid a repeat of the present error as EEPNL will not be in a position to accept any further nominations that are not in compliance with the PSC."

96.    NNPC wrote in reply on 29 November 2007 that it would continue to recover the overlift in an accelerated manner, as previously advised in its October and November correspondence (see Exh. C-65).

97.    On 10 December 2007, NNPC advised EEPNL of its proposed dates for crude oil lifting nominations in February 2008 (see Exh. C-67). A week later, on 17 December 2007, NNPC wrote to EEPNL, stating that the Erha terminal would be shut down and there would be no production during the month of February 2008, nor any lifting of crude oil by either party, as NNPC had not received confirmation of its proposed dates for the February 2008 liftings (see Exh. C-9).

98.    EEPNL replied on 18 December 2007, confirming NNPC's crude lifting nomination for February 2008, and advising that it was complying under protest with NNPC's nomination of four (4) cargoes of crude oil for February 2008 (see Exh. C-10).

99.    EEPNL proposed, in a letter dated 3 January 2008, that the March crude oil liftings be split as between EEPNL and NNPC and "henceforth maintain parity between the positions of both parties while the dispute is being resolved through arbitration or otherwise" (see Exh. C-68).

100.   NNPC rejected this proposal in a letter dated 7 January 2008, advising that it would continue to lift the maximum number of cargoes from Erha until the alleged overlift position was totally eliminated (see Exh. C-69). Thus, by letter dated 11 January 2008, NNPC placed six (6) crude oil cargo liftings for the month of March 2008 (see Exh. C-70).

101.  EEPNL rejected NNPC's crude oil listings for March 2008 by letter dated 16 January 2008 (see Exh. C-71).  However, NNPC subsequently notified EEPNL of its schedule for lifting nominations, requiring five (5) cargo liftings in March 2008 (see Exh. C-73).  EEPNL again agreed to NNPC's lifting nominations under protest (see Exh. C-74).

102.  On 29 February 2008, EEPNL also agreed to NNPC's lifting nominations for April 2008 under protest, recording the following (see Exh. C-76):

> "You have advised that NNPC has already allocated these April 2008 cargoes despite our objections and further, that NNPC will only grant approvals for cargoes that conform to NNPC's views.  We consider that this position is in disregard of NNPC's obligations under the PSC.
>
> Faced with these circumstances, Esso as Operator will provide NNPC with its nominated cargoes in April 2008. This is being done to mitigate the Contractor's exposure to damages that would otherwise result and is not to be taken as prejudicing the Contractor's position in any way. Specifically, we understand that were Esso not to accept NNPC's proposed lifting nominations, NNPC would not permit any liftings from the Erha field, which would obviously compound the damage that Esso is already suffering as a result of NNPC's overlifting."

103.  EEPNL has continued to provide the lifting nominations requested by NNPC, under protest, and to object to the filing of PPT returns by NNPC with FIRS.

104.  The Claimants served a Notice of Dispute on NNPC on 30 June 2009 (see Exh. C-8), which was subsequently followed by the filing of the Notice of Arbitration which initiated the present arbitration proceedings.

### 5.  The Stabilisation Claim

105.  The FIRS issued a Notice of Assessment to the Claimants for 2008 PPT liability on 14 July 2009 (see Exh. C-93).  According to EEPNL's Statement of Claim dated 13 April 2010, the Notice of Assessment reflects an erroneous calculation of PPT and "constitutes a change from the FIRS' previous application of ITC".  The Notice of Assessment "was received by the Contractor only days before the submission of the Notice of Arbitration that commenced this arbitration." (see Statement of Claim, para. 21).

106.   In their Statement of Claim, the Claimants "note the procedure set forth in Clause 19.2 of the PSC, and the Claimants reserve their right to refer this matter to the Tribunal in due course as provided for in Clause 19.2" (see Statement of Claim, para. 25).

107.   On 24 May 2010, the FIRS provided NNPC with a letter entitled "Decisions on Production Sharing Contract Tax Issues" in support of the Respondent's defence in this and other proceedings relating to disputes under other production sharing contracts.  The FIRS recorded its "Decisions" on the PSC tax issues as follows (see Exh. RC-1):

> "1)   **Timing of Amortisation of Capital Costs: - FIRS Position**
>
> In response to the averment contained in paragraph 14.2 of the statement of defence, it is the view of FIRS that going by the provision of Section 9 of Deep Offshore Inland Basin Act 1999, as regards the determination of actual PPT liability payable on a month by month basis, the amortisation of Capital Allowance over a period of Sixty months is correct and therefore justified. In essence, in the determination of actual PPT payable on a month by month basis, consideration will be to actual costs incurred during the reference month.
>
> 2)   **Consolidation of OPL 316/OML125 & OPL 211/OML134 for Purposes of Computation of PPT**
>
> Clause 8.1e of the PSC between Agip and NNPC is clearly in violation of Section 3 (1) (2) and Section 12 of Deep Offshore Act of 1999 and Section 22 (3), (4) and (5) of PPTA. Accordingly, the act of consolidation as enshrined in clause 8.1e of the PSC agreement is null and void ab initio and therefore of no legal consequence whatsoever.
>
> 3)   **Allocation of Tax Oil**
>
> FIRS aligns itself with NNPC to the extent of the determination of Tax Oil, its lifting and remittance of its proceeds to the relevant Government Account designated for that purpose. This is to the effect that Tax Oil is to be calculated and paid on the basis of actual monthly PPT liability.  This is in line with the provision of Section 15 of the Deep Offshore and Inland Basin Production Sharing Contract Act CAP D3 LFN 2004 which states, inter alia. [*sic*]
>
> 4)   **INVESTMENT TAX CREDIT (ITC)**
>
> Petroleum Profits Tax (Amendment) Decree No.24 of 1979 tied entitlement to Investment Tax Credit (ITC) to ownership of asset.  Equally, Finance (Miscellaneous Taxation Provisions)

Decree No.31 of 1996 which replaced ITC with Petroleum Investment Allowance (PIA) also reiterated this position.

This position was further reinforced by Finance (Miscellaneous Taxation Provisions) Decree No.30 of 1999 which revived the provisions of paragraph 5(2) of Decree 24 of 1979 provides [sic] that ITC shall be deducted from the cost of the asset to arrive at the amount of qualifying expenditure and before arriving at the annual allowance.

Based on the law that introduced ITC therefore, our position is that ITC is to be treated as a deduction from qualifying Capital expenditure before arriving at the value of the asset that is available for Capital Allowances computation on a Contract area by Contract area basis without consideration of producing and non producing contract areas.

5) **Signature Bonuses, Loan Interest & Non-operator Costs**

It is trite law that accounting profit is not the same as taxable profit. By similar token, cost recoverability is not coterminous with tax deductibility. In effect, what is not cost recoverable cannot be tax deductible. To this extent therefore, any cost that the contractor cannot recover from the Concessionaire cannot be tax deductible for purposes of determining the PPT payable on the Contract Area. This position holds true in respect of signature bonuses, loan interest and Non-operator Costs.

6) **Arbitral Proceedings**

Section 59(2) of the Federal Inland Revenue Service (Establishment) Act No. 13 2007 stipulates that the Tax Appeal Tribunal (TAT) shall have power to settle disputes arising from the operations of the Act and under the First Schedule of the Act. In other words, any dispute bothering on taxation must of necessity be handled by the TAT. It is therefore our humble submission that this dispute should be taken before the TAT for adjudication.

7) **PPT Administration**

You claimed in paragraph 19.3 of your Statement of Defence that 'the FIRS has been tardy in the issuance of receipts for the payments of PPT made by the Respondent. It will be appreciated if you could clarify this statement so as to enable us to put the issue in proper perspective."

108. On 12 August 2010, less than two months after the filing of the Respondent's Statement of Defence in this proceeding, the Parties held an in-person meeting during which the Claimants gave notice to the Respondent of a claim under Clause 19.2 of the PSC (see Exh. C-133).

- 37 -

109.   Also on 12 August 2010, EEPNL wrote to NNPC triggering the 90 day negotiation period under Clause 19.2 of the PSC (see Exh. C-130).  Specifically, EEPNL provided notice in connection with (i) the FIRS Notice of Assessment in respect of OML 133, dated 16 June 2009 (the 2008 Notice of Assessment); (ii) the FIRS Notice of Assessment in respect of OML 133, dated 22 June 2010 (the 2009 Notice of Assessment); and (iii) the letter from FIRS Director of Tax Policy to NNPC, dated 24 May 2010 (see Exh. RC-1, cited at paragraph 107 above).  EEPNL explained the purpose of its notice as follows (see Exh. C-130):

> "The Notice of Assessment and the 24 May 2010 letter from the FIRS all evidence a change in policy pertaining to the Erha PSC by a Government department, parastatal or agency towards the application and calculation of certain elements of PPT (including, by way of example and without limitation, the application of investment tax credits, the timing of available capital allowances, and the tax deductibility of costs).  Such change has materially and adversely affected the Contractor's rights and obligations and its economic benefits and has therefore triggered the Contractor's rights under Clause 19.1 of the PSC.
>
> Clause 19.2 provides that the Contractor and NNPC should, for a 90-day period following the date on which the chance in question took effect, use their 'best efforts to agree to such modifications to [the PSC] as will compensate for the effect of such changes.'
>
> This letter constitutes a formal notification of the beginning of a 90-day modification negotiation period.  Accordingly, OML 133 representatives are available to meet with you to discuss potential amendments to the PSC consistent with Clause 19.2.  We propose organising a first meeting in Abuja during the week of August 16, 2010.  If your representatives are unable to meet during this week, we would be pleased to meet at your convenience.
>
> We hope that these discussions will result in agreement on such modifications during the contractually-designated period.  However, should the parties be unable to agree any such mutually-acceptable modifications, the Contractor intends to refer the matter to arbitration before the Tribunal in the ongoing arbitration proceedings in accordance with Clause 19.2.  Finally, and in addition, we note that such a change in policy also breaches the Contractor's rights under applicable bilateral investment treaties. The Contractor hereby reserves all of its rights under such treaties and international law".

110.   On 20 September 2010, the Claimants wrote to the Respondent recording the Parties' meeting of 12 August and the Respondent's "indication at the meeting that NNPC was

willing to engage in 'best efforts' discussions as contemplated by Clause 19.2 of the PSC" (see Exh. C-133; Witness Statement of Adebayo Sofidiya, para. 11).

111.   The Claimants fully argued their position in respect of their claim under Clause 19.2 in their Statement of Reply of 11 October 2010 (see Statement of Reply, paras. 295-366).

112.   On 8 November 2010, NNPC advised EEPNL by letter that no meaningful negotiation of the issues raised in its August 12th letter could be held unless the present arbitration proceeding was withdrawn or suspended (see Exh. RR-7).

## IV.   ISSUES TO BE DETERMINED

113.   The issues before the Tribunal for determination may be briefly summarized as follows:

(a)   <u>Jurisdiction</u>:  Does the Tribunal have jurisdiction over the Claimants' claims under Clause 21 of the PSC and/or the Claimants' stabilisation claim?

(b)   Liability:

(i)   *Enforcement of the PSC*:  Is Clause 2.4 of the PSC Enforceable?

(ii)   *The Lifting Allocation Claim*: Has the Respondent over-lifted crude oil in breach of the lifting allocation procedure in the PSC?

(iii)   *The Production Tranches Claim*: Has the Respondent improperly calculated the Parties' respective entitlement to royalty, cost, tax and profit oil in breach of the PSC?

(iv)   *The Tax Calculation and Return Preparation Claim*: Has the Respondent unilaterally filed PPT tax returns in breach of the PSC?

(v)   *The Stabilisation Claim*:  In the alternative and in addition to the above claims, has there been a change of government policy which has materially and adversely affected the rights and obligations or the economic benefits of the Claimants within the meaning of Clause 19.2 of the PSC?

(c) <u>Causation, Quantum & Interest</u>:   If any of the above claims is found to be substantiated, is the loss suffered by the Claimants caused by the acts or omissions of the Respondent and, if so, to what quantum of damages and interest are the Claimants entitled?

(d) <u>Costs</u>:   How and in what amount should the costs of the arbitration, including legal and other fees, be allocated as between the Parties?

## V.   Analysis and Discussion

114.   The Tribunal shall now discuss and determine each of these issues in turn.

115.   The summaries provided below canvas the Parties' principal arguments, as expressed in their written and oral submissions.   Due to the extensive nature of these submissions, the Tribunal does not intend to provide an exhaustive account of all arguments developed by the Parties in support of their respective positions.    The entirety of the Parties' submissions have, however, been taken into consideration by the Tribunal.

### A. Context of the Dispute

116.   In considering the Claimants' claims, the Respondent urges the Tribunal to consider the economics of the Claimants' investment.   Specifically, it notes that the price of crude oil exceeded $60/barrel in real terms several years before Erha started producing crude oil, which has resulted in a return to the Claimants on their investment far in excess of 12.5% (as much as 20.91% presently in OML 133) (<u>see</u> Statement of Defence, para. 8; Statement of Rejoinder, para. 27).

117.   The Claimants respond that they invested more than US$6.1 billion in the exploration and development of the Erha block on the basis of the rights and assurances contained in the PSC and accompanying documents (<u>see</u> Statement of Claim, para. 10; Cl. Pre-Hearing Br., para. 67).   Moreover, they aver that the Respondent's economic argument ignores the facts that NNPC is also doing better than anticipated, both Parties would be doing worse if the price of oil had evolved in a different direction, and such movements in price have no impact on the Parties' respective rights and obligations under the PSC in respect of how risk is allocated (<u>see</u> Cl. Post-Hearing Br., para. 17).

118.   The Claimants add that this dispute cannot be divorced from its "political context", submitting that the governmental status of NNPC and its relationship to other governmental agencies, such as the DPR and the FIRS, provide relevant context for understanding the PSC framework, NNPC's actions and the intervention of certain government agencies in this dispute (see Statement of Reply, para. 32; Cl. Pre-Hearing Br., para. 25).

119.   The Respondent denies that there is any "political context" to the dispute, submitting that its position reflects a policy that has been applied consistently since March 2006, when the Erha field started producing crude oil.  The Respondent notes that Sections 16(1) and (2) of the *Deep Offshore Act* provide for "periodic review" of the incentives granted by the Nigerian Government in the PSC.  As the Government has not interfered to date with the PSC, the Respondent reasons that no "political context" can be imputed to its position.

120.   Nevertheless, the Respondent strongly contends that the PSC cannot be isolated from the statutory framework applicable to it, as the OPL and OML, which form the very basis for the PSC, were granted pursuant to the provisions of the Petroleum Act.  The Respondent thus characterises these licences as the "substratum of the PSC", such that all laws governing the licences also govern the PSC (see Statement of Rejoinder, paras. 11-12).

121.   As regards NNPC's relationship with the DPR and the FIRS, the Respondent contends that it is entirely legitimate for these entities to "share an interest in maximizing the state's oil revenue", notwithstanding the Claimants' attempts to impugn the arm's-length nature of their interactions on this basis (see Statement of Rejoinder, paras. 26-27).

122.   The Tribunal has considered the Parties' respective characterisations of the present dispute and its context, including the status of NNPC as a government agency.   In considering the claims herein, however, the Tribunal shall be guided first and foremost by the express terms of the Parties' contract, applicable legislation and the specific documentary and witness evidence adduced in these proceedings.

### B. *Jurisdiction*

#### 1. The Respondent's Position

123.   The Respondent takes the position that the Tribunal lacks jurisdiction to adjudicate upon or otherwise determine the issues in dispute because the Claimants' claims must be submitted for adjudication to the Nigerian Tax Appeal Tribunal ("**TAT**"), pursuant to the *Federal Inland Revenue Services (Establishment) Act*, No. 13 of 2007 (the "**FIRS Act**") (see Statement of Defence, para. 1.3; Statement of Rejoinder, paras. 8 and 92; Exh. RL-1).   The Respondent relies upon a public announcement by the TAT, dated 23 November 2010, which identifies disputes arising from the PPT Act, among other tax laws, as within its jurisdiction (see Exh. RR-6).   The Respondent also relies upon the Fifth Schedule to the FIRS Act, which provides as follows at Section 11(1) (see Exh. RL-1; Statement of Rejoinder, para. 95):

> "11-(1) The Tribunal shall have power to adjudicate on disputes, and controversies arising from the following tax laws (hereinafter referred to as 'the tax laws') –
>
> (i)      Companies Income Tax Act, CAP, 60 LFN; 1990
>
> (ii)     Personal Income Tax Act No. 104, 1993
>
> (iii)    Petroleum Profits Tax Act CAP, 354 LFN; 1990;
>
> (iv)     Value Added Tax Act No. 102; 1993;
>
> (v)      Capital Gains Tax Act CAP, 42 LFN; 1990, and
>
> (vi)     any other law contained in or specified in the First Schedule to this Act or other laws made or to be made from time to time by the national Assembly.
>
> (2)      The Tribunal shall apply such provision of the tax laws referred to in subparagraph (1) of this paragraph as may be applicable in the determination or resolution of any dispute or controversy before it."

124.   The Respondent adds that, according to Section 10(2) of the *Interpretation Act*, Cap 123 LFN 2004, "[a]n enactment which confers power to do any act shall be construed as also conferring all such other powers as are reasonable [sic] necessary to enable that act to be done or are incidental to the doing of it."   The Respondent thus takes the view that the TAT has the exclusive power to interpret Nigerian tax legislation (see Statement of Rejoinder, para. 97).

125.    The Respondent avers that what is in dispute between the Parties is not the collection of a debt owing to FIRS, but rather the adjudication of disputes and controversies arising from tax legislation, consistent with Section 11(1) of the Fifth Schedule to the FIRS Act. Moreover, the Respondent submits that Section 35(a) of the Act, which provides that "[t]his act shall not affect any other law by virtue of which certain disputes – (a) may not be submitted to arbitration", ousts the jurisdiction of the Tribunal because the FIRS Act confers jurisdiction over PPT disputes on the TAT, including controversies such as the issues in dispute in this arbitration (see Statement of Rejoinder, para. 102).

126.    In response to the Claimants' assertion that their dispute can be "compromised lawfully by way of accord and satisfaction" so as to render the dispute arbitrable, the Respondent contends that "accord and satisfaction" cannot apply to PPT disputes, relying on the Black's Law Dictionary definition of accord and satisfaction (i.e., "An agreement to substitute for an existing debt some alternative form of discharging that debt, coupled with the actual discharge of the debt by the substituted performance. The new agreement is called the accord and the discharge is called the satisfaction." (see Statement of Rejoinder, para. 104).

127.    Alternatively, the Respondent contends that all of the disputes raised in this arbitration are disputes between the Claimants and the FIRS (see Statement of Defence, para. 1.3; Statement of Rejoinder, paras. 8 and 105).   The Respondent reasons that any decision rendered by the Tribunal in this proceeding will not bind the FIRS, which will remain "at liberty to take a completely different view from that of the Tribunal and insist upon its view being accepted by the parties" (see Resp. Pre-Hearing Br., para. 4.4).

128.    During the Hearing, the Respondent conceded that the Tribunal has jurisdiction over the dispute to the extent of those matters relating to interpretation of the PSC, such as which party to the PSC has the right to calculate lifting allocations, but averred that the Tribunal's jurisdiction does not extend to the "effect" of the dispute (see Tr. Day 1, pp. 117-118):

> "I may concede that the basis of the quarrel is this disagreement on the allocation of oil.  To that extent, your Lordships have the jurisdiction to look into that cause of the disagreement. Because that agreement was the

cause that gave rise to those four tranches of production my good friend has shown you. They all came out [of that].

THE CHAIRMAN: What you are saying, chief, is that this is a matter of interpretation of the contract?

CHIEF CLARKE: Well, my Lord, what I'm saying is that, to the extent that there is a dispute that your Lordships can look into, this dispute relates to the contract, and stops there. The effect of the dispute is what we are seeing on the board. And the effect is what we are telling your Lordships you cannot look into. You can look into the dispute, and what is the dispute? We are quarrelling as to who has the right to submit allocations. But the effect of the allocations is not within your purview, with respect, to look into, because they are all basically tax matters."

129.  The Respondent clarified in its post hearing submission that the impact of tax legislation on the Parties' rights and obligations has a "multiplier effect", because the computation of tax affects the calculation of cost oil, tax oil, royalties, the ITC, signature bonus, loan interest and non-operator costs (see Resp. Post-Hearing Br., Sec. 6).

130.  Finally, the Respondent argues that any monies received as a result of NNPC's royalty and tax oil liftings were passed on to the Nigerian Government, therefore any damages award would have to be satisfied through the Government, a third party to this proceeding (see Tr. Day 1, pp. 124-126):

"What we are seeing here is that whatever your Lordships come about, and say: go and pay $1.82 billion, because this is money not belonging to NNPC. Most of this overlifting they are talking about, it's money we have taken on behalf of the Government, as oil. We have sold it, and we have passed the money, royalty has been passed to the Ministry of Petroleum through DPR. Tax oil has been sold. The money has been passed to the tax people. It is not money we have.

Now, if you now say what we have done is wrong, and we don't own the money now, it means we have to go back to the tax people and say, look, money we have collected on your behalf as tax, the tribunal says it has to be paid to the contractors. And they are not parties to this.

So what we are saying is that one has to be careful, because the bridge ends here. The second bridge: how do we collect this money? Even if you say we should pay them 1.92 billion, which is overlifting of tax oil, which money did not enter our own pocket, but we paid it to the authorities. If you now ask us to pay it back to them, we never took it. So we have to go back to the man we paid to, and say, look, the arbitrators say we have -- so that's the problem we are trying to show you, with great respect. That one has to be very careful in assuming jurisdiction on these tax matters.

- 44 -

We don't have the money. We never kept the money. We were just agents of Government in collecting royalty oil and in collecting tax oil. Once we collect the oil, we sell them and we carry the money back to Government coffers.

So what are you going to ask us to pay back to them now? We have to go back, and that's the second bridge. How are we going to cross it? That is what we are trying to say here. You can assume jurisdiction to say, oh, there is a dispute arising from the lifting allocation. What it has triggered by the dispute, what it has triggered, are those four things, and they are all under PPT as the professor has rightly said, with respect. They are tax matters."

131. The Respondent went further in its closing submissions, taking the position that NNPC is not liable to the Claimants because NNPC is merely an agent of the Nigerian Government (see Tr. Day 3, p. 229).

132. In its post hearing submission, the Respondent suggested, for the first time in this arbitration, that any decision with respect to the alleged overlifting of crude oil would fall within the ambit of Section 251(1)(b) of the *Constitution of the Federal Republic of Nigeria, 1999* "which confers exclusive jurisdiction on the Federal High Court over such matters" (see Resp. Post-Hearing Br., p. 41). The Respondent subsequently added that the Constitution vests jurisdiction on the Federal High Court because any determination by the Tribunal on the Claimants' claims would require the interpretation and application of the PPT Act (see Resp. Reply to Cl. Supplemental Post-Hearing Br., para. 9).[4]

133. As regards the Claimants' stabilisation claim, the Respondent contends that this claim is "incompetent" because it was not commenced in accordance with Clause 19.2 of the PSC and cannot, in any event, be pursued concurrently with arbitration proceedings under

---

[4] Section 251(1)(b) of the *Constitution of the Federal Republic of Nigeria, 1999* provides as follows:

"251-(1)       Notwithstanding anything to the contrary contained in this Constitution and in addition to such other jurisdiction as may be conferred upon it by an Act of the National Assembly, the Federal High Court shall have and exercise jurisdiction to the exclusion of any other court in civil causes and matters—

[…]

(b)       connected with or pertaining to the taxation of companies and other bodies established or carrying on business in Nigeria and all other persons subject to Federal taxation;"

Clause 21 (see Statement of Defence, para. 1.5; Statement of Rejoinder, para. 18). Specifically, the Respondent claims that Clause 21 operates as an estoppel to a Clause 19.2 claim (see Resp. Post-Hearing Br., para. 5.4). The Respondent also notes that the FIRS has been issuing tax assessments on the PSC Contract Area since 2006, questioning when the alleged change took effect so as to trigger the 90-day period for the parties to seek to agree on a modification of the Contract (see Statement of Rejoinder, paras. 19.1, 21-22).

### 2. The Claimants' Position

134. The Claimants take the position that the issues in dispute, which implicate an application of the PPT Act and related legislation, are properly raised in these proceedings because the applicable fiscal regime has been enshrined within the PSC. The Claimants thus submit that the Respondent's position overlooks the reality that this is, in form and substance, a contractual dispute.

135. The Claimants note that the Respondent has, in fact, accepted the characterization of the present dispute as a contractual one, which implicates Nigerian tax law, referring to paragraph 14.6 of the Statement of Defence in which the Respondent states: "The Respondent contends that the parties differ as to the interpretation of provisions of certain tax statutes. It is this difference that is, primarily, responsible, for the dispute concerning the interpretation and/or performance of Clause 8.1(c) of the PSC".

136. The Claimants aver that none of the provisions of the FIRS Act vests the TAT with broad and exclusive jurisdiction over any dispute that may require an interpretation of the PPT Act. The Claimants contend that the TAT's jurisdiction extends only to disputes "arising from" the PPT Act, not those "relating to" or "in connection with" the Act. Thus, there are two types of actions that the TAT may hear: appeals from decisions of the FIRS and appeals by the FIRS. In their view, the Fifth Schedule to the FIRS Act simply does not create a body vested with broad jurisdiction to hear any and all disputes that in any way implicate Nigerian tax legislation. Nor does it provide that the TAT is vested with exclusive power to interpret Nigerian tax legislation. In respect of this latter point, the Claimants note that several provisions of the FIRS Act contemplate that the Federal High

- 46 -

Court also has the power to interpret and apply Nigerian tax legislation (see Statement of Reply, para. 284).

137.    The Claimants also note that tax issues are commonly arbitrated, observing that, in such cases, arbitrators distinguish between "purporting to exercise the power to administer the collection of taxes in tax returns, on the one hand, and exercising their unassailable 'jurisdiction to decide all contractual matters falling within the scope of the arbitration clause, even when such matters are relevant to the Tax Court', on the other" (see Statement of Reply, para. 284, quoting ICC Case No. 6223, Y.B. Comm. Arb'n XX (1995), Exh. LA-46, pp. 58-59). Thus, the fact that contractual issues may require consideration and interpretation of tax statutes has not been seen as a bar to arbitral jurisdiction.

138.    Although the Act does not identify specific non-arbitrable matters, the Claimants note that the Supreme Court of Nigeria has excluded certain classes of disputes from arbitration. However, tax disputes are not among those classes of disputes determined to be non-arbitrable. The Claimants refer in this regard to *Kano State Urban Development Board v. FANZ Construction Co*, [1990] 4 NWLR (Pt. 142) 1, where the Supreme Court cited favourably the following proposition from Halsbury's Laws of England (see Exh. LA-38, *FANZ*, p. 29):

> "A dispute or difference which the parties to an arbitration agreement agree to refer must consist of a justifiable issue triable civilly. A fair test of this is whether the difference can be compromised lawfully by way of accord and satisfaction. Thus, an indictment for an offence of a public nature cannot be the subject of an arbitration agreement."

139.    The Claimants note that the FIRS recently recognized that the present dispute, or a part thereof, is between the Contractor and the NNPC, advising the Contractor in response to its objection to the 2009 Notice of Assessment "that all areas of differences should be reconciled with NNPC …" (see Exh. C-132). The Claimants clarify that, to the extent they have any disputes with the FIRS, those disputes have been submitted to and will be heard by the TAT. The relief in those proceedings, *i.e.* revision of the Contractor's tax assessments, is relief that the Tribunal is not empowered to give. The Claimants aver that the overliftings by NNPC occurred independently of those assessments and the TAT has

no power in the proceedings before it to order NNPC to compensate the Contractor for past overliftings or to adjust its future liftings (see Statement of Reply, paras. 277-278).

140.    Indeed, the Claimants observe that the FIRS itself has argued in the pending TAT proceedings that the TAT's jurisdiction does not extend to contractual disputes between the Parties in view of the presence of the arbitration clause contained in the PSC, citing the following statement by the FIRS in the appeal of the Contractor's 2009 tax assessment before the TAT (see Cl. Pre-Hearing Br., para. 165, Exh. C-143):

> "There is an Agreement between the Appellants [Contractor] and Corporation [NNPC] that sets out the machinery for the settlement of disputes as stated in Clause 21 of the PSC Contract which provides for consultation and Arbitration....
>
> The Appellants cannot approach this tribunal unless and until the Appellants exhaust the provisions as stated in Clause 21 of the PSC Agreement."

141.    The Claimants aver that it is irrelevant for the purposes of the Tribunal's jurisdiction whether the money collected by NNPC has gone to a third party (see Tr. Day 3, p. 182). The Claimants insist that this case is about determining the tranches of production, not tax liability, and to the extent the production allocations are inconsistent with a Party's tax assessment, that issue may be the subject of an appeal to the TAT (see Tr. Day 3, pp. 182-183):

> "The case is about the determination of tranches of production. Royalty and cost oil are two tranches of the production which are determined before you get to tax oil. So of course they have an impact on tax oil, but tax oil does not have an impact on those tranches.
>
> The waterfall is clear. One tranche is calculated by reference to PPT liability as amended, contractually memorialised, but that is still, as I said in our opening, a tranche of production. So the distinction that must be drawn here is between, on the one hand, production allocation which is an issue only between the parties involving compensation for over-allocation by NNPC, whether or not NNPC tells you it can pay such an award or not. And to decide that, you don't need any bridges. You don't need to enter into any Gardens of Eden. You simply need to stay within the four corners of our contract.
>
> On the other hand, to the extent that tax assessments are inconsistent with that allocation of production, then that has to be the subject of appeal to the TAT. And that will result in a determination some years in the future. I'm told if it goes all the way up through the Nigerian legal

> system, many years in the future, and that will result, when finally determined, if the taxpayer is successful, in a refund of that taxation. Or a setting off against future tax responsibilities. Both of which will take into account the outcome of this contractual dispute, either by the FIRS or by these parties."

142. Finally, regarding Section 251 of the Constitution of Nigeria, the Claimants state that the Respondent's argument is based on a mischaracterization of the dispute, which the Claimants characterise as entirely contractual. The Claimants further contend that Section 251(1) of the Constitution establishes the jurisdiction of the Federal High Court as between itself and "*any other court*". Its function is therefore not to determine what categories of disputes are arbitrable but to allocate jurisdiction as between the various Nigerian judicial bodies (see Cl. Supplemental Post-Hearing Br., para.14).[5]

143. As regards the stabilization claim, the Claimants reject the Respondent's assertions that the Contractor improperly "reserved" its rights or that the Tribunal is incompetent to hear the Clause 19.2 claims. The Claimants aver there is no inconsistency, let alone an "estoppel", in proceeding under Clause 21 and bringing a stability claim under Clause 19.2. They note also that there is nothing in Clause 19.2 which would support an interpretation that the 90-day negotiation period is a limitation period (see Cl. Pre-Hearing Br., paras. 218-219).

144. Moreover, the Claimants contend there is no requirement under Clause 21 of the PSC or Nigerian law for the Contractor to commence new arbitral proceedings in relation to what is, in their view, an intrinsically related claim. For greater certainty, the Claimants submit that there are, in any event, compelling reasons for the Clause 19.2 claim to be determined along with the Contractor's primary claim, namely: both claims are based on the same factual matrix and NNPC will suffer no prejudice as a result of the Tribunal considering the stabilisation claim once the 90-day negotiation window has expired, *i.e.,* 10 November 2010.

---

[5] Because the Respondent invoked Section 251 of the Constitution of Nigeria for the first time in this arbitration in its post hearing submission (see para 131, *supra*), the Tribunal invited the Claimants to respond to this argument on 11 July 2011, which the Claimants did on 25 July 2011. The Tribunal then invited the Respondent to reply to the Claimants' response, which the Respondent did on 2 August 2011.

145.   The Claimants submit that this claim is not an "afterthought", explaining that the first sign of a change in policy by FIRS was its assessments of 2008 and 2009, which were respectively communicated to the Contractor in July 2009 and July 2010.  The change was only confirmed in the FIRS letter of May 2010 (see Cl. Pre-Hearing Br., para. 220).

### 3.  Discussion

146.   The Parties agree that the Tribunal has jurisdiction to consider their dispute concerning the allocation of crude oil.  The Tribunal understands this to mean that it may consider and determine whether the Claimants are solely entitled to determine lifting allocations. The Respondent contends, however, that the Tribunal is precluded from taking the next step, in the event of a finding in favour of the Claimants, and assessing any damages flowing from that finding or rendering a binding declaration as to the Parties' respective entitlements going forward.

147.   Section 12 of the Act establishes that the Tribunal is competent to rule on questions pertaining to its jurisdiction.

148.   Clause 21 of the PSC provides that the Tribunal has jurisdiction over "a difference or dispute between the CORPORATION and the CONTRACTOR, concerning the interpretation or performance of this Contract."  Clause 21 of the PSC does not selectively limit the Tribunal's jurisdiction so as to preclude its consideration of matters touching on Nigerian tax legislation.  It simply provides that "[t]he arbitration award shall be binding upon the parties ..." (see Exh. C-1).  Therefore, any limitation on the Tribunal's jurisdiction must flow from Nigerian law, if at all.

149.   Section 11(1) of the Fifth Schedule of the FIRS Act empowers the TAT to adjudicate on "disputes or controversies arising from the ... Petroleum Profits Tax Act CAP, 354 LFN; 1990" (see Exh. RL-1).  Two observations are apposite on the face of this provision. First, Section 11(1) does not purport to confer exclusive jurisdiction over disputes or controversies arising from the PPT Act on the TAT.  The Public Announcement referred to by the Respondent goes no further than the FIRS Act.

150.   Similarly, Section 10(2) of the *Interpretation Act* does not confer exclusive jurisdiction over disputes arising under the PPT Act on the TAT.  Rather, it simply recognizes that in

order for an adjudicative body's jurisdiction to be effective it must be assumed to have all powers necessary or incidental to the exercise its jurisdiction. It is not "necessary" in order for the TAT to exercise jurisdiction over a dispute arising under the PPT Act that it have exclusive jurisdiction over that dispute.

151. Second, Section 11(1) does not purport to confer jurisdiction – much less exclusive jurisdiction – on the TAT over disputes or controversies arising in connection with or relating to the PPT Act. Rather, the language of the provision is much narrower, conferring jurisdiction on the TAT only in respect of those matters "arising under" the PPT Act.

152. Section 35(a) of the Act is of no further assistance to the Respondent in that there is no apparent conflict between it and the FIRS Act. The question remains whether, despite the neutrality of the language in Section 11(1) of the Fifth Schedule to the FIRS Act, the present dispute is nonetheless inarbitrable under Nigerian law so as to oust jurisdiction from the Tribunal.

153. In *Kano State Urban Development Board v. Fanz Construction Co. Ltd.*, [1990] 4 NWLR 1, the Supreme Court of Nigeria adopted a test for arbitrability based on Halsbury's *Laws of England*, 4th ed. (see Exh. LA-38):

> As to the nature of the dispute or difference the same work says at page 256 paragraph 503:-
>
> 503.   The dispute or difference which the parties to an arbitration agreement agree to refer must consist of a justiciable issue triable civilly. A fair test of this is whether the difference can be compromised lawfully by way of accord and satisfaction. Thus an indictment for an offence of a public nature cannot be the subject of an arbitration agreement, nor can disputes arising out of an illegal contract nor disputes arising under agreements void as being by way of gaming or wagering. Equally, disputes leading up to change of status, such as a divorce petition, cannot be referred, nor, it seems, can any agreement purporting to give an arbitrator the right to give a judgment in *rem*. Similarly, there is no dispute within the meaning of an agreement to refer disputes where there is no controversy in being, as when a party admits liability but simply fails to pay, or when a cause of action has disappeared owing to the application, where it now continues to apply, of the maxim *action personalis moritur cum persona*." (emphasis added)

154.    Although the Supreme Court left open the category of matters that may be considered to be non-arbitrable, in adopting the test for arbitrability set out in Halsbury's *Laws of England* it provided some guidance as to the class of disputes that are likely to fall within the parameters of arbitrable disputes in Nigeria, *i.e.*, disputes that are triable civilly or capable of settlement by way of accord and satisfaction.

155.    It is recalled that the present dispute is between the Contractor and NNPC, not the Contractor and the FIRS (a third-party to this proceeding), and relates to the interpretation and performance of the PSC. The Respondent conceded this much in its Pre-Hearing Brief, despite maintaining its position that the Tribunal lacks jurisdiction (see Resp. Pre-Hearing Br., para. 3.7):

> "There are no substantial disputes about the facts of this case. The Respondent accepts that the parties disagree about the interpretation and construction of provisions of the PSC as well as of certain Nigerian statutes. The disputes are therefore, essentially, disputes as to the proper construction of the PSC in the light of applicable Nigerian statutory and other regulatory provisions. The Respondent contends not only that, given the nature of these disputes, this Tribunal is not the proper forum in which they should be determined and lacks the jurisdiction to adjudicate thereon, but also, in any event, that its interpretation and construction of the PSC and the relevant statutory and regulatory provisions is correct." (emphasis added)

156.    Each of the allegations made by the Claimants in their Statement of Claim is anchored in a provision of the PSC. For example, the overlifting claim turns on the interpretation of Article III of Annex C; the royalty oil allocation claim turns on the interpretation of Article III(1) of Annex B and Clause 8.1(b); the cost oil allocation claim turns on the interpretation of Article IV(5)(b) of Annex B and Clause 8.1(b); the tax oil allocation claim turns on the interpretation of Article III(2)(a) of Annex B, Clause 8.1(c) and Clause 15.2(a); the profit oil allocation claim turns on the interpretation of Clause 8.1(f) of the PSC; and the PPT Computation claim turns on the interpretation of Article III(2) of Annex B.

157.    It is clear as a matter of Nigerian law that, "it is the Statement of Claim that determines the jurisdiction of the court, in other words, the jurisdiction to entertain any suit or matter." (see *Stabilini Visinoni Limited v Federal Board of Inland Revenue*, [2009] 13 NWLR (Pt. 1157) 200, Court of Appeal (Ibadan Division), at 222, Exh. LA-62).

158.   The fact that elements of the dispute relate to tax matters and require some consideration of Nigerian tax legislation does not transform the dispute from a contractual dispute into a tax dispute.[6]

159.   Finally, the Tribunal finds unpersuasive the Respondent's argument based on Section 251 of the Constitution of Nigeria.

160.   Section 251(1)(b) of the Constitution of Nigeria confers jurisdiction to the Federal High Court "*to the exclusion of any other court*" over matters "*connected with or pertaining to the taxation of companies*" (see Exh. LA-8). It does not, by its terms, preclude this arbitral Tribunal from assuming jurisdiction over the present contractual dispute.

161.   Moreover, the Tribunal notes that Section 251 is located in Part I of the Chapter on the *Judicature* which attributes jurisdiction to Nigeria's various Federal Courts, namely the Supreme Court of Nigeria, the Court of Appeal of Nigeria, the Federal High Court, the High Court of the Federal Capital Territory, the Sharia Court of Appeal of the Federal Capital Territory and the Customary Court of Appeal. This is in contrast to Part II which addresses the jurisdiction of State Courts. Section 251 thus attributes jurisdiction to the Federal High Court in the context of attributing jurisdiction to the various courts of law in Nigeria, and does not relate to the arbitrability of the enumerated subject matters.

162.   In any event, the Tribunal finds that in the stipulation "*to the exclusion of any other court*" at Section 251(1) of the Constitution, the word "court" does not include privately constituted arbitral tribunals, such as the present Tribunal (see Exh. LA-8). This is plainly confirmed by the references to "tribunals" in other sections of the Constitution, such as Section 36(1), which specifically refers to "*a court or other tribunal established by law*" (see Exh. LA-8).

---

[6] Although, as noted earlier in this award, the present reference is a domestic arbitration, it is nevertheless of interest to note that this is a well accepted proposition in international arbitration proceedings (see Final Award of 1992 in ICC Case No. 6233, para. 3, Exh. LA 46; and *Chevron Corp. (USA) and Texaco Petroleum Co. (USA) v. The Republic of Ecuador*, UNCITRAL, PCA Case No. 34877 (US/Ecuador BIT), Partial Award on the Merits, (20 March 2010), para. 554: see Tr. Day 3, pp. 123-124).

163.  For all these reasons, the Tribunal finds that the dispute, properly characterised as a contractual dispute as opposed to a tax dispute, is triable civilly, is capable of being compromised by way of accord and satisfaction, and is therefore arbitrable.

164.  The Tribunal now turns to the Respondent's arguments concerning the potential impact of an award rendered by the Tribunal (see the Resp. Pre-Hearing Br., para. 4.4; and the Resp. Reply to the Cl. Supplemental Post-Hearing Br., para.12(b)).  The fact that third parties may be affected by an award rendered by the Tribunal does not undermine the Tribunal's jurisdiction to make an award binding on the Parties in the first place, nor does it absolve the Respondent of liability in the event the Tribunal finds liability in this case.

165.  The Tribunal notes that the FIRS has also, in another forum, taken the view that at least some of the matters in dispute are subject to the Tribunal's jurisdiction.  Specifically, in its reply to the Contractor's appeal before the TAT of its 2009 Notice of Assessment, the FIRS sought an order dismissing the appeal "as incompetent in its entirety" on the grounds the Contractor had not availed itself of Clause 21 of the PSC (see Exh. C-143):

> "1.  There is an Agreement between the Appellants and Corporation that sets out the machinery for the settlements of disputes as stated in Clause 21 of the PSC Contract which provides for consultation and Arbitration.
>
> 2.  In addition Annex D Article IV(2) provides that in event the Corporation disagrees with any of the contractor's reports, the area of disagreement shall be mutually resolved by the Appellants and the Corporation to the satisfaction of the Ministry. The Appellant shall thereafter prepare a revised report to reflect the changes agreed.
>
> 3.  The Appellants have failed, neglected and refused to adopt and exhaust the provisions of the said clause to the commencement of this Appeal.
>
> 4. The Appellants cannot approach this tribunal unless and until the Appellants exhaust the provisions as stated in Clause 21 of the PSC." [7]

166.  The FIRS also asserted that the Contractor lacked standing to bring the appeal.  During the Hearing, Mr. Dike, Director of the FIRS, explained that the Contractor cannot bring a complaint to the TAT independent of the NNPC.  In other words, using Mr. Dike's analogy, the Contractor is a minor without capacity to stand on its own before the TAT

---

[7] The Tribunal has not been informed of any decision by the TAT in this matter.

absent its parent's (NNPC's) consent (see Tr. Day 2, pp. 103-104).  NNPC is, however, under no obligation to give its consent.

167.    The Tribunal notes, in respect of the pending administrative proceedings before the TAT, the Claimants' submission that double recovery is not being sought (see Cl. Post-Hearing Br., para. 140; Tr. Day 3, pp. 185-186):

> "...
>
> (b) If in due course the judgment of those proceedings accords with the view the Contractor urges this Tribunal to adopt – that the FIRS' assessments have got it wrong – the result will be a right of NNPC and the Contractor to a refund of tax overpaid or a setoff of those overpayments against future tax liability. To the extent that the Contractor has recovered damages from NNPC as a result of this arbitration, that can be taken into account by the FIRS and the Parties at the time of processing any such refund or setoff.
>
> (c) If, however, the Contractor is eventually unsuccessful at the TAT and in any subsequent appeals, then the impact of that will depend on how it affects the allocation of future production. If that assessment and the interpretation of the PPT Act it reflects are effectively imposed on the PSC Parties going forward and NNPC's lifting proceeds on the basis of it, then that would give rise to a new claim under Clause 19.2 of the PSC that would fall to a future arbitral tribunal to adjudicate. Such an outcome would not alter this Tribunal's judgment as to the contractual allocation of production pursuant to the PSC."

168.    The Respondent did not take issue with this reasoning during the Hearing, nor did it contest the FIRS' ability to manage any risk of double recovery in the event the Claimants are successful in this arbitration through set-off.

169.    Accordingly, the Tribunal finds that it has jurisdiction over the Claimants' claims under Clause 21 of the PSC.

170.    As regards the Claimants' stabilisation claim, the Respondent objects to its admissibility on two grounds: (1) the claim cannot be brought in the absence of a formal application by the Contractor to amend its Statement of Claim; and (2) Clause 19.2 cannot be invoked concurrently with Clause 21, as the latter clause operates as an estoppel.

171.    Section 19(3) of the Act provides that a claim may be amended or supplemented:

- 55 -

> "Unless otherwise agreed by the parties, a party may amend or supplement his claim or defence during the course of the arbitral proceedings if the arbitral tribunal considers it appropriate to allow such amendment or supplement having regard to the time that has elapsed before the making of the amendment or supplement."

172.  The Act does not impose any additional requirements, such as a requirement that the Statement of Claim or Defence be formally amended.

173.  It has been submitted by the Claimant, and is uncontested by the Respondent, that this provision is based on Article 20 of the UNCITRAL Arbitration Rules, which provides as follows:

> During the course of the arbitral proceedings either party may amend or supplement his claim or defence unless the arbitral tribunal considers it inappropriate to allow such amendment having regard to the delay in making it or prejudice to the other party or any other circumstances. However, a claim may not be amended in such a manner that the amended claim falls outside the scope of the arbitral clause or separate arbitration agreement.

174.  The Tribunal considers it appropriate to interpret Section 19.3 of the Act consistently with Article 20 of the UNCITRAL Arbitration Rules.   No formal amendment requirements are found in Article 20 of the UNCITRAL Arbitration Rules.

175.  The only *prima facie* limitation to accepting an amendment pursuant to Article 20 of the UNCITRAL Arbitration Rules is if the amended claim falls outside the arbitration clause or is found in a separate arbitration agreement.[8]

---

[8] The Tribunal notes the following in the commentary to Article 20 of the UNCITRAL Arbitration Rules (see David D. Caron, Lee M. Caplan and M. Pellonpaa, *The UNCITRAL Arbitration Rules: A Commentary*, Oxford University Press, 2006, p. 470):

> "An amendment found to fall under the arbitration clause or agreement should be accepted unless it is inappropriate to do so on the grounds of: (1) delay, (2) prejudice to the other party, or (3) any other circumstances. In the words of the Iran-US Claims Tribunal, "the Tribunal must consider whether the other Party would be prejudiced by the proposed amendment, whether the other party has had an opportunity to respond to the newly-added or amended claim, and whether the proposed amendment would needlessly disrupt or delay the arbitral process." The amendment may be inappropriate on a single ground, although in practice more often than not a combination of various interrelated grounds will lead to its rejection."

176.   As noted earlier in this Award, the Claimants adverted to their stabilisation claim in their Statement of Claim, although they did not plead it fully until their Statement of Reply (see Statement of Claim, para. 127).

177.   The Tribunal considers that the Respondent had sufficient notice of the claim and opportunity to respond in full in its various written submissions (*i.e.*, the Statement of Rejoinder, Pre-Hearing Brief, and Post-Hearing Brief), as well as during the Hearing, and therefore has suffered no prejudice by virtue of the Claimants' claim being admitted.

178.   With respect to the Respondent's second argument that Clause 19.2 cannot be invoked concurrently with Clause 21 because of the common law principle of "issue estoppel", the Tribunal notes that the Respondent has not referred the Tribunal to any provision in the PSC or any Nigerian precedent in support of its proposition.  Clause 21 could operate as an estoppel to the bringing of a separate claim under Clause 19.2 if some decision had been rendered in respect of the issue or cause of action.  In this case, no decision or determination had been made by the Tribunal at the time the Claimants raised their stabilization claim.  This argument is therefore rejected.

179.   Accordingly, the Tribunal finds that it also has jurisdiction to hear the Claimants' alternative and additional claims under Clause 19.2 of the PSC.

180.   The Respondent's jurisdictional objections are therefore dismissed and the Tribunal has jurisdiction to hear the Claimants' main claims pursuant to Clause 21 of the PSC, as well as their alternative and additional claims pursuant to Clause 19.2 of the PSC.

### C. Liability

#### 1.  Enforcement of the PSC

##### a)  The Respondent's Position

181.   The Respondent submits that Clause 2.4 of the PSC, which provides that the Contractor is engaged in "Petroleum Operations", is inconsistent with Section 2 of the PPT Act, which defines "Petroleum Operations" as "the winning or obtaining and transportation of petroleum or chargeable oil in Nigeria by or on behalf of a company for its own account". According to the Respondent, the Contractor has not, at any time, been engaged in

petroleum operations for its own account and is therefore not subject to PPT liability nor entitled to tax benefits under the PPT Act. Rather, pursuant to Clause 2.1 of the PSC, its is engaged as an agent of NNPC, and is therefore engaged in petroleum operations for NNPC's account, not for its own account.

182. The Respondent describes Clause 2.4 as a "hangover" from the traditional joint venture arrangements in existence prior to the advent of production sharing contracts, such as the Erha PSC (see Statement of Defence, para. 4.2(a); Tr. Day 1, p. 134). Under those arrangements, both joint venture partners had title to the OPL/OML and were considered to be engaged in petroleum operations within the meaning of the PPT Act. As a result, the Respondent argues that Clause 2.4 of the PSC is unenforceable. The Respondent submits that the legislation enacted to give effect to the terms of the PSC (i.e., Decree No. 9 or the *Deep Offshore Act*) failed to give Clause 2.4 the necessary validity to overcome this inconsistency (see Statement of Defence, para. 4.6(2)).

183. The Respondent further explains that under the terms of the PSC, NNPC holds the OPL and the OML to explore and develop the Erha contract area. As the sole licence holder, the Respondent submits that only NNPC is engaged in petroleum operations. The Respondent also refers to Sections 5 and 11 of the First Schedule of the Petroleum Act, which give the holder of an OPL and the lessee of an OML the exclusive right to explore and prospect for petroleum within the licence area (see Statement of Defence, para. 4.3(b)).

184. The Respondent adds that the Contractor does not – and cannot – have an interest in the petroleum reserves because the Nigerian Constitution provides that all petroleum *in situ* in Nigeria belongs exclusively to the Federal Government (see Statement of Rejoinder, para. 42). The Respondent acknowledges, however, that the Contractor has an economic interest in the development and production of crude oil from the contract area (see Resp. Pre-Hearing Br., para. 5.9).

185. The Respondent dismisses the Claimants' reliance on Clause 11.1 of the PSC and the Second Memorandum, arguing that the Contractor does not own the equipment used in "petroleum operations", but rather has a contractor's lien over the equipment, and therefore is not assisted by these provisions (see Statement of Rejoinder, para. 45-47).

*b)  The Claimants' Position*

186.   The Claimants submit that the PSC and its implementing legislation support the view that the Contractor is engaged in "Petroleum Operations" within the meaning of the PPT Act. Specifically, the Claimants note that Clause 2.1 of the PSC provides for "Petroleum Operations and provision of financial and technical requirements by the CONTRACTOR"; Clause 5.1 contemplates that the annual Work Programme and Budget will "set[] forth the Petroleum Operations which CONTRACTOR proposed to carry out"; Clause 6.1(c) records that the Management Committee will ensure that "the CONTRACTOR … conducts Petroleum Operations pursuant to this Contract"; and Clause 7.1(c) states that the Contractor is to "carry out approved Work Programmes", which themselves "itemiz[e] the petroleum operations to be carried out in the Contract Area" (see Statement of Reply, para. 53; Exh. RC-1).

187.   As regards Nigerian legislation, the Claimants submit that Decree No. 9 (now the *Deep Offshore Act*) establishes that both the Contractor and NNPC are considered to carry out petroleum operations under the PSC (see Statement of Reply, paras. 64-65).   For example, Section 12 provides that the "chargeable tax on petroleum operations in the contract area under the Production Sharing Contracts shall be split between the Corporation … and the Contractor in the same ratio as the split of profit oil as defined in the Production Sharing Contract between them."   The Claimants argue that the *Deep Offshore Act* confirms that the PPT Act applies to all operations pursuant to the PSC in the manner provided for in the PSC and that, by virtue of its Sections 1 and 15, the *Deep Offshore Act* prevails over any inconsistent legislation, including the PPT Act.   The Claimants aver that there has been no legislative failure in the enactment of the *Deep Offshore Act.*

188.   As a practical matter, the Claimants also submit that the Contractor has a clear economic interest in the development of petroleum deposits in the contract area, as reflected in Clause 2.3 of the PSC.   The Claimants aver there is no inconsistency in NNPC holding the OPL and OML and in eventually taking title to the equipment used in Petroleum Operations, on the one hand, and the Contractor conducting Petroleum Operations for its own account, on the other hand.   The Claimants observe that Clause 11.1 of the PSC states that both the Contractor and NNPC have the right to use equipment for Petroleum

Operations and, in any event, pursuant to the Second Memorandum the Contractor retains ownership of the equipment for Petroleum Operations until the end of the PSC or until the cost thereof is fully recovered (see Statement of Reply, paras. 77-78).

189.    The Claimants contest the Respondent's interpretation of Sections 5 and 11 of the First Schedule to the Petroleum Act, reasoning that these provisions have nothing to do with who is deemed to conduct Petroleum Operations. Rather, the Claimants submit that these provisions are aimed at establishing the license or leaseholder's exclusivity in the contract area vis-à-vis others who may have been granted permission to prospect for or exploit petroleum resources in the area (see Statement of Reply, para. 85; Exh. LA-18).

190.    Moreover, the Claimants argue that the Respondent takes an overly narrow reading of Section 2 of the PPT Act, emphasizing that "Petroleum Operations" include tasks performed by a company on behalf of another company, *i.e.* an agent, which is still considered to be performing those tasks for its own account (see Statement of Reply, para. 81; Exh. LA-17).

191.    The Claimants submit that the Respondent is, in effect, asking the Tribunal to declare the entire PSC unenforceable, reasoning that a provision specifying the applicable fiscal regime is undoubtedly fundamental to the PSC and not subject to severance. The Claimants add that the Respondent itself was unable to say whether Clause 2.4 is severable from the rest of the PSC when asked during the Hearing (see Cl. Post-Hearing Br., para. 32; Tr. Day 1, pp. 135-136; Day 3, p. 221).

### c)    Discussion

192.    The Respondent appears, in essence, to take the position that the Contractor does not conduct petroleum operations for its own account because it is an agent of NNPC, and Clause 2.4 of the PSC therefore gives rise to an inconsistency with Section 2 of the PPT Act the effect of which is to render Clause 2.4 void *ab initio*.

193.    Clause 2.4 of the PSC provides as follows:

> "The CONTRACTOR is engaged in Petroleum Operations pursuant to the Petroleum Profits Tax Act 1959 Cap 354 Laws of the Federation of Nigeria 1990 ("PPT Act") as amended and accordingly the Companies

Income Tax Act 1979 Cap 60 Laws of the Federation of Nigeria 1990, as amended, shall have no application."

194.    Section 2 of the PPT Act defines "Petroleum Operations" as follows (see Exh. LA-17):

> "... the winning or obtaining and transportation of petroleum or chargeable oil in Nigeria <u>by or on behalf of a company for its own account</u> by any drilling, mining, extracting or other like operations or process, not including refining at a refinery, in the course of a business carried on by the company engaged in such operations, and all operations incidental thereto and any sale of or any disposal of chargeable oil by or on behalf of the company;" (emphasis added)

195.    The qualification that a company engaged in the winning or obtaining and transportation of petroleum be so engaged "for its own account" is not, in the Tribunal's opinion, inconsistent with a company performing such tasks as an agent of another company. On the contrary, Section 2 appears to contemplate precisely such an arrangement. The Act does not, however, provide any guidance as to what being engaged for one's "own account" means. The Respondent offers no explanation as to the meaning of this term, resting primarily on its position that the Contractor cannot be engaged for its own account if it is engaged on behalf of NNPC. However, the Claimants suggest that this phrase plainly refers to a company engaged in petroleum operations for a share in the profits as opposed to a service arrangement in which the company is guaranteed payment for services rendered (see Cl. Post-Hearing Br., para. 75).

196.    Clauses 2.1 and 2.3 of the PSC confirm that the Contractor is engaged in Petroleum Operations on behalf of NNPC and has an "economic interest" in the development of petroleum deposits in the Contract Area (see Exh. C-1):

> "2.1 This Contract is a Product Sharing Contract governed in accordance with the terms and provisions hereof. Petroleum Operations and provision of financial and technical requirements by the CONTRACTOR in accordance with the terms of this Contract shall be in consultation with the CORPORATION. The CORPORATION, as holder of all rights in and to the Contract Area, hereby appoints and constitutes the CONTRACTOR the exclusive company to conduct Petroleum Operations in the Contract Area.
>
> ...
>
> 2.3 The CONTRACTOR shall provide funds and bear the risk of Operating Costs required to carry out Petroleum Operations and shall

therefore have an economic interest in development of Crude Oil deposits in the Contract Area."

197.   Moreover, Clause 8.1 of the PSC affirms that the Contractor is entitled to a share of any Profit Oil, being the balance of available crude oil after the deduction of royalty, cost and tax oil.

198.   The Tribunal finds this interpretation of the PPT Act and the PSC to be compelling.[9]

199.   Mr. Dike, the Director of the FIRS, was also cross-examined on this issue. After initially refusing to answer whether the Contractor was engaged in Petroleum Operations, Mr. Dike finally stated that he was not qualified to answer this question (see Tr. Day 2, pp. 57-61). However, he later testified that the Contractor is, in essence, an agent of NNPC, and therefore not a company engaged in Petroleum Operations for its own account (see Tr. Day 2, p 102):

> "Q.  Let's walk through the grounds, because in this document the FIRS is, first of all, confirming in ground 1 that the appellants – that's the contractors under the Erha PSC – are indeed companies engaged in petroleum operations. This is particulars 2 on page 1680 – are indeed companies engaged in petroleum operations to which the Petroleum Profits Tax Act and the Deep Offshore Act applies.
>
> You don't disagree with him, do you?
>
> A.  I think there's a need for some kind of clarity there. Companies as companies, and then companies who are in their own individual rights winning or obtaining a licence to engage in petroleum operations for their own account, and then companies acting as agents of another entity.
>
> So to that extent, I don't agree that there is – a company may be a company engaged in a petroleum licence, you know, so to do. But I then assumes a different life under a different engagement.
>
> Q. So you would read that as saying the appellants being companies engaged as agents in petroleum operations?
>
> A. If you so say.
>
> Q. What do you say?

---

[9]  While the Tribunal in no way relies on it in making this Award, it notes that its conclusion in this regard is confirmed by expert evidence adduced in these proceedings (see Expert Report of Justice Uwaifo, para. 5.5; and Tr. Day 3, pp. 91-92).

A. Well, your words, You put the words. And I adopt your words."

200.  Aside from the apparent contradiction between this testimony and the language of Section 2 of the PPT Act, as well as Mr. Dike's own admission that he is not competent to express an opinion on the matter, the document put to Mr. Dike (*i.e.*, the FIRS' Reply to the Contractor's Notice of Appeal concerning its 2009 Tax Assessment) does not contain such a distinction. Rather, the document appears to confirm that the Contractor *is* engaged in "Petroleum Operations" within the meaning of the PPT Act (see Exh. C-143):

> "That the Appellants being companies engaged in petroleum operations, the Petroleum Profits Tax Act and the Deep Offshore and Inland basin production Sharing Contracts Act applies in ascertaining the education tax payable by the appellants pursuant to S.1(3) of the Education tax Act."

201.  Sections 5 and 11 of the First Schedule of the Petroleum Act do not shed any additional light on the alleged inconsistency between Clause 2.4 of the PSC and Section 2 of the PPT Act. These provisions establish the exclusivity of the rights of licence and lease-holders to explore and prospect for petroleum, but do not speak to who conducts petroleum operations for the purposes of the PPT Act.

202.  Finally, despite some suggestion that there was a legislative failure in enacting the *Deep Offshore Act*, the Respondent itself relies on this Act in support of various elements of its case, including for the proposition that certain inconsistent provisions of the PPT Act must give way to provisions of the *Deep Offshore Act* (see e.g., Resp. Pre-Hearing Br., para. 8.5). In its post-hearing submissions, the Respondent also relies on the *Deep Offshore Act* in support of its contention that the Act gave legislative effect to the fiscal incentives in the Letter of Guarantee, thereby rendering the Guarantee no longer relevant (see Resp. Post-Hearing Br., para. 2.4). The Tribunal sees no basis on which to conclude that the *Deep Offshore Act* failed to accomplish its purpose of "giv[ing] effect to certain fiscal incentives given to the oil and gas companies operating in the Deep Offshore and Inland Basin areas under production sharing contracts between the Nigerian national Petroleum Corporation or other companies holding oil prospecting licenses or oil mining leases and various petroleum exploration and production companies." Moreover, Sections 1 and 15 of the *Deep Offshore Act* clearly establish its priority over all other Nigerian legislation to the extent of any inconsistency, including the PPT Act.

203. Based on the foregoing, the Tribunal concludes that the Contractor is indeed engaged in "Petroleum Operations", within the meaning of Section 2 of the PPT Act and therefore Clause 2.4 of the PSC is valid.  The consequences of this finding are discussed in detail below.

### 2.  The Lifting Allocation Claim

#### a)  The Claimants' Position

204. The Claimants take the position that the Respondent has breached the PSC by disregarding the Contractor's Lifting Allocation and unilaterally overlifting production. The Claimants explain that the Respondent has accomplished this by threatening a *de facto* shut-in of production.  The Claimants rely on Articles III(3) and III(4) of Annex C of the PSC, which contemplate that "the CONTRACTOR shall notify the CORPORATION of the estimated Lifting Allocation and each Party shall notify the other of its Primary Nomination of Available Crude Oil which it intends to lift … which shall not exceed its estimated Lifting Allocation" (see Statement of Claim, paras. 142-143; Statement of Rejoinder, para. 105; Exh. C-1).  The Claimants add that in estimating the Lifting Allocation, the Contractor is required pursuant to the terms of Clause 8 and Annex B to determine the amount of oil to be lifted by the Contractor and/or NNPC in respect of each tranche of oil (see Cl. Post-Hearing Br., para. 49(c)).

205. The Claimants disagree that the procedure set out in Annex C of the PSC was abandoned or modified, averring that the changes to Annex C were limited to timing and meeting format changes, *i.e.* moving to monthly rather than quarterly lifting allocation meetings, in order to streamline the process and make it more competitive with processes in Angola (see Statement of Rejoinder, paras. 108-109).

206. As regards the Respondent's argument that the Contractor unilaterally amended the PSC by introducing its entitlement model without NNPC's approval, the Claimants explain that the entitlement model is "simply a tool to track and implement" Clause 8.1 of the PSC and its related provisions in Annexes B and C.  In any event, the Claimants assert that they discussed the entitlement model with NNPC in 2006 and while NNPC indicated that it did not agree with certain inputs, it did not object to the model itself or its use (see Statement of Reply, para. 114).

- 64 -

207.   Turning to the Respondent's arguments in connection with the *Petroleum (Drilling and Production) Regulations*, the Claimants argue that the Regulations do not alter the Parties' agreement that the Contractor will determine the prospective Lifting Allocations for both Parties.  Moreover, the Claimants contend that there is no inconsistency between NNPC's regulatory obligations and the contractual allocation of responsibility to the Contractor to prepare Lifting Allocations (see Statement of Reply, paras. 118-121).

208.   The Claimants dismiss the Respondent's reliance on other provisions of the PSC in support of its position that NNPC has approval rights in respect of Lifting Allocations. Specifically, the Claimants describe Article 1.1 of the PSC as a "general, introductory statement" which fails to address the specific allocation of rights and obligations set out in Annex C.  Similarly, the Claimants contend that Article IV.2 of Annex D and Article IV of Annex B have nothing to do with the prospective Lifting Allocations determined by the Contractor under Annex C.  Rather, in their view, these provisions relate to NNPC's right to approve and/or challenge reports and lifting allocation schedules submitted by the Contractor *retrospectively* in order to, for example, reconcile Lifting Allocations with actual liftings.  Overall, the Claimants submit that Annex B reinforces the Contractor's role in determining Lifting Allocations by referring back to the Contractor's rights under Annex C to designate the Parties' Lifting Allocations (see Statement of Rejoinder, paras. 125-134).

209.   With regard to Article IV.4 of Annex C, the Claimants note the "inconsistency" in the Respondent's reliance on this provision while simultaneously claiming that Annex C has been abandoned.  Substantively, however, the Claimants contend that this provision addresses potential disagreement between the Parties in respect of how much Available Crude Oil was actually lifted and imposes no limitation on the Contractor's right to determine Lifting Allocations prospectively (see Statement of Rejoinder, paras. 135-138).

### b)   The Respondent's Position

210.   According to the Respondent, the Parties' differing positions in respect of Lifting Allocations have been evident since 2005 when the Claimants created a different entitlement model. Although these issues have been discussed between the Parties, the Respondent contends that it decided to insist upon enforcing its rights by rejecting the

Claimants' interpretation of the PSC and implementing its own interpretation thereof, which has been accepted by the FIRS (see Statement of Defence, para. 9.4; Exh. RC-1).

211.   The Respondent submits that, prior to production in 2006, the Contractor and NNPC agreed, "by their conduct", to disregard or abandon the allocation procedure set out in Annex C to the PSC.  The Respondent further contends that the Contractor "unilaterally modified" the PSC in breach of Clause 22.2 by developing an entitlement model without NNPC's approval, which was required by Section 15.2 of the *Petroleum (Drilling and Production) Regulations* (see Statement of Defence, para. 8.6-8.8; Exh. LA-11).

212.   The Respondent also relies upon Section 15.2 *Petroleum (Drilling and Production) Regulations* in support of its position that the Contractor's lifting allocations have to be approved by NNPC.  Section 15.2 provides as follows (see Exh. LA-11):

> "15- (2) The licensee or lessee may exercise any of his rights or powers through agents or independent contractors, but shall be responsible for all the actions of the agents and contractors in question."

213.   The Respondent further refers to Section 53 of the *Petroleum (Drilling and Production) Regulations*, which provides that NNPC is obligated to "keep full accurate accounts" of crude oil produced in the Contract Area, for the proposition that the Claimants' Lifting Allocation must be approved by the Respondent (see Exh. LA-11).  This is reinforced, in the Respondent's view, by Article I(1) of Annex C to the PSC, which provides that "… the *parties* shall allocate all lifting of available crude oil …" (Respondent's emphasis). In other words, the Lifting Allocation is not a unilateral act of the Claimants (see Statement of Defence, paras. 9.2; Statement of Rejoinder, paras. 61-62).

214.   The Respondent notes that Clause 8 of the PSC provides that "the allocation of Available Crude Oil shall be in accordance with the *Accounting Procedure (Annex 'B')*, the *Allocation Procedure, Annex 'C'* and this Clause 8".  Thus, the Respondent takes the position that the allocation procedure is dependent upon the accounting provisions set out under Article IV.1 of Annex B to the PSC, which requires that a monthly accounting analysis be submitted to NNPC for its consideration and approval (see Statement of Defence, para. 10.5).

215.   The Respondent also relies upon the text of Article IV(2) of Annex D to the PSC, which refers to six statements or reports the Contractor is required to submit to NNPC for approval, which include reports setting out "Lifting Against Available Crude Oil" and "Each Party's Allocation of Available Crude Oil" (see Statement of Defence, paras. 9.4; Statement of Rejoinder, para. 63).

216.   Based on the foregoing, the Respondent contends that it was entitled to approve the accounting analysis, the allocation of proceeds from lifting and, therefore, also the allocation, nomination and lifting of crude oil.   As the Claimants submitted monthly accounting analyses pursuant to Article IV.1 of Annex B for approval to NNPC (which approval was never given), the Respondent submits that the Claimants have recognized this right.   The Respondent denies therefore that it is in breach of the provisions of the PSC or that its actions have deprived the Claimants of any right under Clause 7.1(i). Moreover, it maintains that its actions, challenged by the Claimants as "overlifting," were entirely consistent with the provisions of the PSC and applicable statutory provisions (see Statement of Defence, paras. 10.7-11.1).

### c)   Discussion

217.   The Claimants contend on the basis of the PSC that they have the sole right under the PSC to determine the Lifting Allocation procedure whereby Royalty Oil, Cost Oil, Tax Oil, and Profit Oil are respectively designated to be lifted.   The Respondent, by contrast, submits that the regulatory and legislative framework surrounding the PSC imposes certain obligations on NNPC which result in it having a say in the Lifting Allocations.

218.   Clause 8.1 of the PSC provides that the "allocation of Available Crude Oil shall be in accordance with the Accounting Procedure (Annex B), the Allocation Procedure (Annex C) and this Clause 8" of the PSC (see Exh. C-1).   The remainder of Clause 8.1 describes the allocation of each tranche of oil as between the Contractor and NNPC and does not further specify who is responsible for making the initial allocation.   Annexes B and C shall therefore be examined in turn.

219.   Article III.1 of Annex B provides that the Contractor is responsible for computing the amount of Royalty and Concession Rentals payable to NNPC pursuant to Clause 8.1.

Article III.2(a) of Annex B further specifies that it is the Contractor's responsibility to calculate the PPT payable by NNPC pursuant to Clause 8.1 of the PSC. These provisions appear to establish, at a minimum, an obligation on the Contractor to calculate amounts due for the payment of royalties and PPT on crude oil lifted.

220.   Article IV.1 of Annex B, on which the Respondent relies, states that (see Exh. C-1):

> "[a] monthly accounting analysis in the form of schedule B-1 attached to this accounting Procedure shall be prepared by the Contractor and furnished to the Corporation within sixty (60 days) of the end of the period covered by such analysis for consideration and approval." (emphasis added)

221.   Article IV.1 appears to establish an accounting reconciliation procedure, providing for the retrospective consideration and approval by NNPC of the Contractor's monthly accounting analysis. Indeed, Schedule B-1, the form in which the Contractor is to submit its monthly accounting analysis, records the "Lifting Summary" for the reporting month and "Allocation of Proceeds" as between the Contractor and NNPC, including any carry-over to future months. This provision does not confer on NNPC the right or obligation to prospectively estimate Lifting Allocations. Article IV.3, which stipulates that the allocation of the quantity of Available Crude Oil to each party pursuant to Clause 8 "shall be according to and governed by provisions of the Allocation Procedure", reinforces this conclusion (see Exh. C-1).

222.   Turning to Annex C, which contains the Allocation Procedure, Article I(1) provides that (see Exh. C-1):

> "[t]his Allocation Procedure ("this Procedure") sets out the methods for the allocation of Available Crude Oil from the Contract Area and the Parties shall allocate all lifting of Available Crude Oil in accordance with this Procedure and the Contract".

223.   Article III of Annex C sets out the Lifting Allocation procedure in detail. Article III(3) states that "the Contractor shall notify the CORPORATION of the estimated Lifting Allocation" and "indicat[e] the estimated Royalty Oil, Tax Oil, Cost Oil and Profit Oil …". Article III(4) states that a Party's lifting nomination "shall not exceed its estimated Lifting Allocation" (see Exh. C-1).

- 68 -

224. Article I(1) of Annex C therefore appears to direct the Parties to lift in accordance with the procedure described in Article III, which establishes that the Contractor is both entitled and obligated to estimate Lifting Allocations for the Parties. The Respondent's only obligations under Article III are to lift its own Lifting Allocation and to not exceed that Allocation.

225. Annex D sets out the nomination, ship scheduling and lifting procedure for the Parties. Article IV.2 of Annex D states that (see Exh. C-1):

> "[i]n the event the CORPORATION disagrees with any of the CONTRACTOR'S reports, the area of disagreement shall be mutually resolved by the CONTRACTOR and the CORPORATION to the satisfaction of the Ministry. The CONTRACTOR shall thereafter prepare a revised report to reflect the changes agreed."

226. The "reports" referred to in Article IV.2 are identified in Article IV.1 as follows (see Exh. C-1):

> "The CONTRACTOR shall, not more than fifteen (15) working days after the end of each calendar month, and quarter, prepare and furnish to the CORPORATION a written statement showing in respect of the month and quarter respectively:
>
> (a) Production Quota: each Party's allocation of Commercial Production Quota;
>
> (b) Lifting against Available Crude Oil;
>
> (c) Each Party's allocation of Available Crude Oil;
>
> (d) Quantity of Crude Oil in Stock for each Party at the end of the said calendar month or quarter;
>
> (e) Any production losses attributable to Crude Oil used in Petroleum Operations; and
>
> (f) Cumulative production."

227. As with the accounting procedure in Annex B, Article IV.2 establishes a mechanism by which discrepancies may be reconciled by the Parties retrospectively. This is reinforced by Clause 8.7, which states that the Parties "shall meet on a monthly or quarterly basis as may be agreed to reconcile all Crude Oil allocated and lifted during the period as per Article III(7) of Annex D." (see Exh. C-1).

228. The above provisions all indicate that the Claimants have both the right and the responsibility to estimate Lifting Allocations for both itself and NNPC, to the exclusion of any such right by NNPC. The only rights held by the Respondent under the PSC in respect of Lifting Allocations are retrospective in nature, whereas it has a positive obligation under the terms of the PSC to respect the Contractor's Lifting Allocation estimate and to only lift that amount to which it is entitled in a given period based on that estimate.

229. Beyond the terms of the PSC, the Respondent argues that Sections 15.2 and 53 of the *Petroleum (Drilling and Production) Regulations* entitle it to estimate Lifting Allocations. These provisions are not, however, apposite to the issue of who is responsible for estimating Lifting Allocations. Section 15.2 of the Regulations relates only to NNPC's legal liability for the acts of its agents, not to the allocation of rights and responsibilities under the PSC; additionally, Section 53 appears to confirm NNPC's role as set out in Annex B and Annex D of the PSC to retrospectively consider and, as the case may be, approve certain reports submitted by the Contractor (see Exh. LA-11).

230. With respect to the entitlement model used by the Contractor, the evidence suggests that the model is a tool to calculate the allocation of oil production and, as such, aids in the implementation of the PSC; it is not, as the Respondent contends, a unilateral amendment to or modification of the PSC (see Tr. Day 1, p. 198; Day 3, p. 188). In addition, written and oral evidence confirm that the format and timing changes to the Lifting Allocation process were not made unilaterally by the Contractor but were, in fact, made at NNPC's request (see Tr. Day 1, pp. 176-77; Day 2, p. 184; Witness Statement of Francis Usoro, paras. 11-120; Witness Statement of Adedoyin Lawal, paras. 21-22).

231. Based on the foregoing, the Tribunal concludes that the PSC vests in the Contractor the exclusive right (and duty) to determine Lifting Allocations.

232. NNPC does not dispute that it has disregarded the Contractor's Lifting Allocations for all four "tranches" of oil – Royalty Oil, Cost Oil, Tax Oil, and Profit Oil – and has lifted oil in accordance with its own determinations instead. Accordingly, the Tribunal finds that NNPC has breached the PSC and that the Contractor is entitled to damages representing the difference between what NNPC actually lifted and what it was entitled to lift pursuant

to the Contractor's allocations.  The quantum of these damages is discussed in detail in Section V.D.3 below.

### 3.  The Production Tranches Claim

233.  This claim, in essence, seeks to quantify the consequences of the Respondent's breach of the Lifting Allocation procedure.  The Tribunal shall consider and determine each tranche of crude oil which forms the basis of the Lifting Allocations in turn.

#### a)  *The Royalty Regime*

##### (i)      The Claimants' Position

234.  The Claimants submit that the royalty regime in the PSC, and in particular the establishment of a 0% royalty rate for Petroleum Operations in water of 1000 metres depth or greater, was required by the Contractor and included by the Government of Nigeria as an incentive for ultra-deep water exploration and development.  According to the Claimants, this sliding scale, based on water depth, is reflected in Article III(1) of Annex B and Clause 15.1 of the PSC, and enables the parties to apply different rates to different fields within different areas of the "Contract Area" (see Statement of Claim, paras. 211-212; Exh. C-1).

235.  The Claimants submit that the parties consciously used the term "areas" as opposed to the defined term "Contract Area" in Clause 15.1, which refers to the whole licensed area subject to the PSC.  The Claimants reason that, had the parties intended that a single royalty rate should apply to the entire "Contract Area", there would have been no reason to establish a regressive scale of different royalty rates in Clause 15.1.  Furthermore, the Claimants observe that the mechanisms set forth in Annex B to the PSC contemplate various royalty amounts, on a graduated basis, and cannot be construed as setting a single royalty rate across the entire "Contract Area" (see Statement of Claim, para. 216).

236.  According to the Claimants, the above terms are mirrored in Section 5(1) of the *Deep Offshore Act*, and confirmed in Section 61(3) of the *Petroleum (Drilling and Production) Regulations*, which specifies how royalty is to be calculated (see Cl. Post-Hearing Br., paras. 65 and 68).

237. The Claimants recall that there are three different fields within the "Contract Area" (Erha, Erha North and Bosi), each with distinct hydrocarbon accumulation at a different pressure, a different depth and physically separated by significant areas on non-porous subsoil and/or water. Erha lies entirely beyond the 1000-metre depth, therefore the Claimants assert that no royalty is due in connection with production from this field. As Bosi is not yet producing, no royalty is yet due in connection with production from this field, leaving only Erha North. As a small section of Erha North straddles the 1000-metre depth contour, the Claimants submit that royalty of 0.331% is payable on production from this field (see Statement of Claim, paras. 217-221; Cl. Post-Hearing Br., para. 70).

238. With respect to the calculation of royalty payable, the Claimants contend that it is the Contractor's responsibility to compute this amount under the PSC. The Claimants therefore submit that NNPC's application of a 1% royalty rate on all Crude Oil produced under the PSC is both irrational for its lack of substantiation and contrary to the terms of the PSC. Moreover, the Claimants contend that, pursuant to Section 61(2) of the *Petroleum (Drilling and Production) Regulations*, NNPC, as the licence holder, is obliged only to pay the amount of Royalty that is not disputed by the Contractor until such time as the dispute with the DPR is resolved (see Statement of Claim, paras. 222-224; Cl. Pre-Hearing Br., para. 99; Exh. LA-11). This is reinforced, in the Claimants' view, by several provisions of the PSC, including Clause 7.2(e), which prohibits NNPC from "exercise[ing] all or any of its rights or authority over the Contract Area in derogation of the rights of the Contract"; Clause 15.4, which provides that NNPC pays royalty on behalf of itself and the Contractor, thereby establishing an agency relationship and duty by NNPC towards the Contractor; Clause 21, which requires the Parties to seek to resolve disputes amicably, failing which the matter must be referred to arbitration; and Article III of Annex C, which provides that NNPC is obliged to comply with the Contractor's Lifting Allocations, including allocation as to royalty (see Cl. Pre-Hearing Br., para. 99; Exh. C-1).

(ii)     The Respondent's Position

239. The Respondent accepts the royalty regime as described in Clause 15.1 of the PSC but, as royalties are administered by the Ministry of Petroleum Resources, it relies on the DPR's

position as to the administration of the royalty regime (see Statement of Defence, para. 17.1; Statement of Rejoinder, para. 75).

240.   Pursuant to Section 61(2) of the *Petroleum (Drilling and Production) Regulations*, the Respondent, as the licensee or lessee of OML 133, admitted that a 1% royalty rate was payable.  In the Respondent's view, it cannot be held in breach of the PSC for complying with its statutory obligations (see Resp. Post-Hearing Br., para. 4.1).

241.   The Respondent avers that the absence of the word "field" from the *Deep Offshore Act* is relevant in view of Section 15 of that Act, which provides that the provisions of the *Deep Offshore Act* prevail over any inconsistent legislative enactments, irrespective of the language of the *Petroleum (Drilling and production) Regulations*, which it describes as "subsidiary legislation" (see ibid.).

242.   Additionally, the Respondent submits that the Regulations contemplate more than one OML being derived from an OPL, which is why "Contract Area" is defined in the PSC as "the area of the OPL and any OML(s) derived therefrom".  The Respondent reasons that reference will be made to "areas" and royalties in those areas, but these are not synonymous with reference to "fields" (see ibid.).

(iii)   Discussion

243.   The Claimants take the position that royalties are to be assessed on a sliding scale according to the water depth of those areas constituting the Contract Area, in an amount estimated by the Contractor.  The Respondent takes the view that it is obligated by law to pay royalties in whatever amount it "admits" to be due where royalties are disputed with the DPR, and has admitted, consistent with the DPR's position, that royalties of 1% are due.

244.   As a preliminary matter, the Parties appear to agree that the regime set out in Clause 15.1 of the PSC governs the payment of royalties.  Clause 15.1 establishes a graduated scale of royalty rates according to "areas" of water depth.  In areas deeper than 1000 metres, no royalty is payable by either NNPC or the Contractor.  In areas between 801 and 1000 metres of depth, royalty of 4% is payable to DPR.  As the water depth of an area becomes shallower, the royalty amount increases.  This scheme is reproduced at Section 5(1) of the

- 73 -

*Deep Offshore Act.* Together, these provisions establish that royalties are payable on the basis of the water depth in a given "area" (see Exh. LA-*9bis*; Exh. C-1).

245.    The Claimants have adduced evidence indicating that during the negotiation of the PSC, the Parties considered the implications of an area that straddled two water depths for the purpose of assessing royalties (*i.e.*, multiple fields within an area of the Contract Area). Mr. Turner, who was involved in negotiating the PSC on behalf of Exxon, provided the following written evidence concerning the Parties' negotiations (see Witness Statement of Edwin B. Turner, paras. 42-44):

> "As notes above, the PSC clearly stated that the royalty rates would apply per "area", which is to be contrasted with the use of the defined term "Contract Area" wherever the PSC referred to entire Block 209. This distinction between the "area" applicable for royalty rates and the entire block was consistent with industry-wide practice of calculating royalties on the basis of the fields within a block where there are different rates based on physical characteristics, such as water depth or daily production.
>
> This view was expressly confirmed during an exchange I had with the Deputy Director of the DPR, Mr. Richard Adelu. In this meeting, on 2 February 1993, I asked Mr. Adelu a question raised by Louis Smith during his review of the January 1993 PSC where he queried how royalty would be addressed in circumstances where a field straddled a depth contour and thus fell within more than one tranche for royalty calculations.
>
> Mr. Adelu indicated that the determination of royalty in this situation would be addressed "as and when the issue actually arose". Mr. Adelu did not take issue with the premise of my question, i.e. where a field within the block straddled a depth contour. This premise only makes sense if royalty is being assessed on a field by field rather than block-wide basis. This was consistent with what at the time would have been absolutely obvious to myself, Mr. Adela and all the individuals involved in the negotiations: i.e. that royalty was to be assessed on a field by field basis." [footnotes omitted]

246.    Mr. Turner was called to testify during the Hearing. However, the Respondent elected not to cross-examine him on the above evidence, nor did the Respondent produce any evidence to demonstrate that this is an inaccurate account of the Parties' negotiations.

247.    The Tribunal agrees with the Claimants that where the Parties intended to refer to the entire Contract Area for any purpose, they have done so explicitly. The Tribunal also accepts the Claimants' evidence that the Parties intended for royalties to be assessed on

an area-by-area basis, as is reflected on the face of the PSC and the *Deep Offshore Act*, and that areas within the Contract Area may be comprised of multiple fields at varying water depths.

248.   The question remains whether the Respondent was required to accept the Contractor's assessment of royalties payable, that is 0.333% assessed only on production from the Erha North field, until such time as the dispute with the DPR is resolved.

249.   The Tribunal notes that Section 61 of the *Petroleum (Drilling and Production) Regulations*, on which both the Claimants and the Respondent rely, provides in relevant part as follows (<u>see</u> Exh. LA-11):

> "61- (1) The licensee or lesse shall pay to the Minister not more than one month after the end of every quarter (including the quarter in which his license or lease becomes effective), or otherwise as the Minister may direct –
>
> (a)     a royalty rate *per centum* of the chargeable value (calculated in accordance with paragraph (3) of this regulation of the crude oil and casing-head petroleum spirit, produced from the relevant are in the relevant period as follows –
>
> [...]
>
> (2) If any dispute arises as to the amount of royalty due for a quarter, the licensee or lessee –
>
> (a) shall pay within the time provided by or under paragraph (1) of this regulation whatever he admits to be due; and
>
> (b) where on the settlement of the dispute by agreement, arbitration or otherwise, any further amount is agreed or found to be due, shall pay that further amount within seven days of the settlement."

250.   The Claimants emphasize the contractual relationship between the Parties, including certain duties they allege NNPC owes the Contractor to abide by the Contractor's estimate of royalties payable; the Respondent emphasizes the plain language of the Regulations, which speaks only to the licensee or lessee's obligation to pay those royalties "admit[ted]" pending resolution of a dispute over royalties payable.

251.   It is abundantly clear to the Tribunal that there are two distinct relationships here.   There is a relationship between NNPC and the Government which is governed by the *Petroleum*

*(Drilling and Production) Regulations* and the relationship between NNPC and the Claimants which is governed by the PSC.

252.    Accordingly, Section 61 of the *Petroleum (Drilling and Production) Regulations* addresses the Respondent's obligation, as licensee to the Government, to pay royalties to the Minister at the end of every quarter.  In the event of a dispute, Section 61(2) provides that the Respondent shall pay to the Minister whatever the Respondent admits to be due.

253.    The Regulations do not govern the obligations as between the Claimants and the Respondent (see Exh. LA-11).  It is rather the PSC that determines the obligations of these two Parties, as between themselves, in relation to computation and payment of royalties.  Article III of Annex B clearly establishes that "the CONTRACTOR shall compute the amount of Royalty … payable by the CORPORATION pursuant to Clause 8.1 of this Contract".  This is reinforced by Article III(3) of Annex C, which provides that the Contractor is the Party responsible for estimating Lifting Allocations, including the quantity of Royalty Oil that is to be lifted in a given period.  The Parties are specifically precluded from lifting quantities of crude oil in respect of any tranche of oil in excess of the Contractor's estimated amount (see Exh. C-1).

254.    Based on the terms of the PSC, the Respondent does not have the autonomy to unilaterally determine or admit royalties payable on production from a given area in contradiction to the Contractor's estimate of royalties payable (see Exh. C-1).

255.    Accordingly, the Tribunal finds that the Respondent breached the terms of the PSC by lifting a quantity of crude oil as Royalty Oil in excess of the amount estimated by the Contractor, pending resolution of the dispute with the DPR concerning royalties owing.

### b)   The Cost Oil Regime

#### (i)    The Claimants' Position

256.    The Claimants contend that, pursuant to Clause 8.1(b) of the PSC, the Contractor is entitled to recover all of its operating costs as Cost Oil, subject to the retrospective audit provided for in Clause 13.2 of the PSC.  The Claimants note in this regard that the Respondent does not dispute that the Contractor is entitled to recover all of its operating costs through Cost Oil, such that there is no justification for NNPC to lift on the basis of

a Cost Oil figure that does not fully reflect the Contractor's operating costs (<u>see</u> Statement of Claim, para. 73; Statement of Rejoinder, paras. 179-183; Tr. Day 1, pp. 112, 130).

257.  The Claimants submit that any reliance by the Respondent on the FIRS letter of 24 May 2010 is misplaced because the Contractor's entitlement to lift Cost Oil is a "wholly contractual issue that in no way implicates Nigerian tax law" (<u>see</u> Statement of Rejoinder, paras. 186).

258.  As regards the Respondent's arguments concerning the validity of Clause 8.1(e) of the PSC, which provides that "[t]he CONTRACTOR shall for PPT purposes be entitled to consolidate OPL 209 and any OMLs derived therefrom", the Claimants contend that if the Contractor were not able to "consolidate" the OPL with the resulting OML in respect of the Contract Area for purposes of cost recovery, it would *never* be able to recover the exploration costs incurred in finding the oil in the first place (<u>see</u> Statement of Rejoinder, paras. 191; Exh. C-1).

(ii)     The Respondent's Position

259.  The Respondent submits that the only costs which may properly be taken into account in the computation of operating costs for the purpose of allocating an amount of Cost Oil are those costs incurred in respect of the petroleum operations in OML 133.  However, the Respondent avers that the Contractor has not, at any time, been engaged in petroleum operations "for its own account", so as to come within the definition of "Petroleum Operations" under the PPT Act (<u>see</u> Resp. Pre-Hearing Br., para. 4.5).  This is, in essence, the same argument the Respondent advanced in defence of the Lifting Allocation claim (<u>see</u> paragraph 181 *et seq.* above).

260.  The Respondent takes the position that Cost Oil is a tax issue and therefore the interpretation of Clause 8.1(b) of the PSC is a matter for the FIRS, to be made pursuant to the provisions of the FIRS Act.  In this regard, the Respondent notes that the FIRS agrees with the Respondent's position, as set out in its May 24th letter (<u>see</u> Exh. RL-1).  The Respondent adds that, pursuant to Section 15.2 of the *Petroleum (Production and Drilling) Regulations*, the Respondent is responsible for all acts of the Contractor,

including its allocation of Cost Oil, and therefore the Contractor is not entitled to unilaterally estimate lifting allocations (<u>see</u> Post Hearing Br., para. 4.2).

261.   In any event, the Respondent contends that the Contractor is not entitled to consolidate OPL 209 and the OML(s) derived therefrom "for PPT purposes" or for any other purpose, notwithstanding the language of Clause 8.1(e) (<u>see</u> Statement of Defence, para. 12.6).   Alternatively, the Respondent avers that, as the Contractor is not engaged in "Petroleum Operations" for the purposes of the PPT Act, it is not subject to PPT under Section 8 of the Act and therefore is not entitled to consolidate OPL 209 and OMLs derived therefrom for PPT purposes (<u>see</u> Statement of Defence, para. 12.7; Statement of Rejoinder, paras. 37-39, 51-52; Resp. Pre-Hearing Br., para. 5.9; Exh. LA-17).

262.   In the further alternative, the Respondent contends that Section 3(1) of the *Deep Offshore Act* provides for PPT to be applicable in a "contract area".   The Respondent's interpretation of this provision would yield the same result as its argument above, in that the consolidation of costs from more than one licence or lease is not contemplated in the applicable statutory framework (<u>see</u> Statement of Defence, para. 12.8).

(iii)   Discussion

263.   The Claimants take the position that they are entitled to recover all of their costs in Cost Oil, as estimated by them.   The Tribunal notes that in its Statement of Defence the Respondent admitted that the Claimants were entitled to recover their costs (<u>see</u> Statement of Defence at para. 8.3), but later in the arbitration it contended that this is a tax issue and the amount of any recovery is ultimately to be determined by the FIRS, not unilaterally by the Contractor.

264.   Clauses 8.1(b), (d) and (e) of the PSC provide as follows (<u>see</u> Exh. C-1):

> "(b)  Cost Oil shall be allocated to the CONTRACTOR in such quantum as will generate an amount of Proceeds sufficient for recovery of Operating Costs in OPL 209 any OMLs derived therefrom.  All operating Costs expended in U.S. Dollars will be recovered in U.S. Dollars through Cost Oil allocations.
>
> ...

(d) All approved expenses incurred on the OPLs for exploration activities prior to the Effective Date of this Contract shall be recoverable as Operating Cost by the CONTRACTOR from Cost Oil under this Contract. Such cost shall be capitalised and recoverable in accordance with the PPT Act 1959 as amended.

(e) The CONTRACTOR shall for PPT purposes be entitled to consolidate OPL 209 and any OMLs derived therefrom. ''

265.   Operating Costs are defined in Clause 1 of the PSC as "expenditures made and obligations incurred in carrying out Petroleum Operations as determined in accordance with the Accounting Procedure". Article II of Annex B, which contains the Accounting Procedure, further states that Operating Costs are "all costs, expenses paid and obligations incurred by the CONTRACTOR in carrying out Petroleum Operations and shall consist of (1) Non-Capital Costs, and (2) Capital Costs" (see Exh. C-1).

266.   As discussed above, the Tribunal has already determined that the Contractor is carrying out "Petroleum Operations" within the meaning of the PPT Act (see paragraph 203 above). Accordingly, the Respondent's objections relating to the definition of Petroleum Operations are rejected.

267.   During the Hearing, the Respondent agreed that the Contractor is entitled to recover "every penny spent by them ... in the PSC" (see Tr. Day 1, pp. 112, 130). Nonetheless, the Respondent maintains the view that the FIRS is the ultimate arbiter of what costs are recoverable as Cost Oil, not the Contractor, and that the initial estimate of the amount recoverable through Lifting Allocation is a shared right as between NNPC and the Contractor under the PSC. The latter contention appears to be based on Section 15.2 of the *Petroleum (Drilling and Production) Regulations*. As noted above, Section 15.2 of the Regulations provides that the NNPC is "responsible for all the actions" of its contractors (see Exh. LA-11).

268.   The Respondent is not, however, vested with a right or power under the PSC or its surrounding legislative framework to estimate Lifting Allocations, including Cost Oil. Its responsibility for the acts of the Contractor is engaged in respect of those particular rights and powers held by NNPC and delegated to the Contractor. As discussed above, the right or power to estimate Lifting Allocations is allocated to the Contractor under the PSC.

269.   As regards the FIRS, it is irrelevant for the purposes of the Contractor's estimate of Cost Oil whether the FIRS subsequently disagrees with how Cost Oil has been calculated. The Contractor is entitled, based on the terms of the PSC, to estimate Lifting Allocations, including Cost Oil, in an amount sufficient to recover its Operating Costs, as defined in the PSC, in OPL 209 and any OMLs derived therefrom.

270.   It may well be that there are tax consequences arising from the recovery of certain costs. However, it appears that such consequences within the scheme established by the PSC and its implementing legislation are to be taken into account in the estimation of Tax Oil to be lifted. For example, Section 8 of the *Deep Offshore Act* establishes that "Cost Oil shall be allocated to the contractor in such quantum as shall generate an amount of proceeds sufficient for the recovery of operating costs in oil prospecting licences as defined in the production sharing contracts and any oil mining leases derived therefrom." Section 11 then confirms that royalty, concession rental and PPT shall be paid out of royalty oil and tax oil – not cost oil. The Act therefore maintains the priority or "waterfall" established in the PSC (see Exh. LA-*9bis*).

271.   Accordingly, the Tribunal determines that the Respondent has breached the terms of the PSC by reducing the Cost Oil to be lifted by the Contractor, as estimated by the Contractor, through the lifting of an excess amount of Tax Oil.

c)   *The Tax Oil Regime*

(i)   The Claimants' Position

272.   The Claimants submit that Clause 8.1(c), Clause 15.2(a) and Article III(2)(b) of Annex B of the PSC provide that Tax Oil is to be calculated by reference to liability for PPT pursuant to the PPT Act. The Claimants aver that there is no dispute that PPT is assessed on the total revenues of undivided production from the Contract Area and on the profit attributable to both NNPC and the Contractor such that tax reliefs are necessarily shared by both Parties (see Cl. Post-Hearing Br., para. 90(c)).

273.   The Claimants take the position that NNPC is obligated to lift Tax Oil only in a manner that complies with the PPT Act, contending that NNPC has misapplied the PPT Act in

several ways: (1) by using the ITC to reduce annual capital allowances; (2) by misallocating annual capital allowances; and (3) by failing to deduct certain costs.

274.   Beginning with the ITC, the Claimants submit that the difference in approach taken by the Contractor and NNPC in computing the ITC reflects their differing views as to whether the full asset cost remains to be depreciated or whether the ITC reduces the depreciable asset base, thereby significantly lessening the tax relief effect of the ITC. The Claimants take the position that Clause 15 provides that the ITC operates as a full tax credit, as confirmed by the Letter of Guarantee, which acknowledges that the inclusion of the fiscal incentives in the PSC, including the ITC rate, required amendments to the then-existing Nigerian law (see Statement of Claim, paras. 162-164; Exh. C-2).

275.   The Claimants explain that, in 1993, the PPT Act comprised the PPT Act 1959 and two amendments (i.e., the Petroleum Profits Tax (Amendment) (No. 2) Decree No. 24 of 1979 ("**Decree No. 24**") and the Petroleum Profits Tax (Amendment) (No. 3) Decree No. 95 of 1979 ("**Decree No. 95**")). The PPT Act provided for an "initial allowance" regime with no requirement that allowances be offset against the cost of assets prior to calculating the depreciable asset base. Decree No. 24 introduced the ITC regime, providing that the ITC shall be deducted from the cost of the asset to arrive at the amount of the qualifying expenditure and before calculating annual allowance. Decree No. 24 also provided that the ITC would be a credit against tax payable and not a charge against income (see Exh. LA-17; Exh. LA-2; Exh. LA-3).

276.   These provisions of Decree No. 24 were subsequently replaced by the following paragraph in Decree No. 95 (see Exh. LA-3):

   "5 – In the Second Schedule to the principle Act –

   (a) for paragraph 5 thereof, there shall be substituted the following new paragraph –

   5. Subject to the provisions of this Schedule, where in any accounting period of a company, the company owning any asset has incurred in respect thereof qualifying expenditure wholly, necessarily and exclusively for the purposes of petroleum operations carried on by it, there shall be due to that company for the accounting period in which such expenditure was incurred, an investment tax credit for the purpose

- 81 -

of section 17(2) at the appointment [sic] rate per centum of such expenditure as set out in Table 1 to this Schedule."

277. The Claimants explain that, in this way, Decree No. 95 revoked the provision by which the ITC would be deducted from qualifying capital expenditure to arrive at a depreciable asset base. However, from the period beginning in 1993, three new decrees were introduced relevant to the application of the ITC. Decree No. 31, enacted in 1996, replaced the ITC regime with a Petroleum Investment Allowance regime that created a less valuable tax deduction (see Exh. LA-7). Decree No. 9, enacted in 1999 (*i.e.*, the *Deep Offshore Act*), retroactively re-instated the ITC regime for PSCs entered into before 1 July 1998, providing as follows (see Exh. LA-9*bis*):

> "4-(1) Where the Nigerian National Petroleum Corporation (in this Act referred to as 'the Corporation') or the Holder and the Contractor have incurred any qualifying capital expenditure wholly, exclusively and necessarily for the purposes of petroleum operations carried out under the terms of a Production Sharing Contract in the Deep Offshore or Inland Basin, there shall be due to the Parties in respect of the Production Sharing Contracts executed prior to 1st July 1998, a credit (in this Decree referred to as 'Investment Tax Credit') at a flat rate of 50 per cent of the qualifying expenditure in accordance with the Production Sharing Contract terms for the accounting period in which that asset was first used for the purposes of such operations."

278. Finally, Decree No. 30, also enacted in 1999, amended the PPT Act to again provide for an ITC rate of 50% through the following provision (see Exh. LA-10):

> "20.-(1). A crude oil producing company which executed a Production Sharing Contract with the Nigerian National Petroleum Corporation in 1993 shall, throughout the duration of the Production Sharing Contract, be entitled to claim an investment tax credit allowance as an offset against tax in accordance with the provisions of the Production Sharing Contract.
>
> (2) The investment tax credit rate applicable to the contract area shall be fifty percent flat rate of chargeable profit for the duration of the Production Sharing Contract.
>
> (3) In computing the tax payable, the investment tax credit shall be applicable in full to petroleum operations in the contract area such that the chargeable tax is the amount of the assessable tax less the investment tax credit.
>
> (4) The chargeable tax computed under subsection (3) of this section shall be spilt [sic] between the Nigerian National Petroleum Corporation

and the crude oil producing company in accordance with the proportion of the percentage of profit oil split.

(5) In this section –

'contract area' means the contract area as defined in the Production Sharing Contract;

'Production Sharing Contract' has the meaning assigned to it in the Deep Offshore and Inland Basin Production Sharing Contracts Decree 1999."

279.   The Claimants observe that there is no provision in Decree No. 30 requiring the ITC to be offset against or deducted from capital expenditures prior to depreciation.  Moreover, the PPT Act, as amended, does not require that the ITC operate as an offset against capital expenditures prior to reducing the depreciable asset base (see Exh. LA-17; Exh. LA-10).

280.   Finally, the Claimants contend that a review of the practice of international oil companies operating in Nigeria under joint venture agreements from 1987 to 1994, as well as leading treatises on Nigerian tax law, confirms that both pre- and post-PSC the ITC was calculated without any deductions of capital expenditures for the purpose of depreciation (see Statement of Claim, paras. 191-203).

281.   In response to the Respondent's contention that the Contractor is not liable to pay PPT and is therefore not entitled to take advantage of the ITC, the Claimants explain that one of the focal points of the negotiation of the PSC was the issue of whether the ITC would be shared with NNPC or whether it could be claimed solely by the Contractor.  The Claimants note that the January 1993 negotiating draft of the PSC presented by the Government of Nigeria provided specifically that the benefit of the ITC would be "shared with NNPC, a non-investing party, through the profit sharing mechanism" (see Exh. C-34, p. 4).  Thus, Clause 15.3(b) of the PSC, as executed, reflects that the ITC will apply to reduce the PPT liability of both NNPC and the Contractor.  Similarly, the Letter of Guarantee expressly confirms a 50% split of the ITC for NNPC and the Contractor (see Statement of Reply, paras. 207-209; Exh. C-1; Exh. C-2).

282.   The Claimants note that the Respondent relies entirely on the FIRS letter in support of its position that the ITC should be deducted from capital expenditures before they are depreciated.  In this regard, the Claimants observe that the FIRS asserts that Decree No. 30 "revived" the provisions of paragraph 5(2) of Decree No. 24.  However, the Claimants

- 83 -

insist that not only does Decree No. 30 not re-enact the language of Decree No. 24, but there is no language specifying that the ITC is to be deducted from the cost of the asset for calculating capital allowances (see Statement of Reply, paras. 221-225).

283. Turning to capital allowances, the Claimants refute the Respondent's argument that because title to all equipment that gives rise to the relevant capital expenditure is vested in NNPC the Contractor is not entitled to claim capital allowances. The Claimants reiterate that, pursuant to the Second Memorandum, the Contractor retains ownership of any capital assets for five years following that asset entering into use, during which the Contractor recovers the costs of that asset (see Statement of Reply, paras. 226-227; Exh. C-4).

284. The Claimants also deny the Respondent's assertion that to allow the Contractor the benefit of capital allowances would amount to "double dipping", reasoning that this reflects a misunderstanding of the relationship between Cost Oil and Profit Oil, as the Contractor is liable for PPT on both revenue streams, subject to the usual deductions, including deductions for depreciable capital expenditure established in the PPT Act (see Statement of Reply, para. 230). The Claimants explain the purpose of capital allowances as follows (see ibid., fn. 168):

> "Allowing the depreciation of capital expenditure together with cost recovery in respect of that expenditure is a customary mechanism in the oil and gas industry for ensuring that the Contractor can enjoy some return on its capital investment over and above simply recouping its expenditure on that investment. Accordingly, the PSC provides for both full cost recovery and that PPT is to be assessed 'in accordance with the PPT Act,' with exclusion of the capital allowances provided for under the act."

285. Similarly, the Claimants refute the Respondent's position on the timing of capital allowances (i.e. that the annual allowance for depreciation of capital allowances should be pro-rated for the year in which the capital expenditure was incurred), observing that the FIRS letter is not an authoritative statement of Nigerian law, nor is Decree No. 9 on this point, which states at Section 3 that the PPT payable under a PSC "shall be determined in accordance with the Petroleum Profits Tax Act as amended" (see Statement of Rejoinder, para. 236-240; Exh. LA-9bis). The Claimants note that

paragraph 6 of the Second Schedule to the PPT Act provides as follows (see Exh. LA-17):

> "... where in any accounting period, a company owning any assets has incurred in respect thereof qualifying expenditure wholly, necessarily and exclusively for the purposes of petroleum operations carried on by it, there shall be due to that company as from the accounting period in which such expenditure was incurred, an allowance (in this Act referred to as 'an annual allowance') at the appropriate rate per centum specified in Table II of this Schedule."

286.   The Claimants further note that "accounting period" is defined in section 2 of the PPT Act as a "period of one year commencing on 1 January and ending on 31 December of the same year" (see Exh. LA-17).  The Claimants contend that these provisions together "contemplate 'an annual allowance,' and there is no mention of proration or any monthly determination of the allowance" (see Statement of Reply, para. 242).

287.   Relying upon expert evidence and authorities, the Claimants assert that these and other provisions in the PPT Act have long been interpreted as providing that a full year allowance is available for the year in which the capital cost in question was incurred, regardless of when in that year the expenditure was made, provided that the asset was owned by the company claiming the allowance at the end of the year (see Statement of Rejoinder, paras. 245-248; Expert Opinion of O. Bickersteth, Sec. 4.3.1).  Despite the Respondent's assertion that Decree No. 9 should be read to supersede the relevant provision of the Second Schedule to the PPT Act, the Claimants aver that there is nothing in Decree No. 9 that dictates a change to the timing of capital allowances or is inconsistent with the relevant provisions of the PPT Act (see Statement of Reply, para. 249; Exh. LA-9bis).

288.   Finally, as regards the tax treatment of those items which the Respondent contends are not recoverable as Cost Oil under the PSC (i.e., signature bonuses, inter-company loan interest, and non-operator costs), the Claimants ask the Tribunal to affirm the principle recited by the FIRS in its May 24th letter that tax deductibility is not coterminous with cost recovery (see Statement of Reply, para. 269).

289.   With respect to the signature bonuses, the Claimants submit that they are properly included as a qualifying capital expenditure for purposes of the ITC and the annual

capital allowances pursuant to paragraphs 1(d) and 6 to the Second Schedule of the PPT Act (see Exh. LA-17).  Similarly, the cost of interest paid on inter-company loans is dealt with in Sections 10(1)(f) and (g) of the PPT Act and, provided that the "interest is paid at commercial rates and wholly, exclusively and necessarily incurred to generate income from Petroleum Operations", is deductible from profits for PPT purposes (see Statement of Reply, paras. 263-264; Exh. LA-17).  Moreover, the Claimants take the view that non-operator costs (e.g., SNEPCo's internal costs of technical and finance personnel necessary for informed decision-making and funding concerning the development and petroleum operations in the Contract Area) satisfy the test set out in Section 10(1) of the PPT Act for deductible costs, namely, that the expenditure is "wholly, exclusively and necessarily incurred" for the Contractor's Petroleum Operations (see ibid., para. 268; Exh. LA-17).

(ii)     The Respondent's Position

290.   The Respondent denies that it is in breach of the PSC and that the Contractor has any entitlement or obligation to compute the PPT payable and to allocate Tax Oil in accordance with the PPT Act.  The Respondent reasons that the Contractor is not carrying on "Petroleum Operations" within the meaning of the PPT Act and is therefore not subject to PPT (see Statement of Defence, para. 16.6; Resp. Post-Hearing Br., para. 4.3). Rather, the Respondent contends that, pursuant to Section 15(2) of the *Petroleum (Drilling and Production) Regulations*, and Clause 7.2(a) of the PSC, NNPC is obligated to compute Tax Oil in order to ensure that PPT is properly paid (see Resp. Post-Hearing Br., para. 4.3; Exh. C-1; Exh. LA-11).

291.   As regards the ITC, the Respondent takes the position that the Contractor is not entitled to take advantage of the ITC because it does not own the underlying capital assets.  The Respondent reiterates its view that NNPC owns all of the assets of the OML 133 operations, by virtue of Clause 11.1 of the PSC and by virtue of the fact that all of the costs of the assets are fully recovered by the Claimants through their Cost Oil allocation, which takes priority over PPT and Profit Oil (see Statement of Defence, para. 16.2).

292.   The Respondent submits that, pursuant to Clause 11.1 of the PSC, title and ownership to the equipment that was to be used in petroleum operations in the Contract Area

transferred to NNPC upon its arrival in Nigeria (see Exh. C-1). As such, the Contractor retains only an equitable interest in the equipment. The Respondent further submits that, to permit the Contractor to claim capital allowances under the PPT Act on assets in respect of which it has recovered the cost in full through cost oil allocations would amount to "double dipping" (see Statement of Defence, para. 15.1; Statement of Rejoinder, paras. 47-49, 81).

293. As regards the timing of the amortization of capital costs, the Respondent contends that capital costs are to be amortized over a period of five years in sixty equal monthly instalments, noting that this position has been accepted by the FIRS as correct (see Exh. RC-1). The Respondent submits that its position is also supported by Article IV.5(b)(ii) of Annex B to the PSC and Sections 9 and 15 of the *Deep Offshore Act*, which respectively provide as follows (see Exh. C-1; Exh. LA-9*bis*):

| Article IV.5(b)(ii), Annex B, PSC | Sections 9 and 15, *Deep Offshore Act* |
|---|---|
| "Capital costs recorded in the books and accounts of the CONTRACTOR shall be recoverable in equal instalments over a five (5) period or the remaining life of the Contract, whichever is less. Amortization of such costs shall be in accordance with the method prescribed under the Second Schedule of the PPT Act, or over the remaining life of the contract, whichever is less." | 9. "Tax oil shall be allocated to the Corporation or the holder, as the case may be, in such quantum as shall generate an amount or proceeds *equal to the actual petroleum profit tax liability payable during each month*". (Respondent's emphasis)<br><br>...<br><br>15. "(1) The relevant provisions of all existing enactments or laws, including but not limited to the petroleum Act, and the Petroleum Profit Tax Act, shall be read with such modifications as to bring them into conformity with the provisions of this Act.<br><br>(2) If the provisions of any other enactment or law, including but not limited to the enactments specified in subsection 91) of this section are inconsistent with the provisions of this Act, the provisions of this act shall prevail and the provisions of that other enactment or law shall, to the extent of that inconsistency, be void." |

294. The Respondent reasons that, given the reference to the "actual petroleum profit tax liability during each month" in Section 9, it follows that "equal instalments over a five year period" in Article IV.5(b)(ii) of Annex B to the PSC means sixty monthly

instalments over a five year period. Accordingly, the Respondent denies that it is in breach of Clause 2.2 of the PSC, Article IV. 5(b)(ii) of Annex B, or Articles III.4 and III.6 of Annex C to the PSC, that the Claimants are entitled to amortize and allocate to themselves, or lift such quantum of Available Crude Oil so as to enable them to recover capital costs in five equal annual instalments over a five year period, or that the Respondent has nominated and lifted Available Crude Oil to which the Claimants are entitled as Cost Oil (see Statement of Defence, paras. 13.5-13.8).

295.   As regards the tax deductibility of certain costs, the Respondent contends that neither the signature bonuses, nor loan interest, nor non-operator costs can be considered as qualifying expenditures for PPT purposes because the Contractor is not liable for PPT (see Statement of Rejoinder, paras. 87-88).

(iii)   Discussion

296.   The Parties differ in respect of two key issues for the purposes of the Tax Oil claim. First, whether the Claimants are subject to the PPT Act such that they share the burdens and benefits of its provisions with NNPC; and second, whether the Claimants own the capital assets involved in petroleum operations in the Erha Block.

297.   As discussed above, the Tribunal finds that the Claimants are engaged in "Petroleum Operations" for the purposes of the PPT Act and are therefore subject to its provisions (see paragraph 203 above). Additionally, the Tribunal finds that the Claimants continue to hold title to the capital assets as they have not yet recovered the costs of the assets through Cost Oil Liftings.

298.   As regards the ITC, under the terms of the PSC, the ITC is to apply as a full tax credit. This appears to be consistent with Nigerian law. The only law to the contrary was Decree No. 24 of 1979, which was repealed in 1979. The argument that this decree has been "revived" appears to be quite strained and, in the opinion of the Tribunal, lacking

merit, considering that no subsequent legislation has reenacted it, which would be required under Nigerian law.[10]

299.  In respect of the timing of annual capital allowances, it appears that both Nigerian law and FIRS' policy (as confirmed by Mr. Dike: see Tr,. Day 2, pp. 80-82) make clear that annual capital allowances may be taken in full in the first year that an asset is brought into use irrespective of when during the year it was actually brought into use.

300.  Finally, the PPT Act provides for deduction of the various contested expenses in certain well defined circumstances.  Signature bonuses, loan interest and other expenses are deductible under the PPT Act to the extent they are "wholly, exclusively and necessarily incurred . . . for the purposes of petroleum operations." (see Exh. LA-17).  Moreover, interest on inter-company loans and expenditures in relation to the acquisition of rights over petroleum deposits are expressly referred to as being deductible under the PPT Act. With respect to signature bonuses, the PPT Act provides for the deduction of capital expenditures incurred in connection with "the acquisition of, or of rights in or over, petroleum deposits" (see Exh. LA-17).  The Respondent advances no argument as to why the Contractor's claimed expenses do not fit in these categories.

301.  Based on the foregoing, the Tribunal finds that the Respondent has breached the terms of the PSC by overlifting Tax Oil and the Claimants are consequently entitled to damages, which are included in the Claimants' total damage calculation.

### d)  The Profit Oil Regime

#### (i)   The Claimants' Position

302.  The Claimants explain that because Profit Oil is a residual tranche of production which depends on how much production remains after allocation to the other tranches, errors in calculating the other tranches will necessarily translate into an error in the amount of Profit Oil available to be lifted by the Contractor.  The Claimants therefore rely on the

---

[10] While the Tribunal in no way relies on it in making this Award, it notes that its conclusion in this regard is confirmed by expert evidence adduced in these proceedings (see Expert Report of Justice Uwaifo, paras. 8.3-8.6; and Tr. Day 3, pp. 65-66).

above discussed errors in support of their position that NNPC has also breached the PSC provisions on Profit Oil (see Cl. Post-Hearing Br., para. 107).

(ii)    The Respondent's Position

303.    The Respondent submits that it has not lifted quantities of available crude oil in excess of Tax Oil payable and therefore Profit Oil is in no way adversely affected by the Tax Oil lifted (see Resp. Post-Hearing Br., para. 4.4).

(iii)    Discussion

304.    Clause 8.1(f) of the PSC provides as follows (see Exh. C-1):

> "Profit Oil, being the balance of Available Crude Oil after deducting Royalty Oil, Tax Oil, and Cost Oil, shall be allocated to each Party pursuant to Schedule B-2 of the Accounting Procedure (Annex B) as follows:

| CUMULATIVE PRODUCTION MMB FROM CONTRACT AREA | PROFIT OIL PERCENTAGES CORPORATION | CONTRACTOR |
|---|---|---|
| 0-350 | 20 | 80 |
| 351-750 | 35 | 65 |
| 751-1000 | 45 | 55 |
| 1001-1500 | 50 | 50 |
| 1501-2000 | 60 | 40" |

305.    Having determined that the Respondent breached the provisions of the PSC relating to Royalty Oil, Cost Oil and Tax Oil, the Tribunal concludes that the Respondent has also breached the PSC's provision concerning Profit Oil, being the balance of Available Crude Oil after the other three tranches have been properly allocated and deducted.

4.   The Tax Calculation and Return Preparation Claim

a)   The Claimants' Position

306.    The Claimants submit that the Respondent has breached Annex B of the PSC by disregarding the Contractor's PPT returns, failing to "onward file" the Contractor's PPT Returns to the FIRS and filing its own unauthorized PPT Returns for the years 2006 through 2010 in putative support of its unilateral overlift.  In the Claimants' view, these

"unilateral filings" breach several provisions of the PSC (see Statement of Reply, paras. 142-145).

307.   The Claimants note that Clause 7.1(b) and Article II(2)(a) and (e) of Annex B of the PSC provide that it is the Contractor's obligation and entitlement to compute the PPT payable and to prepare PPT returns. The Claimants also state that, pursuant to Article III(2)(e) of Annex B to the PSC, NNPC's sole responsibility is to "onward file" with the FIRS the PPT returns as determined and prepared by the Contractor (see Exh. C-1).

308.   The Claimants contend that, in letters dated 12 May 2009 and 31 August 2009, NNPC acknowledged that the PSC provides for the Contractor to prepare and submit PPT returns for onward filing by NNPC to the FIRS, but stated that it was not precluded from ensuring that the PPT returns aligned with its own computation or otherwise verifying and considering for approval the Contractor's PPT returns. The Claimants take the position that NNPC's view on the PPT returns has no basis in the PSC and was never contemplated by the Parties at the time the PSC was concluded (see Statement of Claim, paras. 153-154; Exh. C-91; Exh. C-99).

309.   In response to the Respondent's position that the Contractor is not subject to and therefore not liable to pay PPT, such that the Contractor cannot claim a right to have input on the PPT returns, the Claimants aver that they have a contractual interest in the calculation of Tax Oil, as this calculation directly affects the quantity of Profit Oil which they are entitled to lift. Moreover, they claim that this contractual interest has been recognized by the FIRS (see Statement of Reply, para. 147; Exh. C-116).

310.   The Claimants reject the Respondent's contention that the Contractor does not engage in "Petroleum Operations" for the purposes of Section 30 of the PPT Act, as only NNPC prepares and submits certain accounts and particulars to the FIRS under the Act as a "company engaged in petroleum operations" (see Exh. LA-17). The Claimants aver that they do engage in Petroleum Operations and is itself a PPT tax payer required to comply with Section 30 of the PPT Act. In any event, the Claimants contend that the obligation in Section 30 to prepare certain accounts and particulars is independent from the tax return process, which is expressly governed by the terms of the PSC (see Statement of Reply, paras. 10, 147-152).

311.   The Claimants contend that the Respondent's reliance on Section 9 of Decree No. 9 is misplaced. According to their interpretation, this provision merely reiterates the terms of Clause 8.1(c) of the PSC, to the effect that Tax Oil shall be allocated to NNPC in such amount as will generate proceeds equal to the actual PPT liability payable each month, and does not impact the contractual designation of the Contractor as the party with the right and obligation to prepare the PPT returns to be submitted by NNPC to the FIRS (see Statement of Reply, paras. 153-154).

312.   The FIRS letter of 24 May 2010 is also, in the Claimants' opinion, unpersuasive, for several reasons (see Exh. RC-1). First, the letter was obtained from a "fellow government agency", which shares in NNPC's "interest in maximizing the State's oil revenue". Both of these entities were "subject to the presidential directive announced on 20 May 2008, whereby NNPC, the FIRS and other arms of the State were directed to 'take immediate steps' to recover monies from international oil companies". Moreover, pursuant to the FIRS Act, the Board of the FIRS includes "the Group Managing Director of the NNPC or his representative" (see Statement of Reply, para. 167).

313.   Second, the FIRS letter was procured in "a manner which undermines any credibility it might otherwise retain", as FIRS was first provided with a copy of the draft Statement of Defence prepared by NNPC in a parallel arbitration involving a similar production sharing contract and a letter seeking FIRS' "substantial contribution" to NNPC's litigation effort (see Statement of Reply, para. 168).

314.   Third, according to judicial authority, the FIRS letter is not "an authoritative statement of Nigerian tax law" (see Statement of Reply, para. 169).

315.   Fourth, because the FIRS letter reflects a policy which has "undergone a convenient, revenue-maximizing change from the way in which it applied many of the relevant tax provisions" at the time the PSC was concluded and until disputes under the 1993 PSCs arose, it should be viewed with scepticism (see Statement of Reply, para. 170).

316.   As regards the procuring of tax receipts for OML 133, the Claimants submit that NNPC failed to provide the Contractor with any receipts for PPT paid prior to the filing of the Statement of Defence, despite the express requirement to do so in Clause 15.6 of the

PSC, the First Memorandum to the PSC and Sections 11(2) and 14 of Decree No. 9 (see Exh. C-1; Exh. C-3; Exh. LA-9*bis*). The Claimants explain that these receipts "provide evidence that the Contractor is a PPT tax payer engaged in Petroleum Operations and evidence that it has paid PPT" (see Statement of Reply, para. 158). Thus, these tax receipts were to have been issued in both NNPC and the Contractor's name. According to the Claimants, however, the tax receipts produced with the Statement of Defence fail to conform with the PSC by, among other things, identifying only NNPC (see Statement of Reply, paras. 158-162).

### b) The Respondent's Position

317.    The Respondent contends that it is clear from Section 30 of the PPT Act that only a "company engaged in petroleum operations" prepares all particulars necessary in the computation of PPT. The Respondent reiterates its position that the Contractor has not at any time been engaged in petroleum operations "for its own account" so as to come within the definition of "Petroleum Operations" under Section 2 of the PPT Act (see Statement of Defence, paras. 14.2-14.4; Exh. LA-17).

318.    The Respondent submits the following on the basis that the Contractor is not subject to, and therefore not liable to pay, PPT (see Statement of Defence, para. 19.2):

> "a)    the PPT returns prepared by the Contractors for onward filing with the FIRS were erroneous and, therefore, the Respondent was under no obligation to file them with the FIRS, in the form prepared by the Contractor, because the Respondent was the party with the liability to PPT. As the Respondent is the Lessee and the party engaged in petroleum operations, the obligation to pay tax vested on the Respondent also carries with it the obligation to ensure that the right taxes are paid. It is the Respondent's duty to ensure that actual monthly Tax oil is allocated for payment of PPT as required by Section 30 of the PPTA ... and Section 9 of the Deep Offshore Act (Claimants' Exhibit LA-9).
>
> b)    as it was the party liable to pay PPT, and not the Contractor, the PPT returns filed by it were properly so filed (in any event the Respondent contends that any dispute concerning taxation issues is to be resolved exclusively in accordance with the FIRS Act and, therefore, the Arbitral Tribunal lacks jurisdiction to adjudicate in respect thereof);
>
> c)    sums paid to the Government as PPT were properly so paid; and
>
> d)    the Respondent does not have in its possessions any tax receipts issued by the FIRS in the name of the Contractor, but does have receipts

issued for Tax oil production liftings for 2007, 2008, 2009 in its name in respect of the Erha Field evidencing 'Tax Oil' payments for Petroleum Profit Tax."

319.   The Respondent adds that it is implicit in the FIRS May 24th letter that NNPC is the sole PPT payer pursuant to the PSC (see Statement of Rejoinder, para. 67; Exh. RC-1).

320.   The Respondent dismisses the Claimants' assertion that the preparation of accounts and particulars is an obligation that is legally independent of tax returns as a distinction without a difference, because tax returns cannot be prepared without incorporating those particulars (see Statement of Rejoinder, para. 70).

   c)   Discussion

321.   The Tribunal has already rejected the Respondent's contentions that the Claimants are not subject to the PPT Act or engaged in Petroleum Operations, and shall not therefore consider these arguments again here (see paragraph 203 above).

322.   Article III(2)(e) of Annex B to the PSC provides as follows (see Exh. C-1):

> "The CORPORATION shall make all required PPT payments to Federal Board of Inland Revenue.  The CONTRACTOR shall prepare all returns required under the PPT Act and timely submit them to the CORPORATION for onward filing with the Federal Board of Inland Revenue.  The monthly PPT payment shall be determined from such PPT returns."

323.   Under this scheme, NNPC receives the PPT returns only "for onward filing with the Federal Board of Inland Revenue."  The PSC does not give NNPC any further role, and it certainly does not give NNPC the right to alter the returns or to submit its own returns in place of the ones prepared by the Contractor.  NNPC agrees that it has not filed the PPT returns prepared by the Contractor.  Therefore, the Respondent is in breach of this provision and the Tribunal so finds.

324.   The quantum of the resulting damages, as to which there is no dispute, is the increase in the FIRS' tax assessments based on the tax returns separately filed by NNPC itself.  The Claimants also seeks declaratory relief to ensure that NNPC comply in the future with its contractual obligations to file the PPT returns prepared by the Claimants.

325.   The Tribunal finds that the Claimants are entitled to relief under this head of claim.

5.  The Stabilisation Claim

a)  *The Claimants' Position*

326. As the Tribunal noted earlier, the Claimants contend that they "presaged" the bringing of a claim under Clause 19.2 of the PSC in their Statement of Claim, whereby they reserved their right to refer certain matters relating to an alleged change of policy by the FIRS to the Tribunal under this provision (<u>see</u> Statement of Claim, para. 21).   The Claimants further contend that the Respondent recognized in its Statement of Defence that such a Clause 19.2 claim is, in principle, available to the Claimants (<u>see</u> Statement of Reply, para. 298).

327. As already noted but traversed again now for ease of reference, the stabilisation claim is brought in the alternative and in addition to the Claimants' primary position that the law remains in all material respects as it was or was agreed to be on the effective date of the PSC and the FIRS' inconsistent conduct in relation to PTT does not alter this.  During the Hearing, the Claimants described their stabilisation claim as "principally an alternative", noting that if the Tribunal finds that the Claimants are wrong on the law or that the FIRS' letter is binding, the Claimants have necessarily factually established a change in the application of the PPT such that the Claimants "win if they [NNPC] are right" (<u>see</u> Tr. Day 3, p. 190).

328. The Claimants explain that a stabilisation clause, such as Clause 19.2, is to be applied and interpreted primarily by reference to its terms.  The terms of Clause 19.2 prescribe a broad range of events that can trigger its application and relief thereunder, including "any enactment of or change in" any of "the laws or regulations of Nigeria or any rules, procedures, guidelines, instructions, directives or policies" (<u>see</u> Exh. C-1).

329. The Claimants submit that three documents issued by the FIRS evidence a change in policy as regards the application of PPT and the calculation of PPT liability for 1993 deep offshore production sharing contracts, within the scope of Clause 19.2.  Specifically, the Claimants contend that the 2008 and 2009 Notices of Assessment impose an erroneous calculation of PPT liability for OML 133 pursuant to the current FIRS' policy, which is set out in the FIRS letter of 24 May 2010.  In the Claimants' view, the policies articulated in that letter are based on flawed interpretations of the relevant legislation and

- 95 -

the PSC relating to the ITC, the timing of capital allowances and the tax deductibility of certain costs (see Statement of Reply, paras. 306-308; Exh. RC-1; Exh. C-93; Exh. C-128).

330. With respect to the ITC, the Claimants recall that pursuant to the PPT Act, as amended and applied on the effective date of the PSC, the ITC was to be applied as a full tax credit without any reduction of the depreciable asset base. This remains the proper application of the ITC for the PSC and is in accordance with Decrees No. 9 and 30, as far as the Claimants are concerned. By contrast, the FIRS policy is that the ITC should be netted against qualifying capital expenditure for OML 133, thereby reducing any qualifying capital expenditure to be amortised via capital allowances for the purposes of determining chargeable profit (see Statement of Reply, para. 310).

331. The Claimants illustrate their point by reference to petroleum joint ventures between foreign oil companies and NNPC at the time of the negotiation and execution of the PSC. The PPT returns for those joint ventures demonstrate that the ITC was, at that time, being applied as a full tax credit with no reduction to the depreciable base. The Claimants point in particular to the PPT returns for Mobil Producing Nigeria Unlimited which demonstrate that, for the 1992-1993 period, total qualifying capital costs were not reduced by the amount of the ITC prior to calculating capital allowances, thus allowing ITC to be applied as a full tax credit (see Statement of Reply, paras. 313-314; Exh. C-15.6).

332. The Claimants also rely upon a memorandum, dated 27 July 2009, prepared for a committee considering new legislation to govern the petroleum industry in Nigeria. In that memorandum, the FIRS recognized that, under current law, the ITC operates as a full tax credit and proposed a change to existing legislation to reduce or eliminate the benefit of the ITC (see Statement of Reply, para. 317; Exh. C-118).

333. Turning to capital allowances, the Claimants submit that the Contractor has always understood and applied the Second Schedule of the PPT Act in such a manner as to allow the taking of a full annual capital allowance of 20% of capital expenditure starting in the year in which the relevant capital cost was incurred, irrespective of when in that year the cost was incurred. However, the FIRS' current policy is that capital allowances should

be pro-rated for the year in which the capital cost was incurred in order to reflect only the number of months within the year that capital asset was owned.   The Claimants again rely on the PPT returns for joint ventures valid as of the effective date of the PSC and the 2009 memorandum in support of their view that a change in policy has occurred (see Statement of Reply, paras. 321-324; Exh. C-15.6-15.8; Exh. C-18.1-18.6; Exh. C-118).

334.   Finally, with respect to the application of PPT deductions for certain costs, including the Signature Bonus, inter-company loan interest, non-operator and other costs, the Claimants submit that the FIRS current policy is to link deductibility for PPT purposes to cost recoverability under the PSC.   Again relying on the PPT returns for joint ventures valid as of the effective date of the PSC and the 2009 memorandum, the Claimants contend that this is a change of policy from the policy which applied as of the effective date of the PSC (see Statement of Reply, paras. 326-330; Exh. C-15.6-15.8; Exh. C-18.1-18.6; Exh. C-118).

335.   The Claimants submit that the above changes of FIRS policy have materially and adversely affected the Contractor's rights and economic benefits under the PSC, estimating the economic impact of such changes on the Contractor at approximately US$1,103,000,000.00 excluding interest (see Cl. Updated Quantum, para. 10).

336.   Despite the notice submitted to NNPC by the Contractor on 12 August 2010, which triggered a 90-day negotiation period under this provision, the Claimants state that NNPC has failed to observe the negotiation terms of Clause 19.2.   Nonetheless, since, in the Claimants' view, all the requirements of Clause 19.2 have been met, this provision has been properly triggered.

337.   Failing an agreement between the parties within the 90-day negotiation period, the Claimants contend that the Tribunal is empowered to determine the modifications to which the Contractor is entitled under the PSC.   The Claimants propose three main modifications.   First, the Claimants propose a modification to the Profit Oil split under the PSC that will compensate for the overlift carried out by NNPC as a result of the FIRS change in policy.   The Claimants submit that this modification may be accomplished in one of two ways:

| Option 1 – New Clause 8.1(h) | Option 2 – New Clause 10.4 |
|---|---|
| "Notwithstanding the terms of Clause 8.1(f) and (g), after [date] and until such time as the Profit Oil thereafter recovered by the Contractor is sufficient to generate Proceeds in the amount of [amount] plus interest at The rate of [interest rate], Profit Oil shall be allocated entirely to the CONTRACTOR. Thereafter, this clause 8.1(h) shall cease to have any application, and Profit Oil shall be allocated to each Party as provided for in Clause 8.1(f) or 8.1(g) as the case may be. In the event that the recovery of Profit Oil pursuant to this clause does not result in full compensation of the amount plus interest stated above, then any uncompensated amount shall be immediately payable by NNPC, at the latest, upon the date of termination or expiration of the PSC." | "On or before [date] the CORPORATION shall pay to the CONTRACTOR the amount of [amount] in consideration of the FIRS' change in policy since the Effective Date of the PSC with respect to the determination of PPT liability." |

338.  Second, the Claimants state that, at present, there will likely be sufficient production of Available Crude Oil from OML 133 prior to the expiry of the PSC in 2023 for an amendment to the Profit Oil split to fully compensate the Claimants for the shortfall in liftings imposed by NNPC. However, the Claimants contend that awarding the Claimants any less than a certain threshold percentage of the Profit Oil could result in a failure to fully compensate it for the FIRS' change in policy and NNPC's corresponding overlift.

339.  In order to make them whole, the Claimants submit that the Tribunal should apply a commercial rate of interest to the amount of overlift. Although a specific rate of interest to be applied in such circumstances is not stipulated in the PSC, the Claimants contend that LIBOR plus 4% for the period from 2007 through to the date of Award, followed by a flat rate of 10% going forward until full compensation is achieved, would be a reasonable commercial rate. Based on this rate of interest, the Claimants conclude that if the price of OML 133 crude oil were to remain constant at a price of US$60/barrel for the remainder of the PSC, the Contractor would need to be allocated in excess of 94% of the Profit Oil each month in order to recover the value of the overlift, plus interest, prior to the end of the PSC (see Statement of Reply, paras. 356-361).

340. <u>Third</u>, in the event NNPC continues overlifting, the Claimants contend the minimum threshold above would no longer be adequate to protect the Contractor's economic benefits under the PSC. Therefore, the Claimants propose that the following additional language be added as a "protective mechanism":

> **New Clause 8.1(i)**
>
> "Notwithstanding the terms of Clauses 8.1(f) and (g), in the event that the change in policy by the FIRS with respect to the determination of ITC, capital allowances and the tax deductibility of the signature bonus, sole costs or disallowed costs for OML 133 results in a future difference in the determination of Tax Oil (i.e. a difference between the Tax Oil resulting from the application of the policy as it existed upon the Effective Date of the PSC and the Tax Oil resulting from the application of the policy as it exists as of **[date]**), then, until such time as the Profit Oil thereafter recovered by the Contractor is sufficient to generate Proceeds in the amount of such difference, Profit Oil shall be allocated to the Contractor."

341. The Claimants invite the Tribunal to award damages to the Contractor in addition to or as an alternative to the above proposed modifications, in the event the Tribunal considers the modifications would fail to compensate or fully compensate the Contractor for the adverse impacts it has suffered as a result of the FIRS' change in policy

342. The Claimants observe that the language of Clause 19.2 ensures that the determination of the Tribunal will be sufficient to give effect to the modifications to the PSC and to amend the rights and obligations of the Parties accordingly. Therefore, any failure by the Respondent to abide by the modifications following the award would itself, in their view, constitute a breach of the PSC as modified by the Tribunal, thereby entitling the Contractor for damages for breach of contract.

### b) The Respondent's Position

343. The Respondent contends that there has been no change in policy so as to trigger Clause 19.2 because FIRS, on its own, is not competent to make or change tax policy (see Statement of Rejoinder, para. 16). The Respondent adds that, in his witness statement, Mr. Dike confirmed that FIRS' letter is not, in any event, a change of policy (see Resp. Pre-Hearing Br., para. 4.10). The Respondent therefore urges the Tribunal to reject the Claimants' stabilisation claim.

*c) Discussion*

344. Having found that the Tribunal has jurisdiction over the stabilization claim (see paragraph 179 above), the Tribunal will now consider the merits of the Claimants' claim.

345. The Tribunal recalls again the terms of Clause 19.2 of the PSC (see Exh. RC-1):

> "In the event that any enactment of or change in the laws or regulations of Nigeria or any rules, procedures, guidelines, instructions, directives or policies, pertaining to the Contract introduced by any Government department or Government parastatals or agencies occurs subsequent to the Effective Date of this Contract which materially and adversely affects the rights and obligations or the economic benefits of the CONTRACTOR, the Parties shall use their best efforts to agree to such modifications to this Contract as will compensate for the effect of such changes. If the Parties fail to agree on such modifications within a period of ninety (90) days following the date on which the change in question took effect, the matter shall thereafter be referred at the option of either Party to arbitration under Article 21 thereof. Following [the] arbitrator's determination, this Contract shall be deemed forthwith modified in accordance with that determination."

346. Thus, by the terms of Clause 19.2, the Claimants are entitled to relief under Clause 19.2 if the following factors are made out:

(a)   there has been a change in "laws" or "policies";

(b)   the change in law or policy pertains to "any Government department or Government parastatals or agencies";

(c)   the change in law or policy has had a material adverse impact on the Contractor's "rights and obligations or … economic benefits"; and

(d)   within the 90-day negotiation period ending on 12 November 2010, the Contractor and NNPC were unable to agree on a modification to the PSC to compensate the Contractor for the effect of "such changes".

(i)   The Change in Policy

347. NNPC disputes that there has been a change in policy.  However, the Contractor has identified three significant areas of change between 1993 and the issuance of the FIRS Letter on 24 May 2010 – namely, the  manner in which ITC is applied, the manner in

which annual capital allowances are applied, and the manner in which PPT deductions are applied (see Statement of Reply, paras. 301-330).

348. The Claimants summarise these three changes as follows (see Cl. Pre-Hearing Br., paras. 199-201):

> "199.    Since this overlifting dispute began, the FIRS has manifestly and materially changed its policy towards the application of the PPT regime. The effect of those changes have been to support NNPC's overlifting from the Erha Contract Area.
>
> 200.    The FIRS has effected such a change in policy relating to the interpretation and application of the PPT Act, as evidenced by the 2008 Notice of Assessment, the 2009 Notice of Assessment and the FIRS Letter sent by Mr. Mark Anthony Dike, the FIRS Director of Tax Policy.
>
> 201.    The changes in the FIRS' policy relate to:
>
>   (a) The application of ITC to reduce annual capital allowances;
>
>   (b) The timing of annual capital allowances; and
>
>   (c) The application of certain tax deductions." [citations omitted]

349. NNPC has not refuted the existence of these changes.

350. The Tribunal recalls that Mr. Dike testified that the FIRS does have tax policies and that these policies can and do change (see Tr. Day 2, p. 34:12-22 and pp. 71-72:25-15)

> "Q. And as the director of the tax policy department, you would agree with me, would you not, that the FIRS has indeed tax policies?
>
> A. Yes.
>
> [...]
>
> Q.  Did you say that the policy or the position changes, Mr Dike?
>
> A.  The policy can change. The policy cannot be constant because circumstances change, perspectives change. But policies will remain, you know, constant if they are fully aligned with express provisions of the law. To the extent that they are not, they are inconsistent, then they cannot be held religiously by anybody. Yes, the taxpayer will say yes, as far as that says so.
>
> Q.  You agree with me --

A. Under my charge, is that we are trying to recently align all our policy statements to be in tune with the law as much as possible.

Q. And this is a process that has taken place recently?

A. We commenced, yes, in the last, you know, couple of months."

351.  The Tribunal further notes the differences in the positions and/or tax policies delineated in the FIRS letter of 24 May 2010 and the 2008 and 2009 Notices of Assessment as compared to the various PPT returns submitted by joint venture operations at the time of the PSC was executed and the statements made in the memorandum of 27 July 2009 (see Exh. RC-1; Exh. C-15.1 to C-15.8; Exh. C-18.1 to C-18.6; Exh. C-93; Exh. C-118; and Exh. C-128).

352.  With respect to the application of the ITC, the FIRS policy at the time of the PSC's execution was to apply the ITC as a full tax credit.  This is clear from the FIRS' acceptance of various PPT returns which apply the ITC in this manner.  In particular, the 1992 PPT return for Mobil Producing Nigeria Unlimited, submitted on 28 May 1993, seven days after the execution of the PSC, applied the ITC as a full tax credit with no reduction to the depreciable asset base (see Exh. C-15.6).  On 24 July 1998, the FIRS accepted Mobil Producing Nigeria Unlimited's 1992 PPT liability (see Exh. C-18.4).

353.  Contrary to this practice, in its May 2010 letter, the FIRS states that the "ITC is to be treated as a deduction from qualifying Capital expenditure" and not as a full tax credit (see Exh. RC-1).  Further evidence of the change in policy is found in the Memorandum by the FIRS at the Public Hearing on the Petroleum Industry Bill, dated 27 July 2009, wherein it is recognized under pre-1998 petroleum sharing contracts that the ITC operates as a full tax credit and that this treatment should be changed (see Exh. C-118, p.10).

354.  With respect to the treatment of capital allowances, the FIRS policy at the time of the PSC's execution was to depreciate the capital costs in five annual installments. This is evidenced by the various tax returns submitted by Mobil Producing Nigeria Unlimited. For example, the PPT returns for Mobil Producing Nigeria Unlimited for 1992 and 1993 clearly indicate capital allowances as being applied in five yearly installments beginning in the year the capital expenditure was incurred and were approved by the FIRS (see Exh. C-15.6; Exh. C-15.7; Exh. C-18.4; Exh. C-18.5).  Contrary to this practice, the FIRS now

claims that "the amortisation of Capital Allowance [is] over a period of Sixty months" (see Exh. RC-1).

355.    With respect to the tax deductibility for certain costs such as Signature Bonuses, inter-company loan interest, and sole and non-Operator costs, the FIRS policy at the time of the PSC's execution was to allow such costs as part of the qualifying capital expenditures for joint venture operations.  Contrary to the position taken in the FIRS letter, such costs were approved as deductions from the total operating expenditures of Mobil Producing Nigeria Unlimited in 1992 and 1993 (see Exh. C-15.6; Exh. C-15.7; Exh. C-18.4; Exh. C-18.5).  Moreover, the Memorandum by the FIRS at the Public Hearing on the Petroleum Industry Bill dated 27 July 2009 mentions the following as a "proposed amendment" (see Exh. C-118, p. 11):

> "Signature bonuses should not be allowed as deductions against the income of oil and gas companies."

356.    With respect to the evidence of FIRS practice based on the PPT returns for joint venture operations, the Tribunal considers that this evidence is relevant given that the PPT regime that then applied to joint ventures in respect of the application of the ITC, the timing of capital allowances and the tax deductibility of the relevant costs were in all material respects the same as the PPT regime applicable to the PSC.

357.    In the light of the foregoing, the Tribunal finds that the tax policies of the FIRS have changed in respect of the application of ITC, the timing of capital allowances and the tax deductibility of certain costs.

(ii)    The change in policy pertains to a Government department or agency

358.    The Tribunal notes that the FIRS Act specifies that the object of the FIRS is "to control and administer the different taxes and laws" of Nigeria (see Exh. RL-1).  It appears uncontested between the Parties that the FIRS is an agency of the Government within the meaning of Clause 19.2 of the PSC.  Accordingly, the second element required by Clause 19.2 is met.

(iii)   The change in policy has had a material adverse impact on the Claimants

359.   The Claimants state that the monetary effect of the changes to the FIRS' policies which correspond to those elements of the Claimants' primary claim amount to US$1,103,000,000.00 as updated to 30 April 2011 (see Cl. Updated Quantum, para. 10).

360.   The Tribunal recalls the written and oral testimony of Mr. Lawal to the effect that he calculated the financial impact of the three FIRS policy changes (see Witness Statement of Adedoyin A. Lawal, paras. 13-16; Tr. Day 1, pp. 211-215).  According to the witness, the "impacts on the Contractor of these changes in policy are all felt as a result of a decrease in the capital allowances, ITC credit and operating cost deductions available to reduce the amount of Tax Oil Payable" (see Witness Statement of Adedoyin A. Lawal, para. 15).  The Defendants did not contest the financial impact alleged by the Claimants as resulting from the FIRS policy changes, or cross-examine the witness on his method of calculating same.

361.   The Tribunal finds that the changes in FIRS policy resulted in an adverse financial impact on the Claimants.  For the reasons set out below, the Tribunal need not consider the exact quantum of this financial impact.

(iv)   The Parties were unable to agree on a modification of the PSC within the 90-day negotiation period

362.   It appears uncontested that on 12 August 2010, during an in-person meeting between the Parties, the Claimants gave notice to the Respondent of a claim under Clause 19.2 of the PSC.  On the same day, the Claimants provided written notice to NNPC of their claim under Clause 19.2 of the PSC, triggering the commencement of the 90-day negotiating period, as evidenced by the Claimants' letter of 12 August 2010 (see Exh. C-130).

363.   On 20 September 2010, the Claimants wrote to the Respondent, recording the Parties' meeting on 12 August and the Respondent's "indication at the meeting that NNPC was willing to engage in 'best efforts' discussions as contemplated by Clause 19.2 of the PSC" (see Exh. C-133; Witness Statement of Adebayo Sofidiya, para. 11).

364. Having received no response to its letter of 20 September 2010, it appears that the Claimants fully argued their position in respect of their claim under Clause 19.2 in their Statement of Reply of 11 October 2010 (see Statement of Reply, paras. 295-366).

365. On 8 November 2010, the Respondent wrote to the Claimants to advise that "no meaningful negotiation on the issues" under Clause 19.2 of the PSC could be held "unless the present Arbitration proceeding initiated pursuant to Clause 21 of the PSC is first withdrawn or at least suspended" (see Exh. RR-7).

366. In the circumstances, the Tribunal finds that the negotiation period stipulated at Clause 19.2 of the PSC commenced on 12 August 2010 and ended ninety (90) days later on 10 November 2010.

367. Consequently, the Tribunal finds that all four requirements under Clause 19.2 of the PSC have been met. It remains for the Tribunal to consider the Claimants' requests for relief under this Clause.

368. The Claimants request the following relief under Clause 19.2 of the PSC (see Cl. Post Hearing Br., para. 160):

> "(a)    The current quantification of the material, adverse effect of the FIRS' changes in policy (US$ 1,090 million as at 30 December 2010) is a subset of the total damages (US$ 1,870 million as at 30 December 2010) claimed under the Contractor's primary claim. The Contractor does not seek double recovery, but claims a contractual modification to compensate for that amount of those damages attributable to changes in the FIRS' policy principally as an alternative relief
>
> (b)    If the Tribunal were to reject the Contractor's damages claim on the ground that it was not supported by Nigerian law (i.e. as reflected in the Notices of Assessment and the FIRS Letter), then the relief under the stabilization clause provides an alternative remedy.
>
> (c)    If the tribunal were to grant the Contractor's primary claim for damages in full, then no claim for contractual modification to compensate for historical overlifting (as stated at paragraph 351 of the Reply) would arise. The claim for contractual modification to address future overlifting based on the changes in the FIRS' policy (as stated at paragraph 362 of the Reply) would, however, remain as an additional claim."

369.    In the light of the Tribunal's conclusions on liability with respect to the Claimants' primary claim above, the Claimants will have fully recovered from the effects of such policy changes through the award of damages.   To grant the Claimants, in addition, their alternative claim would amount to double recovery.   The Tribunal thus dismisses the Claimants' alternative claim under Clause 19.2 of the PSC.

370.    There remains the Claimants' additional claim under Clause 19.2.   The Tribunal finds that the Claimants have proven that they are entitled to relief under the stabilization clause to prevent future overlifting by NNPC based on the changes in the FIRS' policies. The Tribunal thus orders the modification of the PSC, so as to add the following provision at Clause 8.1(i):

> "Clause 8.1(i)
>
> Notwithstanding the terms of Clauses 8.1(f) and (g), in the event that the change in policy by the FIRS with respect to the determination of ITC, capital allowances and the tax deductibility of the signature bonus, sole costs or disallowed costs for OML 133 results in a future difference in the determination of Tax Oil (i.e. a difference between the Tax Oil resulting from the application of the policy as it existed upon the Effective Date of the PSC and the Tax Oil resulting from the application of the policy as it exists as of 24 October 2011), then, until such time as the Profit Oil thereafter recovered by the Contractor is sufficient to generate Proceeds in the amount of such difference, Profit Oil shall be allocated to the Contractor."

While the Tribunal has declined to grant the Claimants' request for similar relief elsewhere in this award,[11] in the light of the history leading up to this arbitration and the instant award, inclusion of such a provision for relief in the future, in an amended PSC, with effect forthwith, is appropriate.

### D.  Causation, Quantum & Interest

#### 1.  The Claimants' Position

371.    The quantum of the Claimants' claim for the total value of the Respondent's overlifting, as of 30 April 2011, is US$1,799,000,000.00 (see Cl. Updated Quantum Submission, para. 3).

---

[11] See *infra*, para. 378.

372.   The Claimants submit that, as the Respondent has not questioned or challenged its calculations of NNPC's overlifting, this quantum is not in dispute and the Claimants' calculations should stand subject only to resolution of NNPC's various arguments concerning its lifting entitlements (see Cl. Pre-Hearing Brief, paras. 187-189).

373.   The Claimants also claim simple interest at a rate of LIBOR plus four percent (4%) on the amount of damages awarded running from the date of the Respondent's breach until the date of the award as well as interest at the same rate on any monetary compensation awarded from the date of the Tribunal's award until the date of payment (see Cl. Updated Quantum Submission, para. 9).   The Claimants submit that the Tribunal's power to award interest extends to awarding pre-award interest from the date of NNPC's breaches, as well as post-award interest, both of which are commonly awarded by Nigerian courts (see Statement of Claim, paras. 229-232; Exh. LA-20).   According to the Claimants, as at 30 April 2011, the pre-award interest payable amounted to US$243 million (see Cl. Updated Quantum Submission, para. 9).

### 2.   The Respondent's Position

374.   The Respondent denies that it has breached Clause 8.1(c), 15.1, 15.2(a), 15.3, Annex C, Article III, paragraph 4 or Annex C, Article III, paragraph 6 of the PSC and that, therefore, the issue of quantum "does not arise" (see Statement of Rejoinder, para. 107). The Respondent also denies that the Claimants have any claim under Clause 19.2 of the PSC.

375.   During the Hearing, the Respondent submitted for the first time that the Tribunal did not have the "wherewithal" to mathematically assess the quantum claimed by the Claimants (see Tr. Day 1, p.119).

376.   With respect to the award of interest, the Respondent submits that "the Act confers no express power on an arbitral tribunal to award interest and whilst it is conceded that it is generally accepted that arbitral tribunes in Nigeria may award interest, such power does not extend to an award of interest on costs and expenses, as sought by the Claimants" (see Resp. Post Hearing Br., p. 44).

### 3. Discussion

377.   It is clear, and the Tribunal so finds, that the breaches by the Respondent of the PSC have caused the damages suffered by the Claimants.

378.   In the light of the Tribunal's above findings on liability, and in the absence of any substantive contestation of the quantification of the total overlift as presented by the Claimants, the Tribunal grants the Claimants' claim, quantified as at 30 April 2011 in the total amount of US$1,799,000,000.00.   The Tribunal declines, however, to grant the Claimants' request that the Tribunal order it "entitled to nominate and lift such quantum of Available Crude Oil as enables the Contractor to generate Proceeds sufficient to satisfy the Contractor's contractual entitlement and all monetary awards." (see Cl. Post-Hearing Br., para. 161, cited *supra*, para. 54(o)).

379.   With respect to the applicable rate of interest, the Tribunal notes that neither the Rules of Arbitration, nor the PSC provides for an applicable rate of interest in the circumstances. The Tribunal also notes that Clause 8.5 of the PSC provides that in the event that one Party, at the request of the other, lifts the other Party's Available Crude Oil, the lifting Party shall transfer the proceeds of the sale to the non-lifting Party within sixty days and that any overdue payments bear interest at the rate of one month LIBOR plus two percent (2%).   However, Clause 8.5 of the PSC is inapplicable as such in the present case as the circumstance contemplated therein is entirely different.   Nevertheless, the Tribunal considers that Clause 8.5 does provide some guidance in that it reflects the only interest rate to which the Parties turned their mind and saw fit to include in the PSC.

380.   The Tribunal refers to Section 15(2) of the Act which permits it to use its discretion to "conduct the arbitration proceedings in such a manner as it considers appropriate so as to ensure a fair hearing."

381.   The Tribunal notes that its power to award interest extends to pre-award and post-award interest according to the decision of the Court of Appeal of Nigeria (Lagos Division) in the matter of *Bellview Airlines Limited v. Aluminium City Limited*, in which the arbitrator's award of both pre-award and post-award interest was upheld as valid (see Exh. LA-20).

382.    The Tribunal takes judicial notice of the fact that the Central Bank of Nigeria, pursuant to the *Central Bank of Nigeria Decree*, Decree No. 24 of 1991, establishes the applicable interest rate in Nigeria, also known as the Monetary Policy Rate ("MPR") and that, as of September 2011, the MPR was 9.25%.

383.    As this is a domestic Nigerian arbitration that is governed by Nigerian law, the Tribunal could apply the MPR of 9.25%. However, the Tribunal would be granting to the Claimants more than they are claiming, which it cannot do.

384.    In the circumstances, in the exercise of its discretion, the Tribunal has decided to grant to the Claimants pre- and post-award interest at a rate of 30-day LIBOR at the time of the Award, plus four percent (4%). Interest will be calculated from the date of the Respondent's first overlifting in December 2007 until the Award is paid in full by the Respondent.

### E.  Summary of Findings

385.    Having considered the Parties' respective submissions on all of the above issues, the Tribunal finds as follows:

(a)    The Tribunal has jurisdiction over the Claimants' claims under Clause 21 of the PSC and the Claimants' alternative and additional claims under Clause 19.2 of the PSC;

(b)    The PSC and its Clause 2.4 are valid and enforceable;

(c)    NNPC has breached the PSC by lifting crude oil contrary to the Contractor's Lifting Allocations;

(d)    NNPC has breached the PSC by unilaterally filing PPT Returns;

(e)    NNPC has breached the PSC by misapplying and/or denying the Contractor's entitlement to certain tax deductions in its unilaterally filed PPT Returns, including the misapplication of the ITC, miscalculation of annual capital allowances, and failure to deduct signature bonuses, loan interest and other expenses;

(f)     The Claimants are entitled to damages in the amount of US$1,799,000,000.00, bearing interest as of December 2007 at the rate of 30-day LIBOR rate plus four percent (4%), as a consequence of NNPC's breaches of the PSC;

(g)     There has been a change of policy within the meaning of Clause 19.2 of the PSC and therefore the Claimants' additional claim under Clause 19.2 of the PSC is allowed.  The Tribunal will issue an order adding to the PSC a new Clause 8.1(i), as set forth in paragraph 370 above;

(h)     The Claimants' alternative claim under Clause 19.2 of the PSC is dismissed.

## VI.  COSTS

### 1.  The Claimants' Position

386.    The Claimants submit that the Arbitration Rules in Nigeria follow the well settled principle that costs follow the event, or in other words that the successful party is awarded its costs. The Claimants further aver that the circumstances that gave rise to the present arbitration and the Respondent's conduct throughout the proceeding reinforce the Claimants' right to full costs.

387.    According to the Claimants, the Respondent's continued overlifting and undisputed threats to shut in the production of oil resulted in the Claimants having no choice but to initiate arbitration.

388.    Moreover, the Respondent's failure to comply with the deadlines established in the Tribunal's various Procedural Orders led to additional correspondence and pleadings from the Claimants and procedural directions from the Tribunal.

389.    The Claimants claim:

(a)     the costs of the hearing, including the cost of transcription services in the amount of US$45,913.49 and GBP£13,756.47. For logistical convenience, and on the understanding that the Respondent would share these costs equally, these amounts were paid in full by the Claimants (see Cl. Costs Submission, paras.20-21 and Appendix 1);

(b)     the fees and expenses of the Tribunal, including the aggregate amount of GBP£100,000.00 in advances on fees and US$10,854.46 in travel and other expenses in connection with the Tribunal's attendance at the Hearing  (see Cl. Costs Submission, paras.22-23);

(c)     the travel and other expenses of the Claimants' fact witnesses in the amount of US$18,771.40 and (see Cl. Costs Submission, paras. 24-26 and Appendix 1);

(d)     the fees of the Claimants' international counsel, Freshfields Bruckhaus Deringer LLP, as at 31 March 2011, in the amount of GBP£3,079,632.58, and the expenses incurred by Freshfields in the amount of GBP£371,419.68;

(e)     the fees of the Claimants' Nigerian counsel, Templars, as at 31 March 2011, in the amount of US$2,846,933.75 and the expenses incurred by Templars in the amount of US$265,623.61 (see Cl. Costs Submission, paras. 27 and 29 and Appendix 3);

(f)     the fees and expenses of the Claimants' expert witnesses and consultants on Nigerian law and tax practice in the amount of US$645,724.67 (see Cl. Costs Submission, paras. 27 and 30 and Appendix 3); and

(g)     the expenses associated with the Claimants' legal representation and assistance as a result of the payment directly by the Claimants of travel expenses and other disbursements incurred by counsel and expert witnesses in the amount of US$39,043.58 (see Cl. Costs Submission, paras. 31 and Appendix 1).

2.   The Respondent's Position

390.   The Respondent makes no substantive argument in support of its costs claim (see Resp. Costs Submission).

391.   The Respondent claims:

(a)     the fees and expenses of the Respondent's legal counsel, Messrs. Clarke, Paiko & Co., in the amount of NGN53,000,000.00;

(b)     the expenses in relation to transcription services at the Hearing in the amount of GBP£1,179.49;

(c)     the amounts deposited on account for the fees of the Tribunal in the amount of GBP£100,000.00;

(d)     the fees and expenses of the Respondent's expert tax consultants, Messrs. WTS Adebiyi & Associates, in the amount of NGN4,100,000.00;

(e)     the travel and other expenses of the Respondent's fact witnesses in the amount of NGN3,185,000.00; and

(f)     the travel and other expenses of the Respondent's staff in the amount of NGN621,000.00.

### 3.   Discussion

392.    The Tribunal notes that Articles 38 to 40 of the Nigerian Arbitration Rules, which address the question of costs, provide as follows:

> "Article 38
>
> The arbitral tribunal shall fix the costs of arbitration in its award.  The term "costs" includes only:
>
> (a) the fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 39;
>
> (b) the travel and other expenses incurred by the arbitrators;
>
> (c) the costs of expert advice and of other assistance required by the arbitral tribunal;
>
> (d) the travel and other expenses of witnesses to the extent that such expenses are approved by the arbitral tribunal;
>
> (e) the costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such cost is reasonable.
>
> Article 39

The fees of the arbitral tribunal shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject-matter, the time spent by the arbitrators and any other relevant circumstances of the case.

Article 40

1. Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion each of such cost between the parties if it determines that apportionment is reasonable taking into account the circumstances of the case.

2. With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

3. When the arbitral tribunal issues an order for the termination of arbitral proceedings or makes an award on agreed terms it shall fix the costs of arbitration referred to in article 38 and article 39, in the text of that order or award.

4. No additional fees may be charged by an arbitral tribunal for interpretation or correction or completion of its award under articles 35 to 37.”

393.   The Tribunal has considered the Parties’ respective costs claims in accordance with these provisions of the Nigerian Arbitration Rules.

394.   The provisions of Articles 38, 39 and 40 of the Nigerian Arbitration Rules are no different from the provisions of many other domestic and international arbitral rules with respect to the allocation of costs with which the members of this Tribunal are familiar: in effect, the Tribunal in the present arbitration has the discretion to apportion and allocate the costs in a just and reasonable way taking into account all the circumstances of the case.

395.   There is no doubt that the Respondent is the unsuccessful party in this arbitration both as to jurisdiction and the merits.

396.   On the other hand, the issues which arose in these proceedings were substantial and complex. Both Parties presented serious and well-reasoned submissions to the Tribunal.

397. Under the terms of the PSC, the Parties will have to live together for many more years and the Tribunal is fully conscious that its decision may not assist that relationship.

398. Taking all of the circumstances into consideration, the Tribunal exercises the discretion it is accorded by leaving the Parties' legal costs with them and allocating one half of the costs of the arbitration to each.

## VII. OPERATIVE PART

On these grounds, the Tribunal:

1. **DECLARES**:

   a. that the Respondent has breached the Production Sharing Contract;

   b. that the Respondent has overlifted cargoes of Crude Oil in excess of its entitlements and hence wrongfully;

   c. that the Respondent cannot, consistent with the terms of the Production Sharing Contract, submit its own unilateral tax returns or alter tax returns prepared by the Contractor;

   d. that the Contractor is entitled on an ongoing basis to lift as Cost Oil an amount of Available Crude Oil sufficient to generate proceeds equivalent to all of the Operating Costs reflected in the Contractor's books and accounts, subject only to an exception subsequently arising out of the Respondent's retrospective audit of the Contractor's books and accounts pursuant to Clause 13.2;

   e. that, for purposes of ascertaining Tax Oil pursuant to the Production Sharing Contract, costs are to be treated as tax deductible as provided for in Nigerian legislation regardless of whether they are recoverable as Cost Oil under the Production Sharing Contract; and

   f. that, in calculating Tax Oil pursuant to the Production Sharing Contract:

      (i) The Signature Bonus is to be included as a qualifying capital expenditure for purposes of calculating the Investment Tax Credit and the annual capital allowance pursuant to paragraphs 1(d) and 6 of the Second Schedule to the Petroleum Profits Tax Act;

      (ii) Inter-company loan interest is, if pre-production, to be included as a qualifying capital expenditure for purposes of calculating the Investment Tax Credit and the annual capital allowances, and, if post-production, to be deducted from profit, in both cases to the extent that it is obtained on terms prevailing under the open market and is wholly, exclusively and necessarily paid for the purpose of generating income from Petroleum Operations as provided for in sections 10(1)(c) and (f) of the Petroleum Profits Tax Act; and

      (iii) Any other costs, including sole costs, non-Operator costs and costs not recoverable as Cost Oil are, if pre-production, to be included as a

- 115 -

qualifying capital expenditure for purposes of the ITC and annual capital allowances, and, if post-production, to be deducted from profit and, in both cases, to the extent they are wholly, exclusively and necessarily incurred for the purpose of generating income from Petroleum Operations as provided for in Section 10(1) of the Petroleum Profits Tax Act.

2.  **ORDERS**:

 a.  that the Respondent cease overlifting forthwith;

 b.  that the Respondent lift future cargoes of Crude Oil only in accordance with the Contractor's Lifting Allocation and/or entitlement schedules;

 c.  that the Respondent cease making or purporting to make tax payments that are inconsistent with tax returns prepared by the Contractor;

 d.  that the Respondent refrain from submitting its own unilateral tax returns or altering tax returns prepared by the Contractor;

 e.  that the Respondent request Petroleum Profits Tax receipts from the Federal Inland Revenue Service bearing the names of the Contractor parties and allocating Petroleum Profits Tax paid between them in proportion to their entitlement to Profit Oil as provided for in Clause 15.6 of the Production Sharing Contract, the First Memorandum and sections 11(2) and 14 of Decree No. 9 of 1999; and

 f.  that Esso Exploration and Production Nigeria Limited and Shell Nigeria Exploration and Production Company Limited shall pay half of the costs of this arbitration; that Nigerian National Petroleum Corporation shall pay half of the costs of this arbitration; and that each of the Parties bear its own legal expenses incurred in this arbitration,

3.  **AMENDS** (exercising the powers granted it under Clause 19.2 of the Production Sharing Contract) the Production Sharing Contract dated 21 May 1993, which in consequence shall be deemed forthwith to be so modified, by adding the following:

"Clause 8.1(i)

Notwithstanding the terms of Clauses 8.1(f) and (g), in the event that the change in policy by the FIRS with respect to the determination of ITC, capital allowances and the tax deductibility of the signature bonus, sole costs or disallowed costs for OML 133 results in a future difference in the determination of Tax Oil (i.e. a difference between the Tax Oil resulting from the application of the policy as it existed upon the Effective Date of the PSC and the Tax Oil resulting from the application of the policy as it exists as of 24 October 2011), then, until such time as the Profit Oil thereafter recovered by the Contractor is sufficient to generate

> Proceeds in the amount of such difference, Profit Oil shall be allocated to
> the Contractor."

4.  **CONDEMNS** the Nigerian National Petroleum Corporation to pay to Esso Exploration and Production Nigeria Limited and Shell Nigeria Exploration and Production Company Limited:

    a.  the sum of US$1,799,000,000.00 (one billion seven hundred ninety-nine million United States dollars), plus simple interest at the rate of 30-day LIBOR plus 4% (four percent) from 17 December 2007, the date of breach, up until 30 April 2011, to wit, US$243,000,000 (two hundred forty-three million United States dollars);

    b.  simple interest at the rate of 30-day LIBOR plus 4% (four percent) on the sum of US$1,799,000,000.00 (one billion seven hundred ninety-nine million United States dollars) from 30 April 2011 up until the date of payment; and

    c.  the sum determined by the volume and value of overlifting by the Respondent that has taken place since 30 April 2011 and until the date of this Final Award, plus simple interest at the rate of 30-day LIBOR plus 4% (four percent) from 30 April 2011 up until the date of payment.

5.  **DISMISSES** all other claims for relief.

PLACE OF ARBITRATION: Abuja, Nigeria

DATED:  _24 October_  2011

**SIGNED:**

_Charles N. Brower_
**The Hon. Charles N. Brower**
**Co-Arbitrator**

Date: _24 OCTOBER 2011_

_____
**Prof. Paul Idornigie**
**Co-Arbitrator**

Date: _____

_L. Yves Fortier_
**L. Yves Fortier, C.C., Q.C.**
**Chairman**

Date: _24 October 2011_

- 117 -

Proceeds in the amount of such difference, Profit Oil shall be allocated to
the Contractor."

4.  **CONDEMNS** the Nigerian National Petroleum Corporation to pay to Esso Exploration and
Production Nigeria Limited and Shell Nigeria Exploration and Production Company Limited:

  a.  the sum of US$1,799,000,000.00 (one billion seven hundred ninety-nine million United
      States dollars), plus simple interest at the rate of 30-day LIBOR plus 4% (four percent)
      from 17 December 2007, the date of breach, up until 30 April 2011, to wit,
      US$243,000,000 (two hundred forty-three million United States dollars);

  b.  simple interest at the rate of 30-day LIBOR plus 4% (four percent) on the sum of
      US$1,799,000,000.00 (one billion seven hundred ninety-nine million United States
      dollars) from 30 April 2011 up until the date of payment; and

  c.  the sum determined by the volume and value of overlifting by the Respondent that has
      taken place since 30 April 2011 and until the date of this Final Award, plus simple
      interest at the rate of 30-day LIBOR plus 4% (four percent) from 30 April 2011 up until
      the date of payment.

5.    **DISMISSES** all other claims for relief.

PLACE OF ARBITRATION: Abuja, Nigeria

DATED:  24 October  2011

SIGNED:

_____                              _____ (DISSENTING)
The Hon. Charles N. Brower                            Prof. Paul Idornigie
Co-Arbitrator                                        Co-Arbitrator

Date: _____                                Date: 24 October, 2011

                        _____
                        L. Yves Fortier, C.C., Q.C.
                        Chairman

                        Date: 24 October 2011

IN THE MATTER OF AN AD HOC ARBITRATION PURSUANT TO
THE NIGERIAN ARBITRATION AND CONCILIATION ACT


Esso Exploration and Production Nigeria Limited

and

Shell Nigeria Exploration and Production Company Limited

Claimants

v.

Nigerian National Petroleum Corporation

Respondent

---

## DISSENTING OPINION OF PROFESSOR PAUL OBO IDORNIGIE

---

*The Arbitral Tribunal*:

L. Yves Fortier, C.C., Q.C. (Chairman)
The Hon. Charles N. Brower
Prof. Paul Idornigie

*Secretary to the Tribunal*:

Alison G. FitzGerald
Rachel Bendayan (*Pro Tempore*)

*Representing the Claimants*:

Mr. Constantine Partasides
Ms. Elizabeth Snodgrass
Mr. Patrick Taylor
FRESHFIELDS BRUCKHAUS DERINGER LLP

Mr. Oghogho Akpata
Mr. Adewale Atake
Mr. Afolabi Elebiju
TEMPLARS

*Representing the Respondent*:

Mr. Robert Clarke, SAN
Mr. Chidi Egwuenu
Mr. B. Muhammed
Ms. A.K. Dosunmu
CLARKE, PAIKO & CO.

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................5

II.   PROCEDURAL HISTORY .................................................................................5

    A.    The Parties .......................................................................................................5

    B.    The Notice of Arbitration ...............................................................................6

    C.    The Arbitral Tribunal and Commencement of the Proceedings ......................6

    D.    The Written Procedure ....................................................................................7

    E.    The Oral Procedure .........................................................................................9

    F.    The Post-Hearing Procedure .........................................................................10

    G.    The Arbitration Agreement ...........................................................................10

    H.    Relief Requested ...........................................................................................11

III.  FACTUAL BACKGROUND ..............................................................................14

        1.    Negotiation of the PSC ...........................................................................15

        2.    Terms of the PSC ....................................................................................15

        3.    Amendments to the PSC and the Government Guarantee ......................19

        4.    Production under the PSC ........................................................................20

        5.    The Stabilisation Claim ..........................................................................25

IV.   ISSUES TO BE DETERMINED .........................................................................29

V.    ANALYSIS AND DISCUSSION ........................................................................30

    A.    Context of the Dispute ...................................................................................30

    B.    Jurisdiction ....................................................................................................32

        1.    The Respondent's Position ......................................................................32

        2.    The Claimants' Position ..........................................................................36

        3.    Discussion ...............................................................................................40

    C.    Liability .........................................................................................................50

1.   *Enforcement of the PSC*.................................................................. *50*

2.   *The Lifting Allocation Claim*......................................................... *56*

3.   *The Production Tranches Claim*.................................................... *64*

4.   *The Tax Calculation and Return Preparation Claim*.......................... *83*

D.   **Summary of Findings**.................................................................. **87**

VI.   COSTS.................................................................................................... **88**

# GLOSSARY

| | |
|---|---|
| DPR | Department of Petroleum Resources |
| EEPNL | Esso Exploration and Production Nigeria Limited |
| FIRS | Federal Inland Revenue Service |
| ITC | Investment Tax Credit |
| NNPC | Nigerian National Petroleum Corporation |
| OPL | Oil Prospecting License |
| OML | Oil Mining License |
| PPT | Petroleum Profits Tax |
| PSC | Production Sharing Contract, dated 21 May 1993 |
| SNEPCo | Shell Nigeria Exploration and Production Company Limited |
| TAT | Tax Appeal Tribunal |

Professor Paul Obo Idornigie

After deliberations,

Gives the following Dissenting Opinion:

## I.  Introduction

1.  This arbitration involves a dispute over the interpretation of certain provisions in a Production Sharing Contract (PSC) entered into by the parties almost 20 years ago for the exploration and development of offshore ultra-deep water crude oil reserves in the Niger Delta region of Nigeria. The Claimants contend that they have the sole right under the PSC to determine lifting allocations of crude oil according to which royalty, cost, tax and profit oil are allocated, and that the Respondent has overlifted its share of crude oil in breach of that PSC. The Claimants also contend that they have the sole right to prepare tax returns estimating the tax payable on the crude oil lifted, and that the Respondent has breached the PSC by filing its own tax returns in lieu of those prepared by the Claimants.

2.  The Respondent denies that the Arbitral Tribunal[1] has jurisdiction to hear the present dispute, averring that the matters addressed herein are primarily within the exclusive jurisdiction of the Nigerian Tax Appeal Tribunal (TAT) established under the provisions of the Federal Inland Revenue Act, 2007 and the Federal High Court established under the provisions of the 1999 Constitution of the Federal Republic of Nigeria. Consequently, the dispute herein is not arbitrable. The Respondent also denies that it has overlifted crude oil or otherwise acted in breach of the PSC as it was carrying out its statutory functions under the relevant Nigerian laws.

## II.  Procedural History

### A.  *The Parties*

3.  The Claimants, Esso Exploration and Production Nigeria Limited ("**EEPNL**") and Shell Nigeria Exploration and Production Company Limited ("**SNEPCo**")

---

[1] Under section 57(1) of the Nigerian Arbitration and Conciliation Act, 2004 'arbitral tribunal' means a sole arbitrator or a panel of arbitrators. I am not a Sole Arbitrator in this reference though giving a dissenting opinion but where appropriate, I will adopt the position of the majority decision and indicate clearly where I depart from that position.

(together, the "**Contractor**"), have their main offices at Mobil House, Lekki Expressway, Lagos, Nigeria and Freeman House, 21/22 Marina, Lagos, Nigeria, respectively. They are represented in this arbitration by Mr. Constantine Partasides, Ms. Elizabeth Snodgrass and Mr. Patrick Taylor of FRESHFIELDS BRUCKHAUS DERINGER LLP, 65 Fleet Street, London, EC4Y 1HS, England, and Messrs. Oghogho Akpata, Adewale Atake and Afolabi Elebiju of TEMPLARS, 4th Floor, The Octagon, 13A, A.J. Marinho Drive, Victoria Island Annexe, P.O. Box 72252, Victoria Island, Lagos, Nigeria.

4.   The Respondent, Nigerian National Petroleum Corporation ("**NNPC**" or the "**Corporation**"), has its main office at NNPC Towers, Herbert Macaulay Way, Central Business District, Garki, Abuja, Nigeria. NNPC is represented in this arbitration by Chief Robert Clarke, SAN, Mr. Chidi Egwuenu, Mr. B. Muhammed and Ms. A.K. Dosunmu of CLARKE, PAIKO & CO., Barristers, Solicitors & Notaries Public, Ground Floor, Union Bank Building, 6 Moloney Street, Onikan, Lagos, Nigeria.

### B.   The Notice of Arbitration

5.   The Claimants commenced these arbitration proceedings by way of a Notice of Arbitration, dated 31 July 2009, pursuant to Article 3 of the Arbitration Rules contained at Schedule 1 of the Nigerian *Arbitration and Conciliation Act* 1988, Cap 19, Laws of the Federation of Nigeria 1990 (the "**Act**") and Clause 21 of the Production Sharing Contract, dated 21 May 1993 (the "**PSC**"), entered into by EEPNL and NNPC for the purpose of conducting petroleum operations in ultra-deep waters off the coast of the Federal Republic of Nigeria ("**Nigeria**").

### C.   The Arbitral Tribunal and Commencement of the Proceedings

6.   The Arbitral Tribunal was constituted on 6 May 2009. It is composed of Mr. L. Yves Fortier, C.C., Q.C. (Canadian), appointed by agreement of the Co-arbitrators as Chairman, the Hon. Charles N. Brower (American), appointed by the Claimants as Co-arbitrator, and Professor Paul Obo Idornigie (Nigerian), appointed by the Respondent as Co-arbitrator (the "**Tribunal**").

7.   The Tribunal held a first meeting with the Parties on 6 May 2010, in London, England, to discuss, among other matters, the execution of Terms of Appointment, the appointment

of an assistant to the Tribunal, and a provisional timetable for the conduct of the proceedings.

8.  During the first procedural meeting, the Tribunal and the Parties duly executed Terms of Appointment which provide, *inter alia*, **that the proceedings shall be conducted in accordance with the Act and the PSC; that the substantive law of the arbitration is the Laws of Nigeria; and that the place of arbitration is Abuja, Nigeria.**  The Nigerian Legal System is composed of the Constitution, which is the basic norm, as well as statutes, judicial precedent, texts, common law and equity.

9.  Accordingly, this reference is a domestic arbitration governed by the laws of Nigeria. Additionally, the parties are also Nigerian.[2]

10.  The Parties also agreed to the appointment of Ms. Alison G. FitzGerald (Canadian) as Secretary to the Tribunal, consistent with the terms of Article 7(h) of the Terms of Appointment.  Subsequently, on 17 January 2011, the Parties further agreed to the appointment of Ms. Rachel Bendayan (Canadian) as *pro tempore* Secretary to assist the Tribunal during the Hearing in Nigeria.

11.  After consulting with the Parties, the Tribunal established a provisional timetable for the conduct of the proceedings, which is recorded in Procedural Order No. 1, dated 10 May 2010.  Subsequently, Procedural Orders Nos 2, 3, 4 and 5 dated 30 August, 2010, 28 September, 2010, 20 December, 2010 and 18 February, 2011 respectively were issued by the Tribunal.

### D.    *The Written Procedure*

Written Submissions, Evidence and Authorities

---

[2] According to section 54 of the Nigerian Companies & Allied Matters Act, 2004, every foreign company having the intention of carrying on business in Nigerian shall take all steps necessary to obtain incorporation as a separate entity in Nigeria for that purpose.  The Claimants are, therefore, Nigerian companies though the shareholders may be foreigners.- This also draws a line between domestic and investment treaty arbitration where in the case of the latter, the definition of 'national' may mean the national of the other contracting party.

12.    The Claimants filed their Statement of Claim, together with five (5) witness statements, documents and legal authorities, on 13 April 2010.  Witness statements were filed by the following individuals:

-    Mr. Edwin Barrett Turner, counsel with Exxon Mobil Corporation's ("**Exxon**") legal department, providing evidence relating to the tender process for the Erha PSC;

-    Mr. Louis Eugene Smith, senior advisor to the upstream planning group of Exxon Exploration Company ("**EEC**"), providing evidence relating to negotiation of the Erha PSC;

-    Mr. Gerald Christopher Mudd, Regional Vice-President, EEC, providing evidence relating to negotiation of the Erha PSC;

-    Mr. Francis Usoro, Crude Lifting and Coordination Manager for Erha, providing evidence relating to the calculation of crude oil liftings and the evolution of the overlifting dispute; and

-    Mr. Adebayo Sofidiya, Manager for Deepwater Development, EEPNL, providing evidence relating to the topographical characteristics of the Erha block and the application of the royalty regime.

13.    The Respondent filed its Statement of Defence, together with documents and legal authorities, on 30 June 2010.

14.    The Claimants filed their Statement of Reply, together with three (3) reply witness statements, two (2) expert reports, documents and legal authorities, on 11 October 2010. Specifically, reply witness statements and expert reports were filed by the following individuals:

-    Mr. Adebayo Sofidiya (see above), providing evidence relating to the stabilisation claim and proposed modifications to the PSC;

-    Mr. Olawale Dawodu, Financial Reporting Manager, Exxon Nigerian subsidiaries, providing evidence relating to the Claimants' lifting allocation entitlement model;

- Mr. Adedoyin Adeleke Lawal, Supervisor, Deepwater Financial Reporting & Analysis, Exxon Nigerian subsidiaries, providing evidence relating to the effect on lifting of changes in FIRS' policy and modifications to the allocation procedure under Annex C to the PSC;

- Hon. Justice O. Uwaifo, JSC, CON., providing expert evidence regarding certain aspects of Nigerian law and their application to matters in dispute;

- Mr. Oluseyi Bickersteth, national senior partner of KPMG Professional Services, providing expert evidence relating to the application of the Investment Tax Credit ("**ITC**").

15. The Respondent filed its Statement of Rejoinder on 3 December 2010, together with documents and legal authorities.  As explained below, the Respondent simultaneously brought an application for approval to serve four (4) witness statements.

16. On 7 February 2011, each Party filed a Pre-Hearing Brief with the Tribunal.

### E. *The Oral Procedure*

17. A Hearing on jurisdiction and the merits was held in Abuja, Nigeria, between 28 February and 2 March 2011 (the "**Hearing**").  The following persons appeared before the Tribunal:

– On behalf of the Claimants: Mr. Constantine Partasides, Ms. Elizabeth Snodgrass and Mr. Patrick Taylor of Freshfields Bruckhaus Deringer LLP and Messrs. Oghogho Akpata, Adewale Atake and Afolabi Elebiju of Templars; and

– On behalf of the Respondent: Chief Robert Clarke, SAN, Mr. Chidi Egwuenu, Mr. B. Muhammed., and Ms. A.K. Dosunmu of Clarke Paiko & Co.

18. During the Hearing, the following fact witnesses were called to testify: *for the Claimants* – Mr. Edwin Barrett Turner, Mr. Francis Usoro, Mr. Adebayo Sofidiya, Mr. Olawale Dawodu and Mr. Adedoyin Adeleke Lawal; *for the Respondent* – Ms. Juliet Ogedi David-West, Mr. Moses Dayo Olamide, Mr. David Ogugua Mbanefo and Mr. Mark Anthony Dike.

19. The Parties agreed prior to the Hearing that the presence of Messrs. Louis Eugene Smith and Gerald Christopher Mudd was unnecessary. The non-attendance of these witnesses does not, however, constitute an admission by either Party as to the relevance or credibility of their evidence.

20. The following expert witnesses were also called to testify: *for the Claimants* – The Hon. Justice Uwaifo and Mr. Oluseyi Bickersteth.

21. The Respondent chose not to call any expert witness.

## F.     *The Post-Hearing Procedure*

22. At the close of the Hearing, the Tribunal directed the Parties to exchange post-hearing briefs simultaneously on 5 April 2011, and to exchange costs submissions simultaneously on 19 April 2011. These submissions were duly filed by the Parties. The Respondent filed a second cost submission on 21 April 2011, having omitted to attach its costs figures with its original filing.

23. The Claimants also filed a supplemental quantum submission with the Tribunal on 25 May 2011, bringing their damages figures current to 30 April 2011.[3]

24. The Arbitral Tribunal met in Montreal, Canada on 28-29 June, 2011 to deliberate on its decisions on the issues raised by the parties. Following these deliberations, I informed my Co-arbitrators that I was going to file a Dissenting Opinion. I gave reasons for my dissent to my Co-arbitrators.

## G.     *The Arbitration Agreement*

25. Clause 21 of the PSC contains the Parties' arbitration agreement and provides as follows:

---

[3] The Claimants state as follows in respect of their updated quantum figure (see Cl. Updated Quantum Submission, para. 4):

> "This figure is a reduction from the figure at 31 December 2010 due to variations in the volumes of oil that NNPC demanded to lift. It remains based on a mechanical comparison of the amount of oil the Contractor is entitled to have lifted based on the Lifting Allocation pursuant to the PSC and the amount of oil that the Contractor has actually lifted as at 30 April 2011."

"If a difference or dispute arises between the CORPORATION and the CONTRACTOR, concerning the interpretation or performance of this Contract, and if the parties fail to settle such difference or dispute by amicable agreement, then either Party may serve on the other a demand for arbitration. Within thirty (30) days of such demand being served, each party shall appoint an arbitrator and the two arbitrators thus appointed shall within a further thirty (30) days appoint a third arbitrator and if the arbitrators do not agree on the appointment of such third arbitrator, or if either Party fails to appoint the arbitrator to be appointed by it, such an arbitrator or third arbitrator shall be appointed by the President of the Court of Arbitration of the International Chamber of Commerce (ICC) in Paris on the application of the other Party (notice of the intention to apply having duly given in writing by the applicant party to the other party) and when appointed the third arbitrator shall convene meeting [sic] and act as chairman thereat.  If an arbitrator fails or is unable to act, a successor shall be appointed by the respective party or by the arbitrators in the event the chairman must be succeed. The arbitration award shall be binding upon the parties and the expenses shall be borne by the parties in such proportion and manner as may be provided in the award. The Nigerian Arbitration and Conciliation Act, Cap. 19, Laws of the Federation of Nigeria, 1990 shall apply to this contract.  The venue of the arbitration shall be anywhere in Nigeria as agreed by the parties."

### H.    *Relief Requested*

26.    The Claimants seek both declaratory relief and damages for alleged breaches of the PSC. In particular, the Claimants request the following relief from this Tribunal (see Cl. Post-Hearing Br., para. 161):

(a)    DECLARE that the Respondent has breached the PSC;

(b)    DECLARE that the Respondent has wrongfully overlifted cargoes of Crude Oil in excess of its entitlements;

(c)    ORDER the Respondent to cease such overlifting forthwith;

(d)    ORDER the Respondent to lift future cargoes of Crude Oil only in accordance with the Contractor's Lifting Allocation and/or entitlement schedules;

(e)    DECLARE that the Respondent cannot, consistent with the terms of the PSC, submit its own unilateral tax returns or alter tax returns prepared by the Contractor and ORDER the Respondent to refrain from doing so;

(f)    ORDER that the Respondent cease making or purporting to make tax payments that are inconsistent with tax returns prepared by the Contractor;

(g)    ORDER that the Respondent request PPT receipts from the FIRS bearing the names of the Contractor parties and allocating PPT paid between them in proportion to their entitlement to Profit Oil as provided for in Clause 15.6 of the PSC, the First Memorandum and sections 11(2) and 14 of Decree No. 9 of 1999;

(h)    DECLARE that the Contractor is entitled on an ongoing basis to lift as Cost Oil an amount of Available Crude Oil sufficient to generate proceeds equivalent to all of the Operating Costs reflected in the Contractor's books and accounts, subject only to an exception subsequently arising out of NNPC's retrospective audit of the Contractor's books and accounts pursuant to Clause 13.2;

(i)    DECLARE that, as agreed by the Parties in the PSC, in calculating Tax Oil, the ITC shall only be deducted from assessable tax and shall not also be deducted from qualifying expenditures;

(j)    DECLARE that, for purposes of ascertaining Tax Oil pursuant to the PSC, costs are to be treated as tax deductible as provided for in Nigerian legislation regardless of whether they are recoverable as Cost Oil under the PSC;

(k)    DECLARE that, in calculating Tax Oil pursuant to the PSC:

    (i)    The Signature Bonus is to be included as a qualifying capital expenditure for purposes of calculating the ITC and the annual capital allowance pursuant to paragraph 1(d) and 6 of the Second Schedule to the PPT Act;

    (ii)   Inter-company loan interest is, if pre-production, to be included as a qualifying capital expenditure for purposes of calculating the ITC and the annual capital allowances, and, if post-production, to be deducted from profit, in both cases to the extent that it is obtained on terms prevailing under the open market and is wholly, exclusively and necessarily paid for the purpose of generating income from Petroleum Operations as provided for in sections 10(1)(f) and (g) of the PPT Act; and

●      - 12 -

(iii)   Any other costs, including sole costs, non-Operator costs and costs not recoverable as Cost Oil are, if pre-production, to be included as a qualifying capital expenditure for purposes of the ITC and annual capital allowances, and, if post-production, to be deducted from profit and, in both cases to the extent they are wholly, exclusively and necessarily incurred for the purpose of generating income from Petroleum Operations as provided for in Section 10(1) of the PPT Act.

(l)   AWARD the Claimants damages and other compensation and appropriate relief for all losses suffered by the Contractor, including those losses caused by NNPC's breaches of the PSC, including, but not limited to, the wrongful overlifting of Crude Oil cargoes with a value of approximately US$1.87 billion as of 31 December 2010 (such figure to be updated as at the end of the first quarter of 2011 at the end of April);[4]

(m)   Subject to the other remedies granted by the Tribunal, ORDER that the terms of the PSC are forthwith modified as requested by the Contractor in paragraphs 230 and 231 of its Pre-Hearing Brief in accordance with Clause 19.2 of the PSC;

(n)   AWARD the Claimants interest at the rate of LIBOR plus four percent on any monetary sums awarded to the Claimants, from the date of breach up to the date of payment, which as at 31 December 2010 was US$214 million (such figure to be updated as at the end of the first quarter of 2011 at the end of April);[5]

(o)   ORDER that, without prejudice to the Claimants' right to enforce the above monetary awards by any and all other means available to them, the Contractor shall be entitled to nominate and lift such quantum of Available Crude Oil as enables the Contractor to generate Proceeds sufficient to satisfy the Contractor's contractual entitlement and all monetary awards;

---

[4] In their Updated Quantum Submission of 25 May 2011, the Claimants revised their damages claim to US$1.799 billion as at 30 April 2011.

[5] In their Updated Quantum Submission of 25 May 2011, the Claimants revised their interest calculation to US$243 million as at 30 April 2011.

(p)     AWARD the Claimants their costs and expenses of the arbitration (including interest on such costs and expenses); and

(q)     ORDER such other interim or final relief as the Arbitral Tribunal considers appropriate.

27.     The Respondent seeks the following relief from this Tribunal (<u>see</u> Statement of Rejoinder, para. 109):

**Declaratory and Injunctive Relief**

(a)     As the Arbitral Tribunal lacks the jurisdiction to adjudicate on the claims presented by the Claimants, all declaratory and injunctive reliefs sought by the Claimants should be declined.

(b)     In the alternative, as the Claimants are not entitled to any of the declaratory and/or injunctive relief sought, the same should be dismissed in their entirety.

**Monetary Awards**

(c)     As the Arbitral Tribunal lacks jurisdiction to adjudicate on the claims presented by the Claimants, all the monetary claims presented by the Claimants should be declined.

(d)     In the alternative, as the Claimants are not entitled to any monetary award, the claims therefore should be dismissed in their entirety.

**Costs**

(e)     The Respondent seeks an order terminating these proceedings by the making of a final award dismissing the claims herein (either on the ground that the Arbitral Tribunal lacks jurisdiction to entertain the claims made herein, or on the merits) and directing that the Claimants should pay the Respondent the costs of the arbitration incurred by the Respondent including:

(i)     The fees of the Arbitral Tribunal;

(ii)     The travel and other expenses incurred by the arbitrators; and

(iii)    The costs incurred by the Respondent for legal representation and assistance.

## III.    Factual Background

28.    I set out below, in summary, the principal factual basis for my dissenting opinion which, for ease of reference follows the detailed chronology set out in the majority Award.  The facts are largely undisputed (see Resp. Pre-Hearing Br., para. 3.7; Cl. Post-Hearing Br., para. 5).  However, where disputed by the Parties, the facts below have been established primarily from the contemporaneous documentation adduced in evidence by the Parties, supplemented by the testimony of the factual witnesses (both oral and written) as provided to the Tribunal in these arbitration proceedings.  Where I depart from the majority decision in terms of chronology, I have clearly indicated.

### 1.    Negotiation of the PSC

29.    In 1990, Nigeria began inviting bids from international oil companies for open acreage for petroleum exploration.  The open acreages included a total of 136 blocks in five sedimentary basins of the Nigerian mainland and offshore waters, including 15 blocks in the deep offshore covering approximately 31,000 km$^2$ (see Exh. C-16).

30.    On 5 June 1992, the Department of Petroleum Resources ("**DPR**") approved the allocation of OPL 209 to Esso (see Exh. C-21).  Consistent with Section 2 of the Petroleum Act, the OPL was, however, granted exclusively to NNPC, a government agency (see Resp. Pre-Hearing Br., para. 3.1).

31.    From June 1992 to May 1993, Esso proceeded to negotiate the terms of the PSC with the Ministry of Petroleum and Mineral Resources ("**Ministry of Petroleum**") and NNPC.  Among those matters discussed in the course of the negotiations were fiscal incentives appropriate to reflect the highly technical nature of the proposed venture in deep offshore waters.  Although fiscal incentives had been available in connection with petroleum exploration and development in the past, such incentives were considered by many international petroleum companies and the NNPC to have reflected a greater sharing of risk as between international petroleum companies and NNPC through joint venture operations (see Exh. 136).

32.     Further negotiations between the Parties ensued, ultimately culminating on 31 May 1993 with the execution of the PSC on the terms set out below (see Exh. C-1).

            2.      Terms of the PSC

33.     The PSC has a term of 30 years, which includes a 10-year exploration period under the OPL and a 20-year "OML period", that is, production under an Oil Mining License ("OML").  The OML is a lease granted by the Minister of Petroleum Resources under the *Petroleum Act*, CAP 350, Laws of the Fed. of Nigeria 1990, as amended, "to search for, win, work, carry away and dispose of Petroleum" (see Exh. C-1, Clause 1 and 3).  At the end of the OML period, NNPC is obligated to seek renewal of the OML and, if granted, the PSC will be extended at the option of either party for a period to be determined.

34.     Clause 2 sets out the scope of the PSC:

            2.1     This Contract is a Production Sharing Contract governed in accordance with the terms and provisions hereof.  Petroleum Operations and provision of financial and technical requirements by the CONTRACTOR in accordance with the terms of this Contract shall be in consultation with the CORPORATION. **The CORPORATION, as holder of all rights in and to the Contract Area, hereby appoints and constitutes the CONTRACTOR the exclusive company to conduct Petroleum Operations in the Contract Area. (emphasis added)**

            2.2     During the term of this Contract the total Available Crude Oil shall be allocated to the Parties in accordance with the provisions of Clause 8, the Accounting Procedure (Annex B) and the Allocation Procedure (Annex C).

            2.3     The CONTRACTOR shall provide funds and bear the risk of Operating Costs required to carry out Petroleum Operations and shall therefore have an economic interest in development of Crude Oil deposits in the Contract Area.

            2.4     The CONTRACTOR is engaged in Petroleum Operations pursuant to the Petroleum Profits Tax Act 1959 Cap 354 Laws of the Federation of Nigeria 1990 ("PPT Act") as amended and accordingly the Companies Income Tax Act 1979 Cap 60 Laws of the Federation of Nigeria 1990, as amended, shall have no application."

35.     As shall be seen, an important aspect of the dispute between the Parties concerns whether the Claimants are carrying out "petroleum operations" for the purposes of the PPT Act,

for their own account such that they are subject to the PPT Act and entitled to certain tax benefits established thereunder or whether the Claimants are carrying out "petroleum operations" as agents of the Respondent.   Another important aspect of the dispute is the actual relationship between the Parties.   Thus Clause 2.1 shows clearly that the Respondent is the holder of all rights in and to the Contract Area and appointed the Claimants as the Contractor thereby establishing an agency relationship.   This is reinforced  by paragraph 5, First Schedule to  the Petroleum Act  **(Exh LA-18) which provides that the holder of an oil prospective licence shall have the exclusive right to explore and prospect for petroleum within the area of his licence.**

36.    Clause 7 of the PSC sets out the respective rights and obligations of the Parties.  Among other obligations, Clause 7 establishes that the Contractor must prepare estimated and final PPT returns and submit same to NNPC in accordance with the PPT Act.

37.    Clause 8 describes how "Available Crude Oil" (*i.e.*, the "Crude Oil won and saved from the Contract Area after deducting amounts used in Petroleum Operations") will be allocated under the PSC.  The Claimants describe the tiered structure of Clause 8 as a "waterfall", each contractual tranche of crude oil giving rise to the next.

38.    Clause 11 establishes who shall hold title to equipment used in conducting Petroleum Operations in the Contract Area, which is relevant to whether the Contractor is entitled to claim certain tax deductions and benefits under the PPT Act. Clause 11 provides in relevant part as follows:

> "11.1   The CONTRACTOR shall finance the cost of purchasing all equipment to be used in Petroleum Operations in the Contract Area pursuant to the Work Programmes and such equipment shall become the property of the CORPORATION on arrival in Nigeria.  The CONTRACTOR and CORPORATION shall have the right to use such equipment outside the Contract Area, such use shall be subject to terms and conditions agreed by the Parties provided that it is understood Petroleum Operations hereunder shall take precedence over such use by the CORPORATION."

39.    Clause 14  provides for Bonuses while Clause 14.1 and 14.2 is headed 'Signature Bonus'.  Clause 14.1  provides that the Contractor shall pay to the Corporation a bonus of ten million US Dollars ($10m) on the Effective Date of the Contract which bonus the Corporation shall pay to the Account designated by Government.  **Clause 14.2 provides**

●    - 17 -

**that the Signature Bonus shall not be recoverable as Cost Oil.** 'Effective Date' is defined in Clause 1(n) of the PSC as the date of the Contract; in other words, 21st May, 1993. The effect of this is that the PSC would be ineffective without the payment of the Signature Bonus, thus making the Signature Bonus the consideration furnished by the Claimants. Under Nigerian law, the PSC would be classified as a simple contract as the PSC was not executed as a deed nor is there any evidence that the PSC was sealed. Consequently, the PSC would not have been effective without the Claimants furnishing 'consideration' for the right to engage in petroleum operations on behalf of the Respondent and benefit from the PSC.

40.   As will be seen, the recoverability or otherwise of the Signature Bonus is one area in dispute between the Parties.

41.   Royalty rates, PPT rates and ITC rates are set out in Clause 15 of the PSC.

42.   These terms are confirmed in Article III of Annex B to the PSC, entitled "Computation of Royalty, Concession Rental and PPT".   Article III further affirms that it is the Contractor's responsibility to "compute the PPT payable by [NNPC] pursuant to Clause 8.1 of this Contract in accordance with the provisions of the PPT Act and any prevailing Government fiscal incentives including, but not limited to, any credit which offset PPT liability".

43.   A detailed crude oil allocation procedure is set out in Annex C to the PSC, while Annex D contains detailed nomination and lifting procedures.   Article III(3) to Annex C is central to the Parties' overlifting dispute and, in particular, who as between the Parties is entitled to estimate the lifting allocation for each Party under the PSC.   Article III(3) provides as follows:

> "Thirty-five (35) days before commencement of production from the Contract Area and thereafter thirty-five (35) days prior to the beginning of the Forecast Quarter, the CONTRACTOR shall notify the CORPORATION of the estimated Lifting Allocation which can be produced and made available for disposal during the Forecast Quarter. Such estimated Lifting Allocation shall take into account any Proceeds Imbalance for the quarter first preceding the Current Quarter and any estimated Proceeds Imbalance for the Current Quarter computed in accordance with paragraph 3 of Article IV. Such notice shall be in the form of Schedule C-1 attached hereto indicating the estimated quantities

of Royalty Oil, Tax Oil, Cost Oil and Profit Oil, each Party's estimated Lifting Allocation and the estimated Realizable Price used to prepare such estimated Lifting Allocations."

44.    Finally, Clause 19 deals with Laws and Regulations.  Clause 19.1 provides that the **PSC shall be governed by and construed in accordance with the Laws of the Federation of Nigeria and any dispute arising therefrom shall be determined in accordance with such laws,** while Clause 19.2 is a stabilization clause.  One significant area of this dispute is whether the PSC can be construed and disputes arising therefrom resolved without reference to the provisions of Laws of the Federation of Nigeria.  Clause 19.2 forms the basis for the Claimants' alternative and additional claim in this arbitration. It provides thus:

> "19.2    In the event that any enactment of or change in the laws or regulations of Nigeria or any rules, procedures, guidelines, instructions, directives, or policies, pertaining to the Contract introduced by any Government department or Government parastatals or agencies occurs subsequent to the Effective Date of this Contract which materially and adversely affects the rights and obligations or the economic benefits of the CONTRACTOR, the Parties shall use their best efforts to agree to such modifications to this Contract as will compensate for the effect of such changes. If the Parties fail to agree on such modifications within a period of ninety (90) days following the date on which the change in question took effect, the matter shall thereafter be referred at the option of either Party to arbitration under Article 21 hereof. Following arbitrator's determination, this Contract shall be deemed forthwith modified in accordance with that determination."

Another significant issue in this reference is how this Clause 19.2 is to be invoked.  In other words, can this Clause 19.2 and Clause 21 (dealing with reference to arbitration) be invoked simultaneously/concurrently and how is the Clause 19.2 to be triggered?   Similarly is the invocation of Clause 19.2 a condition precedent to the invocation of Clause 21?

### 3.    Amendments to the PSC and the Government Guarantee

45.    Two memoranda were also signed by the Parties to supplement the PSC.  The first memorandum, dated 31 May 1993 deals with matters concerning PPT (see Exh. C-3).

46.    The second memorandum, dated 1 December 1993, further clarified certain aspects of the PSC and the Parties' respective obligations (see Exh. C-4).

•     - 19 -

47.    The Government of Nigeria also executed a letter of guarantee in favour of EEPNL on 31 May 1993 (see Exh. C-2).

48.    During the Hearing, the Respondent took the position that the Guarantee ceased to exist or have any effect once the legislative framework applicable to the PSC was amended (see Tr. Day 1, p 128; Day 3, pp. 229-230).    In its post-hearing submission, the Respondent confirmed that the *Deep Offshore and Inland Basin Production Sharing Contracts Act,* Cap D3 LFN 2004 (see Exh. LA-9*bis)*, which entered into effect on 1 January 1993, gave legislative effect to the fiscal incentives in the Guarantee (see Resp. Post Hearing Br., para. 2.4).    The Tribunal therefore understands that this is no longer a point in contention between the Parties.    In my view, the position of Justice Uwaifo, an Expert called by the Claimants in this regard is inadmissible  because he does not possess such qualification under Nigerian law. (see Tr. Day 3, pp 23-25, 62, 71-73).

49.    Several assignments of EEPNL's interest under the PSC have taken place, resulting in EEPNL holding 56.25% of the Contractor's interest under the PSC and SNEPCO holding the remaining 43.75% interest (see Exhs. C-5, C-6 and C-7).    The validity of such assignments is challenged by the Respondent for failure of the Claimants to obtain prior written consent pursuant to Clause 7.1(e) of the PSC (see Statement of Rejoinder, para. 31).    Such challenge does not, however, appear to be linked to the Respondent's substantive defence to the claims in this arbitration, was not raised during the Hearing, and is therefore not considered further.

## 4.    Production under the PSC

50.    The Contract Area subject to the PSC is composed of three (3) fields: Erha, Erha North and Bosi.    Production from the Erha field began in March 2006, followed by production from Erha North in September 2006.    Production has not yet commenced from Bosi.

51.    On 8 September 2006, EEPNL wrote to the DPR, advising that NNPC had scheduled the lifting of three cargoes of Crude Oil from Erha in November 2006 for payment of Royalty Oil (see Exh. C-45).    In a further letter dated 25 September 2006, Esso explained that, in its view, production from the Erha field is not subject to royalty payment because the entire hydrocarbon area is deeper than 1000 meters in water depth (see Exh. C-47).

52.  EEPNL wrote to NAPIMS, the corporate unit within NNPC charged with managing the Nigerian Government's investment in the upstream oil and gas sector, on 11 October 2006, shortly after production began from Erha North, recalling that, pursuant to Clause 15 of the PSC, royalty rates are graduated based on water depth with 0% royalty rate in areas in excess of 1000 meters of water depth.  EEPNL therefore advised NAPIMS as follows (see Exh. C-48):

> "Based on seismic-based bathymetry data, the entire hydrocarbon area associated with the Erha resource is deeper than 1000 meters water depth. For Erha North, the majority of the resource area is deeper than 1000 meters with some hydrocarbon volume extending into shallower water depths.
>
> Pursuant to Article III of the OML 133 PSC, EEPNL as Contractor shall compute the amount of royalty payable by the Corporation. As previously reviewed with NAPIMS, EEPNL has computed the applicable royalty rates as follows:
>
> | | |
> |---|---|
> | Erha | 0.00% |
> | Erha North | 0.331%" |

53.  A working session was held between the Parties to the PSC on 19 March 2007 to discuss, among other matters, the applicable royalty rate for production from these fields. Following this working session, NNPC advised EEPNL in a letter dated 18 April 2007 that, pending the final outcome of the determination of the royalty rate applicable to Erha, a one percent (1%) royalty rate would be applied (see Exh. C-50 and C-51).  As will be seen shortly, section 61(2) of the Petroleum (Drilling and Production) Regulations (Exh. LA-11) provides that where there is a dispute as to the amount of royalty payable, the NNPC can pay whatever sum it has admitted due (1%) to the Minister until the resolution of the dispute.  This is in recognition of the fact that it is the NNPC that has exclusive title to OPL 209 which is not shared with the Claimants.

54.  It appears from a synopsis of the Parties' meeting of 19 March 2007 that Mr. Sofidiya then "explained the basis of the 0.3% [sic] royalty being applied in Erha North" (see Exh. C-50).  In this regard, Mr. Sofidiya states (see Witness Statement of Adebayo Sofidiya, at para. 18):

> As set out above, the two producing fields within OML 133 lie entirely in water depths below 1,000 metres with the exception of a small section

of the Erha North field, which lies at 996 metres water depth.  Based on this, only crude oil from the portion of the Erha North field lying below the 1,000 metre depth contour attracts a royalty payment.  On that basis, in October 2006, we computed that the royalty rate payable in respect of oil production from Erha North is 0.331%.

55.   In a letter dated 1 June 2007, EEPNL expressed its disagreement with the application of a one percent (1%) royalty rate to the Erha field, noting its location in water depths exceeding 1000 meters (see Exh. C-54).  NNPC nonetheless maintained its position in a letter dated 3 July 2007 that, pending final resolution of the royalty issue, a one percent (1%) royalty rate would be applied to the Erha field (see Exh. C-55).

56.   NNPC and EEPNL attended a Crude Oil Allocation and Cost Recovery Meeting on 27 September 2007, during which the Parties discussed the continuing royalty issue, as well as their differing understandings in respect of the appropriate computation of tax on Erha for 2006 and 2007 (see Exh. C-57).

57.   On 17 October 2007, NNPC wrote to EEPNL advising of its decision to recover all outstanding taxes, royalty and NNPC profit oil in an accelerated manner, explaining that NNPC's entitlement model showed that the Contractor was at an overlift position of US$415.7 million of Crude Oil by the end of August 2007 (see Exh C-59).

58.   EEPNL replied on 14 November 2007, stating that it objected to NNPC's position on the basis that it disregarded the express provisions of the PSC with respect to the procedure for the determination of entitlements and liftings.  Specifically, EEPNL took the position that it was their exclusive right and obligation, pursuant to Annexes C and D of the PSC, to advise NNPC of the estimated lifting allocation and consequent lifting entitlements and computations using its entitlement model (see Exh C-60).

59.   NNPC wrote to EEPNL on 20 November 2007, stating that, in accordance with Clause 8.1 and Annex B, Article IV, of the PSC, NNPC had evaluated the Schedule B-1 submissions provided by EEPNL for consideration and approval and established that the basis of EEPNL's computations did not conform to provisions of the PSC and relevant Nigerian Laws.  NNPC clarified the basis for its rejection of EEPNL's Schedules as follows (see Exh. C-11):

> "**Treatment of ITC**

- 22 -

Your model failed to deduct ITC from cost of assets before arriving at the amount of Qualifying Capital Expenditure (QCE) and computing Capital Allowance, thereby treating ITC as **Gratis**.

Please note that Decree 9 (1999) reintroduced ITC for all PSC signed before 1ˢᵗ July 1998 and Decree 30 (1999) clarifies its treatment in Section 12 to align with paragraph 5 of Decree 24 (1979) by deleting its sub-paragraph 3.

**Timing of Capital Allowance**

Your model grants a full year allowance for the year in which an asset is acquired or first used. This implies that even if an asset is acquired or used by November, a full year capital allowance would be granted.

NNPC relies on the superiority of the Decree 9 (1999) which requires payment of actual PPT liabilities on monthly basis (Paragraph 9) and the PSC which requires payment within 60 days from the month under consideration. Annual computation based on estimates cannot guarantee this provision.

**Royalty Rates**

The royalty rate applicable to OML 133 shall be as advised by DPR. However, pending the determination of the royalty rate applicable to OML 133 by DPR, NNPC decide to apply the rate of 1%.

The objective of Clause 8.1 and Annex B (IV) stating that the Corporation is to consider and approve Schedule B-1 is to ensure that all computations by the Contractor conform to the terms of the Agreement and relevant Nigerian laws.

Your Schedule B-1 will be considered and approved by the Corporation as soon as you align your position on the above with the terms of the PSC and the relevant laws of Nigeria. Thereafter, the Corporation will completely cede the responsibility for producing Annex C-1 to ESSO."

60.   On 22 November 2007, EEPNL wrote to the FIRS, claiming a refund of overpaid 2007 PPT instalments, explaining that NNPC was unilaterally determining the amount of PPT, notwithstanding that the PSC establishes the Contractor as the responsible party for preparing tax returns and calculating the amount of monthly PPT payable. EEPNL had calculated a zero PPT liability for 2007 in its PPT return (see Exh. C-62).

61.   EEPNL also wrote to NNPC on 27 November 2007, formally advising of its disagreement with NNPC's interpretation of the PSC with respect to the treatment of each party's lifting allocation and consequent entitlement to lift crude oil. EEPNL stated as follows (see Exh. C-63; see also Exh. C-64):

- 23 -

> "Based on COMD's interpretation of the terms and conditions of the PSC, COMD nominated five Erha crude cargoes for January 2008 out of available six cargoes. Since NNPC has already allocated these January 2008 cargoes, albeit erroneously, we shall in the spirit of good working relations but in protest, go ahead to award the acceptances as overlifts against NNPC's account. The disagreement in interpretation herein above stated and the resultant lifting allocation entitlements are very fundamental and so we seek an urgent meeting with you during the week of December 3 2007 to arrive at a resolution of these issues. We urge that this meeting and resolution of these issues be finalised before the February 2008 Lifting Program is concluded. This is to avoid a repeat of the present error as EEPNL will not be in a position to accept any further nominations that are not in compliance with the PSC."

62.    NNPC wrote in reply on 29 November 2007 that it would continue to recover the overlift in an accelerated manner, as previously advised in its October and November correspondence (see Exh. C-65).

63.    On 10 December 2007, NNPC advised EEPNL of its proposed dates for crude oil lifting nominations in February 2008 (see Exh. C-67). A week later, on 17 December 2007, NNPC wrote to EEPNL, stating that the Erha terminal would be shut down and there would be no production during the month of February 2008, nor any lifting of crude oil by either party, as NNPC had not received confirmation of its proposed dates for the February 2008 liftings (see Exh. C-9).

64.    EEPNL replied on 18 December 2007, confirming NNPC's crude lifting nomination for February 2008, and advising that it was complying under protest with NNPC's nomination of four (4) cargoes of crude oil for February 2008 (see Exh. C-10).

65.    EEPNL proposed, in a letter dated 3 January 2008, that the March crude oil liftings be split as between EEPNL and NNPC and "henceforth maintain parity between the positions of both parties while the dispute is being resolved through arbitration or otherwise" (see Exh. C-68).

66.    NNPC rejected this proposal in a letter dated 7 January 2008, advising that it would continue to lift the maximum number of cargoes from Erha until the alleged overlift position was totally eliminated (see Exh. C-69). Thus, by letter dated 11 January 2008, NNPC placed six (6) crude oil cargo liftings for the month of March 2008 (see Exh. C-70).

67.   EEPNL rejected NNPC's crude oil listings for March 2008 by letter dated 16 January 2008 (see Exh. C-71). However, NNPC subsequently notified EEPNL of its schedule for lifting nominations, requiring five (5) cargo liftings in March 2008 (see Exh. C-73). EEPNL again agreed to NNPC's lifting nominations under protest (see Exh. C-74).

68.   On 29 February 2008, EEPNL also agreed to NNPC's lifting nominations for April 2008 under protest, recording the following (see Exh. C-76):

> "You have advised that NNPC has already allocated these April 2008 cargoes despite our objections and further, that NNPC will only grant approvals for cargoes that conform to NNPC's views. We consider that this position is in disregard of NNPC's obligations under the PSC.
>
> Faced with these circumstances, Esso as Operator will provide NNPC with its nominated cargoes in April 2008. This is being done to mitigate the Contractor's exposure to damages that would otherwise result and is not to be taken as prejudicing the Contractor's position in any way. Specifically, we understand that were Esso not to accept NNPC's proposed lifting nominations, NNPC would not permit any liftings from the Erha field, which would obviously compound the damage that Esso is already suffering as a result of NNPC's overlifting."

69.   EEPNL has continued to provide the lifting nominations requested by NNPC, under protest, and to object to the filing of PPT returns by NNPC with FIRS.

70.   The Claimants served a Notice of Dispute on NNPC on 30 June 2009 (see Exh. C-8), which was subsequently followed by the filing of the Notice of Arbitration on 31 July, 2009 which initiated the present arbitration proceedings.

<u>5.</u>      The Stabilisation Claim

71.   The FIRS issued a Notice of Assessment to the Claimants for 2008 PPT liability on 14 July 2009 (see Exh. C-93). According to EEPNL's Statement of Claim dated 13 April 2010, the Notice of Assessment reflects an erroneous calculation of PPT and "constitutes a change from the FIRS' previous application of ITC". The Notice of Assessment "was received by the Contractor only days before the submission of the Notice of Arbitration that commenced this arbitration." (see Statement of Claim, para. 21).

72.   As will be seen, this is another area of dispute. I query why, if the Claimants knew of the change in policy as contemplated in Clause 19.2 of the PSC on 14 July, 2009, this clause

was not invoked before Clause 21 of the PSC?  The question is whether the Notice of Arbitration should have been based on Clause 19.2 and if the conditions precedent stated in this clause are fulfilled then arbitration will be trigerred under Clause 21 of the PSC.

73.   In their Statement of Claim, the Claimants "note the procedure set forth in Clause 19.2 of the PSC, and the Claimants reserve their right to refer this matter to the Tribunal in due course as provided for in Clause 19.2" (see Statement of Claim, para. 25).

74.   As will also be seen, the dispute regarding Clause 19.2 is whether Clause 19.2 and Clause 21 of the PSC can be invoked simultaneously/concurrently.

75.   On 24 May 2010, the FIRS provided NNPC with a letter entitled "Decisions on Production Sharing Contract Tax Issues" in support of the Respondent's defence in this and other proceedings relating to disputes under other production sharing contracts.  The FIRS recorded its "Decisions" on the PSC tax issues as follows (see Exh. RC-1):

> "1)   **Timing of Amortisation of Capital Costs: - FIRS Position**
>
> In response to the averment contained in paragraph 14.2 of the statement of defence, it is the view of FIRS that going by the provision of Section 9 of Deep Offshore Inland Basin Act 1999, as regards the determination of actual PPT liability payable on a month by month basis, the amortisation of Capital Allowance over a period of Sixty months is correct and therefore justified. In essence, in the determination of actual PPT payable on a month by month basis, consideration will be to actual costs incurred during the reference month.
>
> 2)   **Consolidation of OPL 316/OML125 & OPL 211/OML134 for Purposes of Computation of PPT**
>
> Clause 8.1e of the PSC between Agip and NNPC is clearly in violation of Section 3 (1) (2) and Section 12 of Deep Offshore Act of 1999 and Section 22 (3), (4) and (5) of PPTA. Accordingly, the act of consolidation as enshrined in clause 8.1e of the PSC agreement is null and void ab initio and therefore of no legal consequence whatsoever.
>
> 3)   **Allocation of Tax Oil**
>
> FIRS aligns itself with NNPC to the extent of the determination of Tax Oil, its lifting and remittance of its proceeds to the relevant Government Account designated for that purpose. This is to the effect that Tax Oil is to be calculated and paid on the basis of actual monthly PPT liability.  This is in line with the

provision of Section 15 of the Deep Offshore and Inland Basin Production Sharing Contract Act CAP D3 LFN 2004 which states, inter alia. [sic]

4) **INVESTMENT TAX CREDIT (ITC)**

Petroleum Profits Tax (Amendment) Decree No. 24 of 1979 tied entitlement to Investment Tax Credit (ITC) to ownership of asset. Equally, Finance (Miscellaneous Taxation Provisions) Decree No. 31 of 1996 which replaced ITC with Petroleum Investment Allowance (PIA) also reiterated this position.

This position was further reinforced by Finance (Miscellaneous Taxation Provisions) Decree No. 30 of 1999 which revived the provisions of paragraph 5(2) of Decree 24 of 1979 provides [sic] that ITC shall be deducted from the cost of the asset to arrive at the amount of qualifying expenditure and before arriving at the annual allowance.

Based on the law that introduced ITC therefore, our position is that ITC is to be treated as a deduction from qualifying Capital expenditure before arriving at the value of the asset that is available for Capital Allowances computation on a Contract area by Contract area basis without consideration of producing and non producing contract areas.

5) **Signature Bonuses, Loan Interest & Non-operator Costs**

It is trite law that accounting profit is not the same as taxable profit. By similar token, cost recoverability is not coterminous with tax deductibility. In effect, what is not cost recoverable cannot be tax deductible. To this extent therefore, any cost that the contractor cannot recover from the Concessionaire cannot be tax deductible for purposes of determining the PPT payable on the Contract Area. This position holds true in respect of signature bonuses, loan interest and Non-operator Costs.

6) **Arbitral Proceedings**

Section 59(2) of the Federal Inland Revenue Service (Establishment) Act No. 13 2007 stipulates that the Tax Appeal Tribunal (TAT) shall have power to settle disputes arising from the operations of the Act and under the First Schedule of the Act. In other words, any dispute bothering on taxation must of necessity be handled by the TAT. It is therefore our humble submission that this dispute should be taken before the TAT for adjudication.

7) **PPT Administration**

You claimed in paragraph 19.3 of your Statement of Defence that 'the FIRS has been tardy in the issuance of receipts for the

payments of PPT made by the Respondent.  It will be appreciated if you could clarify this statement so as to enable us to put the issue in proper perspective."

76.  On 12 August 2010, less than two months after the filing of the Respondent's Statement of Defence in this proceeding, the Parties held an in-person meeting during which the Claimants gave notice to the Respondent of a claim under Clause 19.2 of the PSC (see Exh. C-133).

77.  Also on 12 August 2010, EEPNL wrote to NNPC triggering the 90 day negotiation period under Clause 19.2 of the PSC (see Exh. C-130).  Specifically, EEPNL provided notice in connection with (i) the FIRS Notice of Assessment in respect of OML 133, dated 16 June 2009 (the 2008 Notice of Assessment); (ii) the FIRS Notice of Assessment in respect of OML 133, dated 22 June 2010 (the 2009 Notice of Assessment); and (iii) the letter from FIRS Director of Tax Policy to NNPC, dated 24 May 2010 (see Exh. RC-1, cited at paragraph 75 above).  EEPNL explained the purpose of its notice as follows (see Exh. C-130):

> "The Notice of Assessment and the 24 May 2010 letter from the FIRS all evidence a change in policy pertaining to the Erha PSC by a Government department, parastatal or agency towards the application and calculation of certain elements of PPT (including, by way of example and without limitation, the application of investment tax credits, the timing of available capital allowances, and the tax deductibility of costs).  Such change has materially and adversely affected the Contractor's rights and obligations and its economic benefits and has therefore triggered the Contractor's rights under Clause 19.1 of the PSC.
>
> Clause 19.2 provides that the Contractor and NNPC should, for a 90-day period following the date on which the chance in question took effect, use their 'best efforts to agree to such modifications to [the PSC] as will compensate for the effect of such changes.'
>
> This letter constitutes a formal notification of the beginning of a 90-day modification negotiation period.  Accordingly, OML 133 representatives are available to meet with you to discuss potential amendments to the PSC consistent with Clause 19.2.  We propose organising a first meeting in Abuja during the week of August 16, 2010. If your representatives are unable to meet during this week, we would be pleased to meet at your convenience.
>
> We hope that these discussions will result in agreement on such modifications during the contractually-designated period.  However, should the parties be unable to agree any such mutually-acceptable modifications, the Contractor intends to refer the matter to arbitration

before the Tribunal in the ongoing arbitration proceedings in accordance with Clause 19.2. Finally, and in addition, we note that such a change in policy also breaches the Contractor's rights under applicable bilateral investment treaties. The Contractor hereby reserves all of its rights under such treaties and international law".

78.   On 20 September 2010, the Claimants wrote to the Respondent recording the Parties' meeting of 12 August and the Respondent's "indication at the meeting that NNPC was willing to engage in 'best efforts' discussions as contemplated by Clause 19.2 of the PSC" (see Exh. C-133; Witness Statement of Adebayo Sofidiya, para. 11).

79.   The Claimants argued their position in respect of their claim under Clause 19.2 in their Statement of Reply of 11 October 2010 (see Statement of Reply, paras. 295-366).

80.   On 8 November 2010, NNPC advised EEPNL by letter that no meaningful negotiation of the issues raised in its August 12th letter could be held unless the present arbitration proceeding was withdrawn or suspended (see Exh. RR-7) thus raising the issue of desirability or otherwise of invoking Clause 19.2 before Clause 21.  This also raised the issue as to whether by relying on Clause 21 in the Request for Arbitration the right to raise issues connected with Clause 19.2 had been waived.

## IV.   ISSUES TO BE DETERMINED

81.   The issues before the Tribunal for determination may be briefly summarized as follows:

(a)   <u>Jurisdiction</u>:   Does the Tribunal have jurisdiction over the Claimants' claims under Clause 21 of the PSC and/or the Claimants' stabilisation claim under Clause 19.2 of the PSC?

(b)   Liability:

(i)   *Enforcement of the PSC*:  Is Clause 2.4 of the PSC Enforceable?

(ii)   *The Lifting Allocation Claim*: Has the Respondent over-lifted crude oil in breach of the lifting allocation procedure in the PSC?

- 29 -

(iii)   *The Production Tranches Claim*: Has the Respondent improperly calculated the Parties' respective entitlement to royalty, cost, tax and profit oil in breach of the PSC?

(iv)   *The Tax Calculation and Return Preparation Claim*: Has the Respondent unilaterally filed PPT tax returns in breach of the PSC?

(v)   *The Stabilisation Claim*:  In the alternative and in addition to the above claims, has there been a change of government policy which has materially and adversely affected the rights and obligations or the economic benefits of the Claimants within the meaning of Clause 19.2 of the PSC and whether Clause 19.2 was properly triggered?

## V.   Analysis and Discussion

82.   In my analysis and discussion, I intend to follow the approach adopted by the majority decision.  Where I depart from the majority's conclusions and holdings, I so indicate.

83.   The summaries provided below canvas the Parties' principal arguments, as expressed in their written and oral submissions and follow the structure set out in the majority Award Due to the extensive nature of the Parties' submissions,  I also do not intend to provide an exhaustive account of all arguments developed by the Parties in support of their respective positions.  The entirety of the Parties' submissions have, however, been taken into consideration by me.

### A.   *Context of the Dispute*

84.   In considering the Claimants' claims, the Respondent urges the Tribunal to consider the economics of the Claimants' investment.  Specifically, it notes that the price of crude oil exceeded \$60/barrel in real terms several years before Erha started producing crude oil, which has resulted in a return to the Claimants on their investment far in excess of 12.5% (as much as 20.91% presently in OML 133) (see Statement of Defence, para. 8; Statement of Rejoinder, para. 27).

85.   The Claimants respond that they invested more than US\$6.1 billion in the exploration and development of the Erha block on the basis of the rights and assurances contained in the

PSC and accompanying documents (see Statement of Claim, para. 10; Cl. Pre-Hearing Br., para. 67). Moreover, they aver that the Respondent's economic argument ignores the facts that NNPC is also doing better than anticipated, both Parties would be doing worse if the price of oil had evolved in a different direction, and such movements in price have no impact on the Parties' respective rights and obligations under the PSC in respect of how risk is allocated (see Cl. Post-Hearing Br., para. 17).

86.    The Claimants add that this dispute cannot be divorced from its "political context", submitting that the governmental status of NNPC and its relationship to other governmental agencies, such as the DPR and the FIRS, provide relevant context for understanding the PSC framework, NNPC's actions and the intervention of certain government agencies in this dispute (see Statement of Reply, para. 32; Cl. Pre-Hearing Br., para. 25).

87.    The Respondent denies that there is any "political context" to the dispute, submitting that its position reflects a policy that has been applied consistently since March 2006, when the Erha field started producing crude oil. The Respondent notes that Sections 16(1) and (2) of the *Deep Offshore Act* provide for "periodic review" of the incentives granted by the Nigerian Government in the PSC. As the Government has not interfered to date with the PSC, the Respondent reasons that no "political context" can be imputed to its position.

88.    Nevertheless, the Respondent strongly contends that the PSC cannot be isolated from the statutory framework applicable to it, as the OPL and OML, which form the very basis for the PSC, were granted pursuant to the provisions of the Petroleum Act. The Respondent thus characterises these licences as the "substratum of the PSC", such that all laws governing the licences also govern the PSC (see Statement of Rejoinder, paras. 11-12). This is underscored by the fact that the PSC expressly provides in Clause 19.1 that the PSC shall be governed by and construed in accordance with the Laws of the Federation of Nigeria and any dispute arising therefrom shall be determined in accordance with such laws. Other than the PSC, therefore, this dispute must be determined in accordance with all relevant Nigerian laws.

89.   As regards NNPC's relationship with the DPR and the FIRS, the Respondent contends that it is entirely legitimate for these entities to "share an interest in maximizing the state's oil revenue", notwithstanding the Claimants' attempts to impugn the arm's-length nature of their interactions on this basis (see Statement of Rejoinder, paras. 26-27).

90.   I have considered the Parties' respective characterisations of the present dispute and its context, including the status of NNPC as a government agency and that of the Claimants as Contractors to NNPC. In my opinion, the status of the Claimants in this context is that of an agent of NNPC, a disclosed principal. In all other matters of context, I shall, considering the claims herein, be guided by the express terms of the PSC, applicable legislation (the Nigerian Constitution, the Petroleum Act, the Petroleum Profits Tax Act, the Deep Offshore Act, the Federal Inland Revenue Services Act, among others) and the specific documentary and witness evidence adduced in these proceedings.

## B.   *Jurisdiction*

### 1.   The Respondent's Position

91.   The Respondent takes the position that the Tribunal lacks jurisdiction to adjudicate upon or otherwise determine the issues in dispute because the Claimants' claims fall within the provisions of Section 251(1)(b) of the 1999 of the Constitution of the Federal Republic of Nigeria dealing with the exclusive jurisdiction of the Federal High Court (see Exhs. LA-8 and LA-25; see also Respondent's Post-Hearing Brief, p 41)[6]  and the Nigerian Tax Appeal Tribunal ("**TAT**"), pursuant to the *Federal Inland Revenue Services (Establishment) Act*, No. 13 of 2007 (the "**FIRS Act**" – **Exh RL-1**) (see Statement of Defence, para. 1.3; Statement of Rejoinder, paras. 8 and 92; Exh. RL-1).   The

---

[6] Section 251(1)(b) of the *Constitution of the Federal Republic of Nigeria, 1999* provides as follows:

> "251-(1)       Notwithstanding anything to the contrary contained in this Constitution and in addition to such other jurisdiction as may be conferred upon it by an Act of the National Assembly, the Federal High Court shall have and exercise jurisdiction to the exclusion of any other court in civil causes and matters–

> [...]

> (b)       connected with or pertaining to the taxation of companies and other bodies established or carrying on business in Nigeria and all other persons subject to Federal taxation;"

Respondent relies upon a public announcement by the TAT, dated 23 November 2010, which identifies disputes arising from the PPT Act, among other tax laws, as within its jurisdiction (see Exh. RR-6). The Respondent also relies upon the Fifth Schedule to the FIRS Act, which provides as follows at Section 11(1) (see Exh. RL-1; Statement of Rejoinder, para. 95):

> "11-(1) The Tribunal shall have power to adjudicate on disputes, and controversies arising from the following tax laws (hereinafter referred to as 'the tax laws') –
>
> (i)      Companies Income Tax Act, CAP, 60 LFN; 1990
>
> (ii)     Personal Income Tax Act No. 104, 1993
>
> (iii)    Petroleum Profits Tax Act CAP, 354 LFN; 1990;
>
> (iv)     Value Added Tax Act No. 102; 1993;
>
> (v)      Capital Gains Tax Act CAP, 42 LFN; 1990, and
>
> (vi)    any other law contained in or specified in the First Schedule to this Act or other laws made or to be made from time to time by the national Assembly.
>
> (2)     The Tribunal shall apply such provision of the tax laws referred to in subparagraph (1) of this paragraph as may be applicable in the determination or resolution of any dispute or controversy before it."

92.    The Respondent adds that, according to Section 10(2) of the *Interpretation Act*, Cap 123 LFN 2004, "[a]n enactment which confers power to do any act shall be construed as also conferring all such powers as are reasonable [sic] necessary to enable that act to be done or are incidental to the doing of it." The Respondent thus takes the view that the TAT has the exclusive power to interpret Nigerian tax legislation (see Statement of Rejoinder, para. 97).

93.    The Respondent avers that what is in dispute between the Parties is not the collection of a debt owing to FIRS, but rather the adjudication of disputes and controversies arising from tax legislation, consistent with Section 11(1) of the Fifth Schedule to the FIRS Act. Moreover, the Respondent submits that Section 35(a) of the Act, which provides that "[t]his act shall not affect any other law by virtue of which certain disputes – (a) may not be submitted to arbitration", ousts the jurisdiction of the Tribunal because the FIRS Act

confers jurisdiction over PPT disputes on the TAT, including controversies such as the issues in dispute in this arbitration (see Statement of Rejoinder, para. 102).

94.    In response to the Claimants' assertion that their dispute can be "compromised lawfully by way of accord and satisfaction" so as to render the dispute arbitrable, the Respondent contends that "accord and satisfaction" cannot apply to PPT disputes, relying on the Black's Law Dictionary definition of accord and satisfaction (i.e., "An agreement to substitute for an existing debt some alternative form of discharging that debt, coupled with the actual discharge of the debt by the substituted performance. The new agreement is called the *accord* and the discharge is called the *satisfaction*." (see Statement of Rejoinder, para. 104).

95.    Alternatively, the Respondent contends that all of the disputes raised in this arbitration are disputes between the Claimants and the FIRS (see Statement of Defence, para. 1.3; Statement of Rejoinder, paras. 8 and 105).  The Respondent reasons that any decision rendered by the Tribunal in this proceeding will not bind the FIRS, which will remain "at liberty to take a completely different view from that of the Tribunal and insist upon its view being accepted by the parties" (see Resp. Pre-Hearing Br., para. 4.4).

96.    During the Hearing, the Respondent conceded that the Tribunal has jurisdiction over the dispute to the extent of those matters relating to interpretation of the PSC, such as which party to the PSC has the right to calculate lifting allocations, but averred that the Tribunal's jurisdiction does not extend to the "effect" of the dispute (see Tr. Day 1, pp. 117-118):

> "I may concede that the basis of the quarrel is this disagreement on the allocation of oil.  To that extent, your Lordships have the jurisdiction to look into that cause of the disagreement. Because that agreement was the cause that gave rise to those four tranches of production my good friend has shown you. They all came out [of that].
>
> THE CHAIRMAN: What you are saying, chief, is that this is a matter of interpretation of the contract?
>
> CHIEF CLARKE: Well, my Lord, what I'm saying is that, to the extent that there is a dispute that your Lordships can look into, this dispute relates to the contract, and stops there.  The effect of the dispute is what we are seeing on the board. And the effect is what we are telling your Lordships you cannot look into. You can look into the dispute, and what

is the dispute? We are quarrelling as to who has the right to submit allocations. But the effect of the allocations is not within your purview, with respect, to look into, because they are all basically tax matters."

97.     The Respondent clarified in its post hearing submission that the impact of tax legislation on the Parties' rights and obligations has a "multiplier effect", because the computation of tax affects the calculation of cost oil, tax oil, royalties, the ITC, signature bonus, loan interest and non-operator costs (see Resp. Post-Hearing Br., Sec. 6).

98.     Finally, the Respondent argues that any monies received as a result of NNPC's royalty and tax oil liftings were passed on to the Nigerian Government, therefore any damages award would have to be satisfied through the Government, a third party to this proceeding (see Tr. Day 1, pp. 124-126):

> "What we are seeing here is that whatever your Lordships come about, and say: go and pay $1.82 billion, because this is money not belonging to NNPC. Most of this overlifting they are talking about, it's money we have taken on behalf of the Government, as oil. We have sold it, and we have passed the money, royalty has been passed to the Ministry of Petroleum through DPR. Tax oil has been sold. The money has been passed to the tax people. It is not money we have.
>
> Now, if you now say what we have done is wrong, and we don't own the money now, it means we have to go back to the tax people and say, look, money we have collected on your behalf as tax, the tribunal says it has to be paid to the contractors. And they are not parties to this.
>
> So what we are saying is that one has to be careful, because the bridge ends here. The second bridge: how do we collect this money? Even if you say we should pay them 1.92 billion, which is overlifting of tax oil, which money did not enter our own pocket, but we paid it to the authorities. If you now ask us to pay it back to them, we never took it. So we have to go back to the man we paid to, and say, look, the arbitrators say we have -- so that's the problem we are trying to show you, with great respect. That one has to be very careful in assuming jurisdiction on these tax matters.
>
> We don't have the money. We never kept the money. We were just agents of Government in collecting royalty oil and in collecting tax oil. Once we collect the oil, we sell them and we carry the money back to Government coffers.
>
> So what are you going to ask us to pay back to them now? We have to go back, and that's the second bridge. How are we going to cross it? That is what we are trying to say here. You can assume jurisdiction to say, oh, there is a dispute arising from the lifting allocation. What it has triggered by the dispute, what it has triggered, are those four things, and

they are all under PPT as the professor has rightly said, with respect. They are tax matters."

99.     The Respondent went further in its closing submissions, taking the position that NNPC is not liable to the Claimants because NNPC is merely an agent of the Nigerian Government (see Tr. Day 3, p. 229).

100.    As regards the Claimants' stabilisation claim, the Respondent contends that this claim is "incompetent" because it was not commenced in accordance with Clause 19.2 of the PSC and cannot, in any event, be pursued concurrently with arbitration proceedings under Clause 21 (see Statement of Defence, para. 1.5; Statement of Rejoinder, para. 18). Specifically, the Respondent claims that Clause 21 operates as an estoppel to a Clause 19.2 claim (see Resp. Post-Hearing Br., para. 5.4). The Respondent also notes that the FIRS has been issuing tax assessments on the PSC Contract Area since 2006, questioning when the alleged change took effect so as to trigger the 90-day period for the parties to seek to agree on a modification of the Contract (see Statement of Rejoinder, paras. 19.1, 21-22).

2.      The Claimants' Position

101.    The Claimants take the position that the issues in dispute, which implicate an application of the PPT Act and related legislation, are properly raised in these proceedings because the applicable fiscal regime has been enshrined within the PSC. The Claimants thus submit that the Respondent's position overlooks the reality that this is, in form and substance, a contractual dispute.

102.    The Claimants note that the Respondent has, in fact, accepted the characterization of the present dispute as a contractual one, which implicates Nigerian tax law, referring to paragraph 14.6 of the Statement of Defence in which the Respondent states: "The Respondent contends that the parties differ as to the interpretation of provisions of certain tax statutes. It is this difference that is, primarily, responsible, for the dispute concerning the interpretation and/or performance of Clause 8.1(c) of the PSC".

103.    The Claimants aver that none of the provisions of the FIRS Act vests the TAT with broad and exclusive jurisdiction over any dispute that may require an interpretation of the PPT Act. The Claimants contend that the TAT's jurisdiction extends only to disputes "arising

from" the PPT Act, not those "relating to" or "in connection with" the Act. Thus, there are two types of actions that the TAT may hear: appeals from decisions of the FIRS and appeals by the FIRS. In their view, the Fifth Schedule to the FIRS Act simply does not create a body vested with broad jurisdiction to hear any and all disputes that in any way implicate Nigerian tax legislation. Nor does it provide that the TAT is vested with exclusive power to interpret Nigerian tax legislation. In respect of this latter point, the Claimants note that several provisions of the FIRS Act contemplate that the Federal High Court also has the power to interpret and apply Nigerian tax legislation (see Statement of Reply, para. 284).

104. The Claimants also note that tax issues are commonly arbitrated, observing that, in such cases, arbitrators distinguish between "purporting to exercise the power to administer the collection of taxes in tax returns, on the one hand, and exercising their unassailable 'jurisdiction to decide all contractual matters falling within the scope of the arbitration clause, even when such matters are relevant to the Tax Court', on the other" (see Statement of Reply, para. 284, quoting ICC Case No. 6223, Y.B. Comm. Arb'n XX (1995), Exh. LA-46, pp. 58-59). Thus, the fact that contractual issues may require consideration and interpretation of tax statutes has not been seen as a bar to arbitral jurisdiction.

105. Although the Act does not identify specific non-arbitrable matters, the Claimants note that the Supreme Court of Nigeria has listed certain classes of disputes that are non-arbitrable. However, tax disputes are not among those classes of disputes determined to be non-arbitrable. The Claimants refer in this regard to *Kano State Urban Development Board v. FANZ Construction Co*, [1990] 4 NWLR (Pt. 142) 1, where the Supreme Court cited favourably the following proposition from Halsbury's Laws of England (see Exh. LA-38, *FANZ*, p. 29):

> "A dispute or difference which the parties to an arbitration agreement agree to refer must consist of a justifiable issue triable civilly. A fair test of this is whether the difference can be compromised lawfully by way of accord and satisfaction. Thus, an indictment for an offence of a public nature cannot be the subject of an arbitration agreement."

106. The Claimants note that the FIRS recently recognized that the present dispute, or a part thereof, is between the Contractor and the NNPC, advising the Contractor in response to

its objection to the 2009 Notice of Assessment "that all areas of differences should be reconciled with NNPC ..." (see Exh. C-132). The Claimants clarify that, to the extent they have any disputes with the FIRS, those disputes have been submitted to and will be heard by the TAT. The relief in those proceedings, *i.e.* revision of the Contractor's tax assessments, is relief that the Tribunal is not empowered to give. The Claimants aver that the overliftings by NNPC occurred independently of those assessments and the TAT has no power in the proceedings before it to order NNPC to compensate the Contractor for past overliftings or to adjust its future liftings (see Statement of Reply, paras. 277-278).

107. Indeed, the Claimants observe that the FIRS itself has argued in the pending TAT proceedings that the TAT's jurisdiction does not extend to contractual disputes between the Parties in view of the presence of the arbitration clause contained in the PSC, citing the following statement by the FIRS in the appeal of the Contractor's 2009 tax assessment before the TAT (see Cl. Pre-Hearing Br., para. 165, Exh. C-143):

> "There is an Agreement between the Appellants [Contractor] and Corporation [NNPC] that sets out the machinery for the settlement of disputes as stated in Clause 21 of the PSC Contract which provides for consultation and Arbitration....
>
> The Appellants cannot approach this tribunal unless and until the Appellants exhaust the provisions as stated in Clause 21 of the PSC Agreement."

108. The Claimants aver that it is irrelevant for the purposes of the Tribunal's jurisdiction whether the money collected by NNPC has gone to a third party (see Tr. Day 3, p. 182). The Claimants insist that this case is about determining the tranches of production, not tax liability, and to the extent the production allocations are inconsistent with a Party's tax assessment, that issue may be the subject of an appeal to the TAT (see Tr. Day 3, pp. 182-183):

> "The case is about the determination of tranches of production. Royalty and cost oil are two tranches of the production which are determined before you get to tax oil. So of course they have an impact on tax oil, but tax oil does not have an impact on those tranches.
>
> The waterfall is clear. One tranche is calculated by reference to PPT liability as amended, contractually memorialised, but that is still, as I said in our opening, a tranche of production. So the distinction that must be drawn here is between, on the one hand, production allocation which is

an issue only between the parties involving compensation for over-allocation by NNPC, whether or not NNPC tells you it can pay such an award or not. And to decide that, you don't need any bridges. You don't need to enter into any Gardens of Eden. You simply need to stay within the four corners of our contract.

On the other hand, to the extent that tax assessments are inconsistent with that allocation of production, then that has to be the subject of appeal to the TAT. And that will result in a determination some years in the future. I'm told if it goes all the way up through the Nigerian legal system, many years in the future, and that will result, when finally determined, if the taxpayer is successful, in a refund of that taxation. Or a setting off against future tax responsibilities. Both of which will take into account the outcome of this contractual dispute, either by the FIRS or by these parties."

109. Finally, regarding Section 251 of the Constitution of Nigeria, the Claimants state that the Respondent's argument is based on a mischaracterization of the dispute, which the Claimants characterise as entirely contractual. The Claimants further contend that Section 251(1) of the Constitution establishes the jurisdiction of the Federal High Court as between itself and "*any other court*". Its function is therefore not to determine what categories of disputes are arbitrable but to allocate jurisdiction as between the various Nigerian judicial bodies (see Cl. Supplemental Post-Hearing Br. Para.14).

110. As regards the stabilization claim, the Claimants reject the Respondent's assertions that the Contractor improperly "reserved" its rights or that the Tribunal is incompetent to hear the Clause 19.2 claims. The Claimants aver there is no inconsistency, let alone an "estoppel", in proceeding under Clause 21 and bringing a stability claim under Clause 19.2. They note also that there is nothing in Clause 19.2 which would support an interpretation that the 90-day negotiation period is a limitation period (see Cl. Pre-Hearing Br., paras. 218-219).

111. Moreover, the Claimants contend there is no requirement under Clause 21 of the PSC or Nigerian law for the Contractor to commence new arbitral proceedings in relation to what is, in their view, an intrinsically related claim. For greater certainty, the Claimants submit that there are, in any event, compelling reasons for the Clause 19.2 claim to be determined along with the Contractor's primary claim, namely: both claims are based on the same factual matrix and NNPC will suffer no prejudice as a result of the Tribunal

considering the stabilisation claim once the 90-day negotiation window has expired, *i.e.*, 10 November 2010.

112.   The Claimants submit that this claim is not an "afterthought", explaining that the first sign of a change in policy by FIRS was its assessments of 2008 and 2009, which were respectively communicated to the Contractor in July 2009 and July 2010.  The change was only confirmed in the FIRS letter of May 2010 (see Cl. Pre-Hearing Br., para. 220).

3.   Discussion

113.   The Parties have taken different positions on the jurisdiction of the Tribunal in determining this dispute.  In other words, the Parties disagree on whether the dispute is purely contractual and, therefore, within the jurisdiction of the Tribunal or constitutional/statutory and, therefore, outside the jurisdiction of this Tribunal.   To the extent that the Parties agree that the Tribunal has jurisdiction, I understand this to mean that I may consider and determine whether the Claimants' reliefs are arbitrable within the context of the PSC.  In doing this, I will be examining the provisions of the PSC,  the 1999 Constitution and all relevant Nigerian statutes.

114.   Section 12(1) of the Act establishes that the Tribunal is competent to rule on questions pertaining to its jurisdiction.   The consequence of this is that I do not need a court ruling/judgment to determine my jurisdiction as the Act has expressly vested this in the Tribunal.

115.   Clause 21 of the PSC provides that the Tribunal has jurisdiction over "a difference or dispute between the CORPORATION and the CONTRACTOR, concerning the interpretation or performance of this Contract"   while Clause 19.1 of the PSC provides "This Contract shall be governed by and construed in accordance with the Laws of the Federation of Nigeria and any dispute arising therefrom shall be determined in accordance with such laws" (see Exh. C-1).  Simply put, this dispute cannot be resolved by examining the provisions of the PSC alone but in the context of all applicable/relevant Nigerian Laws.  In this regard, the provisions of the 1999 Constitution (Exh. LA-8), the Petroleum Act  (Exh LA-18), the Petroleum Profits Tax Act (Exh. LA-17), the Deep Offshore Act  (Exh. LA-9Bis) and the FIRS Act (Exh RL-1), among others, shall be

considered as well as the proper interpretation of *Kano State Urban Development Board v. FANZ Construction Co*, [1990] 4 NWLR (Pt. 142) 1 (see Exh. LA-38).   This is underscored by the fact that the Respondent's powers to enter into the PSC cannot be determined in the abstract but by locating it in the context of Nigerian laws.

116.   As a preliminary issue, it must be stressed that the Tribunal has the jurisdiction to interpret the  PSC and all relevant tax statutes.  However, the challenge is whether  in interpreting these provisions, the Tribunal has the jurisdiction to determine disputes arising from their interpretation as well as the respective taxes payable by the Parties.  It is pertinent, therefore,  to examine the constitutional and statutory basis giving right to the PSC's execution and the rights of the Parties under the PSC and relevant tax laws. Furthermore, the references to various legislative provisions in this arbitration shows clearly that the  dispute cannot be resolved by interpreting the PSC only but an examination  and interpretation of all relevant Nigerian laws.

117.   Under the Nigerian legal system, there is the doctrine of judicial notice which is a common law principle[7]  Under this doctrine, statutes are not pleaded and proved because courts/tribunals are deemed to know them.   However, for ease of exposition, I will examine the relevant provisions of the 1999 Constitution and relevant statutes.

118.   Section  1(1) and (3) of the 1999 Constitution of the Federal Republic of Nigeria provides that the  Constitution is supreme and its provisions shall have binding force on all authorities and persons throughout the Federal Republic of Nigeria and if any other law is inconsistent with the provisions of the Constitution, the Constitution shall prevail and that other law shall, to the extent of its inconsistency, be void.    Similarly, section 44(3) of the 1999 Constitution provides, inter alia, that the entire property in and control of all minerals, mineral oils and natural gas in, under or upon any land in Nigeria or in, under or upon the territorial waters and the Exclusive Economic Zone of Nigeria shall vest in

---

[7] Similar to Art II of the Federal Rules of Evidence (FRE) of the United States.  It is a common law doctrine that is part of the Nigerian legal system.

the Government of the Federation and shall be managed in such matter as may be prescribed by the National Assembly.[8]

119.   In pursuance of this section 44(3) of the Constitution, the Petroleum Act was passed by the National Assembly vesting the powers to manage the petroleum resources in the Minister of Petroleum Resources.  It is in exercise of these powers that the Minister of Petroleum Resources granted Oil Prospecting Licence ("OPL") No. 209 to the Respondent.  Under Section 5 of the First Schedule to the Petroleum Act, the holder of an Oil Prospecting Licence shall have exclusive right to explore and prospect for petroleum within the area of its licence (see Exh. LA-18).

120.   The Respondent, in turn, contracted the Claimants to explore and prospect for petroleum on its behalf as the exclusive owner of OPL 209.  This is reflected at Clause 2.1 of the PSC which acknowledges that the Respondent is the holder of all rights in and to the Contract Area and  that the Respondent appointed the Contractor (the Claimants) as the company to conduct petroleum operations in the Contract Area (see Exh. C-1). Consequently, from inception, the rights to OPL 209 are held exclusively by the Respondent and not shared with the Claimants.  Similarly, in determining the duties imposed by the PSC on the parties, it is pertinent to locate the right of title to OPL 209 in the Nigerian legal system.

121.   The provisions of the FIRS Act and section 251 of the Constitution have been exhaustively highlighted.   Where, therefore, in a country where the Constitution is supreme, the Constitution vests exclusive powers regarding a subject matter in the Federal High Court, the crucial question is whether such powers can be shared concurrently  with an Arbitral Tribunal more so that Section 251 of the Constitution also alludes to the additional powers that the National Assembly can confer on the Federal High Court (see Exh. LA-8).  In exercise of these powers, the National Assembly passed the FIRS Act and vested additional powers regarding tax issues in the TAT and Federal High Court (see Exh. RL-1).

---

[8] Section 1 of the Petroleum Act (Exh LA-18) has similar provisions

122. Section 251(1)(b) of the 1999 Constitution vests exclusive jurisdiction in the Federal High Court in civil causes and matters connected with or pertaining to the taxation of companies and other bodies established or carrying on business in Nigeria and all other persons subject to Federal taxation while section 59(2) of the FIRS Act provides that the TAT shall have powers to settle disputes arising from the operations of the FIRS Act and under the First Schedule to the Act (see Exh. RL-1). One of the laws listed in the First Schedule to the FIRS Act is the Petroleum Profits Tax Act. In other words, the TAT has jurisdiction over the disputes arising from the operations of the Petroleum Profits Tax Act.

123. Section 11(1) of the Fifth Schedule of the FIRS Act empowers the TAT to adjudicate on "disputes or controversies arising from the ... Petroleum Profits Tax Act CAP, 354 LFN; 1990" (see Exh. RL-1).

124. A thorough examination of the provisions of Clauses 19.1 and 21 of the PSC show clearly that the contractual rights of the parties to the PSC cannot be determined without reference to the relevant Nigerian laws. In other words and as will be shown when the various tranches of the taxes are being analysed, the dispute between the parties is not merely contractual but also fundamentally constitutional and statutory. The next question is the use of the words, "to the exclusion of any court" in Section 251 of the Constitution. Does that apply to this Arbitral Tribunal? Under Nigerian law, the term "court" includes tribunal.[9] I hold the view that 'court' referred to in the Constitution also refers to tribunals like the present Arbitral Tribunal that performs judicial functions. Consequently, this Arbitral Tribunal is caught by this constitutional provision.

125. Under Nigerian law, the issue of jurisdiction can be raised at any time. It is so critical that it robs any tribunal of its competence to adjudicate. It is immaterial, therefore, that the Respondent started its preliminary objection with the provisions of the FIRS Act and later anchored its jurisdictional objection on the 1999 Constitution (see Resp. Post-Hearing Brief, p. 41).

---

[9] Indeed in section 36 of the 1999 Constitution, 'court' and 'tribunal' are used interchangeably such that a tribunal that performs judicial functions is also viewed as a court. Subsections (1), (3), (4), (7) and (9) of section 36 of the

126. It is well settled under Nigerian law that where a court/tribunal lacks jurisdiction, the proceedings, no matter how well conducted, amount to a nullity.

127. The combined effect of Section 251(1)(b) of the 1999 Constitution and Section 59(2) of the FIRS Act is that although this Arbitral Tribunal has the jurisdiction to interpret the provisions of the PSC and relevant tax legislation, it lacks the jurisdiction to determine the disputes between the parties. Consequently, this dispute is not arbitrable. Similarly, the issues raised by the Claimants in paragraph 284 of the Reply where attempts were made to draw a line regarding 'disputes arising from', 'those relating to' and 'in connection with' are answered in section 251(1)(b) of the Constitution which expressly provides that the Federal High Court has exclusive jurisdiction in civil causes and matters 'connected with' or 'pertaining to' the taxation of companies in Nigeria. The determination of the dispute in this reference is connected with and pertains to the taxation of a company in Nigeria, in this case, the taxes payavle by the Claimants. To that extent, therefore, the dispute is not arbitrable although the Arbitral Tribunal has the jurisdiction to interpret the provisions of the PSC and the relevant tax legislations.

128. Under Nigerian law, there is no statute listing subject matters that are arbitrable and those that are not,[10]. Indeed, it has been argued in Exh LA- 51, that the categories of arbitrable matters are never closed. However, in *Kano State Urban Development Board v. Fanz Construction Co. Ltd.*, [1990] 4 NWLR 1, the Supreme Court of Nigeria adopted a test for arbitrability based on Halsbury's *Laws of England*, 4th ed. (see Exh. LA-38):

> As to the nature of the dispute or difference the same work says at page 256 paragraph 503:-
>
> 503.   The dispute or difference which the parties to an arbitration agreement agree to refer must consist of a justiciable issue triable civilly. A fair test of this is whether the difference can be compromised lawfully by way of accord and satisfaction. Thus an indictment for an offence of a public nature cannot be the subject of an arbitration agreement, nor can disputes arising out of an illegal contract nor disputes arising under agreements void as being by way of gaming or wagering. Equally,

---

1999 Constitution are relevant. Similarly in Black's Law Dictionary, 9th Edn, page 1646, a 'tribunal' is defined as a court or other adjudicatory body.

[10] See Article 577 of the Code of Civil Procedure of Cameroon and Article 7 of the 1993 Tunisian Code which expressly listed non-arbitrable matters.

disputes leading up to change of status, such as a divorce petition, cannot be referred, nor, it seems, can any agreement purporting to give an arbitrator the right to give a judgment in *rem*. Similarly, there is no dispute within the meaning of an agreement to refer disputes where there is no controversy in being, as when a party admits liability but simply fails to pay, or when a cause of action has disappeared owing to the application, where it now continues to apply, of the maxim *action personalis moritur cum persona*." (emphasis added)

129.   Although the Supreme Court left open the category of matters that may be considered to be non-arbitrable, in adopting the test for arbitrability set out in Halsbury's *Laws of England* it provided some guidance as to the class of disputes that are likely to fall within the parameters of arbitrable disputes in Nigeria, *i.e.*, disputes that are triable civilly or capable of settlement by way of accord and satisfaction.

130.   It is noteworthy that under Section 48(b)(i) of the Arbitration and Conciliation Act, an award may be set aside if the court finds that the subject matter of the dispute is not capable of settlement by arbitration under the laws of Nigeria.   This is the nearest provision on the issue of arbitrability under Nigerian law though disputes 'capable of settlement by arbitration under the laws of Nigeria' are not defined anywhere.

131.   In paragraph 288 of their Reply, the Claimants stated that the issue of the Tax Oil that NNPC is contractually entitled to lift pursuant to the PSC is a "difference (that) can be compromised lawfully by way of accord and satisfaction".   I agree with this position contractually.   However, when located within the Nigerian legal environment, it is clear that such a contractual provision must be interpreted within the context of the 1999 Constitution and tax laws.   When so juxtaposed, it becomes clear that a contractual provision cannot override a constitutional/statutory provision and, therefore, the difference cannot be compromised by the parties.   Consequently, the issue of what amounts to tax oil or what is tax deductible is statutory and what is not cost recoverable cannot be tax deductible (Exh.  RC-1).  I hold  and determine that the Parties to this reference cannot compromise tax issues without reference to the relevant tax legislation and interpretation by a third party, that is, the FIRS..

132.   I also hold that the critical question is whether the Parties to this dispute can settle privately  by way of accord and satisfaction what has been constitutionally/statutorily

provided for in the Constitution and the FIRS Act and answer the question in the negative.

133.   It is clear as a matter of Nigerian law that, "it is the Statement of Claim that determines the jurisdiction of the court, in other words, the jurisdiction to entertain any suit or matter." (see *Stabilini Visinoni Limited v Federal Board of Inland Revenue*, [2009] 13 NWLR (Pt. 1157) 200, Court of Appeal (Ibadan Division), at 222, Exh. LA-62). A careful examination of the relief sought by the Claimants shows that the thrust of the claim is about computation of royalty oil, cost oil, tax oil, profit oil, preparation of tax returns – all computed in accordance with tax legislations especially the Petroleum Profits Tax Act that is in the First and Fifth Schedule to the FIRS Act.

134.   I have read the ICC Case No. 6233, Final Award of 1992 where the tribunal held thus(Exh. LA-46):

> "Only this distinction allows the arbitral tribunal to respect both the arbitration clause conferring upon it the power to decide disputes relating to agreements between parties, and the exclusive jurisdiction of State courts in tax matters. **The claims that the arbitral tribunal has been asked to decide in this case are, judging by their subject, not tax claims even if they can be relevant to such claims." (Emphasis added)**

135.   First and foremost, under the doctrine of judicial precedent, this particular ICC award has no force of law in Nigeria as this reference is a domestic reference and not international.   Second and more fundamentally, the claims that the tribunal in that reference was asked to decide were not tax claims even if they could have been relevant to such claims; whereas the dispute in this reference cannot be resolved without a total examination of tax laws, as the thrust of the dispute concerns tax claims. Consequently this reference can be distinguished in the sense that this reference is about tax claims embedded in a contract.

136.   For all these reasons,  I find that while the Arbitral Tribunal has the jurisdiction to interpret the PSC and the relevant Nigerian laws, the dispute between the Parties in this reference cannot be determined by this Arbitral Tribunal. Though  triable civilly, it is

incapable of being compromised by way of accord and satisfaction, and is therefore not arbitrable. This is not to say that there is no dispute between the parties but that arbitration is not the proper forum for resolving the Parties' disputes connected with or pertaining to the taxation of companies in Nigeria.

137.  I note that the FIRS has also, in another forum, taken the view that at least some of the matters in dispute are subject to the Tribunal's jurisdiction. Specifically, in its reply to the Contractor's appeal before the TAT of its 2009 Notice of Assessment, the FIRS sought an order dismissing the appeal "as incompetent in its entirety" on the grounds the Contractor had not availed itself of Clause 21 of the PSC (see Exh. C-143):

> "1.  There is an Agreement between the Appellants and Corporation that sets out the machinery for the settlements of disputes as stated in Clause 21 of the PSC Contract which provides for consultation and Arbitration.
>
> 2.   In addition Annex D Article IV(2) provides that in event the Corporation disagrees with any of the contractor's reports, the area of disagreement shall be mutually resolved by the Appellants and the Corporation to the satisfaction of the Ministry. The Appellant shall thereafter prepare a revised report to reflect the changes agreed.
>
> 3.  The Appellants have failed, neglected and refused to adopt and exhaust the provisions of the said clause to the commencement of this Appeal.
>
> 4. The Appellants cannot approach this tribunal unless and until the Appellants exhaust the provisions as stated in Clause 21 of the PSC."

138.  It is important to stress that in referring to the matter before the TAT, the Claimants have not drawn a line between the FIRS and the TAT – both statutorily established. The Claimants' case in this regard would have been stronger if they exhibited the Ruling/Judgment of the TAT denying jurisdiction. Merely stating a submission by a Counsel to FIRS is not enough and cannot be held to be the position of the law in this matter. I have no hesitation, therefore, in rejecting this exhibit (see Exh. LA-143) that has no evidential value.

139.  Accordingly, I find that although the Arbitral Tribunal has jurisdiction to interpret the provisions of the PSC and relevant Nigerian laws, it has no jurisdiction over the Claimants' claims under Clause 21 of the PSC bordering on civil causes or matters connected with or pertaining to the taxation of companies in Nigeria.

140.    As regards the Claimants' stabilization claim, I hold that the import or scope of Clause 19.2 of the PSC is different from that of Clause 21.   Moreover, the conditions precedent clearly stated in Clause 19.2 have not been met.    Although the Arbitration and Conciliation Act and the Arbitration Rules provide for amendment, my view is that such amendment is inappropriate having regard to the delay in making it or prejudicial to the other party.   According to Article 20 of the Arbitration Rules, a claim may not be amended in such a manner that the amended claim falls outside the scope of the arbitration clause or separate arbitration agreement.  I hold that the scope of Clause 21 is different from the scope of Clause 19.2 and therefore  such amendment to accommodate the scope of Clause 19.2 of the PSC is outside the scope of Clause 21 of the PSC.

141.    Clause 19.2 of the PSC is to  be invoked within 90 days following the date on which the change in question took effect.  To determine, therefore, whether the Claimants properly triggered Clause 19.2, the following elements are pertinent:

(a) FIRS Assessment for Education Tax issued on 14 July, 2009 (see **Exh C-93**, and not August 2010.  It is this assessment of 14 July, 2009 that signified the change in policy warranting the invocation of Clause 19.2 of the PSC;

(b) Notice of Arbitration dated 31 July, 2009, (see pp 11-12).  At the time the Notice was issued, there had already been a change in policy;

(c)  Statement of Claim dated 13  April, 2010 (see  para 21) where the Claimant acknowledged that the FIRS Assessment had been issued on 14 July, 2009;

(d) Statement of Defence dated 30 June, 2010 (see para 1.5);

(e) Statement of Reply dated 11 October, 2010 (see paras 306 – 308); and

(f) Rejoinder dated 3rd December, 2010 (See paras 17-20 and 108)

142.    When such a change in policy takes place, the parties are expected to use their best efforts to agree to a modification of the PSC so as to compensate the Contractor (the Claimants) for the effect of such changes.   If the parties fail to agree on such modifications within a period of 90 days, then the dispute will be referred to arbitration as provided in Clause 21 of the PSC.

143.    I hold that the change in policy took place on 14 July, 2009.  I therefore disagree with the position of the Respondent that there was no change in policy.  I also disagree with the Claimants that the change in policy took place in August, 2010.

144. From the foregoing, it is very clear that the change in policy took effect from 14 July, 2009 (and before the filing of the Notice of Arbitration on 31 July, 2009). Consequently, the 90-day notice provided for in Clause 19.2 started to run from 14 July, 2009 and the Claimants' failure to give the required notice is fatal to their case.

145. Under Nigerian law, by invoking Clause 21 of the PSC instead of Clause 19.2 of the PSC and the fact that the change in policy contemplated took place, the Claimants are deemed to have waived their rights to Clause 19.2. Estoppel would then lie against the Claimants. Estoppel is a notorious principle in common law jurisdictions. According to this principle a party to a case is not allowed to split the causes of action into two or more and litigate them in parts. (See *Alhaji Bature Gafai v United Africa Company Ltd* (1961) All Nigeria Law Reports 814, *Fidelitas Shipping Company Ltd v V O Exportchlet* (1965) 2 All England Law Reports 4 at 9-10 and *Raimi Okunola Ishola Fabunmi v Layiwola Oyewusi* (1990) 6 Nigerian Weekly Law Reports, 728 at 737).

146. The Respondent objects to the admissibility of the stabilization claims on two grounds: (1) the claim cannot be brought in the absence of a formal application by the Contractor to amend its Statement of Claim; and (2) Clause 19.2 cannot be invoked concurrently with Clause 21, as the latter clause operates as an estoppel (see Respondent's Rejoinder, para 18(i) and 18(ii)).

147. Section 19(3) of the Act provides that a claim may be amended or supplemented:

> "Unless otherwise agreed by the parties, a party may amend or supplement his claim or defence during the course of the arbitral proceedings if the arbitral tribunal considers it appropriate to allow such amendment or supplement having regard to the time that has elapsed before the making of the amendment or supplement."

148. The Act does not impose any additional requirements, such as a requirement that the Statement of Claim or Defence be formally amended.

149. It has been submitted by the Claimants, and is uncontested by the Respondent, that this provision is based on Article 20 of the Arbitration Rules set out in Schedule I to the Act, which provides as follows:

> During the course of the arbitral proceedings either party may amend or supplement his claim or defence unless the arbitral tribunal considers it inappropriate to allow such amendment having regard to the delay in making it or prejudice to the other party or any other circumstances. However, a claim may not be amended in such a manner that the amended claim falls outside the scope of the arbitral clause or separate arbitration agreement.

150.  I consider it appropriate to interpret Section 19(3) of the Act consistently with Article 20 of the Arbitration Rules.  No formal amendment requirements are found in Article 20 of the Arbitration Rules.   I agree with the Claimant that in invoking Article 20 of the Arbitration Rules, no formal application is required.

151.  I hold that the only *prima facie* limitation to accepting an amendment pursuant to Article 20 of the Arbitration Rules is if the amended claim falls outside the arbitration clause or is found in a separate arbitration agreement.

152.  My view is that it was inappropriate for the Claimants to trigger the stabilization claim in the way they did in the course of the proceedings under Clause 21 of the PSC and that Clauses 19.2 and 21 cannot be invoked concurrently. It is Clause 19.2 that triggers Clause 21 and not vice versa.   Secondly, the proposed amendment falls outside the scope of Clause 21 of the PSC.  In my view, therefore, the Respondent was right to request that the present reference be withdrawn before Clause 19.2 could be invoked.

153.  I agree with the submission of the Respondent that the stabilization claim is incompetent as it was not commenced in accordance with the express terms of Clause 19.2 of the PSC. I further agree that Clause 21 of the PSC operates as estoppel as the Claimants are deemed to have waived their rights under Clause 19.2 of the PSC

154.  Accordingly, I determine that the Arbitral Tribunal has no jurisdiction to hear the Claimants' alternative and additional claims under Clause 19.2 of the PSC.   In the circumstances, I dismiss the claims under Clause 19.2 of the PSC in their entirety.

155.  To the extent that the Arbitral Tribunal has no jurisdiction to determine civil causes or matters connected with or pertaining to taxation of companies in Nigeria, I would allow the Respondent's jurisdictional objections. Consequently, in my opinion the Arbitral Tribunal has no  jurisdiction to determine the Claimants' main claims pursuant to Clause

21 of the PSC, as well as their alternative and additional claims pursuant to Clause 19.2 of the PSC.

### C.   *Liability*

#### 1.   Enforcement of the PSC

##### a)   *The Respondent's Position*

156.   The Respondent submits that Clause 2.4 of the PSC, which provides that the Contractor is engaged in "Petroleum Operations", is inconsistent with Section 2 of the PPT Act, which defines "Petroleum Operations" as "the winning or obtaining and transportation of petroleum or chargeable oil in Nigeria by or on behalf of a company for its own account". According to the Respondent, the Contractor has not, at any time, been engaged in petroleum operations for its own account and is therefore not subject to PPT liability nor entitled to tax benefits under the PPT Act.   Rather, pursuant to Clause 2.1 of the PSC, its is engaged as an agent of NNPC, and is therefore engaged in petroleum operations for NNPC's account, not for its own account.

157.   The Respondent describes Clause 2.4 as a "hangover" from the traditional joint venture arrangements in existence prior to the advent of production sharing contracts, such as the Erha PSC (see Statement of Defence, para. 4.2(a); Tr. Day 1, p. 134).   Under those arrangements, both joint venture partners had title to the OPL/OML and were considered to be engaged in petroleum operations within the meaning of the PPT Act.   As a result, the Respondent argues that Clause 2.4 of the PSC is unenforceable.   The Respondent submits that the legislation enacted to give effect to the terms of the PSC (*i.e.*, Decree No. 9 or the *Deep Offshore Act*) failed to give Clause 2.4 the necessary validity to overcome this inconsistency (see Statement of Defence, para. 4.6(2)).

158.   The Respondent further explains that under the terms of the PSC, NNPC holds the OPL and the OML to explore and develop the Erha contract area.   As the sole licence holder, the Respondent submits that only NNPC is engaged in petroleum operations.   The Respondent also refers to Sections 5 and 11 of the First Schedule of the Petroleum Act, which give the holder of an OPL and the lessee of an OML the exclusive right to explore and prospect for petroleum within the licence area (see Statement of Defence, para. 4.3(b)).

159.    The Respondent adds that the Contractor does not – and cannot – have an interest in the petroleum reserves because the Nigerian Constitution provides that all petroleum *in situ* in Nigeria belongs exclusively to the Federal Government (see Statement of Rejoinder, para. 42). The Respondent acknowledges, however, that the Contractor has an economic interest in the development and production of crude oil from the contract area (see Resp. Pre-Hearing Br., para. 5.9).

160.    The Respondent dismisses the Claimants' reliance on Clause 11.1 of the PSC and the Second Memorandum, arguing that the Contractor does not own the equipment used in "petroleum operations", but rather has a contractor's lien over the equipment, and therefore is not assisted by these provisions (see Statement of Rejoinder, para. 45-47).

                    *b)      The Claimants' Position*

161.    The Claimants submit that the PSC and its implementing legislation support the view that the Contractor is engaged in "Petroleum Operations" within the meaning of the PPT Act. Specifically, the Claimants note that Clause 2.1 of the PSC provides for "Petroleum Operations and provision of financial and technical requirements by the CONTRACTOR"; Clause 5.1 contemplates that the annual Work Programme and Budget will "set[] forth the Petroleum Operations which CONTRACTOR proposed to carry out"; Clause 6.1(c) records that the Management Committee will ensure that "the CONTRACTOR … conducts Petroleum Operations pursuant to this Contract"; and Clause 7.1(c) states that the Contractor is to "carry out approved Work Programmes", which themselves "itemiz[e] the petroleum operations to be carried out in the Contract Area" (see Statement of Reply, para. 53; Exh. RC-1).

162.    As regards Nigerian legislation, the Claimants submit that Decree No. 9 (now the *Deep Offshore Act*) establishes that both the Contractor and NNPC are considered to carry out petroleum operations under the PSC (see Statement of Reply, paras. 64-65). For example, Section 12 provides that the "chargeable tax on petroleum operations in the contract area under the Production Sharing Contracts shall be split between the Corporation … and the Contractor in the same ratio as the split of profit oil as defined in the Production Sharing Contract between them." The Claimants argue that the *Deep Offshore Act* confirms that the PPT Act applies to all operations pursuant to the PSC in

the manner provided for in the PSC and that, by virtue of its Sections 1 and 15, the *Deep Offshore Act* prevails over any inconsistent legislation, including the PPT Act. The Claimants aver that there has been no legislative failure in the enactment of the *Deep Offshore Act*.

163. As a practical matter, the Claimants also submit that the Contractor has a clear economic interest in the development of petroleum deposits in the contract area, as reflected in Clause 2.3 of the PSC. The Claimants aver there is no inconsistency in NNPC holding the OPL and OML and in eventually taking title to the equipment used in Petroleum Operations, on the one hand, and the Contractor conducting Petroleum Operations for its own account, on the other hand. The Claimants observe that Clause 11.1 of the PSC states that both the Contractor and NNPC have the right to use equipment for Petroleum Operations and, in any event, pursuant to the Second Memorandum the Contractor retains ownership of the equipment for Petroleum Operations until the end of the PSC or until the cost thereof is fully recovered (see Statement of Reply, paras. 77-78).

164. The Claimants contest the Respondent's interpretation of Sections 5 and 11 of the First Schedule to the Petroleum Act, reasoning that these provisions have nothing to do with who is deemed to conduct Petroleum Operations. Rather, the Claimants submit that these provisions are aimed at establishing the license or leaseholder's exclusivity in the contract area vis-à-vis others who may have been granted permission to prospect for or exploit petroleum resources in the area (see Statement of Reply, para. 85; Exh. LA-18).

165. Moreover, the Claimants argue that the Respondent takes an overly narrow reading of Section 2 of the PPT Act, emphasizing that "Petroleum Operations" include tasks performed by a company on behalf of another company, *i.e.* an agent, which is still considered to be performing those tasks for its own account (see Statement of Reply, para. 81; Exh. LA-17).

166. The Claimants submit that the Respondent is, in effect, asking the Tribunal to declare the entire PSC unenforceable, reasoning that a provision specifying the applicable fiscal regime is undoubtedly fundamental to the PSC and not subject to severance. The Claimants add that the Respondent itself was unable to say whether Clause 2.4 is

severable from the rest of the PSC when asked during the Hearing (see Cl. Post-Hearing Br., para. 32; Tr. Day 1, pp. 135-136; Day 3, p. 221).

c)      Discussion

167.   The Respondent appears, in essence, to take the position that the Contractor does not conduct petroleum operations for its own account because it is an agent of NNPC, and Clause 2.4 of the PSC therefore gives rise to an inconsistency with Section 2 of the PPT Act the effect of which is to render Clause 2.4 void *ab initio*.

168.   Clause 2.4 of the PSC provides as follows:

> "The CONTRACTOR is engaged in Petroleum Operations pursuant to the Petroleum Profits Tax Act 1959 Cap 354 Laws of the Federation of Nigeria 1990 ("PPT Act") as amended and accordingly the Companies Income Tax Act 1979 Cap 60 Laws of the Federation of Nigeria 1990, as amended, shall have no application."

169.   Section 2 of the PPT Act defines "Petroleum Operations" as follows (see Exh. LA-17):

> "... the winning or obtaining and transportation of petroleum or chargeable oil in Nigeria by or on behalf of a company for its own account by any drilling, mining, extracting or other like operations or process, not including refining at a refinery, in the course of a business carried on by the company engaged in such operations, and all operations incidental thereto and any sale of or any disposal of chargeable oil by or on behalf of the company;" (emphasis added)

170.   I agree with the majority reasoning that the qualification that a company engaged in the winning or obtaining and transportation of petroleum be so engaged "for its own account" is not inconsistent with a company performing such tasks as an agent of another company.  On the contrary, Section 2 of the PPT Act appears to contemplate precisely such an arrangement.  In my view, although the Act does not provide any guidance as to what being engaged for one's "own account" means, an agency relationship is established between the Claimants and the Respondent.

171.   Clauses 2.1 and 2.3 of the PSC confirm that the Contractor is engaged in Petroleum Operations on behalf of NNPC and has an "economic interest" in the development of petroleum deposits in the Contract Area (see Exh. C-1):

•   - 54 -

"2.1 This Contract is a Product Sharing Contract governed in accordance with the terms and provisions hereof. Petroleum Operations and provision of financial and technical requirements by the CONTRACTOR in accordance with the terms of this Contract shall be in consultation with the CORPORATION. The CORPORATION, as holder of all rights in and to the Contract Area, hereby appoints and constitutes the CONTRACTOR the exclusive company to conduct Petroleum Operations in the Contract Area.

...

2.3 The CONTRACTOR shall provide funds and bear the risk of Operating Costs required to carry out Petroleum Operations and shall therefore have an economic interest in development of Crude Oil deposits in the Contract Area."

172.    Moreover, Clause 8.1 of the PSC affirms that the Contractor is entitled to a share of any Profit Oil, being the balance of available crude oil after the deduction of royalty, cost and tax oil.

173.    Mr. Dike, the Director of the FIRS, was also cross-examined on this issue. After initially refusing to answer whether the Contractor was engaged in Petroleum Operations, Mr. Dike finally stated that he was not qualified to answer this question (see Tr. Day 2, pp. 57-61). However, he later testified that the Contractor is, in essence, an agent of NNPC, and therefore not a company engaged in Petroleum Operations for its own account (see Tr. Day 2, p 102):

"Q.  Let's walk through the grounds, because in this document the FIRS is, first of all, confirming in ground 1 that the appellants – that's the contractors under the Erha PSC – are indeed companies engaged in petroleum operations. This is particulars 2 on page 1680 – are indeed companies engaged in petroleum operations to which the Petroleum Profits Tax Act and the Deep Offshore Act applies.

You don't disagree with him, do you?

A.  I think there's a need for some kind of clarity there. Companies as companies, and then companies who are in their own individual rights winning or obtaining a licence to engage in petroleum operations for their own account, and then companies acting as agents of another entity.

So to that extent, I don't agree that there is – a company may be a company engaged in a petroleum licence, you know, so to do. But I then assumes a different life under a different engagement.

Q.  So you would read that as saying the appellants being companies engaged as agents in petroleum operations?

●    - 55 -

A. If you so say.

Q. What do you say?

A. Well, your words, You put the words. And I adopt your words."

174. Aside from the apparent contradiction between this testimony and the language of Section 2 of the PPT Act, as well as Mr. Dike's own admission that he is not competent to express an opinion on the matter, the document put to Mr. Dike (*i.e.*, the FIRS' Reply to the Contractor's Notice of Appeal concerning its 2009 Tax Assessment) does not contain such a distinction. Rather, the document appears to confirm that the Contractor *is* engaged in "Petroleum Operations" within the meaning of the PPT Act (see Exh. C-143):

> "That the Appellants being companies engaged in petroleum operations, the Petroleum Profits Tax Act and the Deep Offshore and Inland basin production Sharing Contracts Act applies in ascertaining the education tax payable by the appellants pursuant to S.1(3) of the Education tax Act."

175. Sections 5 and 11 of the First Schedule of the Petroleum Act do not shed any additional light on the alleged inconsistency between Clause 2.4 of the PSC and Section 2 of the PPT Act. These provisions establish the exclusivity of the rights of licence and lease-holders (the Respondent) to explore and prospect for petroleum, but do not speak to who conducts petroleum operations for the purposes of the PPT Act.

176. Finally, despite some suggestion that there was a legislative failure in enacting the *Deep Offshore Act*, the Respondent itself relies on this Act in support of various elements of its case, including for the proposition that certain inconsistent provisions of the PPT Act must give way to provisions of the *Deep Offshore Act* (see e.g., Resp. Pre-Hearing Br., para. 8.5). In its post-hearing submissions, the Respondent also relies on the *Deep Offshore Act* in support of its contention that the Act gave legislative effect to the fiscal incentives in the Letter of Guarantee, thereby rendering the Guarantee no longer relevant (see Resp. Post-Hearing Br., para. 2.4). I agree with the majority reasoning that there is no basis on which to conclude that the *Deep Offshore Act* failed to accomplish its purpose of "giv[ing] effect to certain fiscal incentives given to the oil and gas companies operating in the Deep Offshore and Inland Basin areas under production sharing contracts between the Nigerian national Petroleum Corporation or other companies holding oil prospecting licenses or oil mining leases and various petroleum exploration and

production companies." Moreover, Sections 1 and 15 of the *Deep Offshore Act* clearly establish its priority over all other Nigerian legislation to the extent of any inconsistency, including the PPT Act.

177. Based on the foregoing, I conclude that the Contractor is indeed engaged in "Petroleum Operations", within the meaning of Section 2 of the PPT Act as an agent of the Respondent and not in its own exclusive right or account. As agents the Claimants are accountable to the Respondent while the Respondent is obliged to comply with the provisions of all relevant Nigerian laws. Therefore Clause 2.4 of the PSC is valid.

2.    The Lifting Allocation Claim

a)    *The Claimants' Position*

178. The Claimants take the position that the Respondent has breached the PSC by disregarding the Contractor's Lifting Allocation and unilaterally overlifting production. The Claimants explain that the Respondent has accomplished this by threatening a *de facto* shut-in of production. The Claimants rely on Articles III(3) and III(4) of Annex C of the PSC, which contemplate that "the CONTRACTOR shall notify the CORPORATION of the estimated Lifting Allocation and each Party shall notify the other of its Primary Nomination of Available Crude Oil which it intends to lift … which shall not exceed its estimated Lifting Allocation" (see Statement of Claim, paras. 142-143; Statement of Rejoinder, para. 105; Exh. C-1). The Claimants add that in estimating the Lifting Allocation, the Contractor is required pursuant to the terms of Clause 8 and Annex B to determine the amount of oil to be lifted by the Contractor and/or NNPC in respect of each tranche of oil (see Cl. Post-Hearing Br., para. 49(c)).

179. The Claimants disagree that the procedure set out in Annex C of the PSC was abandoned or modified, averring that the changes to Annex C were limited to timing and meeting format changes, *i.e.* moving to monthly rather than quarterly lifting allocation meetings, in order to streamline the process and make it more competitive with processes in Angola (see Statement of Rejoinder, paras. 108-109).

180. As regards the Respondent's argument that the Contractor unilaterally amended the PSC by introducing its entitlement model without NNPC's approval, the Claimants explain

that the entitlement model is "simply a tool to track and implement" Clause 8.1 of the PSC and its related provisions in Annexes B and C. In any event, the Claimants assert that they discussed the entitlement model with NNPC in 2006 and while NNPC indicated that it did not agree with certain inputs, it did not object to the model itself or its use (see Statement of Reply, para. 114).

181.    Turning to the Respondent's arguments in connection with the *Petroleum (Drilling and Production) Regulations*, the Claimants argue that the Regulations do not alter the Parties' agreement that the Contractor will determine the prospective Lifting Allocations for both Parties. Moreover, the Claimants contend that there is no inconsistency between NNPC's regulatory obligations and the contractual allocation of responsibility to the Contractor to prepare Lifting Allocations (see Statement of Reply, paras. 118-121).

182.    The Claimants dismiss the Respondent's reliance on other provisions of the PSC in support of its position that NNPC has approval rights in respect of Lifting Allocations. Specifically, the Claimants describe Article 1.1 of the PSC as a "general, introductory statement" which fails to address the specific allocation of rights and obligations set out in Annex C. Similarly, the Claimants contend that Article IV.2 of Annex D and Article IV of Annex B have nothing to do with the prospective Lifting Allocations determined by the Contractor under Annex C. Rather, in their view, these provisions relate to NNPC's right to approve and/or challenge reports and lifting allocation schedules submitted by the Contractor *retrospectively* in order to, for example, reconcile Lifting Allocations with actual liftings. Overall, the Claimants submit that Annex B reinforces the Contractor's role in determining Lifting Allocations by referring back to the Contractor's rights under Annex C to designate the Parties' Lifting Allocations (see Statement of Rejoinder, paras. 125-134).

183.    With regard to Article IV.4 of Annex C, the Claimants note the "inconsistency" in the Respondent's reliance on this provision while simultaneously claiming that Annex C has been abandoned. Substantively, however, the Claimants contend that this provision addresses potential disagreement between the Parties in respect of how much Available Crude Oil was actually lifted and imposes no limitation on the Contractor's right to determine Lifting Allocations prospectively (see Statement of Rejoinder, paras. 135-138).

*b)*      *The Respondent's Position*

184.   According to the Respondent, the Parties' differing positions in respect of Lifting Allocations have been evident since 2005 when the Claimants created a different entitlement model. Although these issues have been discussed between the Parties, the Respondent contends that it decided to insist upon enforcing its rights by rejecting the Claimants' interpretation of the PSC and implementing its own interpretation thereof, which has been accepted by the FIRS (see Statement of Defence, para. 9.4; Exh. RC-1).

185.   The Respondent submits that, prior to production in 2006, the Contractor and NNPC agreed, "by their conduct", to disregard or abandon the allocation procedure set out in Annex C to the PSC.  The Respondent further contends that the Contractor "unilaterally modified" the PSC in breach of Clause 22.2 by developing an entitlement model without NNPC's approval, which was required by Section 15.2 of the *Petroleum (Drilling and Production) Regulations* (see Statement of Defence, para. 8.6-8.8; Exh. LA-11).

186.   The Respondent also relies upon Section 15.2 *Petroleum (Drilling and Production) Regulations* in support of its position that the Contractor's lifting allocations have to be approved by NNPC.  Section 15.2 provides as follows (see Exh. LA-11):

> "15- (2) The licensee or lessee may exercise any of his rights or powers through agents or independent contractors, but shall be responsible for all the actions of the agents and contractors in question."

187.   The Respondent further refers to Section 53 of the *Petroleum (Drilling and Production) Regulations*, which provides that NNPC is obligated to "keep full accurate accounts" of crude oil produced in the Contract Area, for the proposition that the Claimants' Lifting Allocation must be approved by the Respondent (see Exh. LA-11).  This is reinforced, in the Respondent's view, by Article I(1) of Annex C to the PSC, which provides that "… the *parties* shall allocate all lifting of available crude oil …" (Respondent's emphasis). In other words, the Lifting Allocation is not a unilateral act of the Claimants (see Statement of Defence, paras. 9.2; Statement of Rejoinder, paras. 61-62).

188.   The Respondent notes that Clause 8 of the PSC provides that "the allocation of Available Crude Oil shall be in accordance with the *Accounting Procedure (Annex 'B')*, the *Allocation Procedure, Annex 'C'* and this Clause 8".  Thus, the Respondent takes the

position that the allocation procedure is dependent upon the accounting provisions set out under Article IV.1 of Annex B to the PSC, which requires that a monthly accounting analysis be submitted to NNPC for its consideration and approval (<u>see</u> Statement of Defence, para. 10.5).

189.   The Respondent also relies upon the text of Article IV(2) of Annex D to the PSC, which refers to six statements or reports the Contractor is required to submit to NNPC for approval, which include reports setting out "Lifting Against Available Crude Oil" and "Each Party's Allocation of Available Crude Oil" (<u>see</u> Statement of Defence, paras. 9.4; Statement of Rejoinder, para. 63).

190.   Based on the foregoing, the Respondent contends that it was entitled to approve the accounting analysis, the allocation of proceeds from lifting and, therefore, also the allocation, nomination and lifting of crude oil.  As the Claimants submitted monthly accounting analyses pursuant to Article IV.1 of Annex B for approval to NNPC (which approval was never given), the Respondent submits that the Claimants have recognized this right.  The Respondent denies therefore that it is in breach of the provisions of the PSC or that its actions have deprived the Claimants of any right under Clause 7.1(i). Moreover, it maintains that its actions, challenged by the Claimants as "overlifting," were entirely consistent with the provisions of the PSC and applicable statutory provisions (<u>see</u> Statement of Defence, paras. 10.7-11.1).

<em>c)      Discussion</em>

191.   The Claimants contend on the basis of the PSC that they have the sole right under the PSC to determine the Lifting Allocation procedure whereby Royalty Oil, Cost Oil, Tax Oil, and Profit Oil are respectively designated to be lifted.  The Respondent, by contrast, submits that the regulatory and legislative framework surrounding the PSC imposes certain obligations on NNPC which result in it having a say in the Lifting Allocations.

192.   Clause 8.1 of the PSC provides that the "allocation of Available Crude Oil shall be in accordance with the Accounting Procedure (Annex B), the Allocation Procedure (Annex C) and this Clause 8" of the PSC (<u>see</u> Exh. C-1).  The remainder of Clause 8.1 describes the allocation of each tranche of oil as between the Contractor and NNPC and does not

•    - 60 -

further specify who is responsible for making the initial allocation. Annexes B and C shall therefore be examined in turn.

193.    Article III.1 of Annex B provides that the Contractor is responsible for computing the amount of Royalty and Concession Rentals payable to NNPC pursuant to Clause 8.1. Article III.2(a) of Annex B further specifies that it is the Contractor's responsibility to calculate the PPT payable by NNPC pursuant to Clause 8.1 of the PSC. These provisions appear to establish, at a minimum, an obligation on the Contractor to calculate amounts due for the payment of royalties and PPT on crude oil lifted.

194.    Article IV.1 of Annex B, on which the Respondent relies, states that (see Exh. C-1):

> "[a] monthly accounting analysis in the form of schedule B-1 attached to this accounting Procedure shall be prepared by the Contractor and furnished to the Corporation within sixty (60 days) of the end of the period covered by such analysis for consideration and approval." (emphasis added)

195.    Article IV.1 appears to establish an accounting reconciliation procedure, providing for the consideration and approval by NNPC of the Contractor's monthly accounting analysis. Indeed, Schedule B-1, the form in which the Contractor is to submit its monthly accounting analysis, records the "Lifting Summary" for the reporting month and "Allocation of Proceeds" as between the Contractor and NNPC, including any carry-over to future months. This provision does not confer on NNPC the right or obligation to prospectively estimate Lifting Allocations. Article IV.3, which stipulates that the allocation of the quantity of Available Crude Oil to each party pursuant to Clause 8 "shall be according to and governed by provisions of the Allocation Procedure", reinforces this conclusion (see Exh. C-1).

196.    Turning to Annex C, which contains the Allocation Procedure, Article I(1) provides that (see Exh. C-1):

> "[t]his Allocation Procedure ("this Procedure") sets out the methods for the allocation of Available Crude Oil from the Contract Area and the Parties shall allocate all lifting of Available Crude Oil in accordance with this Procedure and the Contract".

197. Article III of Annex C sets out the Lifting Allocation procedure in detail. Article III(3) states that "the Contractor shall notify the CORPORATION of the estimated Lifting Allocation" and "indicat[e] the estimated Royalty Oil, Tax Oil, Cost Oil and Profit Oil …". Article III(4) states that a Party's lifting nomination "shall not exceed its estimated Lifting Allocation" (see Exh. C-1).

198. Article I(1) of Annex C therefore appears to direct the Parties to lift in accordance with the procedure described in Article III, which establishes that the Contractor is both entitled and obligated to estimate Lifting Allocations for the Parties.

199. Annex D sets out the nomination, ship scheduling and lifting procedure for the Parties. Article IV.2 of Annex D states that (see Exh. C-1):

> "[i]n the event the CORPORATION disagrees with any of the CONTRACTOR'S reports, the area of disagreement shall be mutually resolved by the CONTRACTOR and the CORPORATION to the satisfaction of the Ministry. The CONTRACTOR shall thereafter prepare a revised report to reflect the changes agreed."

200. The "reports" referred to in Article IV.2 are identified in Article IV.1 as follows (see Exh. C-1):

> "The CONTRACTOR shall, not more than fifteen (15) working days after the end of each calendar month, and quarter, prepare and furnish to the CORPORATION a written statement showing in respect of the month and quarter respectively:
>
> (a) Production Quota: each Party's allocation of Commercial Production Quota;
>
> (b) Lifting against Available Crude Oil;
>
> (c) Each Party's allocation of Available Crude Oil;
>
> (d) Quantity of Crude Oil in Stock for each Party at the end of the said calendar month or quarter;
>
> (e) Any production losses attributable to Crude Oil used in Petroleum Operations; and
>
> (f) Cumulative production."

201. As with the accounting procedure in Annex B, Article IV.2 establishes a mechanism by which discrepancies may be reconciled by the Parties retrospectively. This is reinforced

by Clause 8.7, which states that the Parties "shall meet on a monthly or quarterly basis as may be agreed to reconcile all Crude Oil allocated and lifted during the period as per Article III(7) of Annex D." (see Exh. C-1).

202.   The above provisions of the PSC all indicate that the Claimants have both the right and the responsibility to estimate Lifting Allocations for both itself and NNPC.  This function is carried out by the Claimants as the agents of the Respondent.   However, the Respondent has a duty to ensure that the Claimants are within the law especially the Petroleum (Drilling and Production) Regulations (Exh LA-11).  This is so because the exclusive right over OPL 209 is vested in the Respondent and not shared with the Claimants.

203.   To buttress this point, Section 15(2) of the Petroleum (Drilling and Production) Regulations provides as follows (see Exh. LA-11):

> *"The licensee or lessee may exercise any of its rights or powers through agents or independent contractors, but shall be responsible for all the actions of the agents and contractors in question"* (Emphasis added)

204.   Thus the Respondent as the licensee or lessee clearly has a statutory role to perform in terms of the actions of agents and even independent contractors.  This is reinforced by the fact that under the law of agency in Nigeria, once the principal is disclosed, the agent is not normally liable.

205.   Based on the foregoing,  I conclude that the PSC vests in the Contractor the  right (and duty) to determine Lifting Allocations as an agent of the Respondent  and that the Respondent, as a disclosed principal, is responsible for all the actions of the Claimants. In doing this, the Respondent  has a statutory duty to perform to ensure that the relevant laws are complied with.

206.   I therefore hold and determine that the Contractor, as an agent of the Respondent, cannot have an exclusive right to determine Lifting Allocations.  If the Contractor is vested with such a right, the NNPC would be in breach of its statutory duty.

207.   NNPC  insists that it has been carrying out its statutory functions with respect to the Contractor's Lifting Allocations for all four "tranches" of oil – Royalty Oil, Cost Oil, Tax Oil, and Profit Oil.  Accordingly,  in carrying out its statutory functions, I find that NNPC has  not breached the PSC and that the Contractor is not entitled to damages representing the difference between what NNPC actually lifted and what it was entitled to lift pursuant to the Contractor's allocations.

208.   I further hold that if NNPC's position has materially and adversely affected the rights and obligations or the economic benefits of the Claimants, Clause 19.2 of the PSC should be properly invoked to ensure that there is a modification of the PSC and if this fails, the matter should be referred to arbitration under Clause 21 of the PSC to the extent that it is merely an issue of modification and not a tax dispute.  This is so because a line must be drawn between the modification of the PSC and resolution of civil causes and matters connected with or pertaining to the taxation of companies.

### 3.   The Production Tranches Claim

209.   This part of my opinion shows clearly that in carrying out its statutory obligations, the Respondent could not have breached the provisions of the PSC due to the fact that Clause 19.1 provides that any dispute arising from the PSC shall be determined in accordance with Nigerian laws. As above, I have followed the majority Award discussion and, where appropriate, have indicated where I differ in my conclusions.

#### a)   The Royalty Regime

##### (i)   The Claimants' Position

210.   The Claimants submit that the royalty regime in the PSC, and in particular the establishment of a 0% royalty rate for Petroleum Operations in water of 1000 metres depth or greater, was required by the Contractor and included by the Government of Nigeria as an incentive for ultra-deep water exploration and development.  According to the Claimants, this sliding scale, based on water depth, is reflected in Article III(1) of Annex B and Clause 15.1 of the PSC, and enables the parties to apply different rates to different fields within different areas of the "Contract Area" (see Statement of Claim, paras. 211-212; Exh. C-1).

211.   The Claimants submit that the parties consciously used the term "areas" as opposed to the defined term "Contract Area" in Clause 15.1, which refers to the whole licensed area subject to the PSC.  The Claimants reason that, had the parties intended that a single royalty rate should apply to the entire "Contract Area", there would have been no reason to establish a regressive scale of different royalty rates in Clause 15.1.  Furthermore, the Claimants observe that the mechanisms set forth in Annex B to the PSC contemplate various royalty amounts, on a graduated basis, and cannot be construed as setting a single royalty rate across the entire "Contract Area" (see Statement of Claim, para. 216).

212.   According to the Claimants, the above terms are mirrored in Section 5(1) of the *Deep Offshore Act*, and confirmed in Section 61(3) of the *Petroleum (Drilling and Production) Regulations*, which specifies how royalty is to be calculated (see Cl. Post-Hearing Br., paras. 65 and 68).

213.   The Claimants recall that there are three different fields within the "Contract Area" (Erha, Erha North and Bosi), each with distinct hydrocarbon accumulation at a different pressure, a different depth and physically separated by significant areas on non-porous subsoil and/or water.  Erha lies entirely beyond the 1000-metre depth, therefore the Claimants assert that no royalty is due in connection with production from this field.  As Bosi is not yet producing, no royalty is yet due in connection with production from this field, leaving only Erha North.  As a small section of Erha North straddles the 1000-metre depth contour, the Claimants submit that royalty of 0.331% is payable on production from this field (see Statement of Claim, paras. 217-221; Cl. Post-Hearing Br., para. 70).

214.   With respect to the calculation of royalty payable, the Claimants contend that it is the Contractor's responsibility to compute this amount under the PSC.  The Claimants therefore submit that NNPC's application of a 1% royalty rate on all Crude Oil produced under the PSC is both irrational for its lack of substantiation and contrary to the terms of the PSC.  Moreover, the Claimants contend that, pursuant to Section 61(2) of the *Petroleum (Drilling and Production) Regulations*, NNPC, as the licence holder, is obliged only to pay the amount of Royalty that is not disputed by the Contractor until such time as the dispute with the DPR is resolved (see Statement of Claim, paras. 222-

224; Cl. Pre-Hearing Br., para. 99; Exh. LA-11). This is reinforced, in the Claimants' view, by several provisions of the PSC, including Clause 7.2(e), which prohibits NNPC from "exercise[ing] all or any of its rights or authority over the Contract Area in derogation of the rights of the Contract"; Clause 15.4, which provides that NNPC pays royalty on behalf of itself and the Contractor, thereby establishing an agency relationship and duty by NNPC towards the Contractor; Clause 21, which requires the Parties to seek to resolve disputes amicably, failing which the matter must be referred to arbitration; and Article III of Annex C, which provides that NNPC is obliged to comply with the Contractor's Lifting Allocations, including allocation as to royalty (see Cl. Pre-Hearing Br., para. 99; Exh. C-1).

(ii)     The Respondent's Position

215. The Respondent accepts the royalty regime as described in Clause 15.1 of the PSC but, as royalties are administered by the Ministry of Petroleum Resources, it relies on the DPR's position as to the administration of the royalty regime (see Statement of Defence, para. 17.1; Statement of Rejoinder, para. 75).

216. Pursuant to Section 61(2) of the *Petroleum (Drilling and Production) Regulations*, the Respondent, as the licensee or lessee of OML 133, admitted that a 1% royalty rate was payable. In the Respondent's view, it cannot be held in breach of the PSC for complying with its statutory obligations (see Resp. Post-Hearing Br., para. 4.1).

217. The Respondent avers that the absence of the word "field" from the *Deep Offshore Act* is relevant in view of Section 15 of that Act, which provides that the provisions of the *Deep Offshore Act* prevail over any inconsistent legislative enactments, irrespective of the language of the *Petroleum (Drilling and production) Regulations*, which it describes as "subsidiary legislation" (see ibid.).

218. Additionally, the Respondent submits that the Regulations contemplate more than one OML being derived from an OPL, which is why "Contract Area" is defined in the PSC as "the area of the OPL and any OML(s) derived therefrom". The Respondent reasons that reference will be made to "areas" and royalties in those areas, but these are not synonymous with reference to "fields" (see ibid.).

(iii)    Discussion

219.    The Claimants take the position that royalties are to be assessed on a sliding scale according to the water depth of those areas constituting the Contract Area, in an amount estimated by the Contractor. The Respondent takes the view that consistent with the provisions of section 61(2) of the *Petroleum (Drilling and Production) Regulations*, it is obligated by law to pay royalties in whatever amount it "admits" to be due where royalties are disputed with the DPR, and has admitted that royalties of 1% are due.

220.    As a preliminary matter, the Parties appear to agree that the regime set out in Clause 15.1 of the PSC governs the payment of royalties. Clause 15.1 establishes a graduated scale of royalty rates according to "areas" of water depth. In areas deeper than 1000 metres, no royalty is payable by either NNPC or the Contractor. In areas between 801 and 1000 metres of depth, royalty of 4% is payable to DPR. As the water depth of an area becomes shallower, the royalty amount increases. This scheme is reproduced at Section 5(1) of the *Deep Offshore Act*. Together, these provisions establish that royalties are payable on the basis of the water depth in a given "area" (see Exh. LA-9*bis*; Exh. C-1).

221.    The Claimants have adduced evidence indicating that during the negotiation of the PSC, the Parties considered the implications of an area that straddled two water depths for the purpose of assessing royalties (*i.e.*, multiple fields within an area of the Contract Area). Mr. Turner, who was involved in negotiating the PSC on behalf of Exxon, provided the following written evidence concerning the Parties' negotiations (see Witness Statement of Edwin B. Turner, paras. 42-44):

> "As notes above, the PSC clearly stated that the royalty rates would apply per "area", which is to be contrasted with the use of the defined term "Contract Area" wherever the PSC referred to entire Block 209. This distinction between the "area" applicable for royalty rates and the entire block was consistent with industry-wide practice of calculating royalties on the basis of the fields within a block where there are different rates based on physical characteristics, such as water depth or daily production.
>
> This view was expressly confirmed during an exchange I had with the Deputy Director of the DPR, Mr. Richard Adelu. In this meeting, on 2 February 1993, I asked Mr. Adelu a question raised by Louis Smith during his review of the January 1993 PSC where he queried how royalty would be addressed in circumstances where a field straddled a depth

contour and thus fell within more than one tranche for royalty calculations.

Mr. Adelu indicated that the determination of royalty in this situation would be addressed "as and when the issue actually arose". Mr. Adelu did not take issue with the premise of my question, i.e. where a field within the block straddled a depth contour. This premise only makes sense if royalty is being assessed on a field by field rather than block-wide basis. This was consistent with what at the time would have been absolutely obvious to myself, Mr. Adela and all the individuals involved in the negotiations: i.e. that royalty was to be assessed on a field by field basis." [footnotes omitted]

222.   The question remains whether the Respondent was required to accept the Contractor's assessment of royalties payable, that is 0.333% assessed only on production from the Erha North field, until such time as the dispute with the DPR is resolved.

223.   Section 61 of the *Petroleum (Drilling and Production) Regulations*, on which both the Claimants and the Respondent rely, provides in relevant part as follows (see Exh. LA-‑11):

"61- (1) The licensee or lesse shall pay to the Minister not more than one month after the end of every quarter (including the quarter in which his license or lease becomes effective), or otherwise as the Minister may direct –

(a)     a royalty rate *per centum* of the chargeable value (calculated in accordance with paragraph (3) of this regulation of the crude oil and casing-head petroleum spirit, produced from the relevant are in the relevant period as follows –

[…]

(2) If any dispute arises as to the amount of royalty due for a quarter, the licensee or lessee –

(a) shall pay within the time provided by or under paragraph (1) of this regulation whatever he admits to be due; and

(b) where on the settlement of the dispute by agreement, arbitration or otherwise, any further amount is agreed or found to be due, shall pay that further amount within seven days of the settlement."

224.   The Claimants emphasize the contractual relationship between the Parties, including certain duties they allege NNPC owes the Contractor to abide by the Contractor's estimate of royalties payable; the Respondent emphasizes the plain language of the

Regulations, which speaks only to the licensee or lessee's obligation to pay those royalties "admit[ted]" pending resolution of a dispute over royalties payable.

225.   I agree with the majority's assessment that there are two distinct relationships here. There is a relationship between NNPC and the Government which is governed by the *Petroleum (Drilling and Production) Regulations* and the relationship between NNPC and the Claimants which is governed by the PSC.

226.   Accordingly, Section 61 of the *Petroleum (Drilling and Production) Regulations* addresses the Respondent's obligation, as licensee to the Government, to pay royalties to the Minister at the end of every quarter. In the event of a dispute, Section 61(2) provides that the Respondent shall pay to the Minister whatever the Respondent admits to be due.

227.   Although the Regulations do not seem to govern the obligations as between the Claimants and the Respondent (see Exh. LA-11), the Claimants will be bound where the Respondent, as its principal, is bound. This is consistent with the provisions of section 15(2) of the *Petroleum (Drilling and Production) Regulations* that provides that the Respondent shall be responsible for all the actions of the Claimants.   Under the law of agency, an agent is not primarily liable but rather the principal is liable. The Claimants cannot rely wholly on the PSC as the basis of their authority when the Respondent is liable to the Government that exclusively owns the minerals.[11]

228.   Based on the terms of the PSC alone,  the Respondent does not seem to have the autonomy to unilaterally determine or admit royalties payable on production from a given area in contradiction to the Contractor's estimate of royalties payable (see Exh. C-1). However, in view of its obligations under the law,  especially the *Petroleum (Drilling and Production) Regulations*, the Respondent is obliged to pay whatever it admits until the dispute is resolved.

229.   Accordingly, I hold  that the Respondent has not breached the terms of the PSC by fulfilling its statutory obligations.  Whatever is being paid now in terms of royalty is temporary, pending the resolution of the dispute with the DPR concerning royalties

---

[11] See section 44(3) of the Constitution and section 1 of the Petroleum Act.

owing.  The Parties are in a continuing relationship.  It is, therefore, in their joint interest to ensure that the DPR resolves this issue as provided in the *Petroleum (Drilling and Production) Regulations*.

      *b)*     *The Cost Oil Regime*

      (i)     The Claimants' Position

230.    The Claimants contend that, pursuant to Clause 8.1(b) of the PSC, the Contractor is entitled to recover all of its operating costs as Cost Oil, subject to the retrospective audit provided for in Clause 13.2 of the PSC.  The Claimants note in this regard that the Respondent does not dispute that the Contractor is entitled to recover all of its operating costs through Cost Oil, such that there is no justification for NNPC to lift on the basis of a Cost Oil figure that does not fully reflect the Contractor's operating costs (<u>see</u> Statement of Claim, para. 73; Statement of Rejoinder, paras. 179-183; Tr. Day 1, pp. 112, 130).

231.    The Claimants submit that any reliance by the Respondent on the FIRS letter of 24 May 2010 is misplaced because the Contractor's entitlement to lift Cost Oil is a "wholly contractual issue that in no way implicates Nigerian tax law" (<u>see</u> Statement of Rejoinder, paras. 186).

232.    As regards the Respondent's arguments concerning the validity of Clause 8.1(e) of the PSC, which provides that "[t]he CONTRACTOR shall for PPT purposes be entitled to consolidate OPL 209 and any OMLs derived therefrom", the Claimants contend that if the Contractor were not able to "consolidate" the OPL with the resulting OML in respect of the Contract Area for purposes of cost recovery, it would *never* be able to recover the exploration costs incurred in finding the oil in the first place (<u>see</u> Statement of Rejoinder, paras. 191; Exh. C-1).

      (ii)     The Respondent's Position

233.    The Respondent submits that the only costs which may properly be taken into account in the computation of operating costs for the purpose of allocating an amount of Cost Oil are those costs incurred in respect of the petroleum operations in OML 133.  However, the Respondent avers that the Contractor has not, at any time, been engaged in petroleum

operations "for its own account", so as to come within the definition of "Petroleum Operations" under the PPT Act (see Resp. Pre-Hearing Br., para. 4.5). This is, in essence, the same argument the Respondent advanced in defence of the Lifting Allocation claim (see paragraph 156 *et seq.* above).

234. The Respondent takes the position that Cost Oil is a tax issue and therefore the interpretation of Clause 8.1(b) of the PSC is a matter for the FIRS, to be made pursuant to the provisions of the FIRS Act. In this regard, the Respondent notes that the FIRS agrees with the Respondent's position, as set out in its May 24th letter (see Exh. RL-1). The Respondent adds that, pursuant to Section 15.2 of the *Petroleum (Production and Drilling) Regulations*, the Respondent is responsible for all acts of the Contractor, including its allocation of Cost Oil, and therefore the Contractor is not entitled to unilaterally estimate lifting allocations (see Post Hearing Br., para. 4.2).

235. In any event, the Respondent contends that the Contractor is not entitled to consolidate OPL 209 and the OML(s) derived therefrom "for PPT purposes" or for any other purpose, notwithstanding the language of Clause 8.1(e) (see Statement of Defence, para. 12.6). Alternatively, the Respondent avers that, as the Contractor is not engaged in "Petroleum Operations" for the purposes of the PPT Act, it is not subject to PPT under Section 8 of the Act and therefore is not entitled to consolidate OPL 209 and OMLs derived therefrom for PPT purposes (see Statement of Defence, para. 12.7; Statement of Rejoinder, paras. 37-39, 51-52; Resp. Pre-Hearing Br., para. 5.9; Exh. LA-17).

236. In the further alternative, the Respondent contends that Section 3(1) of the *Deep Offshore Act* provides for PPT to be applicable in a "contract area". The Respondent's interpretation of this provision would yield the same result as its argument above, in that the consolidation of costs from more than one licence or lease is not contemplated in the applicable statutory framework (see Statement of Defence, para. 12.8).

(iii)    Discussion

237. The Claimants take the position that they are entitled to recover all of their costs in Cost Oil, as estimated by them. I note that in its Statement of Defence the Respondent admitted that the Claimants were entitled to recover their costs (see Statement of Defence

at para. 8.3), but contended that this is a tax issue and the amount of any recovery is ultimately to be determined by the FIRS, not unilaterally by the Contractor.

238.   Clauses 8.1(b), (d) and (e) of the PSC provide as follows (see Exh. C-1):

> "(b) Cost Oil shall be allocated to the CONTRACTOR in such quantum as will generate an amount of Proceeds sufficient for recovery of Operating Costs in OPL 209 any OMLs derived therefrom. All operating Costs expended in U.S. Dollars will be recovered in U.S. Dollars through Cost Oil allocations.
>
> ...
>
> (d)   All approved expenses incurred on the OPLs for exploration activities prior to the Effective Date of this Contract shall be recoverable as Operating Cost by the CONTRACTOR from Cost Oil under this Contract. Such cost shall be capitalised and recoverable in accordance with the PPT Act 1959 as amended.
>
> (e)   The CONTRACTOR shall for PPT purposes be entitled to consolidate OPL 209 and any OMLs derived therefrom. "

239.   Operating Costs are defined in Clause 1 of the PSC as "expenditures made and obligations incurred in carrying out Petroleum Operations as determined in accordance with the Accounting Procedure". Article II of Annex B, which contains the Accounting Procedure, further states that Operating Costs are "all costs, expenses paid and obligations incurred by the CONTRACTOR in carrying out Petroleum Operations and shall consist of (1) Non-Capital Costs, and (2) Capital Costs" (see Exh. C-1).

240.   As discussed above, I am of the opinion that the Contractor is carrying out "Petroleum Operations" within the meaning of the PPT Act as an agent of the Respondent.

241.   During the Hearing, the Respondent agreed that the Contractor is entitled to recover "every penny spent by them ... in the PSC" (see Tr. Day 1, pp. 112, 130). Nonetheless, the Respondent maintains the view that the FIRS is the ultimate arbiter of what costs are recoverable as Cost Oil, not the Contractor, and that the initial estimate of the amount recoverable through Lifting Allocation is a shared right as between NNPC and the Contractor under the PSC. The latter contention is based on Section 15.2 of the *Petroleum (Drilling and Production) Regulations.* As noted above, Section 15.2 of the

Regulations provides that the NNPC is "responsible for all the actions" of its contractors (see Exh. LA-11).

242.  I hold that other than the PSC, it is the Petroleum Profits Tax Act that determines what is tax deductible or not; in other words, it is not for the Claimants to determine, nor the Respondent.   However, the Respondent has a duty to ensure that the accounts of the Claimants are properly kept because the Respondent is "responsible for all the actions" of the Claimants.

243.  Accordingly, I determine that the Respondent has not breached the terms of the PSC by being responsible for the actions of the Claimants in determining the quantum of cost oil.

      *c)*     *The Tax Oil Regime*

      (i)    The Claimants' Position

244.  The Claimants submit that Clause 8.1(c), Clause 15.2(a) and Article III(2)(b) of Annex B of the PSC provide that Tax Oil is to be calculated by reference to liability for PPT pursuant to the PPT Act.  The Claimants aver that there is no dispute that PPT is assessed on the total revenues of undivided production from the Contract Area and on the profit attributable to both NNPC and the Contractor such that tax reliefs are necessarily shared by both Parties (see Cl. Post-Hearing Br., para. 90(c)).

245.  The Claimants take the position that NNPC is obligated to lift Tax Oil only in a manner that complies with the PPT Act, contending that NNPC has misapplied the PPT Act in several ways: (1) by using the ITC to reduce annual capital allowances; (2) by misallocating annual capital allowances; and (3) by failing to deduct certain costs.

246.  Beginning with the ITC, the Claimants submit that the difference in approach taken by the Contractor and NNPC in computing the ITC reflects their differing views as to whether the full asset cost remains to be depreciated or whether the ITC reduces the depreciable asset base, thereby significantly lessening the tax relief effect of the ITC. The Claimants take the position that Clause 15 provides that the ITC operates as a full tax credit, as confirmed by the Letter of Guarantee, which acknowledges that the inclusion of the fiscal incentives in the PSC, including the ITC rate, required amendments to the then-existing Nigerian law (see Statement of Claim, paras. 162-164; Exh. C-2).

247.  The Claimants explain that, in 1993, the PPT Act comprised the PPT Act 1959 and two amendments (*i.e.*, the Petroleum Profits Tax (Amendment) (No. 2) Decree No. 24 of 1979 ("**Decree No. 24**") and the Petroleum Profits Tax (Amendment) (No. 3) Decree No. 95 of 1979 ("**Decree No. 95**"). The PPT Act provided for an "initial allowance" regime with no requirement that allowances be offset against the cost of assets prior to calculating the depreciable asset base. Decree No. 24 introduced the ITC regime, providing that the ITC shall be deducted from the cost of the asset to arrive at the amount of the qualifying expenditure and before calculating annual allowance. Decree No. 24 also provided that the ITC would be a credit against tax payable and not a charge against income (see Exh. LA-17; Exh. LA-2; Exh. LA-3).

248.  These provisions of Decree No. 24 were subsequently replaced by the following paragraph in Decree No. 95 (see Exh. LA-3):

> "5 – In the Second Schedule to the principle Act –
>
> (a) for paragraph 5 thereof, there shall be substituted the following new paragraph –
>
> 5.  Subject to the provisions of this Schedule, where in any accounting period of a company, the company owning any asset has incurred in respect thereof qualifying expenditure wholly, necessarily and exclusively for the purposes of petroleum operations carried on by it, there shall be due to that company for the accounting period in which such expenditure was incurred, an investment tax credit for the purpose of section 17(2) at the appointment [sic] rate per centum of such expenditure as set out in Table 1 to this Schedule."

249.  The Claimants explain that, in this way, Decree No. 95 revoked the provision by which the ITC would be deducted from qualifying capital expenditure to arrive at a depreciable asset base. However, from the period beginning in 1993, three new decrees were introduced relevant to the application of the ITC. Decree No. 31, enacted in 1996, replaced the ITC regime with a Petroleum Investment Allowance regime that created a less valuable tax deduction (see Exh. LA-7). Decree No. 9, enacted in 1999 (*i.e.*, the *Deep Offshore Act*), retroactively re-instated the ITC regime for PSCs entered into before 1 July 1998, providing as follows (see Exh. LA-9*bis*):

> "4-(1)  Where the Nigerian National Petroleum Corporation (in this Act referred to as 'the Corporation') or the Holder and the Contractor have incurred any qualifying capital expenditure wholly, exclusively and

necessarily for the purposes of petroleum operations carried out under the terms of a Production Sharing Contract in the Deep Offshore or Inland Basin, there shall be due to the Parties in respect of the Production Sharing Contracts executed prior to 1st July 1998, a credit (in this Decree referred to as 'Investment Tax Credit') at a flat rate of 50 per cent of the qualifying expenditure in accordance with the Production Sharing Contract terms for the accounting period in which that asset was first used for the purposes of such operations."

250.   Finally, Decree No. 30, also enacted in 1999, amended the PPT Act to again provide for an ITC rate of 50% through the following provision (see Exh. LA-10):

"20.-(1).  A crude oil producing company which executed a Production Sharing Contract with the Nigerian National Petroleum Corporation in 1993 shall, throughout the duration of the Production Sharing Contract, be entitled to claim an investment tax credit allowance as an offset against tax in accordance with the provisions of the Production Sharing Contract.

(2) The investment tax credit rate applicable to the contract area shall be fifty percent flat rate of chargeable profit for the duration of the Production Sharing Contract.

(3) In computing the tax payable, the investment tax credit shall be applicable in full to petroleum operations in the contract area such that the chargeable tax is the amount of the assessable tax less the investment tax credit.

(4) The chargeable tax computed under subsection (3) of this section shall be spilt [sic] between the Nigerian National Petroleum Corporation and the crude oil producing company in accordance with the proportion of the percentage of profit oil split.

(5) In this section −

'contract area' means the contract area as defined in the Production Sharing Contract;

'Production Sharing Contract' has the meaning assigned to it in the Deep Offshore and Inland Basin Production Sharing Contracts Decree 1999."

251.   The Claimants observe that there is no provision in Decree No. 30 requiring the ITC to be offset against or deducted from capital expenditures prior to depreciation. Moreover, the PPT Act, as amended, does not require that the ITC operate as an offset against capital expenditures prior to reducing the depreciable asset base (see Exh. LA-17; Exh. LA-10).

252.   Finally, the Claimants contend that a review of the practice of international oil companies operating in Nigeria under joint venture agreements from 1987 to 1994, as well as

leading treatises on Nigerian tax law, confirms that both pre- and post-PSC the ITC was calculated without any deductions of capital expenditures for the purpose of depreciation (see Statement of Claim, paras. 191-203).

253.    In response to the Respondent's contention that the Contractor is not liable to pay PPT and is therefore not entitled to take advantage of the ITC, the Claimants explain that one of the focal points of the negotiation of the PSC was the issue of whether the ITC would be shared with NNPC or whether it could be claimed solely by the Contractor.    The Claimants note that the January 1993 negotiating draft of the PSC presented by the Government of Nigeria provided specifically that the benefit of the ITC would be "shared with NNPC, a non-investing party, through the profit sharing mechanism" (see Exh. C-34, p. 4).    Thus, Clause 15.3(b) of the PSC, as executed, reflects that the ITC will apply to reduce the PPT liability of both NNPC and the Contractor.    Similarly, the Letter of Guarantee expressly confirms a 50% split of the ITC for NNPC and the Contractor (see Statement of Reply, paras. 207-209; Exh. C-1; Exh. C-2).

254.    The Claimants note that the Respondent relies entirely on the FIRS letter in support of its position that the ITC should be deducted from capital expenditures before they are depreciated.    In this regard, the Claimants observe that the FIRS asserts that Decree No. 30 "revived" the provisions of paragraph 5(2) of Decree No. 24.    However, the Claimants insist that not only does Decree No. 30 not re-enact the language of Decree No. 24, but there is no language specifying that the ITC is to be deducted from the cost of the asset for calculating capital allowances (see Statement of Reply, paras. 221-225).

255.    Turning to capital allowances, the Claimants refute the Respondent's argument that because title to all equipment that gives rise to the relevant capital expenditure is vested in NNPC the Contractor is not entitled to claim capital allowances.    The Claimants reiterate that, pursuant to the Second Memorandum, the Contractor retains ownership of any capital assets for five years following that asset entering into use, during which the Contractor recovers the costs of that asset (see Statement of Reply, paras. 226-227; Exh. C-4).

256.    The Claimants also deny the Respondent's assertion that to allow the Contractor the benefit of capital allowances would amount to "double dipping", reasoning that this

reflects a misunderstanding of the relationship between Cost Oil and Profit Oil, as the Contractor is liable for PPT on both revenue streams, subject to the usual deductions, including deductions for depreciable capital expenditure established in the PPT Act (see Statement of Reply, para. 230). The Claimants explain the purpose of capital allowances as follows (see ibid., fn. 168):

> "Allowing the depreciation of capital expenditure together with cost recovery in respect of that expenditure is a customary mechanism in the oil and gas industry for ensuring that the Contractor can enjoy some return on its capital investment over and above simply recouping its expenditure on that investment. Accordingly, the PSC provides for both full cost recovery and that PPT is to be assessed 'in accordance with the PPT Act,' with exclusion of the capital allowances provided for under the act."

257. Similarly, the Claimants refute the Respondent's position on the timing of capital allowances (i.e. that the annual allowance for depreciation of capital allowances should be pro-rated for the year in which the capital expenditure was incurred), observing that the FIRS letter is not an authoritative statement of Nigerian law, nor is Decree No. 9 on this point, which states at Section 3 that the PPT payable under a PSC "shall be determined in accordance with the Petroleum Profits Tax Act as amended" (see Statement of Rejoinder, para. 236-240; Exh. LA-9bis). The Claimants note that paragraph 6 of the Second Schedule to the PPT Act provides as follows (see Exh. LA-17):

> "… where in any accounting period, a company owning any assets has incurred in respect thereof qualifying expenditure wholly, necessarily and exclusively for the purposes of petroleum operations carried on by it, there shall be due to that company as from the accounting period in which such expenditure was incurred, an allowance (in this Act referred to as 'an annual allowance') at the appropriate rate per centum specified in Table II of this Schedule."

258. The Claimants further note that "accounting period" is defined in section 2 of the PPT Act as a "period of one year commencing on 1 January and ending on 31 December of the same year" (see Exh. LA-17). The Claimants contend that these provisions together "contemplate 'an annual allowance,' and there is no mention of proration or any monthly determination of the allowance" (see Statement of Reply, para. 242).

259.   Relying upon expert evidence and authorities, the Claimants assert that these and other provisions in the PPT Act have long been interpreted as providing that a full year allowance is available for the year in which the capital cost in question was incurred, regardless of when in that year the expenditure was made, provided that the asset was owned by the company claiming the allowance at the end of the year (see Statement of Rejoinder, paras. 245-248; Expert Opinion of O. Bickersteth, Sec. 4.3.1).   Despite the Respondent's assertion that Decree No. 9 should be read to supersede the relevant provision of the Second Schedule to the PPT Act, the Claimants aver that there is nothing in Decree No. 9 that dictates a change to the timing of capital allowances or is inconsistent with the relevant provisions of the PPT Act (see Statement of Reply, para. 249; Exh. LA-9*bis*).

260.   Finally, as regards the tax treatment of those items which the Respondent contends are not recoverable as Cost Oil under the PSC (*i.e.*, signature bonuses, inter-company loan interest, and non-operator costs), the Claimants ask the Tribunal to affirm the principle recited by the FIRS in its May 24th letter that tax deductibility is not coterminous with cost recovery (see Statement of Reply, para. 269).

261.   With respect to the signature bonuses, the Claimants submit that they are properly included as a qualifying capital expenditure for purposes of the ITC and the annual capital allowances pursuant to paragraphs 1(d) and 6 to the Second Schedule of the PPT Act (see Exh. LA-17).   Similarly, the cost of interest paid on inter-company loans is dealt with in Sections 10(1)(f) and (g) of the PPT Act and, provided that the "interest is paid at commercial rates and wholly, exclusively and necessarily incurred to generate income from Petroleum Operations", is deductible from profits for PPT purposes (see Statement of Reply, paras. 263-264; Exh. LA-17).   Moreover, the Claimants take the view that non-operator costs (e.g., SNEPCo's internal costs of technical and finance personnel necessary for informed decision-making and funding concerning the development and petroleum operations in the Contract Area) satisfy the test set out in Section 10(1) of the PPT Act for deductible costs, namely, that the expenditure is "wholly, exclusively and necessarily incurred" for the Contractor's Petroleum Operations (see ibid., para. 268; Exh. LA-17).

(ii)     The Respondent's Position

262.    The Respondent denies that it is in breach of the PSC and that the Contractor has any entitlement or obligation to compute the PPT payable and to allocate Tax Oil in accordance with the PPT Act.  The Respondent reasons that the Contractor is not carrying on "Petroleum Operations" within the meaning of the PPT Act and is therefore not subject to PPT (see Statement of Defence, para. 16.6; Resp. Post-Hearing Br., para. 4.3). Rather, the Respondent contends that, pursuant to Section 15(2) of the *Petroleum (Drilling and Production) Regulations*, and Clause 7.2(a) of the PSC, NNPC is obligated to compute Tax Oil in order to ensure that PPT is properly paid (see Resp. Post-Hearing Br., para. 4.3; Exh. C-1; Exh. LA-11).

263.    As regards the ITC, the Respondent takes the position that the Contractor is not entitled to take advantage of the ITC because it does not own the underlying capital assets.  The Respondent reiterates its view that NNPC owns all of the assets of the OML 133 operations, by virtue of Clause 11.1 of the PSC and by virtue of the fact that all of the costs of the assets are fully recovered by the Claimants through their Cost Oil allocation, which takes priority over PPT and Profit Oil (see Statement of Defence, para. 16.2).

264.    The Respondent submits that, pursuant to Clause 11.1 of the PSC, title and ownership to the equipment that was to be used in petroleum operations in the Contract Area transferred to NNPC upon its arrival in Nigeria (see Exh. C-1).  As such, the Contractor retains only an equitable interest in the equipment.  The Respondent further submits that, to permit the Contractor to claim capital allowances under the PPT Act on assets in respect of which it has recovered the cost in full through cost oil allocations would amount to "double dipping" (see Statement of Defence, para. 15.1; Statement of Rejoinder, paras. 47-49, 81).

265.    As regards the timing of the amortization of capital costs, the Respondent contends that capital costs are to be amortized over a period of five years in sixty equal monthly instalments, noting that this position has been accepted by the FIRS as correct (see Exh. RC-1).  The Respondent submits that its position is also supported by Article IV.5(b)(ii) of Annex B to the PSC and Sections 9 and 15 of the *Deep Offshore Act*, which respectively provide as follows (see Exh. C-1; Exh. LA-9*bis*):

| Article IV.5(b)(ii), Annex B, PSC | Sections 9 and 15, *Deep Offshore Act* |
|---|---|
| "Capital costs recorded in the books and accounts of the CONTRACTOR shall be recoverable in equal instalments over a five (5) period or the remaining life of the Contract, whichever is less. Amortization of such costs shall be in accordance with the method prescribed under the Second Schedule of the PPT Act, or over the remaining life of the contract, whichever is less." | 9. "Tax oil shall be allocated to the Corporation or the holder, as the case may be, in such quantum as shall generate an amount or proceeds *equal to the actual petroleum profit tax liability payable during each month*". (Respondent's emphasis)<br><br>…<br><br>15. "(1)   The relevant provisions of all existing enactments or laws, including but not limited to the petroleum Act, and the Petroleum Profit Tax Act, shall be read with such modifications as to bring them into conformity with the provisions of this Act.<br><br>(2)  If the provisions of any other enactment or law, including but not limited to the enactments specified in subsection 91) of this section are inconsistent with the provisions of this Act, the provisions of this act shall prevail and the provisions of that other enactment or law shall, to the extent of that inconsistency, be void." |

266.    The Respondent reasons that, given the reference to the "actual petroleum profit tax liability during each month" in Section 9, it follows that "equal instalments over a five year period" in Article IV.5(b)(ii) of Annex B to the PSC means sixty monthly instalments over a five year period.  Accordingly, the Respondent denies that it is in breach of Clause 2.2 of the PSC, Article IV. 5(b)(ii) of Annex B, or Articles III.4 and III.6 of Annex C to the PSC, that the Claimants are entitled to amortize and allocate to themselves, or lift such quantum of Available Crude Oil so as to enable them to recover capital costs in five equal annual instalments over a five year period, or that the Respondent has nominated and lifted Available Crude Oil to which the Claimants are entitled as Cost Oil (see Statement of Defence, paras. 13.5-13.8).

267.    As regards the tax deductibility of certain costs, the Respondent contends that neither the signature bonuses, nor loan interest, nor non-operator costs can be considered as qualifying expenditures for PPT purposes because the Contractor is not liable for PPT (see Statement of Rejoinder, paras. 87-88).

(iii)   Discussion

268.   In my view, the Parties differ in respect of three key issues for the purposes of the Tax Oil claim.  First, whether the Claimants are subject to the PPT Act such that they share the burdens and benefits of its provisions with NNPC; second, whether the Claimants own the capital assets involved in petroleum operations in the Erha Block; and third, whether certain costs, for example, signature bonus, are tax deductible.  I will add a fourth key issue, whether this Tribunal can determine civil causes connected with or pertaining to taxation of companies in Nigeria and disputes connected with the operations of the PPT Act.  The PPT Act is one of the enactments listed in the First and Fifth Schedules to the FIRS Act over which the TAT has jurisdiction (see Exh. RL-1).

269.   As discussed above, I find that the Claimants are engaged in "Petroleum Operations" for the purposes of the PPT Act as  agents of the Respondent and are therefore subject to its provisions, albeit in a limited sense.  Additionally, I hold  that the Claimants continue to hold title to the  capital assets as they have not yet recovered the costs of the assets through Cost Oil Liftings.

270.   Finally, the PPT Act provides for deduction of the various contested expenses in certain well defined circumstances.  The Claimants are of the view that Signature Bonus, Loans on Interest, etc are tax deductible.  However, Clause 14.2 of the PSC provides expressly that the Signature Bonus shall not be recoverable.  As has been stated above, what is not cost recoverable cannot be tax deductible (see Exh. RC-1).  Indeed, under Clause 14.1 of the PSC, the PSC cannot be effective without the payment of the Signature Bonus.  To hold that such a bonus is tax deductible is to turn justice upside down and make the PSC unenforceable as lacking in consideration.

271.   Section 10 of the PPT Act is very clear on what items are tax deductible and they must be incurred within an accounting period, usually  one year.  The interest contemplated in Sections 10(1)(e) and (f) of the PPT Act is the interest on any money borrowed where the Board is satisfied that the interest was payable on capital used to carry out petroleum operations and not interest incurred in obtaining the Signature Bonus

272.  The use of the words "expenses wholly, exclusively and necessarily incurred" in Section 10 of the PPT Act cannot mean, for example, that the Signature Bonus paid in 1993 as consideration is recoverable in 2008.  In any case, whether an expenditure is tax deductible is determined by the FIRS and not this Arbitral Tribunal.

273.  Based on the foregoing, I hold that the Arbitral Tribunal is incompetent to determine the components of Tax Oil.  As stated above, it is the Federal High Court and the TAT that can adjudicate on disputes of this nature.  It may well be that the Claimants have a justiciable claim in this regard but I hold that this Arbitral Tribunal is not the proper forum.  This is because this is a dispute connected with or pertaining to the taxation of a company in Nigeria and also connected with the operations of the PPT Act.

274.  Be this as it may, on the issue of ITC, I hold that Decree No. 24 of 1979 is -inoperative and no longer in force.

### d)   The Profit Oil Regime

#### (i)   The Claimants' Position

275.  The Claimants explain that because Profit Oil is a residual tranche of production which depends on how much production remains after allocation to the other tranches, errors in calculating the other tranches will necessarily translate into an error in the amount of Profit Oil available to be lifted by the Contractor.  The Claimants therefore rely on the above discussed errors in support of their position that NNPC has also breached the PSC provisions on Profit Oil (see Cl. Post-Hearing Br., para. 107).

#### (ii)   The Respondent's Position

276.  The Respondent submits that it has not lifted quantities of available crude oil in excess of Tax Oil payable and therefore Profit Oil is in no way adversely affected by the Tax Oil lifted (see Resp. Post-Hearing Br., para. 4.4).

#### (iii)   Discussion

277.  Clause 8.1(f) of the PSC provides as follows (see Exh. C-1):

> "Profit Oil, being the balance of Available Crude Oil after deducting Royalty Oil, Tax Oil, and Cost Oil, shall be allocated to each Party

- 82 -

pursuant to Schedule B-2 of the Accounting Procedure (Annex B) as follows:

| CUMULATIVE PRODUCTION MMB FROM CONTRACT AREA | PROFIT OIL PERCENTAGES CORPORATION | CONTRACTOR |
|---|---|---|
| 0-350 | 20 | 80 |
| 351-750 | 35 | 65 |
| 751-1000 | 45 | 55 |
| 1001-1500 | 50 | 50 |
| 1501-2000 | 60 | 40" |

278.   Having determined that the Respondent has not breached the provisions of the PSC relating to Royalty Oil, Cost Oil and Tax Oil, I conclude that the Respondent has also not breached the PSC's provision concerning Profit Oil, being the balance of Available Crude Oil after the other three tranches have been properly allocated and deducted.

4.   The Tax Calculation and Return Preparation Claim

a)   The Claimants' Position

279.   The Claimants submit that the Respondent has breached Annex B of the PSC by disregarding the Contractor's PPT returns, failing to "onward file" the Contractor's PPT Returns to the FIRS and filing its own unauthorized PPT Returns for the years 2006 through 2010 in putative support of its unilateral overlift.  In the Claimants' view, these "unilateral filings" breach several provisions of the PSC (see Statement of Reply, paras. 142-145).

280.   The Claimants note that Clause 7.1(b) and Article II(2)(a) and (e) of Annex B of the PSC provide that it is the Contractor's obligation and entitlement to compute the PPT payable and to prepare PPT returns.  The Claimants also state that, pursuant to Article III(2)(e) of Annex B to the PSC, NNPC's sole responsibility is to "onward file" with the FIRS the PPT returns as determined and prepared by the Contractor (see Exh. C-1).

281.   The Claimants contend that, in letters dated 12 May 2009 and 31 August 2009, NNPC acknowledged that the PSC provides for the Contractor to prepare and submit PPT returns for onward filing by NNPC to the FIRS, but stated that it was not precluded from ensuring that the PPT returns aligned with its own computation or otherwise verifying and considering for approval the Contractor's PPT returns.  The Claimants take the

position that NNPC's view on the PPT returns has no basis in the PSC and was never contemplated by the Parties at the time the PSC was concluded (see Statement of Claim, paras. 153-154; Exh. C-91; Exh. C-99).

282.   In response to the Respondent's position that the Contractor is not subject to and therefore not liable to pay PPT, such that the Contractor cannot claim a right to have input on the PPT returns, the Claimants aver that they have a contractual interest in the calculation of Tax Oil, as this calculation directly affects the quantity of Profit Oil which they are entitled to lift.  Moreover, they claim that this contractual interest has been recognized by the FIRS (see Statement of Reply, para. 147; Exh. C-116).

283.   The Claimants reject the Respondent's contention that the Contractor does not engage in "Petroleum Operations" for the purposes of Section 30 of the PPT Act, as only NNPC prepares and submits certain accounts and particulars to the FIRS under the Act as a "company engaged in petroleum operations" (see Exh. LA-17).  The Claimants aver that they do engage in Petroleum Operations and is itself a PPT tax payer required to comply with Section 30 of the PPT Act.  In any event, the Claimants contend that the obligation in Section 30 to prepare certain accounts and particulars is independent from the tax return process, which is expressly governed by the terms of the PSC (see Statement of Reply, paras. 10, 147-152).

284.   The Claimants contend that the Respondent's reliance on Section 9 of Decree No. 9 is misplaced.  According to their interpretation, this provision merely reiterates the terms of Clause 8.1(c) of the PSC, to the effect that Tax Oil shall be allocated to NNPC in such amount as will generate proceeds equal to the actual PPT liability payable each month, and does not impact the contractual designation of the Contractor as the party with the right and obligation to prepare the PPT returns to be submitted by NNPC to the FIRS (see Statement of Reply, paras. 153-154).

285.   The FIRS letter of 24 May 2010 is also, in the Claimants' opinion, unpersuasive, for several reasons (see Exh. RC-1).   First, the letter was obtained from a "fellow government agency", which shares in NNPC's "interest in maximizing the State's oil revenue".  Both of these entities were "subject to the presidential directive announced on 20 May 2008, whereby NNPC, the FIRS and other arms of the State were directed to

'take immediate steps' to recover monies from international oil companies". Moreover, pursuant to the FIRS Act, the Board of the FIRS includes "the Group Managing Director of the NNPC or his representative" (see Statement of Reply, para. 167).

286. Second, the FIRS letter was procured in "a manner which undermines any credibility it might otherwise retain", as FIRS was first provided with a copy of the draft Statement of Defence prepared by NNPC in a parallel arbitration involving a similar production sharing contract and a letter seeking FIRS' "substantial contribution" to NNPC's litigation effort (see Statement of Reply, para. 168).

287. Third, according to judicial authority, the FIRS letter is not "an authoritative statement of Nigerian tax law" (see Statement of Reply, para. 169).

288. Fourth, because the FIRS letter reflects a policy which has "undergone a convenient, revenue-maximizing change from the way in which it applied many of the relevant tax provisions" at the time the PSC was concluded and until disputes under the 1993 PSCs arose, it should be viewed with scepticism (see Statement of Reply, para. 170).

289. As regards the procuring of tax receipts for OML 133, the Claimants submit that NNPC failed to provide the Contractor with any receipts for PPT paid prior to the filing of the Statement of Defence, despite the express requirement to do so in Clause 15.6 of the PSC, the First Memorandum to the PSC and Sections 11(2) and 14 of Decree No. 9 (see Exh. C-1; Exh. C-3; Exh. LA-9bis). The Claimants explain that these receipts "provide evidence that the Contractor is a PPT tax payer engaged in Petroleum Operations and evidence that it has paid PPT" (see Statement of Reply, para. 158). Thus, these tax receipts were to have been issued in both NNPC and the Contractor's name. According to the Claimants, however, the tax receipts produced with the Statement of Defence fail to conform with the PSC by, among other things, identifying only NNPC (see Statement of Reply, paras. 158-162).

b)   The Respondent's Position

290. The Respondent contends that it is clear from Section 30 of the PPT Act that only a "company engaged in petroleum operations" prepares all particulars necessary in the computation of PPT. The Respondent reiterates its position that the Contractor has not at

any time been engaged in petroleum operations "for its own account" so as to come within the definition of "Petroleum Operations" under Section 2 of the PPT Act (see Statement of Defence, paras. 14.2-14.4; Exh. LA-17).

291.    The Respondent submits the following on the basis that the Contractor is not subject to, and therefore not liable to pay, PPT (see Statement of Defence, para. 19.2):

> "a)     the PPT returns prepared by the Contractors for onward filing with the FIRS were erroneous and, therefore, the Respondent was under no obligation to file them with the FIRS, in the form prepared by the Contractor, because the Respondent was the party with the liability to PPT.  As the Respondent is the Lessee and the party engaged in petroleum operations, the obligation to pay tax vested on the Respondent also carries with it the obligation to ensure that the right taxes are paid. It is the Respondent's duty to ensure that actual monthly Tax oil is allocated for payment of PPT as required by Section 30 of the PPTA … and Section 9 of the Deep Offshore Act (Claimants' Exhibit LA-9).
>
> b)     as it was the party liable to pay PPT, and not the Contractor, the PPT returns filed by it were properly so filed (in any event the Respondent contends that any dispute concerning taxation issues is to be resolved exclusively in accordance with the FIRS Act and, therefore, the Arbitral Tribunal lacks jurisdiction to adjudicate in respect thereof);
>
> c)     sums paid to the Government as PPT were properly so paid; and
>
> d)     the Respondent does not have in its possessions any tax receipts issued by the FIRS in the name of the Contractor, but does have receipts issued for Tax oil production liftings for 2007, 2008, 2009 in its name in respect of the Erha Field evidencing 'Tax Oil' payments for Petroleum Profit Tax."

292.    The Respondent adds that it is implicit in the FIRS May 24th letter that NNPC is the sole PPT payer pursuant to the PSC (see Statement of Rejoinder, para. 67; Exh. RC-1).

293.    The Respondent dismisses the Claimants' assertion that the preparation of accounts and particulars is an obligation that is legally independent of tax returns as a distinction without a difference, because tax returns cannot be prepared without incorporating those particulars (see Statement of Rejoinder, para. 70).

*c)*     *Discussion*

294.   I have already held that the Claimants are engaged in Petroleum Operations as agents of the Respondent and not on their sole account and shall not, therefore, consider these arguments again here.

295.   Article III(2)(e) of Annex B to the PSC provides as follows (see Exh. C-1):

> "The CORPORATION shall make all required PPT payments to Federal Board of Inland Revenue.  The CONTRACTOR shall prepare all returns required under the PPT Act and timely submit them to the CORPORATION for onward filing with the Federal Board of Inland Revenue.  The monthly PPT payment shall be determined from such PPT returns."

296.   Based on the provisions of the PSC alone, the NNPC receives the PPT returns "for onward filing with the Federal Board of Inland Revenue." (see Exh. C-1).  However, since title to OPL 209 is exclusively vested in the Respondent, it has a duty to scrutinize the PPT returns.  Therefore, while performing its statutory role as the principal to the Claimants and–in accordance with the provisions of Section 15(2) of the *Petroleum (Drilling and Production) Regulations,* the Respondent is not in breach of this provision of the PSC, and I so hold.

297.   More fundamentally, this is a dispute connected with or pertaining to the taxation of companies in Nigeria that the 1999 Constitution exclusively reserves for the Federal High Court.

298.   I hold and determine that the Claimants are not entitled to any relief under this head of claim.

**D.     *Summary of Findings***

299.   Having considered the Parties' respective submissions on all of the above issues, I hold and determine as follows:

(a)     That the Tribunal has the jurisdiction to interpret the provisions of the PSC and relevant Nigerian laws including the Constitution.

(b)     The Tribunal lacks the jurisdiction to determine the disputes connected with or pertaining to the taxation of companies in Nigeria as the Federal High Court established pursuant to the provisions of the 1999 Constitution  and vested with additional powers under the provisions of the FIRS Act has exclusive jurisdiction over such disputes.

(c)     The PSC and its Clause 2.4 are valid and enforceable.

(d)     The provisions of Clauses 19.2 and 21 of the PSC cannot be invoked concurrently.

(e)     For carrying out its statutory obligations, the NNPC has not breached any provision of the PSC.

(f)     All the Claimants' claims under Clauses 19.2 and 21 of the PSC are dismissed in their entirety.

## VI.  COSTS

300.    I make no order as to costs.

PLACE OF ARBITRATION: Abuja, Nigeria

DATED: 24  OCTOBER 2011

SIGNED:

Professor Paul Obo Idornigie

- 88 -