UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ :
 :
ESSO EXPLORATION AND PRODUCTION :
NIGERIA LIMITED, *et ano.*, :
 :
            Petitioners, :
 :            14cv8445
        -against- :
 :            <u>OPINION & ORDER</u>
NIGERIAN NATIONAL PETROLEUM :
CORPORATION, :
 :
            Respondent. :
 :
------------------------------------------------ :

WILLIAM H. PAULEY III, Senior United States District Judge:

            Respondent Nigerian National Petroleum Corporation ("NNPC") moves pursuant

to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) to dismiss Petitioners Esso Exploration

and Production Nigeria Limited and Shell Nigeria Exploration and Production Company

Limited's (together, "Esso") Third Amended Petition to confirm a Nigerian arbitral award (the

"Award").  NNPC argues that the Third Amended Petition should be dismissed for lack of

personal jurisdiction, on <u>forum non conveniens</u> grounds, and because the Award was set aside by

Nigerian courts.  Esso moves for certain facts to be deemed admitted as a sanction for purported

discovery violations.  It also requests that this Court confirm the $1.799 billion Award and

accrued interest.[1]  For the reasons that follow, NNPC's motion is granted and Esso's motion is

denied.

---

[1]         Because this Court declines to confirm the Award, pre-judgment security is not warranted.

<u>BACKGROUND</u>

This dispute stems from a 1993 Production Sharing Contract (the "Agreement") between Esso and NNPC related to the Erha oil field off the coast of Nigeria. (Third Am. Pet., ECF No. 182 ("TAP"), ¶ 36.) The Agreement assigned Esso the responsibility for the exploration, development, and extraction of oil from the Erha field, in exchange for the right to share profits. (TAP ¶ 37.) Esso was also given the exclusive right to calculate the oil produced and allocate it into four tranches: (1) Royalty Oil, to cover NNPC's payments to the Nigerian government; (2) Cost Oil, to cover Esso's operating costs; (3) Tax Oil, to cover tax payments to the Nigerian government; and (4) Profit Oil, which is derived from the remaining oil and split between Esso and NNPC pursuant to a formula. (TAP ¶ 37.) In addition, Esso had the exclusive right to prepare tax returns to be filed with the Nigerian government related to those tranches of oil. (TAP ¶ 38.) The Agreement also contained a "Stabilization Clause," which required the parties to modify the terms of the Agreement to compensate Esso for any loss sustained due to changes in Nigerian law, regulations, or policies. (TAP ¶ 39.) Finally, the parties agreed that any dispute arising out of the Agreement would be arbitrated in Nigeria subject to Nigerian law. (TAP ¶ 40.) The arbitration clause was limited to disputes "concerning the interpretation or performance" of the Agreement. (Decl. of Adewale Atake, ECF No. 183 ("Atake Decl."), Ex. 2 at cl. 21.)

After executing the Agreement, Esso explored and developed the Erha oil fields and began production in 2006. (TAP ¶ 42.) Through 2009, Esso had invested over $6 billion in the project. (TAP ¶ 42.) However, due to changing oil prices in 2007, Nigeria and NNPC began to rethink the Agreement. By the latest November 2007, President Umaru Musa Yar'Adua of Nigeria established the Presidential Investment Committee (the "Committee") to determine

whether NNPC should be taking—known as "lifting"—more oil than Esso was allocating to NNPC under the Agreement.  (Decl. of Megha Hoon in Supp. of Pets.' Third Am. & Suppl. Pet., ECF No. 187 ("First Hoon Decl."), Ex. 10 at 9; Decl. of Mele Kyari, ECF No. 211 ("Kyari Decl."), ¶¶ 2, 6 (explaining that the Committee formed a Technical Subcommittee, which began its work in November 2007); TAP ¶ 45.)  In early February 2008, the Committee issued its report, which concluded that Nigeria had been deprived of $646.3 million from the Erha oil field and recommended that NNPC lift that amount of oil from Erha.  (First Hoon Decl. Ex. 10 at 20; TAP ¶ 46.)  The Committee then met with President Yar'Adua in April 2008 to give its recommendation.  (First Hoon Decl. Ex. 15.)  On May 20, 2008, President Yar'Adua ordered NNPC to lift more oil per the Committee's recommendation.  (TAP ¶ 46; Decl. of Shannon M. Leitner, ECF No. 207 ("Leitner Decl."), Ex. 14 (Press Release).)  However, NNPC had begun lifting more oil in December 2007 or January 2008—before President Yar'Adua gave the order. (ECF No. 238, Ex. D ¶ 13 & Ex. E.)  In addition, NNPC refused to submit tax returns prepared by Esso to the Nigerian tax authority (the "FIRS") and instead submitted its own returns to FIRS. (TAP ¶ 48.)

Esso objected to what it refers to as the "overlifting" of oil and commenced arbitration against NNPC in July 2009.  (TAP ¶ 49.)  The parties submitted extensive briefing prior to the arbitration hearings.  (TAP ¶ 54.)  During those hearings in 2011, NNPC argued that the dispute was not contractual in nature, but rather a tax dispute subject to the exclusive jurisdiction of the Nigerian Tax Appeal Tribunal.  (TAP ¶ 56.)  NNPC also argued that Nigeria's 1999 Constitution prevented the arbitration of tax disputes.  (TAP ¶ 58.)  However, the arbitral panel ("Arbitral Panel") found that it had jurisdiction to hear the dispute because it was contractual in nature and awarded Esso $1.799 billion.  (TAP ¶¶ 59–61.)  Specifically, the

Arbitral Panel found that NNPC overlifted Royalty and Tax Oil and reduced the Cost Oil due to Esso. (TAP ¶ 61.) Those actions by NNPC also reduced the Profit Oil available to Esso. (TAP ¶ 61.) The Award represented the difference between what NNPC lifted and what it was entitled to lift. (TAP ¶ 61.)

Thereafter, the Nigeria Federal High Court—a trial level court—issued two decisions: (1) the FIRS Decision, which allowed FIRS to enjoin the arbitration, and (2) the Set Aside Decision, which vacated the Award. (TAP ¶ 63.) In the FIRS Decision, the High Court held that the Arbitral Panel lacked jurisdiction because the dispute affected the amount of revenue received by FIRS, which was akin to a tax. (TAP ¶ 64; Atake Decl. Ex. 3 (FIRS Decision).) Notably, though, because the arbitration had been completed before the FIRS Decision was issued, there was no proceeding to enjoin. (TAP ¶ 64.) Esso maintains that the High Court failed to consider its arguments as to why the matter was not a tax dispute. (TAP ¶ 64.) In the Set Aside Decision, which was issued after Esso sought to confirm the Award, the High Court set aside the Award because of a similar jurisdictional issue—namely, that the case was not arbitrable because requiring NNPC to pay contractual damages would reduce the amount of money received by Nigeria through FIRS. (TAP ¶¶ 65–66; Atake Decl. Ex. 4 (Set Aside Decision).) Esso claims that the Set Aside Decision was essentially a "copy/paste" of the FIRS Decision, which appears, at least in part, to be the case. (Compare Atake Decl. Ex. 3 at 24 ("To say that the claims of the Claimants have nothing to do with tax is akin [to] saying that [s]ix is not half a dozen."), with Atake Decl. Ex. 4 ("To say that the claims of the Claimants have nothing to do with tax is akin to saying that [s]ix is not half a dozen.").) Esso appealed both decisions.

In the Set Aside Appeal, the Nigerian Court of Appeal found that the High Court properly set aside the Award because the matter was primarily a tax dispute. (TAP ¶ 68; Atake Decl. Ex. 5 at 20 (Set Aside Appeal).) However, the Court of Appeal reinstated some of the non-monetary aspects of the Award, finding that the High Court should have severed the claims related to the preparation of Petroleum Profit Tax returns and the calculation of lifting allocations from the rest of the Award because they were contractual in nature. (TAP ¶ 68; Atake Decl. Ex. 5 at 20.) Put another way, the Court of Appeal concluded that NNPC had breached the Agreement by overlifting oil and failing to submit the tax returns prepared by Esso, and that these portions of the Award should be restored. (TAP ¶ 68; Atake Decl. Ex. 5 at 20.) NNPC argues that this only provides prospective relief. Moreover, the Court of Appeal found that Esso had essentially waived its argument regarding the Stabilization Clause. (Atake Decl. Ex. 5 at 29.) Thereafter, the Court of Appeal decided the FIRS Appeal in a separate opinion with virtually the same holding and reasoning. (TAP ¶ 70; Atake Decl. Ex. 6 (FIRS Appeal.)

Esso pursued two separate avenues of relief from these rulings. First, it appealed both rulings. (TAP ¶ 73.) Second, it commenced an action in the High Court, seeking compensation for NNPC's violation of the Agreement. (TAP ¶ 74.) However, it commenced that lawsuit while simultaneously seeking to confirm the Award in Nigeria (apparently to avoid statute of limitations issues). (TAP ¶ 74.) The High Court dismissed that suit with prejudice, finding an "abuse of process" because Esso filed a substantive lawsuit while also seeking to confirm the Award. (TAP ¶ 75.) Esso appealed that decision as well.

Now, Esso seeks to confirm the Award in this Court. At the time Esso filed its Third Amended Petition, the value of the Award was $2,669,405,616. (TAP ¶ 61.) NNPC moves to dismiss on numerous grounds. First, NNPC argues that this Court lacks personal

jurisdiction over it.  Next, NNPC argues that even if this Court can exercise personal jurisdiction, the action should be dismissed on <u>forum non conveniens</u> grounds.  Finally, NNPC argues that this Court cannot confirm the Award because it was set aside by the Nigeria courts.  In addition, Esso moves for 12 proposed facts to be ordered established as a discovery sanction.

DISCUSSION

I.   <u>Personal Jurisdiction</u>

    A.  <u>Standard</u>

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), a plaintiff has the burden of establishing personal jurisdiction and "must make a <u>prima facie</u> showing that jurisdiction exists." <u>Eades v. Kennedy PC Law Offices</u>, 799 F.3d 161, 167–68 (2d Cir. 2015).  "Where, as here, there has been jurisdictional discovery but no evidentiary hearing, 'the plaintiff's <u>prima facie</u> showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant.'" <u>In re N. Sea Brent Crude Oil Futures Litig.</u>, 2017 WL 2535731, at *4 (S.D.N.Y. June 8, 2017) (quoting <u>Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.</u>, 722 F.3d 81, 85 (2d Cir. 2013)).  "A court construes the pleadings and affidavits in the light most favorable to the plaintiff and resolves all doubts in plaintiff's favor, notwithstanding any controverting presentation by the moving party." <u>McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani</u>, 295 F. Supp. 3d 404, 409 (S.D.N.Y. 2017) (quotation marks omitted).

For a court to exercise personal jurisdiction (1) there must be procedurally proper service of process, (2) there must be a statutory basis for personal jurisdiction, and (3) the exercise of personal jurisdiction must comport with constitutional due process.  <u>See</u> <u>Waldman v. Palestine Liberation Org.</u>, 835 F.3d 317, 327 (2d Cir. 2016).  The first two requirements are not

contested here. Rather, the parties dispute whether NNPC is entitled to due process, and if so, whether the exercise of personal jurisdiction here would comport with due process.

Esso advances three arguments why due process is either unnecessary or satisfied. First, Esso argues that there is subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") and valid service, which is sufficient to confer personal jurisdiction without establishing due process.[2] Second, Esso contends that NNPC is an alter ego of Nigeria and therefore not entitled to due process. Third, even if due process is required, Esso asserts that NNPC had sufficient minimum contacts with the forum to satisfy due process. In addition, Esso argues this Court can exercise in rem jurisdiction.

### B. Personal Jurisdiction under the FSIA

By way of background, Esso argues that the FSIA sets forth two requirements which, if satisfied, allow this Court to exercise personal jurisdiction over NNPC regardless of whether doing so comports with due process.[3] Specifically, the FSIA provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction under subsection (a) where service has been made . . . ." 28 U.S.C. § 1330(b) (emphasis added). There is no dispute that this Court has subject matter jurisdiction and that service has been made. Accordingly, the question is whether the FSIA can confer personal jurisdiction irrespective of due process.

---

[2]    Because this Court finds that it can exercise personal jurisdiction on other grounds, it need not address the FSIA or in rem jurisdiction. However, it discusses jurisdiction under the FSIA as background.

[3]    In the alternative, Esso argues that satisfaction of the FSIA requirements serves as satisfaction of the minimum contacts test, based on Shapiro v. Republic of Bol., 930 F.2d 1013, 1020 (2d Cir. 1991). This argument rests on a misreading of Shapiro. There, to establish subject matter jurisdiction, plaintiff needed to meet a substantial contact test that would satisfy the commercial activity exception to the FSIA. Thus, the court found a higher level of contact with the forum than minimum contacts. In addition, the Second Circuit explicitly stated that there must be sufficient minimum contacts to exercise personal jurisdiction. Shapiro, 930 F.2d at 1020 ("There is of course a constitutional constraint on the assertion of personal jurisdiction. There must be sufficient 'minimum contacts' . . . .").

Under the FSIA, a "foreign state . . . includes a political subdivision of a foreign state or <u>an agency or instrumentality</u> of a foreign state as defined in subsection (b)." 28 U.S.C. § 1603(a) (emphasis added). NNPC concedes that it is an instrumentality of Nigeria. And the Second Circuit has held that a foreign state is not "entitled to the jurisdictional protections of the Due Process Clause" of the Constitution. <u>Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic</u>, 582 F.3d 393, 399 (2d Cir. 2009). Therefore, Esso argues, because NNPC is a "foreign state" under the FSIA and foreign states are not entitled to due process, this Court can exercise jurisdiction without conducting a due process analysis. NNPC counters that whether an entity is considered a "foreign state" under the FSIA is irrelevant to the question of whether it is entitled to constitutional due process. Put another way, that an instrumentality is a foreign state under the FSIA does not automatically brand it a foreign state for purposes of due process.

Esso's argument is based largely on <u>TMR Energy Limited v. State Property Fund of Ukraine</u>, 411 F.3d 296, 303 (D.C. Cir. 2005), which held that personal jurisdiction could be properly asserted over a foreign state's agent "based solely upon the requirements of the FSIA"—<u>i.e.</u>, without due process. However, NNPC's reliance on <u>TMR</u> is inapposite for two reasons. First, the <u>TMR</u> court held that the State Property Fund of Ukraine was an alter ego of Ukraine, and thus it was considered a literal foreign state. <u>TMR</u>, 411 F.3d at 302. Next, in <u>Frontera</u>, the Second Circuit analyzed <u>TMR</u> but declined to hold that instrumentalities of foreign states do not require due process. 582 F.3d at 400.

In <u>Frontera</u>, the Second Circuit explained that just "because the FSIA treats foreign states and their agencies and instrumentalities identically . . . does not answer the <u>constitutional</u> question of [an agent or instrumentality's] due process rights." <u>Frontera</u>, 582 F.3d at 400 (emphasis in original). But the Second Circuit never answered the constitutional question.

Because the district court failed to determine whether the State Oil Company of Azerbaijan was an alter ego of Azerbaijan, the Second Circuit remanded the case for such a determination.

As discussed below, this Court finds that NNPC is an alter ego of Nigeria. Accordingly, it need not address whether an instrumentality requires constitutional due process.

C.  Alter Ego

It is well established that if NNPC is considered an alter ego of Nigeria, then it should not be afforded due process rights and minimum contacts need not be established.  See Frontera, 582 F.3d at 401.  The primary test for whether an instrumentality is an alter ego of a foreign state originates from First National City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec"), 462 U.S. 611 (1983).  There, the Supreme Court held that a "foreign government's determination that its instrumentality is to be accorded separate legal status" is presumptively valid.  Bancec, 462 U.S. at 628.  However, that presumption can be overcome, and the instrumentality will be considered as one with the foreign state, i.e., an alter ego, where (1) "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created"; or (2) recognizing the entities as separate "would work fraud or injustice." Bancec, 462 U.S. at 629; accord EM Ltd. v. Banco Cent. De La Republica Arg., 800 F.3d 78, 90 (2d Cir. 2015).

As a threshold issue, Esso barely waves its bat at the "fraud or injustice" prong. The "common thread" in cases finding an alter ego under the "fraud or injustice" theory "is that the sovereign states at issue abused the corporate form."  EM Ltd., 800 F.3d at 95; see Bancec, 462 U.S. at 629–30 ("In particular, the Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies.").  Here, Nigeria and NNPC's relationship does not fall within this "common thread."  In EM Ltd., the Second Circuit sampled

various cases in which an instrumentality's separate juridical status was used to avoid liability or block enforcement attempts. For example, in Cuba, the government dissolved Bancec and took complete control of assets to avoid creditors. In Turkmenistan, the government transferred assets from one instrumentality to another to escape liability. And in the Congo, the government created a sham entity with purported sovereign immunity. See EM Ltd., 800 F.3d at 95–96. Based on these examples, the Second Circuit found there was not an alter ego relationship in EM Ltd. because the instrumentality's "separate juridical status has [not] been actively used by Argentina to block plaintiffs' enforcement attempts against Argentina itself," and because "Argentina has [not] transferred its funds to [the instrumentality] in order to shield them from plaintiffs." EM Ltd., 800 F.3d at 96.

The same is true here. Nigeria is not using the separate juridical status of NNPC to avoid liability or thwart enforcement attempts. This dispute revolves around whether NNPC overlifted oil and whether the Arbitral Panel had jurisdiction to hear the overlifting dispute. The only "fraud or injustice" alleged by Esso is that NNPC moved funds to new accounts held by the Central Bank of Nigeria ("CBN") to avoid unspecified creditors. (TAP ¶ 21.) Simply put, Esso fails to allege that Nigeria has used NNPC to shield itself from liability. Accordingly, Esso must demonstrate that Nigeria extensively controlled NNPC.

Determining whether there is extensive control "over an instrumentality by a foreign sovereign is fact-intensive," and courts consider whether the sovereign nation:

> (1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state.

EM Ltd., 800 F.3d at 91. In addition, courts in this district consider:

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

In re 650 Fifth Ave. & Related Props., 881 F. Supp. 2d 533, 549–50 (S.D.N.Y. 2012) (alteration in original) (citations omitted). No one factor is dispositive, and the underlying facts should be weighed collectively. See Funnekotter v. Agric. Dev. Bank of Zim., 2015 WL 9302560, at *6 (S.D.N.Y. Dec. 17, 2015). Ultimately, this Court must determine "whether the sovereign state exercise[d] significant and repeated control over the instrumentality's day-to-day operations." EM Ltd., 800 F.3d at 91. Thus, the question is whether Nigeria and NNPC "operated as a single enterprise." Cortez Byrd v. Corporacion Forestal y Indus. de Olancho, S.A., 974 F. Supp. 2d 264, 271 (S.D.N.Y. 2013).

Esso argues that NNPC was an alter ego of Nigeria for the following reasons: (1) the Committee allegedly instructed NNPC to overlift oil in Erha and it complied; (2) Nigeria controls the day-to-day operations of NNPC; (3) NNPC and Nigeria shared property, including bank accounts; and (4) NNPC acted as Nigeria's agent.[4] In response, NNPC attacks each ground individually. While this Court discusses these grounds in turn for sake of clarity and organization, it weighs them collectively. See Funnekotter, 2015 WL 9302560, at *6.

---

[4]        Esso argues that because several NNPC employees stated that NNPC is an agent of the Nigerian government, NNPC has admitted that it is an alter ego. This argument is meritless. The NNPC employees cited do not make the judicial admission that NNPC is an alter ego of Nigeria—rather, they state that NNPC is generally an agent of Nigeria. Such a statement does not solve the legal question of whether NNPC is Nigeria's alter ego, especially given the fact that NNPC concedes it is an instrumentality of Nigeria.

1. <u>The Committee</u>

The parties spar over whether NNPC overlifted oil from Erha at the direct behest of the Nigerian President.  While it is unclear whether NNPC made the overlift decision completely on its own, it is clear that—at a minimum—President Yar'Adua influenced NNPC's decision.

By the latest November 2007, President Yar'Adua created the Committee to review the performance of the Erha and Bonga oil fields.  (First Hoon Decl. Ex. 10 at 9; Kyari Decl. ¶¶ 2, 6.)  The Committee included 10 members who were all Nigerian officials or NNPC employees.  (First Hoon Decl. Ex. 10 at 9.)  And a Technical Subcommittee—formed to "collate and analy[z]e all relevant data"—also consisted of 10 members who were all Nigerian officials or NNPC employees.  (First Hoon Decl. Ex. 10 at 10.)  Neither the Committee nor the Subcommittee included any Esso officials.

In February 2008, the Committee signed its report, which recommended lifting additional oil from Erha.  (First Hoon Decl. Ex. 10.)  The Committee met with President Yar'Adua to give him its recommendation in April 2008.  (First Hoon Decl. Ex. 15.)  The following month, President Yar'Adua ordered NNPC to overlift oil.  (First Hoon Decl. Ex. 8.)

Esso argues that President Yar'Adua contrived the Committee for the specific purpose of obtaining a recommendation to lift more oil for the benefit of Nigeria.  NNPC counters that because the lifting allocations were disputed before the Committee's formation and it began overlifting before President Yar'Adua's order to do so, NNPC could not have been influenced by Nigeria.  While the parties do not agree on when NNPC began overlifting, the record reflects that it started sometime in December 2007 or January 2008.  (ECF No. 238 Ex. D

¶ 13 & Ex. E.) Accordingly, the overlifting began after the Committee convened but before President Yar'Adua's overlift order.

Ultimately, this Court finds that, regardless of whether the overlift order was the sole reason NNPC overlifted oil, President Yar'Adua's influence on NNPC's actions suggests an alter ego relationship. See McKesson Corp. v. Islamic Republic of Iran, 52 F.3d 346, 352 (D.C. Cir. 1995) (finding an alter ego relationship where the instrumentality took action because it "believed that Iran desired them to take these steps"); EM Ltd., 800 F.3d at 91 (listing whether the sovereign "issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state" as a factor in the alter ego inquiry). Markedly, oil was not overlifted until after the President convened the Committee. And the Committee—which consisted solely of Nigerian officials and NNPC staff—was formed with "[t]he key objective . . . to determine if there are revenue opportunities that might have been lost by [the] Government in the implementation of the [Agreement]." (First Hoon Decl. Ex. 10 at 4.) Moreover, NNPC overlifted oil—specifically, Royalty and Tax Oil—for the direct benefit of the Nigerian government—not NNPC. (See Decl. of Matthew T. Page, ECF No. 186 ("Page Decl."), ¶ 36; TAP ¶ 61.) In sum, NNPC "believed that [Nigeria] desired [it] to take . . . steps" to overlift oil. McKesson, 52 F.3d at 352. However, the overlift order is merely one policy directive and is not entitled to dispositive weight.

    2. Day-to-Day Operations

The totality of the circumstances demonstrates that Nigeria exerts substantial control over NNPC's day-to-day business. As a preliminary matter, the act that created NNPC (the "NNPC Act") provides that one of NNPC's general duties is to "engag[e] in activities that would enhance the petroleum industry in the overall interest of Nigeria." (Atake Decl. Ex. 10

§ 5(1)(h) (emphasis added).) See In re 650 Fifth Ave., 881 F. Supp. 2d at 549 (stating that a factor to consider is "whether the foreign state created the entity for a national purpose"). This is unsurprising given that Nigeria is NNPC's sole shareholder. (First Hoon Decl. Ex. 1 at 198:8–10 ("Well, and the shareholder is Nigeria? A. Yes."), Ex. 4 at 30:2–4 ("Has NNPC ever had a shareholder other than the Government of Nigeria? A. No.").) And in addition to wholly owning NNPC, Nigeria exerts substantial control over NNPC's board of directors and its operations.

For instance, the Nigerian President appoints the Minister of Petroleum Resources, who is also the Chairperson of NNPC's board. (First Hoon Decl. Ex. 4 at 31:1–18; Atake Decl. Ex. 10 § 1(2)-(3).) And historically, Nigerian presidents have served as the Minister of Petroleum—and thus as chairman of NNPC. (See Page Decl. ¶¶ 23–25.) In fact, President Yar'Adua served as the Minister of Petroleum (and chairman of NNPC) at the time he convened the Committee. (See Page Decl. ¶¶ 23–25.) Moreover, the Nigerian President retains substantial power to hire and fire NNPC officers. Specifically, the Nigerian President appoints and has the power to remove all of NNPC's board members, as well as NNPC's Group Managing Director (essentially the CEO), all of NNPC's senior executives, including the equivalent of the CFO, COO, and the CEO of the Crude Oil Marketing Division, and other officials such as general managers, group general managers, and managing directors.[5]

---

[5]    (See First Hoon Decl. Ex. 4 at 31:1–32:7 ("And does the president [of Nigeria] appoint all chairmen of the board of directors of NNPC? A. Yes. Q. And can the president remove the chairman of the board of directors of NNPC? A. Yes. Q. . . . [C]an the president remove the chairman of the board of directors of NNPC for any reason? A. He can remove . . . a member and appoint a member."); 32:15–33:21 ("Are there any board members that are not appointed by the President of Nigeria? A. No. . . . And can the president remove the CEO of NNPC? A. Yes. Q. And can the president remove the CEO of NNPC at any time? A. Yes. Q. And can the president remove the CEO of NNPC for any reason? A. Yes."); 33:22–34:5 ("Does the president appoint other senior officials of NNPC? A. Yes. Q. Which officials at NNPC are appointed by the president? A. From the general managers to the group managing director and those include general managers, group general managers, managing directors and group managing director.").)

Although "the appointment or removal of an instrumentality's officers and directors, standing alone," does not demonstrate the presence of an alter ego relationship, it does suggest such a relationship when considered with other indicia of substantial control, especially where the sovereign "uses its influence over these directors in order to interfere with the instrumentality's ordinary business affairs." EM Ltd., 800 F.3d at 92–93; see McKesson, 52 F.3d at 351 (finding alter ego relationship where, among other reasons, "the[] government entities held 52 percent of Pak Dairy's stock and controlled six of the seven seats on its board of directors"); In re 650 Fifth Ave., 881 F. Supp 2d at 549 (considering "whether the foreign state requires the hiring of public employees" as a factor). Indeed, between 2007 and 2016, Nigerian presidents appointed seven different CEOs, indicating that they served at the pleasure of the Nigerian President. (See Page Decl. ¶ 21.) See EM Ltd., 800 F.3d at 91 (explaining that a factor counseling in favor of finding an alter ego relationship is whether the sovereign "deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies").

Further, it is apparent that Nigeria interjects itself into NNPC's "ordinary business affairs." EM Ltd., 800 F.3d at 93. For instance, the Nigerian President can make decisions for NNPC without board approval or that benefit Nigeria rather than NNPC. (See Decl. of Megha Hoon in Supp. of Pets.' Opp. to Resp. NNPC's Mot. to Dismiss the Third Am. & Suppl. Pet., ECF No. 222 ("Second Hoon Decl."), Ex. 18 at 58:13–19 ("And so consistent with the law, if the decision being contemplated by NNPC is large enough that it has to go to the president it would not need to be disclosed to the board of directors? A. It doesn't need to."); First Hoon Decl. Ex. 1 at 289:23–293:20 (

███████████████████████████████████████████████████████████████████████).)[6]

Indeed, the President "can approve expenses that are not directly for the benefit of NNPC to be paid by NNPC, which NNPC would treat as [an interest-free] loan to the government." (See Second Hoon Decl. Ex. 16 at 191:4–192:10; First Hoon Decl. Ex. 1 at 289:23–293:20.)  See Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc., 39 F. Supp. 3d 516, 525 (S.D.N.Y. 2014) (finding that interest-free loans suggest an alter ego relationship in a veil-piercing case).

Nigeria also exerts control over NNPC's business transactions and budget.  See EM Ltd., 800 F.3d at 91 (considering whether the sovereign "requires the instrumentality to obtain approvals for ordinary business decisions from a political actor" in alter ego analysis); In re 650 Fifth Ave., 881 F. Supp. 2d at 549 (considering "whether the foreign state actively supervises the entity" in alter ego inquiry).  For example, the NNPC Act states that the Nigerian President must personally approve all contracts entered into by NNPC exceeding 5 million naira (approximately $14,000).  (Atake Decl. Ex. 10 § 6(2)).  In practice, the Nigerian President delegates this authority to the NNPC Tenders Board, but he still must approve any local contracts valued over $7.5 million and foreign contracts valued over $20 million.  (See First Hoon Decl. Ex. 4 at 55:15–24 ("If it is in excess of 2.7 billion naira, the board cannot approve it? Q. Yes[.]"); Feb. 1, 2019 Oral Arg. Tr., ECF No. 243 ("Oral Arg. Tr.") at 8:23–9:5, 35:10–18.)  At oral argument, NNPC did not know how many foreign contracts it enters into valued under $20 million, but given that NNPC's revenue purportedly exceeds $7 billion, the Nigerian President likely must approve a substantial portion of NNPC's contracts.  (See Second Hoon Decl. Ex. 23; Oral Arg. Tr. at 11:3–5.)  See EM Ltd., 800 F.3d at 95 & n.77 (suggesting that a requirement for "all checks in excess of a certain amount [to] be signed by a government-appointed director"

[6]    The redactions in this Opinion & Order reference exhibits that the parties filed under seal or in redacted form.  The parties are directed to advise this Court whether there is a continuing need for these redactions.

demonstrated control over "business decisions and daily functions" (quoting Hester Int'l Corp. v. Fed. Republic of Nigeria, 879 F.2d 170, 178 (5th Cir. 1989))). Further, the Nigerian President must review and approve NNPC's annual budget, as well as loans taken out by NNPC. (See Atake Decl. Ex. 10 §§ 7–8; Decl. of Jeremiah Oluwaniyi, ECF No. 199 ("Oluwaniyi Decl."), ¶ 7.) Cf. Bancec, 462 U.S. at 624 ("Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply."). Finally, NNPC even required the Nigerian President's approval to ███████████████████████████████████. (See Second Hoon Decl. Ex. 22.)

Taken together, these examples of control demonstrate that Nigeria has a substantial role in the day-to-day operations of NNPC. Nigeria's control over NNPC is similar to Zimbabwe's control over the Zimbabwe Mining Development Corporation ("ZMDC") in Funnekotter. There, a judge in this district held that ZMDC was an alter ego of Zimbabwe where (1) ZMDC's enabling act required Zimbabwe to own no less than 51% of ZMDC's stock; (2) members of ZMDC's board of directors were to be appointed after consultation with the President; (3) ZMDC could not make investments or loans without seeking direction and advice from the Minister of Mines; and (4) the Minister of Mines could direct ZMDC to take "any actions that the minister deems to be in the national interest." See Funnekotter, 2015 WL 9302560, at *5–6; see also In re 650 Fifth Ave., 881 F. Supp. 2d at 551 (finding alter ego relationship where, among other reasons, the instrumentality terminated employees and board members pursuant to directives from the government of Iran).

3. <u>Shared Property</u>

There is also ample evidence that Nigeria uses NNPC's "property as its own." <u>EM Ltd.</u>, 800 F.3d at 91. For instance, the Ministry of Petroleum Resources maintains office space at premises used and owned by NNPC without a lease and without paying rent. (<u>See</u> First Hoon Decl. Ex. 1 at 288:10–289:10.) Not only does this demonstrate that Nigeria and NNPC share property, but the lack of a lease or any written agreement suggests that they are one and the same. <u>See</u> <u>Am. Federated Title</u>, 39 F. Supp. 3d at 525 (finding that the lack of documentation for agreements suggested an alter ego relationship in a veil-piercing case). Further, and as discussed earlier, NNPC ███████████████████████████████████████████ ███████████████████████████████████████████████. (First Hoon Decl. Ex. 1 at 289:23–293:20.) ████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████████

In addition, evidence suggests that NNPC and Nigeria share bank accounts. <u>See</u> <u>Kensington Int'l Ltd. v. Republic of Congo</u>, 2007 WL 1032269, at *12 (S.D.N.Y. Mar. 30, 2007) (explaining that "commingling of . . . assets" is a "classic earmark[] of an alter-ego relationship"). Although the parties dispute NNPC's control over certain accounts, there are at least three JPMorgan accounts held in New York that relate to NNPC: a CBN/NNPC Crude Oil Revenue (U.S. Dollars) Account, a CBN/NNPC Gas Revenue (U.S. Dollars) Account, and a Joint Venture Cash Call Account. (<u>See</u> Decl. of Effiong Jack Ukitetu, ECF No. 100 ("Ukitetu Decl."), ¶ 5.)

NNPC contends that these accounts—and any funds within them—belong solely to the CBN and that NNPC exercises no control beyond the authority to instruct the CBN to make transfers.  (Ukitetu Decl. ¶ 8.)  But NNPC cannot explain why it needs the ability to direct fund transfers for accounts it does not own.  (Oral Arg. Tr. at 12:10–12 ("I think it's part of the relationship with the government in doing business for the government related to its oil . . . .").)  And, apparently, NNPC is the <u>only</u> entity that can direct the CBN to transfer funds from the accounts.[7]  Further, NNPC receives account statements for the accounts.[8]  In addition, even if NNPC does not own the accounts or funds within them, the mere ability to direct fund transfers indicates close ties between NNPC and Nigeria.

Moreover, the record evidence belies NNPC's argument that it does not share the accounts with the Nigeria government—including the names of the accounts, which suggest they belong to or are maintained for NNPC.  (<u>See</u> Second Hoon Decl. Ex. 25 (reference by ███ ███████████████████████████████████████████); Second Hoon Decl. Ex. 26 (statement by auditor that the CBN maintains the revenue accounts with JPMorgan "on behalf of the NNPC").)  For example, NNPC ordered the CBN to transfer funds from the accounts for non-NNPC, governmental activity, ███████████████████████████████████████████████████████ ██████████████████████████████████.  (<u>See</u> First Hoon Decl. Ex. 1 at 197:18–204:11

---

[7]     (<u>See</u> First Hoon Decl. Ex. 1 at 105:21–106:24 ("Does anybody other than NNPC direct transfers to the oil revenue account [held at JPMorgan]? A. Not that I know of. . . . Q. Now, NNPC periodically instructs CBN to make transfers of funds from this account, correct? A. CBN, yes.  Q. Does any entity other than NNPC have authority to direct CBN to transfer funds from the oil revenue account? A. . . . So NNPC does.  No other entity documentarily is given the road to do that . . . ."), 111:21–112:10 ("Are you aware of any entity other than NNPC that directs transfers to the guest revenue account? A. No. Q. And NNPC periodically instructs the CBN to transfer money from the guest revenue account, correct? A. Yes, it does.  Q. Does any entity other than NNPC direct the CBN to transfer money from the guest revenue account? A. To date, no."), 129:14–131:13 ("Q. Does any entity other than NNPC direct transfers to [the JV Cash Call] account? A. Not that I know of. Q. Does NNPC periodically instruct CBN to make transfers of funds from this account? A. From time to time, yes.").)

[8]     (<u>See</u> First Hoon Decl. Ex. 1 at 105:21–106:24 ("Q. Does NNPC receive account statements for th[e oil revenue account held at JPMorgan]? A. Yes, we do."), 129:14–131:13 ("Does NNPC receive bank statements for t[he JV Cash Call] account? A. From CBN, yes.").)



(⬛⬛⬛⬛⬛⬛⬛⬛), 222:5–235:5 (⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛); Ex. 5 (⬛⬛⬛⬛⬛⬛⬛⬛; Ex. 6

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛); Ex. 7 (⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛). It is unclear why NNPC

would have the authority to instruct account transfers for non-NNPC, governmental transactions

unless there is an alter ego relationship. And conversely, activity logs from the Joint Venture

Cash Call Account—an account that NNPC claims belongs to the CBN—show that funds were

transferred from that account to purchase laptops for NNPC.[9]  (See Second Hoon Decl. Ex. 24.)

    4.   Conclusion on Alter Ego

After weighing the totality of the circumstances and applying the various alter ego

considerations, this Court finds that NNPC is an alter ego of Nigeria. Accordingly, no due

process analysis is required, and this Court can exercise personal jurisdiction over NNPC.

    D.  Due Process

Even if due process were required, this Court finds that NNPC has sufficient

minimum contacts to satisfy due process. "Determining personal jurisdiction over a foreign

defendant in a federal-question case such as this requires a two-step inquiry. First, we . . .

determine whether personal jurisdiction will lie. If jurisdiction lies, we consider whether the

district court's exercise of personal jurisdiction over a foreign defendant comports with due

process protections established under the United States Constitution." Licci ex rel. Licci v.

---

[9]    NNPC argues that Nigeria paid for NNPC's laptops because they were needed for a government project. (Decl. of Cecilia Froelich Moss, ECF No. 196, Ex. F at 44:20–46:10 (explaining generally that expenditures are for NNPC work on government projects).) But it fails to explain how these laptops were related to a government project or why Nigeria would be responsible for paying for NNPC's laptops in such a situation.

Lebanese Can. Bank, SAL, 732 F.3d 161, 168 (2d Cir. 2013) (citation omitted). "[D]ue process requires a plaintiff to allege (1) that a defendant has certain minimum contacts with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 343 (2d Cir. 2018) (quotation marks omitted).

Here, because Esso invokes federal question jurisdiction under the FSIA, the Fifth Amendment's Due Process Clause controls, and the forum is the United States rather than New York. "When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, . . . the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." SEC v. Straub, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) (quotation marks omitted); see Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 497 (1983) (holding that the FSIA creates federal question jurisdiction); L'Europeenne de Banque v. La Republica de Venez., 700 F. Supp. 114, 124 n.10 (S.D.N.Y. 1988) ("Because the FSIA creates federal question jurisdiction, the due process clause of the fifth amendment, rather than that of the fourteenth amendment, controls."). Accordingly, this Court must consider NNPC's contacts with the United States generally—not just its contacts with New York. See Waldman, 835 F.3d at 330 (holding that the due process analyses under the Fifth and Fourteenth Amendments are essentially the same and explaining that courts must consider "the defendant's contacts throughout the United States" where it applies the Fifth Amendment); Alfandary v. Nikko Asset Mgmt. Co., 337 F. Supp. 3d 343, 359 (S.D.N.Y. 2018) (same).

To determine whether a party has sufficient minimum contacts with the forum, courts "evaluate the quality and nature of the defendant's contacts with the forum . . . under a

totality of the circumstances test. . . . [M]inimum contacts . . . exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 82 (2d Cir. 2018) (quotation marks omitted). Stated differently, "the jurisdictional inquiry focuses on the affiliation between the forum and the underlying controversy." Licci, 732 F.3d at 170 (quotation marks omitted). Therefore, "the relationship among the defendant, the forum, and the litigation" are "the central concern of the inquiry into personal jurisdiction." Daimler AG v. Bauman, 571 U.S. 117, 126 (2014).

      "Due process requires that a defendant be haled into court in a forum . . . based on his own affiliation with the [forum], not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the [forum]." Walden v. Fiore, 571 U.S. 277, 286 (2014) (quotation marks omitted). "And although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." Walden, 571 U.S. at 285 (citation omitted). Further, when dealing with contractual claims, courts look specifically to "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985); Stone v. Patchett, 2009 WL 1108596, at *12 (S.D.N.Y. Apr. 23, 2009) (applying Burger King analysis to an action to confirm an arbitral award related to a contract dispute).

      Esso alleges that NNPC has sufficient minimum contacts with the United States because NNPC (1) marketed, solicited, and negotiated the Agreement in the United States, then traveled to the United States in performing it; (2) used U.S. currency and bank accounts in

connection with transactions involving Erha oil; and (3) entered into a contract containing an arbitration clause with an affiliate of an American corporation who is subject to the New York Convention.  NNPC argues that these are insufficient contacts because the underlying dispute relates to the overlifting of oil in Nigeria.  It also points out that the Agreement was negotiated in Nigeria, was executed by Nigerian corporations, contemplated performance in Nigeria, and was subject to arbitration in Nigeria under Nigerian law.  In addition, NNPC attempts to rebut each category of contacts by disaggregating them and arguing that they are individually insufficient. But this Court must "evaluate the quality and nature of [NNPC's] contacts with the forum . . . under a totality of the circumstances test."  <u>Charles Schwab Corp.</u>, 883 F.3d at 82.

       1.  <u>Contacts Regarding the Agreement</u>

Considerable evidence shows that NNPC solicited and negotiated the Agreement in the United States.  In 1991, representatives from the Nigerian government and NNPC attempted to convince Exxon (an affiliate of Esso U.S.) to invest in Nigeria's offshore oil fields, including Erha.  Specifically, Esso cites two advertisements in the Oil and Gas Journal (based in Oklahoma) taken out by Nigeria's Ministry of Petroleum Resources and promoted by TGS Mabon International ("TGS") announcing second-round bidding in offshore Nigerian oil fields. (Decl. of Edwin Barrett Turner, ECF No. 185 ("Turner Decl."), Exs. 3 & 4.)  Further, on October 17, 1991, TGS invited Exxon to attend a late-November 1991 roadshow in Houston related to second-round bidding.  (Turner Decl. ¶ 10; Turner Decl. Ex. 2.)  While NNPC did not take out the advertisement or send the invitation, the brochure attached to the invitation states that "[u]nder a Production Sharing Contract the foreign company is considered as a contractor, NNPC is the title holder."  (Turner Decl. Ex. 2 at 5.)  Simply put, NNPC cannot completely disclaim responsibility for these contacts, given that they were made to induce investors to enter

into agreements with NNPC.  Moreover, as previously discussed, Nigeria's Minister of Petroleum Resources also serves as chairman of NNPC.

In any event, NNPC's involvement with Exxon began to pick up after these initial solicitations.  In November 1991, Edwin Turner, an Exxon employee, attended the roadshow in Houston and states that NNPC officials in attendance promoted investment opportunities in Nigeria's offshore oil fields, including the one in Erha.  (Turner Decl. ¶¶ 9–11.)  Specifically, Turner avers that he attended the first day of the roadshow with several Exxon colleagues and that representatives of Nigeria and NAPIMS (a unit of NNPC)[10] solicited bids from them. (Turner Decl. ¶ 11.)  He states that NNPC informed him and his colleagues about the contractual form the potential investments would take—namely, agreements with NNPC.  (Turner Decl. ¶ 11.)

After the roadshow, Turner and his Exxon colleagues met privately with Nigerian and NNPC representatives, where the Nigerian representatives reiterated their desire to see Exxon invest in Nigeria.  (Turner Decl. ¶ 12.)  Turner further states that the roadshow and that meeting "substantially advanced Exxon's business relationship with NNPC[] and were essential for Exxon to decide to enter into the [Agreement]."  (Turner Decl. ¶ 13.)

On March 12, 1992, Exxon—through Esso U.S.—applied for Blocks 209 (Erha) and 210 of Nigeria's offshore oil fields, both of which were marketed at the roadshow.  (Turner Decl. ¶ 14.)  That application—which stated that any potential license would be issued to a Nigerian subsidiary of Exxon—was sent from the United States to Nigeria's Ministry of

---

[10]     NAPIMS is the Corporate Services Unit of NNPC.  (See Mot. at 20 n.6.)  And "[i]n determining whether a defendant has 'minimum contacts' with the forum . . . , courts can take into account the activities of a defendant's co-venturer or agent to determine whether the defendant had minimum contacts with the forum state."  Stone, 2009 WL 1108596, at *11.  And, in any event, NNPC does not dispute that NAPIMS' conduct can be imputed to NNPC.

Petroleum Resources and discussed a production sharing contract, but it did not directly mention NNPC.[11]  (First Hoon Decl. Ex. 12.)

However, after Exxon submitted its bid, Turner began "negotiating what would become the Erha [Agreement]" and "was in constant contact with Nigerian officials, including NNPC's representatives," and NNPC representatives "were in contact with [Turner] in Houston via phone, fax, and telex messages."  (Turner Decl. ¶¶ 15, 17.)  And on June 5, 1992, the Ministry of Petroleum Resources—whose Minister is also the chairman of NNPC—sent a letter awarding an Oil Prospecting Lease for Block 209 (Erha) to Exxon in Houston.  (Turner Decl. ¶ 16; First Hoon Decl. Ex. 13.)  In that letter, the Ministry of Petroleum Resources advised Exxon to "get in touch with NAPIMS for details on the" Agreement to be entered with NNPC. (First Hoon Decl. Ex. 13.)

Exxon and NAPIMS/NNPC began negotiating the Agreement in the summer of 1992.  Turner "played a key role" in those negotiations and states that he "had extensive contact with NNPC" and NAPIMS.  (Turner Decl. ¶¶ 18–19.)  In doing so, Turner typically met with NNPC/NAPIMS in Lagos, Nigeria, but he sent letters on Exxon letterhead from Houston to NNPC/NAPIMS, and he and NNPC/NAPIMS "exchanged phone calls and faxes" while he was in Houston.  (Turner Decl. ¶ 19.)  Notably, Exxon and its affiliates had no presence in Nigeria until Esso was incorporated on February 26, 1993.  Thus, any contact NNPC had with Exxon that was not in person during negotiations was directed to the United States.  (Turner Decl. ¶¶ 19, 22.)  Simply put, NNPC/NAPIMS directed its communications to American companies in Houston during the bulk of negotiations.  And as a result of these United States-directed negotiations, the parties executed the Agreement on May 21, 1993.  (Turner Decl. ¶ 22.)

---

[11]    This Court notes that bids or communications sent by Exxon from the United States to Nigeria cannot serve as purposeful availments of the forum by NNPC.

Moreover, NNPC concedes that Esso was created solely for the purpose of entering the Agreement. (Oral Arg. Tr. at 26:2–19.)

In addition, Esso claims that "there have been multiple meetings between NNPC and Exxon representatives in Houston concerning the [Agreement], the exploration of the Erha field, and where to drill wells." (TAP ¶ 43 n.18.) However, there is evidence of only two such meetings. First, NNPC representative Mele Kyari travelled to now ExxonMobil's Houston office "in connection with" the Erha oil field in the early 2000s "to determine where to drill the well" in Erha. (Second Hoon Decl. Ex. 17 at 80:5–81:2.) Second, in 2013, ExxonMobil hosted NAPIMS officials for training programs, and "[t]he sponsorship of the training program for NAPIMS [wa]s based on both the legal and contractual obligations placed on" Esso by the Agreement. (Second Hoon Decl. Ex. 27 at 29–40.)[12]

NNPC's primary counterargument is that many of these contacts occurred over 20 years ago and that they were not directly related to this dispute. It cites <u>Moncrief Oil International Inc. v. OAO Gazprom</u>, 481 F.3d 309, 312–13 (5th Cir. 2007), for the proposition that contract negotiations and messages sent from outside the forum are insufficient to demonstrate minimum contacts. But that case—which is not binding on this Court—should not be read so broadly. There, the Fifth Circuit held that "a <u>plaintiff's</u> unilateral activities in [the forum state] do not constitute minimum contacts where the defendant did not perform any of its obligations in [the forum state], the contract did not require performance in [the forum state], and the contract is centered outside of" the forum state. <u>Moncrief Oil</u>, 481 F.3d at 312 (emphasis

---

[12]     Esso argues that several other instances help establish minimum contacts but fails to tie them to this dispute or the Agreement. For example, Esso claims that NNPC regularly ships oil, including oil that was lifted from Erha, to the United States. Esso provides no evidence for this assertion beyond a news article stating that NNPC generally ships oil to the United States—but this motion concerns specific personal jurisdiction, and there is no indication that any of the shipped oil mentioned in the article came from Erha. In addition, Esso argues that NNPC registered its website in the United States to solicit business from and market its services to American companies. But Esso has provided no evidence that NNPC has used its website in connection with this dispute or the Agreement.

added). The Fifth Circuit also noted that a visit to Texas by defendant that "helped to further planning and negotiations" was insufficient where no agreement was established. Moncrief Oil, 481 F.3d at 313.

But here, NNPC entered the United States to solicit bids from and directed communications to Exxon representatives in Houston that led to the formation of the Agreement. And courts in this district have found negotiations essential to the formation of contracts at issue to be sufficient, on their own, to establish minimum contacts. See Sherwin-Williams Co. v. C.V., 2016 WL 354898, at *3–4 (S.D.N.Y. Jan. 28, 2016) (findings minimum contacts where the parties negotiated "key terms" of the contract in New York, even though the concluding negotiations and the contract's execution were not in New York, neither party was from New York, the transactions contemplated by the contract had nothing to do with New York, and the parties agreed to arbitrate in Texas under Mexican law); Millennium, L.P. v. Dakota Imaging, Inc., 2003 WL 22940488, at *4 (S.D.N.Y. Dec. 15, 2003) (holding that defendant's attendance at a trade show to solicit business, which led to the formation of a contract outside the forum, was sufficient to establish minimum contacts); Nat'l Cathode Corp. v. Mexus Co., 855 F. Supp. 644, 647 (S.D.N.Y. 1994) (finding minimum contacts where defendant's agents "physically entered New York and engaged in discussions that were essential to formation of the contract at the heart of this action"); see also Topnotch Tennis Tours, LLC v. Glob. Tennis Connections Ltd., 2014 WL 6389587, at *6 (E.D.N.Y. Nov. 14, 2014) (finding minimum contacts based on a single one-hour meeting in which defendant solicited plaintiff's business, culminating in the parties' negotiation of a contract).

When all NNPC's Agreement-related contacts are considered together, it is clear NNPC purposely availed itself of the forum. See Eades, 799 F.3d at 168 (finding minimum

contacts in a Federal Debt Collection Practices Act action in New York where defendant mailed

a debt collection notice to plaintiff in New York, engaged in one debt collection phone call while

plaintiff was in New York, and mailed a Pennsylvania state-court summons and complaint to

plaintiffs in New York); Porco v. Phoenix Bldg. Corp., 2019 WL 2210659, at *5 (S.D.N.Y. May

21, 2019) (finding minimum contacts where defendant's "communications with Plaintiff reflect[]

that he purposefully solicited investment from New York persons for his own financial gain");

Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC, 2016 WL 7451306, at *4 (S.D.N.Y. Dec. 27,

2016) (finding were minimum contacts with New York where "Defendants marketed and sold

their products nationwide through their websites; on multiple occasions received orders from

New York and shipped products to New York; and . . . directly solicited New York customers

via email"); MasterCard Int'l Inc. v. Fed'n Internationale de Football Ass'n, 2006 WL 2320408,

at *4 (S.D.N.Y. Aug. 10, 2006) (finding minimum contacts in part because defendant "came to

New York for two days to negotiate key aspects of a contract" with a New York-based company

"and then continued to have electronic and telephonic communications with that company

toward completing negotiations and performance of the contract"). Specifically, NNPC attended

the Houston roadshow to solicit bids, engaged in preliminary negotiations in Houston, directed

communications to the United States during contract negotiations, and travelled to the United

States on more than one occasion to facilitate performance of the Agreement.

###   2.   U.S.-Dollar Transactions and Bank Accounts

Next, Esso argues that there are minimum contacts because NNPC (1) transacts in

U.S. dollars; (2) maintains, controls, and uses bank accounts held in the United States, including

correspondent bank accounts; and (3) directs the proceeds of oil—including oil lifted from

Erha—to bank accounts in the United States. (TAP ¶ 23.)[13] Esso's primary focus appears to be

that NNPC may hold bank accounts in the United States. But this Court finds the evidence of

U.S.-dollar transactions and payments directed to United States accounts far more persuasive.

Indeed, the record reflects that NNPC transacts business in U.S. dollars and uses

United States bank accounts to receive and transfer funds related to the Erha oil field. For

instance, bidding fees for Erha were to be paid in U.S. dollars, (Second Hoon Decl. Ex. 28 at 4),

and the letter accepting Exxon's bid required Exxon to "pay the signature bonus and reserved

value of U.S. $10 million," (First Hoon Decl. Ex. 13). See Republic of Arg. v. Weltover, Inc.,

504 U.S. 607, 619–20 (1992) (finding that Argentina had sufficient minimum contacts with the

United States in part because it issued "negotiable debt instruments denominated in United States

dollars and payable in New York"); Official Comm. of Unsecured Creditors of Arcapita v.

Bahrain Islamic Bank, 549 B.R. 56, 71 (S.D.N.Y. 2016) (holding that defendant's decision to

transact in U.S. dollars and use New York accounts to effectuate transactions established

minimum contacts).

In addition, an auditor found that proceeds from Equity Oil were directed to the

CBN and NNPC's joint "JPMorgan USD Crude Oil Account." (Second Hoon Decl. Ex. 26 at

38–39, 112 (2015 Report on the Investigative Forensic Audit into the Allegations of Unremitted

Funds into the Federation Accounts Held by the NNPC).) Moreover, in at least three specific

instances, NNPC directed purchasers of oil lifted from the Erha field to send payments to the

---

[13] Any allegations that NNPC generally uses U.S. dollars or bank accounts or directs oil payments to accounts held in the United States are irrelevant to the extent they do not relate to the Agreement or the Erha oil field because minimum contacts relate to specific, not general, jurisdiction. For instance, Esso alleges that NNPC shipped 155,000 barrels of Naphta crude oil from Nigeria to New York in 2014. But it is entirely unclear how "Naphta" oil has anything to do with this dispute. See In re N. Sea Brent, 2017 WL 2535731, at *6 (finding no specific personal jurisdiction in a case with claims for manipulative trading of crude oil where evidence of shipment of crude oil to the forum did not show "that th[o]se shipments included crude oil cargoes subject to the manipulative trading described in the Complaints").

JPMorgan accounts in the United States, and in one of those instances specifically requested U.S. dollars. (Second Hoon Decl. Ex. 29.) And beyond that, monthly reports provided by NNPC to Nigeria's Federation Account Allocation Committee indicate that NNPC often directs purchasers of Erha oil to deposit large U.S. dollar amounts into JPMorgan accounts in New York. (See ECF No. 239 & Exs. 2–5.) And NNPC's General Manager of Banking Operations explained that NNPC directs U.S. dollar purchasers of oil to make payment into JPMorgan accounts in the United States. (Oluwaniyi Decl. ¶ 11.)

NNPC's purposeful and repeated use of accounts held in the United States relating to this dispute demonstrate that NNPC purposely availed itself of the forum. See Licci, 732 F.3d at 171 (holding that, while the "mere maintenance" of a bank account in the United States is insufficient, the use of a bank account "as an instrument to achieve the very wrong alleged" is sufficient to establish minimum contacts); Bahrain Islamic Bank, 549 B.R. at 70 (finding minimum contacts where defendant "chose to receive . . . funds in U.S. dollars and designated correspondent bank accounts in New York to receive the funds, even though they presumably could have performed the . . . transactions without ever directing the funds through New York or anywhere else in the United States," and the commodities and securities at issue were not purchased in the U.S.); Eldesouky v. Aziz, 2014 WL 7271219, at *8–9 (S.D.N.Y. Dec. 19, 2014) (finding minimum contacts in a fraud, breach of contract, and conversion action where defendants directed plaintiffs to send payments for flaxseed purchases to defendants' New York bank account); Ge Dandong v. Pinnacle Performance Ltd., 966 F. Supp. 2d 374, 384 (S.D.N.Y. 2013) (finding minimum contacts in a securities action because the defendants used "New York bank accounts to deposit funds it raised through the issuance of the Notes, which were then used to purchase . . . CDOs" subject to the dispute).

NNPC's primary counterargument is that the CBN—not NNPC—owns the JPMorgan accounts held in the United States. For the same reasons described in the alter ego section of this Opinion & Order, this argument is unpersuasive. NNPC receives account statements and has authority to direct transfers to and from the accounts. (See First Hoon Decl. Ex. 1 at 105:21–106:24, 111:21–112:10, 129:14–131:13.) And regardless, the point is not whether NNPC owns the accounts, it is that they made purposeful use of them for reasons related to the underlying dispute.

### 3. Conclusion on Minimum Contacts

Ultimately, this Court finds that NNPC has sufficient minimum contacts with the United States to satisfy constitutional due process because NNPC attended a roadshow in Houston, solicited bids and engaged in early contract negotiations in Houston, directed communications to Houston during contract negotiations, visited the United States on more than one occasion during the performance of the Agreement, transacted in U.S. dollars in dealings related to this dispute, and directed purchasers of oil from the Erha field to deposit funds into bank accounts in the United States.[14]

### 4. Reasonableness

Even though NNPC purposefully directed its activities at the forum, it may still defeat jurisdiction if it makes "a compelling case that the presence of some other considerations

---

[14]     Esso also argues that NNPC has minimum contacts with the United States merely because it agreed to an arbitration clause with an affiliate of an American entity and knew that both Nigeria and the United States were signatories to the New York Convention. Esso bases this argument on a Second Circuit case holding that "when a country becomes a signatory to the Convention, by the very provisions of the Convention, the signatory State must have contemplated enforcement actions in other signatory States." Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 578 (2d Cir. 1993). But Esso's argument is inapposite because Seetransport's holding pertained to subject matter jurisdiction, and the Second Circuit separately found personal jurisdiction for unrelated reasons. Seetransport, 989 F.2d at 579. Esso points to no precedent—and this Court is unaware of any—holding that minimum contacts are established where a defendant agrees to an arbitration clause with an affiliate of an American company.

would render jurisdiction unreasonable." Licci, 732 F.3d at 173. Specifically, "a court considers [a respondent's] contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." Charles Schwab, 883 F.3d at 82 (quotation marks omitted); Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement, 326 U.S. 310, 316 (1945). "These considerations include: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum . . . in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Eades, 799 F.3d at 169 (citations and quotation marks omitted). "Where other elements for jurisdiction have been met, dismissals on reasonableness grounds should be few and far between." Rosa v. TCC Commc'ns, Inc., 2017 WL 980338, at *8 (S.D.N.Y. Mar. 13, 2017); accord Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 575 (2d Cir. 1996).

In sum, the factors favor Esso. The burden on NNPC is limited—this is a summary proceeding to confirm an arbitral award that is approaching its conclusion. And Esso has an interest in using this forum to obtain relief. Of course, there is also a substantial interest in obtaining an efficient resolution of this controversy and in confirming arbitral awards. See Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion ("Pemex"), 832 F.3d 92, 105 (2d Cir. 2016) (discussing New York Convention's "pro-enforcement bias" and stressing "the need to ensure legal claims find a forum"); Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc., 403 F.3d 85, 90 (2d Cir. 2005) (observing the "strong public policy in favor of international arbitration"); Ottley v. Sheepshead Nursing Home, 688 F.2d 883, 898 (2d Cir. 1982) ("It has become the fashion for

courts to encourage and foster the use of arbitration as a more expeditious and inexpensive means of settling disputes, particularly as the pressure of mounting judicial caseloads is thereby reduced. No one can doubt that the public interest is generally served when parties to disputes agree upon such means for their resolution."). Accordingly, this Court finds that even if due process were required, this Court may properly exercise personal jurisdiction.

II. *Forum Non Conveniens*

In the alternative, NNPC argues that—after years of jurisdictional discovery—this Court should invoke the doctrine of forum non conveniens to dismiss the action. Forum non conveniens is "a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim." DigitAlb, Sh.a v. Setplex, LLC, 284 F. Supp. 3d 547, 560 (S.D.N.Y. 2018). In exercising their discretion, courts apply the three-step analysis set forth in Iragorri v. United Technologies Corp., 274 F.3d 65 (2d Cir. 2001). See Abdullahi v. Pfizer Inc., 562 F.3d 163, 189 (2d Cir. 2009). "Under the Iragorri analysis, the court (1) determines the degree of deference properly accorded the plaintiff's choice of forum; (2) considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute; and (3) balances the private and public interests implicated in the choice of forum." DigitAlb, 284 F. Supp. 3d at 561.

However, as a threshold issue, "[t]he central purpose of any forum non conveniens inquiry is . . . to ensure that the trial is convenient." Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 154 (2d Cir. 2005). This alone counsels in favor of denying NNPC's motion. There will be no trial in this case and no witnesses will be inconvenienced because no additional discovery is necessary. And given that the parties have expended substantial time and resources litigating this matter, it makes little sense—at this late stage—to dismiss on a

discretionary basis.  In addition, this Court finds that the Iragorri factors weigh in favor of denying the motion.

The first step "starts with a strong presumption in favor of the plaintiff's choice of forum."  Norex, 416 F.3d at 154 (quotation marks omitted).  "Indeed, it is generally understood that, unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."  Norex, 416 F.3d at 154 (quotation marks omitted).  However, "the degree of deference given to the plaintiff's forum [can vary] with the circumstances" on a sliding scale: "[u]sually the greatest deference is afforded a plaintiff's choice of its home forum, while less deference is afforded to a foreign plaintiff's choice of a United States forum."  Norex, 416 F.3d at 154 (quotation marks and citations omitted) (alteration in original).  Ultimately, Esso's choice of this forum should be given deference, but "less deference" than had it chosen a forum in Nigeria.

However, this is not an "abrupt or arbitrary" rule, and, like here, "[t]he more it appears that a . . . foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice."  Norex, 416 F.3d at 154 (quotation marks omitted).  Moreover, this Court notes that "Congress enacted the FSIA specifically to provide access to the United States' courts, and [NNPC] purposefully availed itself of the privilege of conducting business within the United States."  Figueiredo Ferraz Consultoria E Engenharia De Projeto Ltda. v. Republic of Peru, 655 F. Supp. 2d 361, 375 (S.D.N.Y. 2009), rev'd on other grounds sub nom. Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru, 665 F.3d 384, 390 (2d Cir. 2011) (noting that the district court "appropriately gave somewhat reduced deference").

The second step does not weigh strongly in favor of either side. On the one hand, the Set Aside and FIRS Appeals effectively hold NNPC liable but prevent Esso from recovering damages. Cf. DigitAlb, 284 F. Supp. 3d at 562 ("An alternative forum is adequate . . . if it permits litigation of the subject matter of the dispute" and inadequate where it "provides a remedy so clearly unsatisfactory or inadequate that it is tantamount to no remedy at all."). However, those rulings do not necessarily grant a right without a remedy—they arguably grant declaratory relief but hold that the Arbitral Panel was without jurisdiction to issue the Award. And those holdings were supported by the Nigerian courts' interpretations of Nigerian statutes and case law. Moreover, for the reasons stated in Section III, Nigeria could be an adequate forum.

In any event, the third step requires balancing both private and public interest factors to determine whether the case should be adjudicated here or in Nigeria. "The first set of factors . . . [relate to] the convenience of the litigants," including "the relative ease of access to sources of proof;" the availability of compulsory process for attendance of witnesses; the possible need to inspect premises; and other logistics "that make trial of a case easy, expeditious, and inexpensive." Iragorri, 274 F.3d at 73–74. Given the arbitration posture of this case, the private interest factors favor Esso. See In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukr., 311 F.3d 488, 500 (2d Cir. 2002) ("[T]he private interest factors might not ordinarily weigh in favor of forum non conveniens dismissal in a summary proceeding to confirm an arbitration award . . . ."); Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd., 801 F. Supp. 2d 211, 220 (S.D.N.Y. 2011) ("With respect to confirmation of the arbitration awards against ER Cape, the relevant sources of proof—the [contract] and the arbitration awards—are already before this Court.").

The public interest factors are "(1) [the] administrative difficulties flowing from court congestion, (2) the local interest in having controversies decided at home, (3) the interest in having the trial in a forum that is familiar with the law governing the action, (4) the avoidance of unnecessary problems in conflict of laws or in the application of foreign law, and (5) the unfairness of burdening citizens in an unrelated forum with jury duty." <u>Constellation Energy</u>, 801 F. Supp. 2d at 220–22; <u>see</u> <u>Iragorri</u>, 274 F.3d at 74.  The first, third, fourth, and fifth factors counsel in favor of denying the motion, while the only the second factor counsels in favor of granting it.  In sum, the <u>Iragorri</u> analysis suggests that this action should proceed in this forum.

However, NNPC argues that <u>Figueiredo</u> requires dismissal of this action.  In <u>Figueiredo</u>, the Second Circuit dismissed the action on <u>forum non conveniens</u> grounds based on two considerations.  First, the Second Circuit held that the district court improperly deemed Peru an inadequate forum, because the fact that only a United States court could attach assets located in the United States does not render a foreign forum inadequate.  <u>Figueiredo</u>, 665 F.3d at 390–92.  Second, a Peruvian statute limiting the amount of money a Peruvian agency could pay annually to satisfy a judgment was a "highly significant public factor warranting FNC dismissal" that the district court overlooked.  <u>Figueiredo</u>, 665 F.3d at 390–92.  Here, the first consideration is not implicated.  And while the second consideration has some relevance, given that Nigeria arguably has an interest in barring tax disputes from arbitration, this Court is not persuaded that it alone warrants dismissal on discretionary <u>forum non conveniens</u> grounds at this advanced stage of the litigation.

III.   <u>Confirmation of the Award</u>

NNPC also moves under Rule 12(b)(6) to dismiss the Third Amended Petition on the merits, arguing that this Court cannot confirm the Award because it has been set aside at the

36

seat of the arbitration in Nigeria. Conversely, Esso requests that this Court grant the relief requested in the petition and confirm the Award.

In general, "when a party brings an action to confirm an arbitration award falling under the [New York] Convention, a court 'shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.'" Baker Marine (Nigeria) Ltd. v. Chevron (Nigeria) Ltd., 191 F.3d 194, 196 (2d Cir. 1999) (quoting 9 U.S.C. § 207). The party opposing enforcement has the heavy burden of proving the existence of one of these grounds. See NTT DoCoMo, Inc. v. Ultra d.o.o, 2010 WL 4159459, at *2 (S.D.N.Y. Oct. 12, 2010). The relevant ground here falls under New York Convention Article V, paragraph (1)(e), which provides that a court may refuse to confirm an award when it "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 20 (2d Cir. 1997) (quoting Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. V, ¶ (1)(e), June 10, 1988, 21 U.S.T. 2517, 330 U.N.T.S. 38 (hereinafter "New York Convention")). The parties do not dispute that the Award has been set aside in Nigeria.

Notably, this ground is permissive, not mandatory. See Pemex, 832 F.3d at 106. Accordingly, the decision to confirm is committed to this Court's sound discretion. Thai-Lao Lignite (Thai.) Co. v. Government of Lao People's Democratic Republic, 864 F.3d 172, 181 (2d Cir. 2017). Moreover, there is a "strong public policy in favor of international arbitration," and the "review of arbitral awards . . . is very limited." Encyclopaedia Universalis, 403 F.3d at 90 (quotation marks omitted). Indeed, confirmation "is a summary proceeding in nature, which is not intended to involve complex factual determinations, other than a determination of the limited

statutory conditions for confirmation or grounds for refusal to confirm.  A district court confirming an arbitration award does little more than give the award the force of a court order." Zeiler v. Deitsch, 500 F.3d 157, 169 (2d Cir. 2007) (citation omitted).

Esso argues that this Court should confirm the Award—even though it has been set aside in Nigeria—because (1) the liability portion of the Award was reinstated, this Court should confirm that portion of the Award and use its inherent power to award damages; (2) this case is analogous to Pemex, where the Second Circuit confirmed an arbitral award that had been set aside; and (3) Esso has not received due process in Nigeria.

A.  The Liability Portion of the Award Has Been Reinstated

Esso's first argument is that because the Nigerian Court of Appeal restored the part of the Award related to the preparation of Petroleum Profit Tax returns and the calculation of lifting allocations, this Court should confirm that part of the Award—which includes no damages—and use its inherent power to award damages in presumably the same amount as set forth in the Award.  NNPC argues that the Court of Appeal merely ordered declaratory and prospective relief, and that no monetary award exists to be enforced.

The authorities Esso cites do not support the proposition that a district court can fashion a $1.8 billion award using only its inherent authority.  For instance, it claims that Zurich American Insurance Co. v. Team Tankers A.S., 811 F.3d 584, 588 (2d Cir. 2016), holds that courts have discretion to compensate petitioners for damages.  But there, the district court awarded the respondent attorneys' fees and costs—not a massive damages award.  Zurich Am., 811 F.3d at 592.  And in any event, the Second Circuit reversed the district court's order awarding fees and costs.  Zurich Am., 811 F.3d at 592.  Nor is Seed Holdings, Inc. v. Jiffy International AS, 5 F. Supp. 3d 565, 591 (S.D.N.Y. 2014), on point.  In Seed Holdings, the

district court merely augmented an arbitral award to provide interest. Finally, Esso cites <u>Pemex</u>, where the Second Circuit affirmed a district court's interpretation of an arbitral award to include an additional $106 million, reflecting the value of certain performance bonds that should have been included in the original award. <u>See</u> <u>Pemex</u>, 832 F.3d at 112. But resuscitating a vacated award using only a court's inherent authority is in a different dimension than interpreting the proper value of an arbitral award. Indeed, the Federal Arbitration Act provides that courts "may modify and correct [an arbitral] award, so as to effect the intent thereof and promote justice between the parties." 9 U.S.C. § 11.

Ultimately, while this Court may have inherent authority to fashion appropriate relief in certain circumstances, exercising that authority to create a $1.8 billion judgment is a bridge too far.

B. *Pemex*

Esso next argues that this Court should confirm the Award based on the reasoning in <u>Pemex</u>. In <u>Pemex</u>, the Second Circuit ruled that a foreign arbitral award should be confirmed even though it was set aside by the foreign arbitration tribunal. <u>Pemex</u>, 832 F.3d at 107. Specifically, the Second Circuit explained that "[a] judgment is unenforceable as against public policy to the extent that it is repugnant to fundamental notions of what is decent and just in the State where enforcement is sought." <u>Pemex</u>, 832 F.3d at 106; <u>see also</u> <u>Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.</u>, 809 F.3d 737, 743 (2d Cir. 2016). In other words, a United States court should determine whether the judgment setting aside the award is unenforceable because it offends notions of justice from the point of view of the United States. However, the public policy exception is narrow and available only in "rare circumstances," and "[t]he standard is high[] and infrequently met." <u>Pemex</u>, 832 F.3d at 106, 111 (alteration in

original).  Indeed, "a final judgment obtained through sound procedures in a foreign country is generally conclusive."  Ackermann v. Levine, 788 F.2d 830, 837 (2d Cir. 1986).  Therefore, "[a]ny court should act with trepidation and reluctance in enforcing an arbitral award that has been declared a nullity by the courts having jurisdiction over the forum in which the award was rendered."  Pemex, 832 F.2d at 111.

The Second Circuit instructs courts to weigh four considerations: "(1) the vindication of contractual undertakings and the waiver of sovereign immunity; (2) the repugnancy of retroactive legislation that disrupts contractual expectations; (3) the need to ensure legal claims find a forum; and (4) the prohibition against government expropriation without compensation."  Pemex, 832 F.3d at 107.  Esso concedes that the fourth consideration is not at issue.  When weighing these considerations, courts must "accommodate[] uneasily two competing (and equally important) principles: [i] 'the goals of comity and res judicata that underlie the doctrine of recognition and enforcement of foreign judgments' and [ii] 'fairness to litigants.'"  Pemex, 832 F.3d at 106 (second and third alterations in original) (quoting Ackermann, 788 F.2d at 842).

## 1. The Vindication of Contractual Undertakings

With respect to the first factor, the parties agreed to an arbitration clause.  See Pemex, 832 F.3d at 107.  However, the Agreement required any arbitral proceeding to occur in Nigeria and to apply Nigerian law.  And because it is at least arguable that this is a non-arbitrable tax dispute under Nigerian law, it cannot be said that the parties agreed to arbitrate this dispute.  While Esso of course denies that this is in fact a tax dispute, NNPC appears to have maintained from the outset of the arbitration that the matter was a non-arbitrable tax dispute.  (TAC ¶¶ 55–56; Atake Decl. ¶ 23 ("From the outset of [arbitral] proceedings, NNPC did all that it could to

avoid arbitration, arguing that the Tribunal lacked jurisdiction because the dispute between Petitioners and NNPC was allegedly a 'tax dispute,' rather than a contractual one.").) That position is unlike the respondent's in Pemex, who participated in the arbitration "without contending that its act of administrative rescission was beyond the reach of arbitration." Pemex, 832 F.3d at 107. Further, the respondent in Pemex did not dispute that the arbitration clause applied to the underlying dispute. See Pemex, 832 F.3d at 107. Ultimately, while it may be unclear whether this matter is a non-arbitrable tax dispute under Nigerian law, the concerns voiced in Pemex do not apply—namely, the Agreement does not clearly call for this dispute to be arbitrated. Accordingly, the first factor favors NNPC.

      2.  Retroactivity

With respect to the second factor, courts consider whether "[r]etroactive legislation . . . cancels existing contract rights." Pemex, 832 F.3d at 108. This case presents a unique scenario in that Esso does not argue that Nigeria passed a law retroactively nullifying the arbitration clause. Rather, Esso argues that the Nigerian courts' "unprecedented" decisions to hold this dispute not arbitrable serve as a retroactive application of the law. To put this argument in context, it helps to understand the concerns at play in Pemex.

In Pemex, the state oil and gas company of Mexico ("PEP") contracted with COMMISA to build oil platforms in the Gulf of Mexico. Pemex, 832 F.3d at 97–98. That contract included an arbitration clause governed by Mexican law. Pemex, 832 F.3d at 98. At the time of the contract's execution, the PEMEX and Affiliates Organic Law provided that PEP could execute arbitration agreements. Pemex, 832 F.3d at 98. After a dispute arose, COMMISA filed a demand for arbitration, and both parties actively participated in an arbitration and the arbitration panel issued a preliminary award. Pemex, 832 F.3d at 98. To that point, PEP never

41

argued that the dispute was not subject to arbitration. Pemex, 832 F.3d at 99. Thereafter, however, the Mexican Congress shortened the statute of limitations for the types of claims raised by COMMISA from 10 years to 45 days and vested exclusive jurisdiction of those claims in the Tax and Administrative Court, rather than Mexican district courts. Pemex, 832 F.3d at 99. In addition, the Mexican Congress enacted a law ("Section 98") prohibiting arbitration for certain claims, including those raised by COMMISA. Pemex, 832 F.3d at 99. After that, the arbitration tribunal issued its final award. PEP challenged the arbitral award in Mexico (while COMMISA confirmed it in the United States), and a Mexican appeals court held that COMMISA's claims were not arbitrable and annulled the award, relying on the newly enacted Section 98 in its decision. Pemex, 832 F.3d at 99.

Ultimately, the Second Circuit held that the application of Section 98 served as a retroactive change in law, because it was "an abrupt departure from the 'Pemex and Affiliates Organic Law'" that was in effect at the time the parties executed the arbitration clause. Pemex, 832 F.3d at 108. Simply put, the Second Circuit believed that "allowing Section 98 to nullify COMMISA's arbitral award would deprive COMMISA of its contract rights through a retroactive change in law." Pemex, 832 F.3d at 108. The Second Circuit noted that PEP "actively participated in the arbitration proceedings," Pemex, 832 F.3d at 108, and that the new laws divested arbitral jurisdiction and shortened the statute of limitations.

Here, the Nigerian Court of Appeal relied on several Nigerian laws to determine that this dispute was an non-arbitrable tax dispute, including: (1) the Arbitration and Conciliation Act of 1990 (passed before the Agreement), (2) the Petroleum Profit Tax Act ("PPT Act") (passed before the Agreement), (3) Section 251 of Nigeria's 1999 Constitution, and (4) the 2007 FIRS Act. While some of these laws—namely, the 1999 Constitution and the 2007 FIRS Act—

were enacted after the Agreement was executed, all of them were enacted <u>before</u> this dispute arose. That distinguishes this case from <u>Pemex</u>, where the Second Circuit's primary concern was that Mexico changed its law <u>after</u> the petitioner obtained a preliminary award.

However, Esso argues that the Nigerian courts interpreted these laws in contravention to legal precedent, serving as the equivalent of a retroactive application of law. Specifically, Esso argues, at least in part, that no Nigerian court had ever held that Section 251 of the 1999 Constitution made this type of dispute non-arbitrable until Esso had its award in hand. (See First Oguntade Decl. ¶¶ 24–27.) NNPC counters that the Nigerian courts relied primarily on the Arbitration and Conciliation Act and the PPT Act—both of which were enacted prior to the execution of the Agreement—and that Section 251 of the 1999 Constitution only served as a secondary basis for holding the dispute non-arbitrable. As a threshold issue, NNPC is correct that the Nigerian Court of Appeal relied on more than Section 251 of the 1999 Constitution in the Set Aside Appeal and did not appear to rely on the constitution at all in the FIRS Appeal. (See Pets.' Mem. of Law in Opp., ECF No. 219, at 29 ("[T]he Set Aside Appeal . . . interpret[ed] . . . the PPT Act . . . ."); Atake Decl. Ex. 5 at 10–15; Atake Decl. Ex. 6 at 4, 40–43, 58.) But even so, the Nigerian Court of Appeal relied, at least in part, on the 1999 Constitution and 2007 FIRS Act in making its determination in the Set Aside Appeal.

While Esso may not agree with the result, the Nigerian Court of Appeal conducted a fulsome analysis to determine whether tax disputes were arbitrable and whether the dispute at bar was a tax dispute. In doing so, the Nigerian Court of Appeal applied the relevant statutes and case law. (See Atake Decl. Ex. 5 at 10–15; Atake Decl. Ex. 6 at 4, 40–43, 58.) Ultimately, this Court is "in no position to pass upon [the Nigerian] court[s'] interpretation of

[Nigerian] law, or upon the sufficiency of its precedent." Pemex, 832 F.3d at 108. But that is precisely what Esso asks this Court to do.

Instead, this Court must "assess whether the nullification of the [A]ward offends basic standards of justice in the United States." Pemex, 832 F.3d at 108, 111. While this Court is sympathetic to Esso's situation, new interpretations of constitutional provisions and amendments are commonplace in American jurisprudence. Criminal exclusionary rules are a prime example. Before Mapp v. Ohio, 367 U.S. 643 (1961), evidence seized during an illegal search was not inadmissible in state trials, and before Miranda v. Arizona, 384 U.S. 436 (1966), statements obtained without full warnings of constitutional rights were not inadmissible. The words in the Fourth and Fifth Amendments were the same before and after the Supreme Court interpreted those provisions. And Supreme Court jurisprudence is replete with similar examples. See, e.g., Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 (2007) (changing pleading standard under Rule 12); Gideon v. Wainwright, 372 U.S. 335 (1963) (holding, for the first time, that the Sixth Amendment required the appointment of counsel for indigent criminal defendants); Brown v. Board of Educ. of Topeka, Shawnee Cty., Kan., 347 U.S. 483 (1954) (holding that racial segregation in schools violates the Equal Protection Clause, overturning prior interpretations of the same constitutional amendment). Accordingly, the Nigerian courts' holdings do not offend basic standards of justice from the point of view of the United States.

Separately, this consideration favors NNPC because the retroactivity concerns from Pemex are not at issue here, given that Esso knew that NNPC contested jurisdiction before the Award was issued. Conversely, in Pemex, the petitioner received a preliminary award, only to have a Mexican court set aside its award and find its claims retroactively time-barred. Pemex, 832 F.3d at 99. In addition, Esso's insistence on including the Stabilization Clause in the

Agreement demonstrates that it understood Nigerian laws were subject to change. Nevertheless, it executed the Agreement. Therefore, the retroactivity concerns addressed in Pemex are not at issue here.

### 3. The Need to Ensure Legal Claims Find a Forum

With respect to the third factor, Esso argues that it will be left without a forum to confirm the Award or to seek redress for NNPC's liability. On the one hand, even though Esso views its prospects of prevailing in the Nigerian courts as slim, it has multiple appeals pending and could still achieve confirmation of the Award there. Moreover, the fact that the Nigerian Court of Appeal restored part of the Award undercuts Esso's argument that Nigerian courts are inhospitable and that it stands no chance of winning on appeal. In contrast, the petitioner in Pemex had no other forum in which to confirm its award because it was set aside and because a new law shortened the statute of limitations for its claim, retroactively time-barring it. In addition, while this Court understands Esso's complaint that a finding of liability without an ability to recover damages seems inconsistent, the Nigerian Court of Appeals decisions essentially function as a declaratory judgment and a finding that the Arbitral Panel did not have jurisdiction to hear the damages dispute.

On the other hand, if Esso loses its Nigerian appeals, it can no longer bring a claim in Nigeria and it will be left without a forum to recover damages for conduct which Nigerian courts have held NNPC liable. That said, Esso knew that NNPC contested the Arbitral Panel's jurisdiction and could have pursued its claims through litigation. Further, and as discussed above, the Set Aside and FIRS Appeals do not necessarily grant a right without a remedy—they grant declaratory relief while holding that the Arbitral Panel lacked jurisdiction to issue the Award.

Ultimately, this consideration favors NNPC.  Simply put, this case is not <u>Pemex</u>.

Esso has multiple appeals pending in Nigeria and it was on notice that NNPC contested the

Arbitral Panel's jurisdiction before the Award was issued.

    4.  <u>Prohibition Against Government Expropriation Without Compensation</u>

Esso does not address the fourth factor in its papers.  However, this Court finds

that it could favor Esso—at least by analogy.  Here, NNPC—an alter ego of Nigeria—overlifted

oil which deprived Esso of profit.  While this situation may not be entirely congruent with

<u>Pemex</u>, this Court has the same concerns as the Second Circuit—namely, overlifting "amounted

to a taking of private property without compensation for the benefit of the government."  <u>Pemex</u>,

832 F.3d at 110.

    5.  <u>Conclusion on *Pemex*</u>

In sum, although a close call, this Court finds that the <u>Pemex</u> considerations favor

NNPC.  Despite the seemingly anomalous rulings by the Nigerian courts—<u>i.e.,</u> that NNPC is

liable but that no damages can be recovered—and the alter ego relationship between NNPC and

Nigeria, this case does not raise the concerns animating the Second Circuit's decision in <u>Pemex</u>.

Here, NNPC contended "[f]rom the outset of [arbitral] proceedings . . . that the Tribunal lacked

jurisdiction because the dispute between Petitioners and NNPC was allegedly a 'tax dispute,'

rather than a contractual one."  (Atake Decl. ¶ 23.)  Moreover, this is not a case where the

Nigerian government changed the law <u>after</u> Esso had the Award in hand.  Accordingly, and

because this Court must act with "trepidation and reluctance" in enforcing an arbitral award that

has been set aside at the seat of the arbitration, it declines to confirm the Award under <u>Pemex</u>.

<u>See</u> <u>Baker Marine</u>, 191 F.3d at 197 n.3 ("Recognition of the Nigerian [annulment of the arbitral

award] in this case does not conflict with United States public policy.").

C.  Due Process

Finally, Esso argues that this Court should confirm the Award despite its being set aside because Esso did not receive due process in Nigeria.  Specifically, Esso argues that because it expects "substantial delays" in receiving a ruling on its appeals, its due process rights have been violated.  As of November 2018, Esso claimed that it expects that rulings "may take at a minimum a further four to six years."  (First Oguntade Decl. ¶ 78.)  Esso cites no case law within this Circuit to support the proposition that a court should confirm a $1.799 billion award that was set aside in its home country because of a lengthy appeals process.

Esso's argument that any judgment entered in Nigeria will be difficult to collect there is also meritless.  If Esso received a judgment in Nigeria, it is free to convert that judgment to a United States judgment.  Moreover, Esso—a Nigerian company—executed a contract in Nigeria with another Nigerian corporation containing an arbitration clause requiring any arbitration to be held in Nigeria under Nigerian law, and it then sought to confirm the Award in Nigeria.  It cannot now reasonably complain that its efforts to collect will be frustrated in Nigeria.

D.  Conclusion on Confirmation

Under the New York Convention, a court may refuse to confirm an award when it "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."  Yusuf Ahmed, 126 F.3d at 20 (quoting New York Convention art. V, ¶ (1)(e)).  Indeed, "a final judgment obtained through sound procedures in a foreign country is generally conclusive."  Ackermann, 788 F.2d at 837.  And the public policy exception that Esso primarily relies on is narrow, and "[t]he standard is high, and infrequently met."  Pemex, 832 F.3d at 106 (alteration in original).  For the foregoing reasons, this Court is

not persuaded that it should confirm the Award that has been set aside in Nigeria. Accordingly, NNPC's motion to dismiss the Third Amended Petition is granted.

IV.     Adverse Inference Motion

Esso's adverse inference motion seeks to establish 12 facts as a sanction for discovery violations regarding the production of documents related to the Committee and certain bank accounts. "An adverse inference instruction based on the failure to produce . . . requires a showing that (1) the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had a culpable state of mind; and (3) that the missing evidence is relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd., 330 F.R.D. 134, 137 (S.D.N.Y. 2019) (quotation marks omitted). The bulk of Esso's motion fails on the third requirement—relevance.

Facts 1 through 8, 11, and 12[15]—some of which this Court found supported by the record anyway—relate entirely to jurisdiction. Because this Court need not draw the requested inferences to exercise jurisdiction, the motion as it pertains to those facts is denied as moot.

Through Fact 9, Esso seeks to establish that "[t]he team building workshop referenced in the Committee Report took place during the first quarter of 2008. At the team

---

[15]     Facts 1 through 8, which Esso seeks to establish, are: (1) During the third quarter of 2007, President Yar'Adua established the [Committee]; (2) While the Committee was investigating the operation and performance of the Bonga and Erha oilfields, Petitioners were neither included on the Committee nor consulted in connection with the Committee's work; (3) The Committee's goal was to extract more revenue from the Bonga and Erha oilfields at Petitioners' expense; (4) President Yar'Adua supervised the Committee's work; (5) The Committee's recommendations were delivered to President Yar'Adua during April 2008; (6) President Yar'Adua instructed NNPC to lift Petitioners' oil from the Erha field in excess of its contractual entitlements based on the Committee's recommendation; (7) NNPC received President Yar'Adua's instruction to lift Petitioners' oil from the Erha field in excess of NNPC's contractual entitlements; and (8) NNPC's management understood President Yar'Adua's instruction to mean that the President wanted NNPC to recover the amounts identified by President Yar'Adua from Erha, even if doing so required it to lift oil in excess of its contractual entitlement. (Decl. of Shannon M. Leitner in Supp. of Pets.' Mot. for an Order Establishing Facts or Drawing Adverse Inferences, ECF No. 207, Ex. 1 ("List of Proposed Facts"), ¶¶ 1–8.)

building workshop, the Ministry of Energy, NNPC, DPR, FIRS, and the National Planning

Commission harmonized their interpretation of the relevant sections of the [Agreement] and PPT

Act." (List of Proposed Facts, ¶ 9.) And through Fact 10, Esso seeks to establish that

> During the course of the underlying Arbitration and resulting Nigerian Litigations,
> NNPC coordinated with various organs of the Nigerian government, including but
> not limited to the Department of Petroleum Resources, Ministry of Energy,
> Ministry of Justice, Revenue Mobilization and Fiscal Commission, [FIRS], and
> National Planning Commission, to seek to prevent the enforcement of the Award.
> The Nigerian President approved this approach.

(List of Proposed Facts ¶ 10.) But these facts do not relate to the Nigerian judiciary and

therefore do not factor into a Pemex or due process analysis. Moreover, Esso provides no basis

for how the discovery violations relate to these two facts or how this Court could establish them.

Specifically, the discovery violations set forth in Esso's motion for sanctions relate to the

production of documents regarding the Committee and various bank accounts—not to whether

NNPC coordinated with the Nigerian government. Accordingly, the motion with respect to Facts

9 and 10 is also moot.[16]

Ultimately, this Court has "wide discretion" to impose discovery sanctions

pursuant to Rule 37. Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1365 (2d Cir. 1991).

However, because the requested inferences are mostly moot, and the only facts that are arguably

not moot are irrelevant to the discovery violations, this Court cannot impose the requested

sanctions.

But this Court would be remiss if it did not address NNPC's conduct during

discovery. Specifically, NNPC stonewalled Esso's requests for documents related to the

Committee at every turn. Despite this Court's orders to produce the Committee documents,

---

[16]     To the extent Esso seeks to use Facts 9 and 10 to establish that Nigeria has control over NNPC's litigation
strategy, this Court need not consider them because it already found an alter ego relationship.

NNPC turned over a paltry <u>four</u> documents.  And its excuses for its lack of production were equally lacking—particularly that the Committee documents were with someone who died and accordingly lost forever.  Moreover, one of NNPC's Rule 30(b)(6) witnesses appeared unprepared for his deposition in London, further obfuscating discovery related to the Committee's work.  However, because the only relevant facts requested are not related to any discovery violations, the motion must be denied.

CONCLUSION

For the foregoing reasons, NNPC's motion to dismiss is granted and Esso's motion for an adverse inference is denied.  The Third Amended Petition is dismissed.  The parties are directed to advise this Court whether there is a continuing need for redactions in this Opinion & Order by September 21, 2019.  The Clerk of Court is directed to terminate all pending motions and to mark this case as closed.

Dated: September 4, 2019
     New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.